IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

      v.                                   Criminal No. 3:24cr41 (DJN)

MUHAMMAD PAHLAWAN, *et al.*,
      Defendants.

**MEMORANDUM OPINION**

This matter comes before the Court on various pretrial motions filed and adopted by Defendants Muhammad Pahlawan ("Pahlawan") and Mohammad Mazhar ("Mazhar") (collectively, "Defendants"). First, Defendant Pahlawan moved to dismiss Counts One through Four, because (a) the Second Superseding Indictment does not sufficiently allege participation in or the provision of material support to a weapons of mass destruction program and (b) Defendant Pahlawan is not a person "subject to the jurisdiction of the United States" for purposes of 18 U.S.C. § 832(a). (ECF No. 89.) Second, Defendants seek to dismiss the Second Superseding Indictment for violation of their Fifth Amendment Due Process rights. (ECF No. 115.) Third, Defendant Pahlawan argues that Counts Three and Four of the Second Superseding Indictment qualify as multiplicitous. (ECF No. 111.) Fourth, Defendant Pahlawan filed a Motion for a Bill of Particulars, which seeks additional information with regard to Counts Seven and Nine. (ECF No. 112.) Fifth, Defendant Mazhar seeks to sever his trial from that of Defendant Pahlawan, arguing that a joint trial would cause undue prejudice by introducing irrelevant and inflammatory evidence. (ECF No. 118.) And lastly, Defendant Mazhar filed a Motion *in Limine* to exclude evidence related to weapons of mass destruction and events in the Middle East. (ECF No. 96.) For the reasons set forth below, the Court will GRANT Defendant Pahlawan's Motion to Dismiss

for Multiplicity (ECF No. 111) and will DENY all other Motions discussed herein (ECF Nos. 89, 96, 112, 115, 118).

## I.      BACKGROUND

The charges against Defendants arise from a military operation conducted on January 11, 2024, to interdict a maritime vessel (the "dhow" or the "*Yunus*") sailing off the coast of Somalia and in the Arabian Sea.  (ECF No. 239 ¶¶ 1–2.)  On board the dhow, United States Central Command Navy forces, including Navy SEALs, as well as members of the Coast Guard Maritime Safety and Security Team (collectively, the "Boarding Team"), discovered suspected Iranian-made advanced conventional weaponry.  (*Id.* ¶ 1.)

### A.      Factual Background

Defendant Pahlawan, a Pakistani citizen who worked in Iran, purportedly worked with two Iranian brothers, Shahab Mir'Kazei and Yunus Mir'Kazei, who supported Iran and the Islamic Revolutionary Guard Corps ("IRGC"), to smuggle materials from Iran to various recipients, including the Houthi rebel forces in Yemen.  (*Id.* ¶ 2.)  From August 2023 through January 2024, Defendant Pahlawan and his crew, which included Defendant Mazhar, purportedly completed multiple smuggling voyages by traveling with cargo from Iran to the coast of Somalia and transporting that cargo to another dhow for a ship-to-ship transfer.  (*Id.*)

On January 5, 2024, Defendant Pahlawan allegedly departed Konarak, Iran on the *Yunus* and traveled to Chabahar, Iran.  (*Id.* ¶ 34.)  According to the Government, Defendant Pahlawan — as the captain of the *Yunus* — instructed his crew of thirteen mariners, including Defendant Mazhar, to load cargo into the net hold of the *Yunus* while docked in Chabahar.  (*Id.* ¶ 35.)  As directed, the crew loaded several blue and white bags, along with two large black corrugated tubes.  (*Id.* ¶¶ 46–47.)  These bags and tubes contained missile components, including a warhead and propulsion and guidance components for medium-range ballistic missiles and

anti-ship cruise missiles. (*Id.* ¶ 47.) After loading the cargo, the mariners departed Chabahar on the *Yunus* and headed south towards the coast of Somalia. (*Id.* ¶¶ 36, 38.)

According to the Second Superseding Indictment, on the night of January 11, 2024, the Boarding Team, operating from the USS Lewis B. Puller (the "*Puller*") and conducting an authorized flag verification, boarded the *Yunus* in international waters off the coast of Somalia. (*Id.* ¶¶ 1, 37, 40.) During the interdiction, Defendant Pahlawan allegedly threatened his crew members not to identify him as the captain of the dhow, and to instead falsely identify him as a mechanic and to lie about the cargo on the dhow. (*Id.* ¶¶ 1, 42.) Subsequently, several crew members allegedly lied to the Boarding Team and the FBI about the dhow's cargo, the identity of the captain and the dhow's origin. (*Id.* ¶ 44.) According to the Second Superseding Indictment, the Boarding Team thereafter discovered Iranian-made advanced conventional weaponry hidden in the *Yunus*. (*Id.* ¶¶ 1, 46–47.)

### B.    Procedural History

On February 11, 2024, a federal agent obtained a Criminal Complaint, charging each Defendant, as well as crew members Ghufran Ullah ("Ullah") and Izhar Muhammad ("Izhar"), with one count of making a materially false statement to a federal law enforcement officer during a boarding of a vessel in violation of 18 U.S.C. § 2237(a)(2)(B). (ECF No. 3.) The Government also charged Defendant Pahlawan with one count of maritime transport involving weapons of mass destruction in violation of 18 U.S.C. § 2280a(a)(1)(B)(i). (*Id.*) On March 14, 2024, the grand jury returned an Indictment against Defendants, as well as crew members Ullah and Izhar, on the same charges previously alleged in the Criminal Complaint.[1] (ECF No. 21.)

---

[1]    The Indictment charged Ullah with two counts of providing materially false information to a federal law enforcement officer during a boarding of a vessel in violation of 18 U.S.C. § 2237(a)(2)(B). (ECF No. 21 at 3.)

Then, on August 7, 2024, the grand jury returned a Superseding Indictment that expanded the nature of the charges against Defendant Pahlawan and added two Iranian nationals — Shahab Mir'Kazei and Yunus Mir'Kazei — as defendants.  (ECF No. 79.)  Specifically, the grand jury charged Defendant Pahlawan with one count of conspiracy to provide material support to terrorists resulting in death; one substantive count of providing material support to terrorists resulting in death; two counts of participating in weapons of mass destruction threats to the United States; one count of conspiracy to commit maritime transport involving weapons of mass destruction resulting in death; one substantive count of maritime transport involving weapons of mass destruction resulting in death; one count of witness tampering through intimidation or threat; and one count of providing materially false information to a federal law enforcement officer.  (*Id.* at 13–20.)  The grand jury also charged Defendant Mazhar and Izhar each with one count, as well as Ullah with two counts, of providing materially false information to a federal law enforcement officer during a boarding of a vessel.  (*Id.* at 21–24.)

On November 15, 2024, the Government moved to dismiss Counts Ten, Eleven and Twelve of the Superseding Indictment against Ullah and Izhar.  (ECF No. 226.)  That same day, the Government filed motions and affidavits, seeking arrest warrants for Ullah and Izhar as material witnesses and to seek their detention until their testimony could be secured pursuant to Federal Rule of Criminal Procedure 15.  The Court granted the Government's motion to dismiss as to Ullah and Izhar, thereby terminating them as defendants in this case.  (ECF No. 227.)

On December 4, 2024, the grand jury returned a Second Superseding Indictment (ECF No. 239) against Defendants, which charged Defendant Pahlawan with one additional count of witness tampering through intimidation or threat.  (*Id.* at 18–19.)  In addition, the Second Superseding Indictment removed any allegations that death resulted from the commission of the

offenses charged in Counts One, Two, Five and Six.  (*See id.* at 12–13, 16–17.)  Defendant Mazhar still faces one count of providing materially false information to a federal law enforcement officer during a boarding of a vessel.  (*Id.* at 21.)

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b)(3)(B) provides for dismissal of an indictment for "failure to state an offense."  This pretrial motion constitutes "a challenge to the sufficiency of the indictment, which is ordinarily limited to the allegations contained in the indictment." *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012).  When considering a motion to dismiss, "the indictment allegations are presumed to be true, and the motion should not ordinarily be used as a vehicle to test the sufficiency of the evidence behind the allegations." *United States v. Treacy*, 677 F. App'x 869, 873 (4th Cir. 2017).  "An indictment may legally fail to state an offense by omitting a necessary element."  *United States v. Brewbaker*, 87 F.4th 563, 572 (4th Cir. 2023).  Alternatively, an indictment may fail to state an offense if "the allegations therein, even if true, would not state an offense."  *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004).

## III.    ANALYSIS

### A.    Defendant Pahlawan's Motion to Dismiss Counts One Through Four (ECF No. 89)

Defendant Pahlawan submits that the Court must dismiss Counts One through Four of the Second Superseding Indictment for two reasons.  The Court begins by addressing whether Defendant Pahlawan qualifies as a person "subject to the jurisdiction of the United States" for purposes of 18 U.S.C. § 832(a).  The Court next analyzes whether the Second Superseding Indictment sufficiently alleges conduct that constitutes participating in or providing material support to a weapons of mass destruction program as required under that statute.

1.      **Defendant Pahlawan stands subject to the jurisdiction of the United States.**

Defendant Pahlawan challenges Counts One through Four of the Second Superseding Indictment on the basis of jurisdiction.  (ECF No. 89.)  Specifically, Defendant Pahlawan cites the jurisdictional language in 18 U.S.C. § 832(a), which limits the statute's application to "persons within the United States or subject to the jurisdiction of the United States."  18 U.S.C. § 832(a).  According to Defendant Pahlawan, "subject to the jurisdiction of the United States" constitutes a "term of art" that serves to limit extraterritorial application of laws to United States citizens, lawful United States residents and entities organized under United States law.  (ECF No. 89 at 3.)  Significantly, Defendant Pahlawan argues that the term "does *not* encompass foreign citizens charged with entirely extraterritorial conduct."  (*Id*. (emphasis in original).)  In support, Defendant Pahlawan cites evidence of what he submits constitutes the historical understanding of the term, (*id.* at 13–14), and points to several statutes that incorporate similar language, including the Endangered Species Act and the Marine Mammal Protection Act, which have not been applied to foreign citizens acting extraterritorially.  (*Id.* at 14 (citing 16 U.S.C. §§ 1372(a)(1), 1538(a)(1), (a)(2), (c)(1), (g)(1)).)  Defendant Pahlawan also cites to legislative history concerning a different statute, 18 U.S.C. § 2339B, which Congress amended at the same time that it enacted 18 U.S.C. § 832, and where it struck the phrase "subject to the jurisdiction of the United States."  According to Defendant Pahlawan, Congress struck the jurisdictional phrase specifically to permit prosecutions under that statute of "non-U.S. persons whose 'material support' conduct occurred entirely overseas."  (*Id*. at 20.)  Defendant Pahlawan argues that Congress's decision to *include* "subject to the jurisdiction of the United States" in § 832(a) while striking it from § 2339B evinces legislative intent to *exclude* foreign actors acting overseas from § 832's reach — and that applying § 832 to such actors would "constitute a massive expansion of

6

U.S. criminal law." (*Id.* at 22.)  Given the statute's limited jurisdictional scope, and because (a) Defendant Pahlawan was neither a United States citizen nor a lawful resident, and (b) the events described in the Second Superseding Indictment took place outside the United States and its territorial waters, Defendant Pahlawan argues that he cannot be a person "subject to the jurisdiction of the United States" for purposes of § 832 and that Counts One through Four must therefore be dismissed.

The Government opposes Defendant Pahlawan's arguments on several grounds.  As a threshold matter, the Government highlights Congress's express directive that 18 U.S.C. § 832 apply extraterritorially.  *See* 18 U.S.C. § 832(b) ("There is extraterritorial Federal jurisdiction over an offense under this section.").  In rejecting Defendant Pahlawan's interpretation of the statute's jurisdictional language, the Government submits two main arguments for a broader construction of "subject to the jurisdiction of the United States" that encompasses Defendant Pahlawan's conduct.  First, in seeking to debunk Defendant Pahlawan's narrow reading, the Government invokes a "wealth of well-established criminal law, maritime law, and international law" for the proposition that "location and effect" can provide a basis for jurisdiction beyond mere citizenship when an alleged criminal acts abroad.  (ECF No. 159 at 5.)  Second, the Government argues that, under "well-established principles of criminal and international law," United States jurisdiction categorically extends to stateless vessels, regardless of their location, and to any criminal conduct aboard such vessels.  (*Id.*)

As applied to this case, the Government submits that Defendant Pahlawan stands subject to the jurisdiction of the United States, because his actions occurred on a stateless vessel. Although customary international law does not provide specific criteria for determining whether a vessel qualifies as stateless, Congress "is free to adopt the principles which it regards as best

and most suitable" for the purposes of United States criminal law, so long as these do not "overstep" limits of international law.  (*Id.* at 23–24 (citing *United States v. Marin*, 90 F.4th 1235, 1242 (9th Cir. 2024)).)  The Government cites 46 U.S.C. § 70502(d), where Congress adopted a definition of the term "vessel without nationality" within the context of the Maritime Drug Law Enforcement Act ("MDLEA"), and which definition "many [other] criminal statutes rely on."  (*Id.* at 24.)  Applying that definition to the facts at hand, the Government argues that the *Yunus* constituted a stateless vessel:  it flew no flag, carried no registration paperwork, bore no markings indicating nationality, and neither Defendant Pahlawan (as the vessel's captain) nor any of the crew members made a "claim of nationality or registry."  (*Id.* at 27.)  Consequently, the Government argues, Defendant's actions aboard the *Yunus* stand subject to the jurisdiction of the United States and therefore fall within the statute's jurisdictional scope.

### a.   *The presumption against extraterritoriality does not bar Counts One through Four.*

As a threshold matter, the Court recognizes the well-established presumption against the extraterritorial application of federal criminal statutes.  *See RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) ("It is a basic premise of our legal system that, in general, United States law governs domestically but does not rule the world.").  At the same time, Congress indisputably possesses "the authority to apply its laws, including criminal statutes, beyond the territorial boundaries of the United States."  *United States v. Ayesh*, 702 F.3d 162, 166 (4th Cir. 2012).  For a law to apply extraterritorially, Congress must "clearly so provide[]."  *United States v. Shibin*, 722 F.3d 233, 245 (4th Cir. 2013).

Courts in the Fourth Circuit follow a two-step framework to assess questions of extraterritoriality:  "The first step asks whether the text of the relevant statute 'provides a clear indication of an extraterritorial application,' sufficient to rebut the presumption . . . ."  *United*

*States v. Harris*, 991 F.3d 552, 559 (4th Cir. 2021) (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413 (2018)).  Where a statute fails to provide such an indication, courts proceed to inquire "whether the case involves a [permissible] domestic application of the statute."  *United States v. Skinner*, 70 F.4th 219, 224 (4th Cir. 2023) (quoting *WesternGeco*, 585 U.S. at 413).  If the court finds that the statute satisfies either condition, the law may be applied extraterritorially, though such application must remain limited "to [the provision's] terms."  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010).

As relevant here, the Government charges Defendant Pahlawan under two statutes, 18 U.S.C. § 2339A and 18 U.S.C. § 832, with § 832 serving as the predicate crime for the Government's charges under § 2339A.  (ECF No. 239.)  Defendant Pahlawan concedes that § 2339A's silence as to extraterritoriality does not bar its extraterritorial application, so long as the relevant predicate crime applies extraterritorially.  (ECF No. 89 at 10–11); *see also United States v. Abu Khatallah*, 151 F. Supp. 3d 116, 137–38 (D.D.C. 2015) ("[Section] 2339A is an ancillary crime that applies extraterritorially to the extent that an associated substantive offense does.").  Thus, this Court must assess Congress's intent as to the extraterritorial application of § 832 to ascertain whether the presumption against extraterritoriality bars Counts One and Two (charged under § 2339A), as well as Counts Three and Four (charged under § 832).

Fortunately, Congress provides an unambiguous answer to this question within the statute's text:  "There is extraterritorial Federal jurisdiction over an offense under this section."  18 U.S.C. § 832(b).  Although this clause does not specify the contours of the statute's extraterritorial reach, it sets forth precisely the kind of "clear indication of an extraterritorial application" by Congress that courts require to rebut the presumption against extraterritoriality.

9

The Court therefore holds that the presumption against extraterritorially does not bar Defendant Pahlawan's charges under § 832 and § 2339A.

> **b.**        ***Stateless vessels stand subject to the jurisdiction of the United States.***

The Court turns next to assessing whether Defendant Pahlawan and his actions fall within the statute's extraterritorial scope.  In light of the Government's focus on the *Yunus* and its alleged lack of nationality, the Court concentrates its inquiry narrowly on assessing whether the statute's jurisdictional scope covers stateless vessels, rather than attempt to ascertain the full scope of the statute's jurisdictional language.  On the basis of this inquiry, and as explained below, the Court finds that stateless vessels are indeed "subject to the jurisdiction of the United States."

The Court begins its inquiry into the statute's jurisdictional scope by considering the statutory text.  Unlike other criminal statutes containing similar language, § 832(a) does not include a definition of the term "subject to the jurisdiction of the United States."  *Cf.* 46 U.S.C. § 70502(c) (defining the term as it applies to vessels); 42 U.S.C. § 9601(19) (defining the term as it applies to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")).  Nor has the Court uncovered any case law that defines this phrase with regard to § 832.  Where such an express definition is lacking, and where possible, traditional canons of statutory interpretation counsel the Court to interpret the relevant language according to its ordinary, common meaning.  *See Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.").  The parties disagree sharply on this issue, necessitating resolution by the Court.

Defendant Pahlawan argues strenuously that "subject to the jurisdiction of the United States" possesses an ordinary, common-sense meaning — namely, that this "term of art" restricts jurisdiction "to [natural] persons within the United States as well as citizens and residents of the United States who act outside the United States."  (ECF No. 89 at 16 (quotations omitted); ECF No. 208 at 17.)  By logical extension, the term categorically *excludes* "foreign citizens overseas with no connection to this country."  (ECF No. 89 at 13.)  In support of his position, Defendant Pahlawan submits that "subject to the jurisdiction of the United States" constitutes a "well-established common law phrase" with a "long pedigree in the law," akin to legal concepts as universally recognized as the availability of punitive damages in tort suits.  (ECF No. 208 at 17 (citing *Molzof v. United States*, 502 U.S. 301, 306 (1992)).)  As proof, Defendant Pahlawan cites the Fourteenth Amendment and its legislative history, as well as several statutes and select instances of case law, all of which allegedly demonstrate a consistent and unequivocal recognition by Courts that "subject to the jurisdiction of the United States" categorically excludes acts by foreigners outside the United States.

Having reviewed Defendant Pahlawan's submissions, the Court finds his claim that "subject to the jurisdiction of the United States" possesses a uniform definition, and that this definition categorically excludes acts by foreigners abroad, to be lacking in merit for several reasons.  First, the Court notes that Defendant Pahlawan fails to invoke any authoritative definition, whether from a statute, judicial opinion, dictionary, academic journal or other legal publication, to support his claim that "subject to the jurisdiction of the United States" constitutes a well-established, specifically defined term of art — let alone that it possesses the very specific, narrow meaning that he ascribes to it.  Second, Defendant's invocation of other statutes and their similar (but not identical) jurisdictional language undercuts, rather than supports, his argument

11

for a universal understanding of the term "subject to the jurisdiction of the United States."  The relevant language (including language on extraterritoriality) differs markedly and consequentially from statute to statute, as does the context surrounding the language and the ways in which different courts have construed these provisions.  And third, the sampling of cases that Defendant Pahlawan discusses at great length in his briefing fail to support his argument for a universal definition of "subject to the jurisdiction of the United States," and in at least one instance, directly undermines that argument.[2]

---

[2]     Defendant Pahlawan extensively cites *United States v. Yakou*, 428 F.3d 241 (D.C. Cir. 2005), where the D.C. Circuit affirmed the dismissal of an indictment against a former lawful permanent resident ("LPR") with British and Iraqi citizenship, but who no longer lived in the United States.  (ECF No. 89 at 17 (citing *Yakou*).)  The defendant had been charged with violating the Arms Export Control Act, 22 U.S.C. § 2778(b)(2) and associated provisions of the International Traffic in Arms Regulations ("ITAR").  These regulations defined their jurisdictional scope as covering "any U.S. person, wherever located" and "any foreign person located in the United States or otherwise subject to the jurisdiction of the United States."  *Yakou*, 428 F.3d at 243–44 n.1 (quoting 22 C.F.R. § 129.3(a)).

In affirming the lower court's decision, the D.C. Circuit laid out the two jurisdictional bases available to the government:  (a) that the defendant was a "U.S. person, wherever located" or (b) that the defendant was a "foreign person . . . otherwise subject to the jurisdiction of the United States."  *Id.* at 243–44.  The government opted to argue under the former prong, based on the defendant's former LPR status.  *Id.* at 244, 247–48.  The government did not submit an argument as to whether the defendant was "otherwise subject to the jurisdiction of the United States," and neither the lower court nor the D.C. Circuit considered this question.  Defendant Pahlawan's invocation of the court's dictum that "the government does not argue that [the defendant was] otherwise subject to the jurisdiction of the United States" says nothing about the reach of that provision.  *Id.* at 244.

However, and critically, Defendant Pahlawan fails to address that the ITAR provision discussed in *Yakou* expressly covers foreigners acting outside the United States.  By extending jurisdiction to "any foreign person located in the United States *or otherwise subject to the jurisdiction of the United States*," and by juxtaposing "located in the United States" with "otherwise subject to the jurisdiction of the United States," Congress clearly intended to reach foreigners acting outside the United States.  Any other reading would render the latter clause superfluous and mere surplusage.  *Yakou*, and the ITAR provisions that it relies on, thus directly undercut Defendant Pahlawan's argument that "subject to the jurisdiction of the United States" categorically excludes foreigners acting outside the United States.

Quite to the contrary, the Court finds that the submissions by the parties, along with the fruits of its own research, demonstrate just how *unsettled* the term "subject to the jurisdiction of the United States" remains.  Academic scholars continue to hotly contest the meaning of this phrase within the context of the Fourteenth Amendment and birthright citizenship, as evidenced by a lively and ongoing scholarly debate.[3]  Second, Congress has felt the need to define — on multiple occasions, and in differing ways — this phrase's meaning across different statutes, directly undercutting Defendant's "well-defined term of art" theory.[4]  The Court also notes that federal courts of appeals have repeatedly recognized the principle that jurisdictional scope depends not just on nationality and location, but on factual circumstances existing at the time of the alleged criminal acts.  This principle includes cases where a vessel "intended to have an effect in a country" under the so-called "objective principle," or where a vessel "threaten[ed] a

---

[3]     *See, e.g.*, Amy Swearer, *Subject to the (Complete) Jurisdiction Thereof: Salvaging the Original Meaning of the Citizenship Clause*, 24 TEX. REV. L. & POL. 135 (2019) (arguing that illegal or nonimmigrant aliens are not "sufficiently subject to the jurisdiction of the United States" to afford their children birthright citizenship); Patrick J. Charles, *Decoding the Fourteenth Amendment's Citizenship Clause: Unlawful Immigrants, Allegiance, Personal Subjection, and the Law*, 51 WASHBURN L.J. 211, 212 (2012) (raising various definitional questions about the birthright clause, including:  "Are the children of unlawful immigrants 'subject to the jurisdiction thereof' within the meaning and intent of the Framers?" and "Does the Fourteenth Amendment grant Congress any powers to legislate who is 'subject to the jurisdiction thereof,' to include the children of unlawful immigrants?"); Katherine Nesler, *Resurgence of the Birthright Citizenship Debate*, 55 WASH. U. J.L. & POL'Y 215, 220 (2017) ("The language of the Fourteenth Amendment is mostly straightforward. However, the words 'subject to the jurisdiction thereof' have left room for debate.").

[4]     *See, e.g.*, 42 U.S.C. § 9601(19) (defining "otherwise subject to the jurisdiction of the United States" to mean "subject to the jurisdiction of the United States by virtue of United States citizenship, United States vessel documentation or numbering, or as provided by international agreement to which the United States is a party" for purposes of the CERCLA); 46 U.S.C. § 70502 (defining "vessel subject to the jurisdiction of the United States" to include vessels without nationality, foreign-flagged vessels where that nation has consented or waived objection to enforcement of United States law, and other vessels in other extraterritorial locations for purposes of the MDLEA).

nation's security or governmental functions" under the so-called "protective principle."  *United States v. Marino-Garcia*, 679 F.2d 1373, 1380–81, nn.13–14 (11th Cir. 1982) (citing case law from several circuits concerning the objective and protective principles).  This jurisprudence, and the flexibility that it prescribes, undercuts the idea that the term "subject to the jurisdiction of the United States" supports a cut-and-dried definition of the kind proffered by Defendant Pahlawan, where a court may focus only on fixed elements like location and nationality in determining jurisdiction.  Finally, the rare opinion by a federal district court considering the very issue before this Court expressly affirms the reality that Defendant Pahlawan seeks to deny:  given the "widely varying definitions" of the phrase "subject to the jurisdiction of the United States" in statutes and case law, "there is no ordinary common-sense meaning of the phrase."  *United States v. Bodmer*, 342 F. Supp. 2d 176, 183 (S.D.N.Y. 2004).

Seeing as there exists no ordinary, common meaning for "subject to the jurisdiction of the United States," this Court must instead look to the statute itself, as well as any relevant context, to assess its jurisdictional scope and whether that scope includes criminal actors on stateless vessels.  The Court starts by considering the text.  The relevant part of Section 832(a) reads, "[w]hoever, within the United States or subject to the jurisdiction of the United States . . . ."  18 U.S.C. § 832(a).  By using the disjunctive, Congress contrasts "subject to the jurisdiction of the United States" with "within the United States"; under the rule against surplusage, such use of the disjunctive suggests that the former phrase extends jurisdiction to at least some acts that are not "within the United States."  *See Corley v. United States*, 556 U.S. 303, 314 (2009) (describing the rule against surplusage as one of "the most basic interpretative canons," which requires that "no part [of a statute] will be inoperative or superfluous, void or insignificant").  Congress's

express grant of extraterritorial application in the statute's next subsection, as discussed in Section III.A.1.a, further supports such a reading.  18 U.S.C. § 832(b).

Though the Supreme Court has lamented that "[j]urisdiction . . . is a word of many, too many, meanings," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998) (quotation omitted), the Court considers Black's Law Dictionary, which offers two definitions of the term that are potentially relevant here:

> 1.  A government's general power to exercise authority over all persons and things within its territory . . . .
>
> 2.  A court's power to decide a case or issue a decree.

*Jurisdiction*, BLACK'S LAW DICTIONARY (12th ed. 2024).  Because the text of § 832(a) evinces clear intent to criminalize behavior beyond the territory of the United States, the first of these definitions provides no help here.  Thus, the Court will consider the second definition in assessing whether its "power to decide a case or issue a decree" extends to stateless vessels.

By way of background, the Court acknowledges the general rule, under international law, that all vessels "must sail under the flag of one, and only one, state."  *United States v. Aybar-Ulloa*, 987 F.3d 1, 5 (1st Cir. 2021) (citing United Nations Convention on the Law of the Sea art. 92, Dec. 10, 1982, S. Treaty Doc. No. 103-39, 1833 U.N.T.S. 397).  This so-called flag-state system serves multiple purposes, including to provide "clear guidance as to which state bears the primary obligation to regulate conduct occurring on vessels on the seas."  *Id*.  Critically, while international law restricts a nation's right to assert jurisdiction over foreign vessels beyond its national borders, these restrictions "have no applicability in connection with stateless vessels."  *United States v. Caicedo*, 47 F.3d 370, 372 (9th Cir. 1995) (quotation omitted).  Rather, international law "permits any nation to subject stateless vessels on the high seas to its jurisdiction."  *Marino-Garcia*, 679 F.2d at 1383.  After all, without a scheme that permits courts

of all nations to assert their jurisdiction, stateless vessels would "represent floating sanctuaries from authority" and pose "a potential threat to the order and stability of navigation of the high seas." *Id*. at 1382 (citations omitted).

Building on these well-established principles of international law, United States courts have repeatedly exercised their power to decide cases involving crimes committed on stateless vessels. *See, e.g.*, *United States v. Victoria*, 876 F.2d 1009 (1st Cir. 1989) (affirming conviction of defendant for possessing marijuana on board a stateless vessel with intent to distribute); *United States v. Pinto-Mejia*, 720 F.2d 248 (2d Cir. 1983) (holding that, with sufficient foundation for the vessel's statelessness, the district court could exercise jurisdiction over defendants charged with possessing marijuana on such a vessel with intent to distribute); *Aybar-Ulloa*, 987 F.3d at 3 (affirming conviction of defendant on various charges involving possession of cocaine on board a stateless vessel with intent to distribute).  In so doing, courts have expressly articulated their jurisdiction over stateless vessels operating outside our Nation's territorial waters.  *See United States v. Dominguez*, 604 F.2d 304, 308 (4th Cir. 1979) ("By attempting to change its nationality on the high seas, the Sea Crust became a stateless ship.  This conferred on the United States jurisdiction over the ship . . . ."); *Victoria*, 876 F.2d at 1010 ("[T]he United States, as a matter of international law, may prosecute drug offenders on stateless ships found on the high seas").  No conflicting authority exists on this issue.  Consequently, the Court finds no basis to disagree with the overwhelming weight of jurisprudence in finding that United States courts possess the power to decide cases involving stateless vessels.

Defendant Pahlawan contends that the bulk of the case law concerning stateless vessels that the Government cites, including several of the cases mentioned above, stems from prosecutions under the MDLEA, where Congress expressly defined "vessel subject to the

jurisdiction of the United States" to include "a vessel without nationality."  46 U.S.C.

§ 70502(c)(1)(a).  In arguing that these cases are inapposite here, Defendant Pahlawan appears to

suggest that Congress's definition of stateless vessels as "subject to the jurisdiction of the United

States" constitutes a modification and expansion of that jurisdictional phrase relative to

Congress's use of it in § 832(a).  (ECF No. 208 at 13.)  In making this argument, Defendant

Pahlawan also re-invokes the presumption against extraterritoriality, submitting that Congress's

failure to do in § 832 what it did in § 70502 requires the Court to "limit to its terms" § 832(a)'s

jurisdictional language.  (*Id*. at 14 (citing *RJR Nabisco*, 579 U.S. at 339).)  These "terms,"

Defendant Pahlawan presumptively argues, necessarily exclude stateless vessels.  (*Id*.)

Defendant Pahlawan's arguments on this question fail to persuade the Court.  The

international-law principles undergirding United States jurisdiction over stateless vessels are

clear and uncontroverted; the same holds true for federal courts of appeals' repeated affirmation

of the power that United States courts possess to decide cases involving stateless vessels.

Against this backdrop, the Court views Congress's choice to spell out, in § 70502, that stateless

vessels fall within its definition of "subject to the jurisdiction of the United States" not as an

expansion or modification of the latter term, but as a clarification of its already recognized scope.

Meanwhile, Defendant Pahlawan's argument that the presumption against extraterritoriality

exerts a limiting effect here is both tautological and unhelpful.  Admonishing the Court to "limit

that [extraterritorial] provision to its terms" constitutes a hollow command when the "terms" are

precisely what the parties dispute.  (ECF No. 208 at 14.)  Furthermore, the "limit" that Defendant

Pahlawan seeks cannot be available here, given that courts universally acknowledge United

States jurisdiction over stateless vessels, and given Congress's express instruction *in favor of*

extraterritorial application within the scope of that jurisdictional grant.

17

In recognizing § 832's ability to reach stateless vessels that engage in the transportation of dangerous weapons, this Court also acknowledges the context attending the passage of § 832 and its implications for Congress's legislative intent.  As the Government correctly notes, § 832 was enacted in late 2004 as part of the Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), Pub. L. No. 108–458, 118 Stat. 3638.  The legislative hearing notes demonstrate the strong link between this piece of legislation and the 9/11 Commission Report, released earlier that year, and how legislators employed "the Commission's recommendations as our guide and [its] principles as our compass."  National Intelligence Reform Act of 2004, Cong. Rec. Vol. 150, No. 118, 108th Cong. at S9700–02 (Sept. 27, 2004).  The Report's call for a transnational legal regime that permits "the capture, interdiction, and prosecution" of weapons smugglers, and that would allow "any state in the world" to do so, provides important context for § 832 and the broad meaning that this Court may ascribe to the phrase "subject to the jurisdiction of the United States" within that statute.  National Commission on Terrorist Attacks, *The 9/11 Commission Report* (2004) at 380–81.[5]

Defendant Pahlawan's most promising argument for a narrower construction of "subject to the jurisdiction of the United States" compares § 832(a) with 18 U.S.C. § 2339B, which Congress amended at the same time that it enacted § 832(a).  As Defendant Pahlawan points out, Congress eliminated "subject to the jurisdiction of the United States" from § 2339B's text, allegedly due to Department of Justice concerns that such language would prevent the statute

---

[5]    Defendant Pahlawan's arguments concerning the statutory context are unavailing.  The Court's consideration of this context does not "replace the actual text with speculation," as Defendant Pahlawan insinuates, but illuminates its understanding of the statutory text.  (ECF No. 208 at 8.)  Meanwhile, Defendant Pahlawan's objection to the Court's consideration of the 9/11 Commission Report on the basis that the Report "doesn't mention 18 U.S.C. § 832" strikes the Court as particularly disingenuous, given that, as Defendant Pahlawan well knows, the Report was written before the legislation.  (*Id*. at 8.)

from reaching "purely foreign conduct by foreign people."  (ECF No. 208 at 10–11.)  Congress's decision not to remove this language from § 832(a) suggests, in Defendant Pahlawan's telling, that Congress sought to impose "a limitation on the reach of the statute" correspondent to Defendant Pahlawan's interpretation of "subject to the jurisdiction of the United States."  (*Id*. at 7.)

Yet, despite this argument's appeal, the Court also acknowledges the Government's opposing argument concerning Congress's use of different language in § 832(c).  There, Congress uses the words "any person within the United States, or a national of the United States while such national is outside of the United States" — the precise categories that Defendant Pahlawan alleges § 832(a)'s "subject to the jurisdiction" language refers to, but articulated much more directly here.  18 U.S.C. 832(c).  Defendant also fails to address Congress's use of the phrase "committed by or against a national of the United States" in a related statute, 18 U.S.C. § 175(a), which provides another example of Congress articulating more directly what Defendant alleges "subject to the jurisdiction of the United States" to mean.

Ultimately, this Court's duty is "to ask what Congress intended, and not to assay whether Congress might have stated that intent more naturally, more artfully, or more pithily."  *Sullivan v. Everhart*, 494 U.S. 83, 106 (1990) (Stevens, J., dissenting); *see also Torres v. Lynch*, 578 U.S. 452, 472 (2016) ("Rather than expecting . . . perfection in drafting, we have routinely construed statutes to have a particular meaning even as we acknowledged that Congress could have expressed itself more clearly.").  The Court will therefore restrict its inquiry to the statute before it and refrain from lending undue weight to Congress's penmanship in other (albeit related) statutes and provisions.

Based on that inquiry, the statutory text, settled case law and the international law principles upon which it rests, this Court finds that it possesses the "power to decide a case" involving stateless vessels.  Thus, this Court finds that Section 832(a)'s jurisdictional provision, which grants this Court jurisdiction over "whoever . . . subject to the jurisdiction of the United States" performs certain criminal acts, extends to actions on stateless vessels.[6]

### c.  The Yunus qualifies as a stateless vessel, rendering Defendant Pahlawan subject to the jurisdiction of the United States.

The Court's final step in its inquiry as to § 832's applicability to Defendant Pahlawan requires the Court to determine whether the *Yunus* was indeed stateless, as the Government alleges.  While § 832 does not include a definition of the term "stateless vessel," Congress provided a comprehensive definition of that term in the MDLEA.  46 U.S.C. § 70502(d)(1). Congress subsequently designated that definition as a reference point for other statutes, which expressly incorporate its definition.  *See, e.g.*, 18 U.S.C. § 2237(e)(3) ("the term 'vessel subject to the jurisdiction of the United States' has the meaning given the term in section 70502 of title 46").  Given the comprehensive nature of Congress's definition in § 70502 and that definition's

---

[6]     It follows logically that jurisdiction extending to stateless vessels also extends to persons aboard those vessels.  *See, e.g.*, *Caicedo*, 47 F.3d at 372–73 ("[W]here a defendant attempts to avoid the law of *all* nations by travelling on a stateless vessel, he has forfeited these protections of international law and can be charged with the knowledge that he has done so." (emphasis in original)); *Marino-Garcia*, 679 F.2d at 1384 ("[T]he failure to unmistakably accede to the authority of a single sovereign while traversing the high seas will render [all persons aboard vessels engaged in drug trafficking] subject to the criminal jurisdiction of the United States."); *United States v. Holmes*, 18 U.S. 412, 418 (1820) ("[T]he same offence committed by any person from on board a vessel having no national character, as by throwing a person overboard, and drowning him, is within the same [criminal] law." (emphasis omitted)).

adherence to general principles of international law,[7] this Court will employ § 70502(d)(1)'s definitional provisions to assess whether the *Yunus* qualifies as stateless.

Section 70502(d)(1) defines "vessel without nationality" to include, in relevant part:

(B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; [and] . . .

(D) a vessel aboard which no individual, on request of an officer of the United States . . . claims to be the master or is identified as the individual in charge, and that has no other claim of nationality or registry under paragraph (1) or (2) of subsection (e).

46 U.S.C. § 70502(d)(1)(D).  The reference to "other claim[s] of nationality or registry" in subsection (D) concerns claims of nationality based on either:  (1) "possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas" or (2) "flying its nation's ensign or flag."  46 U.S.C. § 70502(e)(1), (2).

Put more simply, to determine whether the *Yunus* qualified as stateless, the Court must ascertain whether one of the following two fact patterns existed at the time that the Boarding Team interdicted the *Yunus*:  (1) Defendant Pahlawan, as the person in charge, failed to make a claim of nationality or registry for the dhow upon request of an authorized federal officer; or (2) federal officers confronted a situation where (a) nobody claimed or could be identified as the

---

[7]     *Marin*, 90 F.4th at 1239 ("[W]e hold that the definition of "vessel without nationality" under 46 U.S.C. § 70502(d)(1)(C) does not conflict with international law."); *see also id.* at 1242 (affirming that, as it concerns the relationship between United States criminal law and international law, "every state remains free to adopt the principles which it regards as best and most suitable" so long as the state "[does] not overstep the limits which international law places upon its jurisdiction.") (citing *S.S. Lotus* (1927), PCIJ (Ser. A) No. 9, at 19).  These principles of international law, though general in nature, ordinarily require disclosure of a vessel's nationality "through some combination of carrying official documents on the vessel, flying the nation's flag, and entry in a national registry of vessels."  *United States v. Nunez*, 1 F.4th 976, 985 (11th Cir. 2021) (citing H. Meyers, *The Nationality of Ships* 156, 177–78 (1967)).

person in charge, (b) nobody produced documents evidencing the dhow's nationality, and (c) the

dhow was not flying a national ensign or flag.  If the evidence establishes either fact pattern, the

*Yunus* qualifies as a "vessel without nationality" under Congress's definition.

Looking at the facts proffered by the Government, this Court finds that the *Yunus*

qualifies as stateless under both definitions outlined above.  The Boarding Team included

officers of the United States with the appropriate authority (i.e., members of the United States

Coast Guard Maritime Safety and Security Team).  (ECF No. 239 ¶ 1.)  According to the Second

Superseding Indictment, Defendant Pahlawan, who served as the captain of the *Yunus*, failed to

identify himself as such.  (*Id*. ¶¶ 1, 3, 45.)  And neither he nor any crew members made a "claim

of nationality or registry" for the dhow.  (ECF No. 159 at 27; ECF No. 239 ¶¶ 1, 37.)  These

facts suffice to establish that Defendant's vessel was stateless under the criteria set forth in

§ 70502(d)(1)(B).  As to § 70502(d)(1)(D), the Government additionally proffers that no

paperwork "evidencing the vessel's nationality" was provided or found on board; rather,

Defendant Pahlawan told the Boarding Team that the paperwork was no longer available.  (ECF

No. 159 at 27–28; ECF No. 239 ¶ 45 (alleging that Defendant Pahlawan stated "that the captain

had departed their dhow for another dhow while at sea and took with him all of their dhow's

paperwork").)  Nor did the boat fly any flag or bear any markings.  (ECF No. 159 at 27; ECF No.

239 ¶¶ 1, 37.)  In sum, nothing on board served to identify the boat's nationality, and despite the

requests of authorized federal officers, nobody on board made any effort to do so, either.  For

these reasons, the Court finds that the *Yunus* qualified as stateless for the purposes of § 832(a).[8]

---

[8]      The Court notes that Defendants, in moving to dismiss their charges under 18 U.S.C.
§ 2237(a)(2)(B) in a different motion, argue that there exists evidence of a "verbal claim of
nationality or registry by the master or individual in charge to make a claim" under 46 U.S.C.
§ 70502(e)(3), because information in discovery illustrates that the *Yunus* had been registered to
Iran in at least one database.  (ECF No. 217.)  Even assuming its truth, this registration does not

In conclusion, the Court finds that stateless vessels are "subject to the jurisdiction of the United States" as that term was used by Congress in § 832(a) and that the *Yunus* satisfies the requirements of a stateless vessel as articulated by Congress. Thus, Defendant Pahlawan stands subject to the jurisdiction of the United States. The Court therefore will DENY Defendant Pahlawan's Motion to Dismiss Counts One through Four on the basis of jurisdiction.

### 2.    The Superseding Indictment sufficiently alleges participation in or support to a weapons of mass destruction program.

Defendant Pahlawan also argues that his alleged actions in transporting weapons on behalf of Iran and the IRGC, both of which constitute Foreign Terrorist Powers ("FTPs") as defined by Congress, *to* the Houthi rebel forces, who were not designated as an FTP at the time of the alleged conduct, does not constitute providing material support "to a . . . weapons of mass destruction program" under 18 U.S.C. § 832(a). Defendant Pahlawan bases his argument on the statutory definition of a "weapons of mass destruction program," which requires a "program or plan for the development, acquisition, or production of any . . . weapons of mass destruction." 18 U.S.C. § 832(d)(2). Invoking the language concerning "development, acquisition, or production," Defendant Pahlawan argues that his actions did not materially support any one of these three categories of activity. Because Congress chose to define "weapons of mass destruction program" only in terms of these categories (rather than, for example, distribution, transfer or transportation of weapons to third parties), Defendant Pahlawan argues that his alleged activities, even if true, do not constitute material support to a weapons of mass destruction program, because he was not involved in development, acquisition or production of

---

amount to a "verbal claim" by Defendant Pahlawan, as required by § 70502(e)(3). Nor does such evidence satisfy the other criteria required to make a claim of nationality or registry. *See* 46 U.S.C. § 70502(e) (stating that "[a] claim of nationality or registry under this section includes *only*" three criteria (emphasis added)).

weapons.  Therefore, in his view, Counts One through Four must be dismissed.  (ECF No. 89 at 6.)

The Court disagrees with Defendant Pahlawan's contorted reading of the statute, which runs counter to the ordinary meaning of the text.  In § 832(a), Congress plainly sets forth two essential aspects of the conduct that it seeks to criminalize:  a criminal *act* and the *object* of that act.  The central act that the statute criminalizes is "participat[ing] in or . . . provid[ing] material support" to a weapons program.  18 U.S.C. § 832(a).  Given the allegations in the Second Superseding Indictment, the Court will focus, for the purposes of this inquiry, on the "providing material support" option.  The central object of the material support must be a "nuclear weapons . . . or other weapons of mass destruction program."  In other words, the text of the statute requires two things above all else:  that a defendant provide material support to a weapons program, and that this weapons program must be either a nuclear weapons program or a weapons of mass destruction program.

Congress provided detailed definitions of both the act (providing "material support") and the object ("weapons of mass destruction program") for purposes of § 832.  As to "material support," Congress incorporated the definition that it provided in 18 U.S.C. § 2339A, which includes "any . . . service, including . . . transportation."  18 U.S.C. § 2339A(b)(1)).  As to "weapons of mass destruction program," Congress defines such a program as one "for the development, acquisition, or production of any weapon or weapons of mass destruction."  18 U.S.C. § 832(d)(2).  It further defines what constitutes a "weapon of mass destruction" in 18 U.S.C. § 2332a(c).

According to the alleged facts, Defendant Pahlawan's actions fall squarely within the definitions of both the act and the object that Congress sought to criminalize in § 832.

24

Defendant's alleged actions in transporting weapons aboard his vessel constituted a "service" and involved "transportation," as expressly provided for in § 2339A(b)(1); they therefore constitute "material support" for the purposes of § 832(a).  Iran's weapons program, meanwhile, falls within Congress's broad definition of a weapons of mass destruction program.  According to the Second Superseding Indictment, Defendant transported Iranian "advanced conventional weaponry," including a warhead and ballistic missile components produced by Iran (ECF No. 239 at 8); this weaponry falls within the broad definition of a weapon of mass destruction under 18 U.S.C. § 2332a(c).[9]  The Court therefore finds that Defendant Pahlawan's actions constitute "material support" under Congress's definition, and that the program to which Defendant Pahlawan provided material support was a program that produced "weapons of mass destruction," therefore constituting a "weapons of mass destruction program."

The Court finds no textual support for Defendant's severely constrained interpretation of § 832's reach.  Defendant Pahlawan appears to suggest that the statute criminalizes only material support that *furthers the purported goals* of a weapons of mass destruction program, namely development, acquisition or production.  But the statute contains no language to that effect.  Rather, Congress adopted a simpler premise:  Defendant Pahlawan need merely provide "material support" to such a program.  By providing transportation services to Iran's and IRGC's programs, Defendant Pahlawan did exactly that.

Nor does the Court share Defendant Pahlawan's misplaced concern that its reading of the statute would "dramatically expand § 832(a) far beyond its text."  (ECF No. 208 at 26.)  The

---

[9]      Pursuant to 18 U.S.C. § 2332a(c), weapons of mass destruction include any "destructive device" as defined in 18 U.S.C. § 921.  That section, in turn, includes a catalogue of weapons, which includes the types of weapons that Defendant Pahlawan allegedly transported.  18 U.S.C. § 921(a)(4).  Defendant Pahlawan has not contested that the weapons in question satisfy this definition.

Court points out the significant limitation that the statute's jurisdictional clause, discussed extensively above, imposes on the ability of United States law enforcement agencies to prosecute extraterritorial conduct "only tangentially related to weapons programs." (*Id.*)  In light of that earlier discussion and these limitations, this Court struggles to imagine how the Iranian bus driver, Afghan cafeteria worker, and Chinese satellite-phone salesman cited by Defendant Pahlawan, all of whom are presumably operating in Iran (and none of whom are presumably sailing on a stateless vessel), could possibly be "subject to the jurisdiction of the United States."

For the reasons stated above, the Court finds that Defendant's actions fall within the statutory language of § 832(a).  Therefore, the Court will DENY Defendant's Motion to Dismiss Counts One through Four for failure to state a claim.

**B.    Defendants Pahlawan and Mazhar's Motion to Dismiss for Violation of Due Process (ECF No. 115)**

Defendants move this Court to dismiss all counts against them for violating the presumption against extraterritoriality and their constitutional right to due process.  (ECF No. 115.)  Defendants raise three arguments in their Motion.  First, Defendants argue that the presumption against extraterritoriality bars their prosecution.  In support, Defendants point to the absence of "explicit statement[s] of congressional intent" for extraterritorial application in the statutes underpinning the Government's charges for Counts One, Two, Five, Six, Nine and Ten.[10] (*Id.* at 4.)  Second, Defendants invoke the Fifth Amendment's Due Process Clause to argue that the Government has failed to prove a "sufficient [jurisdictional] nexus" between Defendants, as

---

[10]    While Defendants fail to specify for which counts they seek dismissal on the basis of extraterritoriality, Defendants concede that "18 U.S.C. § 832 and 18 U.S.C. § 1512 contain[] [an] explicit statement of congressional intent to apply the statute to Mr. Pahlawan's alleged extraterritorial conduct."  (ECF No. 115 at 4.)  Consequently, the Court construes this part of Defendants' Motion to seek dismissal only of the counts charged under statutes that lack such an explicit statement.

foreign nationals, and the United States. (*Id.* at 1.) Given that Defendants "simply ha[ve] no connection to the United States," due process principles prohibit their prosecution in this case. (*Id.* at 9.) Finally, Defendants argue that they lacked constitutional notice, which they define as "fair warning that their conduct could expose them to criminal liability." (*Id.* at 9 (citing *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011)).) While conceding that foreign defendants need only "reasonably understand that their conduct . . . would subject them to prosecution *somewhere*," rather than specifically in the United States, Defendants argue that they did not reasonably possess such an understanding. (*Id.* at 10 (citing *Al Kassar*, 660 F.3d at 119) (emphasis added).) Because Defendant Pahlawan's activities as an Iranian contractor transporting weapons constituted "quintessential activities of armed forces" and Defendants' conduct deceiving United States officers falls under their purported right to deceive a perceived or potential enemy, Defendants submit that their conduct was not "self-evidently criminal" and therefore, without notice, their prosecution would be fundamentally unfair under due process principles. (ECF No. 210 at 2–3, 5.)

The Court disagrees with Defendants' arguments concerning both the presumption against extraterritoriality and due process. It addresses each of these issues in turn.

### 1. The presumption against extraterritoriality does not bar any of the Government's charges.

The Court has already ruled that the presumption against extraterritorially does not bar Counts One and Two. *See supra* Section III.A.1.a. 18 U.S.C. § 2239A, which underlies these counts, applies extraterritorially to the same extent as the charged predicate offense. As discussed above, 18 U.S.C. § 832, which serves as the predicate offense for Counts One and Two, contains express language concerning its extraterritorial application. 18 U.S.C. § 832(b).

Section 2239A therefore applies extraterritorially in this case, rendering Defendants' Motion meritless as to Counts One and Two.

As to Counts Five, Six, Nine and Ten, the Court finds that the presumption against extraterritoriality does not bar Defendants' prosecution under the relevant statutes, because the underlying statutes evince clear Congressional intent of extraterritorial application. *See United States v. Bowman*, 260 U.S. 94, 98 (1922) (recognizing that where the text of a criminal statute stands silent as to extraterritorial application, Congressional intent may "be inferred from the nature of the offense"); *United States v. Birch*, 470 F.2d 808, 811 (4th Cir. 1972) (citing *Bowman* for the proposition that "a federal statute is not necessarily limited to crimes committed within the territorial jurisdiction of the United States because it lacks an express provision that it should be applied extraterritorially" and subsequently inferring extraterritorial application of a criminal statute based on its subject matter). Section 2280a, which underlies Counts Five and Six, expressly criminalizes conduct on stateless vessels in international waters. 18 U.S.C. §§ 2280a(b)(1)(A)(i); 46 U.S.C. § 70502(c). Similarly, 18 U.S.C. § 2237(a)(2)(B), which underlies Counts Nine and Ten, makes express reference to prospective defendants providing false information "during a boarding of a vessel regarding the vessel's . . . nationality, cargo, or crew," while § 2237(d) provides that a "foreign nation may consent or waive objection to the enforcement" of this statute. 18 U.S.C. § 2237(a)(2)(B), (d). In addition, both of these statutes apply to vessels "subject to the jurisdiction of the United States," a phrase that this Court has already found to evince congressional intent to apply to stateless vessels beyond the territorial boundaries of the United States. 18 U.S.C. §§ 2280a(b)(1)(A)(i), 2237(a)(1), (2)*; see supra* Section III.A.1.b. These definitional provisions clearly demonstrate Congress's intent for these

statutes to apply extraterritorially.  The Court therefore denies Defendants' motion to dismiss Counts Five, Six, Nine and Ten on these grounds.

### 2.    Application of the statutes to Defendants would not be arbitrary or fundamentally unfair.

The Court finds that Defendants' arguments concerning alleged violations of their due process rights lack merit.  Under relevant case law and principles of fundamental fairness, the Government does not need to establish a "nexus" between Defendants and the United States where Defendants perform criminal acts aboard a stateless vessel.  By acting aboard such a vessel, Defendants also had sufficient notice that any self-evidently criminal conduct subjected them to prosecution by the United States.  Given that Defendants' acts were self-evidently criminal and given this Court's earlier determination that the *Yunus* qualified as stateless, this Court finds that it would be neither arbitrary nor fundamentally unfair to prosecute Defendants under the statutes that the Second Superseding Indictment relies on.  For these reasons, and as discussed below, the Court will DENY Defendants' Motion to Dismiss based on due process grounds.

The "ultimate question" on a due process claim by a foreign defendant who acted abroad remains whether "application of the statute to the defendant [would] be arbitrary or fundamentally unfair."  *United States v. Juda*, 46 F.3d 961, 967 (9th Cir. 1995).  The Fourth Circuit has cited other circuits for the proposition that, in some cases, "a sufficient nexus" between a foreign defendant acting abroad and the United States may serve as a "proxy" for due process to ensure that extraterritorial application of a criminal statute "would not be arbitrary or fundamentally unfair."  *United States v. Brehm*, 691 F.3d 547, 552 (4th Cir. 2012) (quoting *United States v. Davis*, 905 F.2d 245, 248–49 (9th Cir. 1990)).   However, the nexus "requirement," to the extent that it constitutes one, serves a limited purpose — namely, "it

29

addresses the broader concern of ensuring that a United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country." *United States v. Ali*, 718 F.3d 929, 944 (D.C. Cir. 2013).  Concerning prosecutions involving criminal acts aboard stateless vessels, federal courts of appeals have repeatedly disavowed the notion that constitutional due process requires the Government to establish such a nexus.  *See, e.g.*, *Juda*, 46 F.3d at 966–67 ("Neither our court, nor any other circuit . . . has ever held that a nexus requirement is constitutionally required to support jurisdiction over a stateless vessel."); *United States v. Van Der End*, 943 F.3d 98, 106 (2d Cir. 2019) (holding the same in the context of drug prosecutions against criminal actors on stateless vessels, because "any nation may exercise jurisdiction over stateless vessels").

Relatedly, for the prosecution of a foreign defendant acting abroad to be fundamentally fair and pass constitutional muster, the Due Process Clause requires that defendants possess sufficient notice.  *Al Kassar*, 660 F.3d at 119.[11]  Such notice requires that Defendants receive fair warning that "their conduct was criminal and would subject them to prosecution somewhere," though not specifically in the United States.  *Id.*

Here, the Court finds it neither arbitrary nor fundamentally unfair to prosecute Defendants for their alleged crimes.  As the Government rightly notes, and as the Court previously discussed, it is a well-established principle that stateless vessels are subject to different rules than vessels flying under a national flag.  *See supra* Section III.A.1.b.  That principle incorporates the well-established rule that stateless vessels stand subject to the jurisdiction of all nations.  *See id.*

---

[11]   In *Brehm*, the Fourth Circuit quotes *Al Kassar* extensively, including this passage, and considers the case "instructive" as to the question presently before the Court.  691 F.3d at 553–54.

The unique legal status of stateless vessels, and the Court's earlier finding that the *Yunus* qualified as stateless, bears significantly on both of Defendants' arguments.  As to nexus, the Court finds persuasive the opinions from federal courts of appeals rejecting a nexus requirement for actors on stateless vessels, given the need for all countries to exercise jurisdiction lest these vessels become "floating sanctuaries from authority" that threaten "the order and stability of navigation of the high seas."  *Marino-Garcia*, 679 F.2d at 1382 (citations omitted); *see also Caicedo*, 47 F.3d at 372 (describing stateless vessels as "international pariahs"); *Van Der End*, 943 F.3d at 105–06 (holding that defendants' entitlement to a jurisdictional nexus does not apply to stateless vessels where a subject "attempts to avoid the law of *all* nations by travelling on a stateless vessel" (emphasis in original)).  Given this jurisprudence and the international law principles that undergird it, and given that Defendants operated aboard a stateless vessel and failed to identify the vessel's purported nationality when requested to do so by United States officers, the Court finds that the lack of a direct nexus between Defendants and the United States fails to render Defendants' prosecution fundamentally unfair or arbitrary.  Accordingly, Defendants' claim of a due process violation on the basis of insufficient nexus fails.

As to notice, in light of the uncontroverted principle that stateless vessels stand subject to jurisdiction by all countries, the Court finds that Defendants possessed fair notice that they would be subject to the jurisdiction of any nation, including the United States, when committing the alleged acts on board a stateless vessel.  Furthermore, the Court finds no basis for Defendants' claim that they lacked notice as to the "self-evidently criminal" nature of their actions.  Smuggling weapons between countries, lying to government officials, and obstructing a government's investigation constitute self-evidently criminal acts.  Defendants' alleged "allegiance" to the Iranian government does not contravene their reasonable understanding that

31

such actions would "subject [them] to prosecution somewhere" other than Iran.  Consequently, given the uncontroverted principle of universal jurisdiction over stateless vessels and the self-evidently criminal nature of Defendants' actions, Defendants' claim of a due process violation on the basis of insufficient notice must fail.  For these reasons, the Court will DENY Defendants' Motion to Dismiss for lack of due process.  (ECF No. 115.)

### C.    Defendant Pahlawan's Motion to Dismiss for Multiplicity (ECF No. 111)

The Court next addresses Defendant Pahlawan's argument that the Court should either merge Counts Three and Four or dismiss one of the Counts, because the Government has charged Defendant Pahlawan with two counts of the same statutory violation arising from a single course of conduct in violation of the rule against multiplicity.  (ECF No. 111 at 1.)  The Government, in turn, submits that Congress unambiguously intended for the foreign terrorist powers — here, Iran and the IRGC — to serve as the unit of prosecution.  (ECF No. 163 at 1.)  Because 18 U.S.C. § 832(a) is ambiguous as to its unit of prosecution, and because such ambiguity must be resolved in favor of Defendant Pahlawan, the Court will GRANT Defendant Pahlawan's Motion to Dismiss Count Three or Four for Multiplicity (ECF No. 111).

The rule against multiplicity stands "rooted in the Double Jeopardy Clause of the Fifth Amendment and protects against the imposition of cumulative punishments for the same offense in a single criminal trial."  *See United States v. Smith*, 54 F.4th 755, 763 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 1097 (2023).  To determine whether charges qualify as multiplicitous, a court must first consider "[w]hat Congress has made the allowable unit of prosecution."  *United States v. Shrader*, 675 F.3d 300, 313 (4th Cir. 2012).  "To do so, we must look to the language of the statute, being mindful that any ambiguity must be resolved in favor of the defendant under the rule of lenity."  *United States v. Bennafield*, 287 F.3d 320, 323 (4th Cir. 2002).  Thus, the Court's threshold inquiry consists of assessing whether Congress unambiguously defined the unit of

prosecution under § 832(a) to be the "target beneficiary," (ECF No. 163 at 6), as the Government argues. Such an interpretation would allow Defendant Pahlawan to be charged twice for his alleged smuggling activities aboard a single vessel on a single occasion, as long as his conduct benefits two foreign terrorist powers. The Court concludes that Congress did not put forth such an unambiguous definition.

The relevant statute provides that:

> Whoever . . . willfully participates in or knowingly provides material support or resources (as defined in section 2339A) to a nuclear weapons program or other weapons of mass destruction program of a foreign terrorist power, or attempts or conspires to do so, shall be imprisoned for not more than 20 years.

18 U.S.C. § 832(a).

When determining a statute's unit of prosecution, "the feature that naturally draws [] immediate attention is the statute's verb." *United States v. Rentz*, 777 F.3d 1105, 1109 (10th Cir. 2015) (en banc) (Gorsuch, J.); *see also United States v. Rodriguez–Moreno*, 526 U.S. 275, 279–80 (1999) (recognizing that the "'verb test' certainly has value as an interpretive tool"). As then-Judge Gorsuch explained, "if a law's verb says it's a crime to *kill* someone, we usually think a defendant must *kill* more than one person to be found guilty of more than one offense." *Rentz*, 777 F.3d at 1109; *see also United States v. Buczkowski*, 458 F. App'x 311, 317 (4th Cir. 2011) (noting that the "central focus" of 18 U.S.C. § 2252(a)(1)(A), which criminalizes the transportation of child pornography, "is the act of transporting, not the number of individual images transported"). In § 832(a), Congress provided two relevant verbs — "participates" and "provides."[12] Such language thus suggests that each charge under § 832(a) must involve separate acts of participation or provision. Because "participates" and "provides" constitute the

---

[12]     The statute also prohibits "attempt[ing]" or "conspir[ing] to do so." 18 U.S.C. § 832(a).

statute's operative verbs, the statute focuses attention on how many times the defendant performed those acts — not on how many foreign terrorist powers benefited from those acts.

The Government contends that, because only a narrow group of countries and organizations qualify as a foreign terrorist power,[13] Congress unambiguously intended "to have the beneficiary itself serve as the unit of prosecution."  (ECF No. 163 at 6.)  The Court disagrees. The prepositional phrase, "of a foreign terrorist power," merely imposes additional limits — beyond those created by the statute's verbs — on the availability of a charge under § 832. Nothing about its presence in the statute suggests that Congress intended for this additional limitation to replace the verbs "participates" and "provides" as the relevant units of prosecution; not to mention whether Congress unambiguously intended to do so.

Moreover, the Court stands unpersuaded by the Government's reliance on *United States v. Shrader*, 675 F.3d 300 (4th Cir. 2012).  In *Shrader*, the defendant was charged with two counts of stalking for engaging in a single course of conduct that involved harassment and intimidation of a victim and her husband.  *Id.* at 302–05.  The defendant argued that his charges qualified as multiplicitous, because he engaged in only one course of conduct.  *Id.* at 313.  The Fourth Circuit disagreed, holding that the plain language of 18 U.S.C. § 2261A(2) "unambiguously makes the victim, rather than the course of conduct, the unit of prosecution."[14]

---

[13]     Congress defined "foreign terrorist power" as "a terrorist organization designated under section 219 of the Immigration and Nationality Act, or a state sponsor of terrorism designated under section 6(j) of the Export Administration Act of 1979 or section 620A of the Foreign Assistance Act of 1961."  18 U.S.C. § 832(d)(3).

[14]     The statute at issue in *Shrader* provides that whoever:

> with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic

*Id.* at 313.  Specifically, the Fourth Circuit noted that the "statute does not punish fungible acts, such as possession of cocaine in two different receptacles, but rather defines the defendant's crime — and therefore the unit of prosecution — in terms of his intent to strike fear in a particular individual."  *Id.* (citation omitted).  The Fourth Circuit further recognized that "the effect on a particular victim is also how Congress has chosen to allocate punishment for the offense[,] . . . provid[ing] a scale of punishments depending on the gravity of the harm" to the victim.[15]  *Id.* (citing 18 U.S.C. § 2261(b)).

Section 832(a) proves distinguishable from the statute at issue in *Shrader*.  Unlike the stalking statute in *Shrader*, which defined the crime in terms of the defendant's specific intent to injure or to cause distress to a particular individual, § 832(a) prohibits "fungible acts"[16] (e.g.,

---

communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that —

> **(A)** places that person in reasonable fear of the death of or serious bodily injury to a person, a pet, a service animal, an emotional support animal, or a horse . . . ; or
>
> **(B)** causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A),

shall be punished as provided in section 2261(b) or section 2261B, as the case may be.

18 U.S.C. § 2261A(2).

[15]    These punishments include "life or any term of years, if death of the victim results," *id.* § 2261(b)(1); "not more than 20 years if permanent disfigurement or life threatening bodily injury to the victim results," *id.* § 2261(b)(2); and "not more than 10 years, if serious bodily injury to the victim results," *id.* § 2261(b)(3).

[16]    In broader use, the term "fungible" can mean "interchangeable" or "capable of mutual substitution."  Merriam-Webster, *Fungible*, https://perma.cc/5VHH-7GNT (last visited November 18, 2024).

providing material support or resources) akin to possession of cocaine.  In addition, in *Shrader*, the stalking statute defined punishment specifically in terms of the effect on the victim, whereas here, § 832(a) does not define punishment with relation to the number of foreign terrorist powers involved — it merely sets the punishment at "not more than 20 years."  In sum, although Congress expressly required actions benefitting a foreign terrorist power in § 832(a), it does not focus the crime on the effects on a particular foreign terrorist power.  *Shrader* therefore stands inapposite to this case.

The other cases cited by the Government further support the Court's interpretation of § 832(a).  (*See* ECF No. 163 at 7–8 (citing *United States v. Wiga*, 662 F.2d 1325 (9th Cir. 1981), and then *United States v. Bullock*, 615 F.2d 1082 (5th Cir. 1980)).)  In *Wiga*, for instance, the Ninth Circuit recognized "the general rule of only one unit of prosecution for simultaneous possession" of multiple weapons under 18 U.S.C. § 1202(a)(1), which has since been repealed. 662 F.2d at 1336.  However, the Ninth Circuit noted an "exception" when the defendant stored or acquired weapons "at different times and places."  *Id.* at 1336–37 (relying on *Bullock*, 615 F.2d 1082).  Thus, the central focus of the court's inquiry remained the act (i.e., storing or acquiring) — not the number of weapons.

Lastly, the Government contends, without any citation to the legislative history, that the Congressional purpose for enacting § 832(a) compels its understanding of the relevant unit of prosecution.  (ECF No. 163 at 6–7.)  While acknowledging that the "proliferation of weapons of mass destruction" undoubtedly constituted one of the "most pressing threat[s] to our [nation's] security" at the time that Congress enacted § 832(a), 150 Cong. Rec. S11939-01, S11943, 2004 WL 2812449, the Court cannot presume that the broad purpose of stemming such proliferation unambiguously demonstrates Congress's intent to define the unit of prosecution in terms of how

many foreign terrorist powers that a defendant's conduct benefits. *See Rentz*, 777 F.3d at 1113 ("Assuming that *whatever* seems to further a statute's perceived purpose must be the law commits the fallacy of overgeneralization.").

In sum, 18 U.S.C. § 832(a) is ambiguous as to its unit of prosecution, and such ambiguity must be resolved in favor of Defendant Pahlawan.[17]  *See Smith*, 54 F.4th at 763 (stating that if "Congress fails to define the criminal unit or the legislative intent in this regard is ambiguous, any ambiguity should be resolved in favor of lenity").  The Court therefore construes the verbs "participates" or "provides" as the relevant unit of prosecution for § 832(a).  Given that the Second Superseding Indictment alleges only one instance of Defendant Pahlawan transporting weapons, (ECF No. 239 ¶ 35), the Court finds that the Government has only alleged one instance of Defendant Pahlawan "knowingly provid[ing] material support or resources . . . to a . . . weapons of mass destruction program of a foreign terrorist power."  Accordingly, the Court will GRANT Defendant Pahlawan's Motion to Dismiss Count Three or Four for Multiplicity (ECF No. 111).  If a jury finds Defendant Pahlawan guilty of Counts Three and Four, the Court will merge these duplicative counts into a single conviction.  *See United States v. Shorter*, 328 F.3d 167, 173 (4th Cir. 2003) (recognizing that a court can "merge duplicative convictions after the jury verdicts are recorded" (cleaned up)).

---

[17]   Because the Court resolves the issue as to the unit of prosecution in Defendant Pahlawan's favor, the Court refrains from addressing whether Iran and the IRGC operate distinct weapons of mass destruction programs.

### D.      Defendant Pahlawan's Motion for a Bill of Particulars (ECF No. 112)

The Court now turns to Defendant Pahlawan's request for a bill of particulars with respect to Counts Seven and Nine.[18] (ECF No. 112 at 1.) Specifically, Defendant Pahlawan posits that the Second Superseding Indictment fails to provide sufficient details as to "the federal crime that Mr. Pahlawan purportedly intended to hinder communication about" and "the basis on which the *Yunus* was a 'vessel subject to the jurisdiction of the United States.'" (*Id.* at 2.) For the reasons stated below, the Court will DENY Defendant Pahlawan's Motion for a Bill of Particulars (ECF No. 112).

Pursuant to Federal Rule of Criminal Procedure 7(f), a "court may direct the government to file a bill of particulars." A bill of particulars enables a defendant "to obtain sufficient information on the nature of the charge against him so that he may prepare for trial, minimize the danger of surprise at trial, and enable him to plead his acquittal or conviction in bar of another prosecution for the same offense." *United States v. Adams*, 335 F. App'x 338, 344 (4th Cir. 2009). However, "[a] bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial." *United States v. Automated Med. Lab'ys, Inc.*, 770 F.2d 399, 405 (4th Cir. 1985). The relevant inquiry "is whether deprivation of the information sought will render the defendant subject to unfair surprise." *United States v. Sampson*, 448 F. Supp. 2d 692, 696 (E.D. Va. 2006) (citing *United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996)). The decision to grant a bill of particulars rests within the sound discretion of the trial court. *United States v. Jackson*, 757 F.2d 1486, 1491 (4th Cir. 1985).

---

[18]      In his Motion, Defendant Pahlawan requests a bill of particulars as to Counts Seven and Eight of the Superseding Indictment. (ECF No. 112.) These counts correlate to Counts Seven and Nine of the Second Superseding Indictment, and therefore, the Court considers the motion as a challenge to these same charges in the Second Superseding Indictment.

As a preliminary matter, the Court rejects the Government's argument that Defendant Pahlawan's request for a bill of particulars qualifies as untimely, because the Motion was filed more than fourteen days after Defendant was arraigned on the Superseding Indictment.  (ECF No. 164 at 2.)  The Court deems the Motion timely, because it was filed within the time period set by this Court for the filing of pretrial motions.  *See* Fed. R. Crim. P. 7(f) (providing that a "defendant may move for a bill of particulars before or within 14 days after arraignment *or at a later time if the court permits* (emphasis added)).  Accordingly, the Court proceeds to assess whether a bill of particulars proves warranted as to Counts Seven and Nine of the Second Superseding Indictment.

### 1.    A bill of particulars proves unwarranted as to Count Seven.

Count Seven charges Defendant Pahlawan with witness tampering through intimidation or threat in violation of 18 U.S.C. § 1512(b)(3), as follows:

> From on or about January 11, 2024, and continuing through on or about January 13, 2024, . . . the defendant MUHAMMAD PAHLAWAN . . . knowingly used intimidation, threatened, and corruptly persuaded another person, or attempted to do so, and engaged in misleading conduct toward another person — namely, M.H, Z.A., U.F., M.A., and MU.A. — dhow crewmembers, with intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of a Federal offense.

(ECF No. 239 at 18.)  To secure a guilty verdict under § 1512(b)(3), the Government must demonstrate that Defendant Pahlawan intended to hinder, delay or prevent communication to a federal law enforcement officer regarding the commission or possible commission of a federal offense.  *United States v. Perry*, 335 F.3d 316, 323 (4th Cir. 2003).  Here, the parties contest whether the Second Superseding Indictment provides sufficient details as to the federal offense associated with the charged obstruction.  (ECF No. 112 at 4; ECF No. 164 at 3–5.)  The Court finds that it does.

On January 11, 2024, the Boarding Team conducted an authorized flag verification of the *Yunus*. (ECF No. 239 ¶ 1.) The Second Superseding Indictment specifies that during the interdiction, Defendant Pahlawan threatened his crew members not to identify him as the captain of the dhow, to falsely identify him as a mechanic and to lie about the cargo on the dhow. (*Id.* ¶¶ 1, 42–43.) Subsequently, several crew members allegedly lied to the Boarding Team and the FBI about the dhow's cargo, the identity of the captain and the dhow's origin. (*Id.* ¶ 44.)[19] According to the Second Superseding Indictment, the Boarding Team thereafter discovered Iranian-made advanced conventional weaponry and determined that Defendant Pahlawan served as the captain of the *Yunus* during smuggling voyages between October 2023 and January 2024. (*Id.* ¶¶ 1–2, 46–47.) The Second Superseding Indictment thus presents with sufficient clarity that Defendant Pahlawan engaged in conduct intended to hinder, delay or prevent the communication of information related to the alleged smuggling operation on behalf of Iran's and IRGC's weapons of mass destruction programs. Indeed, Defendant Pahlawan stands charged with various federal offenses related to this proscribed conduct. Because Defendant Pahlawan will not be subject to "unfair surprise" regarding the federal offense associated with his obstruction charge, *Sampson*, 448 F. Supp. 2d at 696, the Court will DENY Defendant Pahlawan's Motion for a Bill of Particulars (ECF No. 112) as to Count Seven.

### 2.    A bill of particulars proves unwarranted as to Count Nine.

Count Nine charges Defendant Pahlawan with providing materially false information to a federal law enforcement officer during a boarding of a vessel in violation of 18 U.S.C. § 2237(a)(2)(B), as follows:

> From on or about January 11,2024, and continuing through on or about January 13, 2024, . . . the defendant MUHAMMAD PAHLAWAN . . . knowingly provided

---

[19]    In addition, various material witnesses have testified in depositions regarding Defendant Pahlawan's alleged threats.

materially false information to a Federal law enforcement officer during a boarding of a vessel regarding the vessel's destination, origin, ownership, registration, nationality, cargo, or crew — to wit, MUHAMMAD PAHLAWAN knowingly provided materially false statements regarding the identity of the vessel's captain — while on board a vessel subject to the jurisdiction of the United States.

(ECF No. 239 at 20.)  As relevant here, the statute requires proof that Defendant Pahlawan was on board a "vessel of the United States" or "vessel subject to the jurisdiction of the United States," 18 U.S.C. § 2237(a)(2), as defined in 46 U.S.C. § 70502.  Defendant Pahlawan contends that the Government must clarify the precise theory under 46 U.S.C. § 70502(d)(1) that deems the *Yunus* a "vessel without a nationality."  (ECF No. 206 at 5–6.)  The Court disagrees and finds that the Government has provided sufficient information as to its asserted basis for the exercise of United States jurisdiction.

To begin, the Court reiterates that a bill of particulars "is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial."  *United States v. Davis*, 53 F.4th 833, 845 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 72 (2023).  Defendant Pahlawan acknowledges that the Superseding Indictment contains factual allegations that the *Yunus* bore "no flag indicating nationality."  (ECF No. 112 at 5 (quoting ECF No. 79 ¶ 1); *see also* ECF No. 239 ¶ 39 (alleging that Defendant Pahlawan "operated the dhow without a flag indicating the dhow's country of origin").)  Moreover, the Government represents that it has produced "unclassified and classified discovery related to the vessel's statelessness and other categorizations (i.e., FBI 302s documenting interviews with Boarding Team members, photographs and videos of the vessel, documents detailing the specifications of the dhow, and more)."  (ECF No. 164 at 5.)  These productions, coupled with the factual allegations in the Second Superseding Indictment, provide ample notice of the Government's asserted basis for exercising jurisdiction over the *Yunus*.  Indeed, Defendant

41

Pahlawan's vehement contestation of whether the *Yunus* constitutes a vessel "subject to the jurisdiction of the United States" demonstrates that he possesses sufficient information to prepare a defense to any such charges.  (*See* ECF No. 89 (challenging United States jurisdiction over the *Yunus*); ECF No. 94 (same).)

Moreover, Defendant Pahlawan's cited authority, *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130 (D.D.C. 2015), does not suggest otherwise.  There, although the defendants faced charges under the MDLEA, the indictment made "no mention of the *Mistby* or the basis for United States jurisdiction over the vessel." *Id.* at 147.  Notwithstanding this shortcoming, the court denied the motion for a bill of particulars, because, as here, information relayed in discovery and the Government's filings "provide[d] ample notice of the [G]overnment's asserted basis for exercising jurisdiction over the vessel pursuant to the MDLEA." *Id.* at 145, 151.  In reaching this decision, the court did not impose a standard that would require the Government to set forth "the precise theory" for United States jurisdiction.  (ECF No. 112 at 5); s*ee also United States v. Cuong Gia Le*, 310 F. Supp. 2d 763, 781 (E.D. Va. 2004) (stating that "a court must not direct the government to reveal . . . the precise manner in which it will make its proof in a bill of particulars").  For these reasons, the Court will DENY Defendant Pahlawan's Motion for a Bill of Particulars (ECF No. 112) as to Count Eight.

### E.  Defendant Mazhar's Motion to Sever (ECF No. 118)

Defendant Mazhar seeks to sever his trial from that of Defendant Pahlawan.  Although Defendant Mazhar does not contest that joinder qualified as proper under Federal Rule of Criminal Procedure 8(b), he submits that a joint trial would be unduly prejudicial, because it would expose the jury to irrelevant and inflammatory evidence that would undermine the reliability of a jury verdict.  (ECF No. 118 at 1.)  Specifically, Defendant Mazhar asserts that evidence of events in the Middle East and evidence of Defendant Pahlawan's conspiracy to

deliver weapons of mass destruction would not be admissible at his own trial.[20]  (*Id.* at 5–6.)
The Government contends that the at-issue evidence qualifies as necessary to provide context
and preserve the narrative integrity of its case-in-chief.  (ECF No. 162 at 2.)  Defendant Mazhar
elected not to file a reply, and the time to do so has elapsed, rendering this Motion ripe for
resolution.  Because Defendant Mazhar has not met his burden of demonstrating a strong
showing of prejudice, the Court will DENY his Motion to Sever (ECF No. 118).

Federal Rule of Criminal Procedure 8(b) provides that the Government may charge
defendants together "if they are alleged to have participated in the same act or transaction, or in
the same series of acts or transactions, constituting an offense or offenses," Fed. R. Crim. P. 8(b),
while Rule 14 permits the district court to grant a severance if a consolidated trial "appears to
prejudice a defendant or the government."  Fed. R. Crim. P. 14.  A defendant seeking severance
"has the burden of demonstrating a strong showing of prejudice." *United States v. Goldman*, 750
F.2d 1221, 1225 (4th Cir. 1984).  In addition, the determination of whether joinder qualifies as so
prejudicial to warrant severance constitutes a matter committed to the sound discretion of the
district court. *United States v. Mir*, 525 F.3d 351, 357 (4th Cir. 2008).

The Supreme Court has indicated that "[t]here is a preference in the federal system for
joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537
(1993).  Indeed, where, as here, defendants have been properly joined under Rule 8(b), "a district
court should grant a severance only if there is a serious risk that a joint trial would compromise a
specific trial right of one of the defendants, or prevent the jury from making a reliable judgment
about guilt or innocence." *United States v. Oloyede*, 933 F.3d 302, 312 (4th Cir. 2019).  "Such a

---

[20]     Defendant Mazhar also argued that evidence of the deaths of two Navy SEALs qualifies
as irrelevant to his case and would be unfairly prejudicial.  However, this argument now qualifies
as moot.  (ECF No. 254 at 2; ECF No. 257 at 2.)

risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Zafiro*, 506 U.S. at 539.

Although "[i]rrelevant evidence is not admissible," Fed. R. Evid. 402, the Federal Rules of Evidence set a low bar for relevance.  Under Rule 401, evidence qualifies as relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence[] and . . . the fact is of consequence in determining the action."  However, even relevant evidence may be excluded under Rule 403 "if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.

The Court finds that evidence of weapons on board the dhow qualifies as relevant to the false statement charge against Defendant Mazhar.  The grand jury charged Defendant Mazhar with one count of providing materially false information to a federal law enforcement officer during a boarding of a vessel in violation of 18 U.S.C. § 2237(a)(2)(B).  According to the Second Superseding Indictment, Defendant Mazhar lied about the "identity of the vessel's captain." (ECF No. 239 at 21.)  The Government alleges that Defendant Pahlawan steered the *Yunus* from Konarak to Chabahar, where the mariners were met at the port by Shahab Mir'Kazei and members of the Iranian military.  (*Id.* ¶¶ 34–35; ECF No. 162 at 2–3.)  There, Defendant Mazhar, in accordance with Defendant Pahlawan's instruction, actively participated in loading cargo consisting of missile components into the net hold of the *Yunus*.  (ECF No. 239 ¶ 35.) Given Defendant Mazhar's participation in more than one voyage, a jury may find that Defendant Mazhar was aware of the contents of the cargo.  (*Id.* ¶ 2 (stating that the "January 2024 trip was part of a larger operation"); *id.* ¶¶ 26–30 (outlining events of a similar voyage from November to December 2023).)  Thus, evidence that Defendant Pahlawan was smuggling

weapons on board the dhow qualifies as relevant to Defendant Mazhar's false statement charge, because it provides an explanation for why Defendant Mazhar may have lied to avoid implicating his brother, Defendant Pahlawan, as the captain of the dhow.

Furthermore, evidence of events in the Middle East — events that Defendant Mazhar claims to lack any awareness of — may demonstrate consciousness of guilt. The Government represents that the FBI "questioned mariners on board the Navy ship about their knowledge of the open and apparent international conflicts related to the War in Gaza and the Houthi conflicts in the Red Sea. None of the mariners clamed to know anything about these open and notorious world events." (ECF No. 162 at 13.) Such allegations suggest that Defendant Mazhar offered a statement that tends to show his innocence but that a jury may find false. As the Fourth Circuit has routinely held, "the making of false exculpatory statements . . . is probative of a Defendant's knowledge of his wrongdoing." *United States v. Elsheikh*, 578 F. Supp. 3d 752, 780 (E.D. Va. 2022), *aff'd*, 103 F.4th 1006 (4th Cir. 2024). Accordingly, evidence of events in the Middle East qualifies as relevant to Defendant Mazhar's false statement charge.

Moreover, Rule 403 does not require exclusion of such evidence. Defendant Mazhar argues that evidence regarding weapons of mass destruction and "the international terrorism links" must be excluded under Rule 403, because such evidence would evoke strong emotions from jurors. (ECF No. 118 at 5–6.) However, when performing a Rule 403 analysis, the court must account for "the offering party's need for evidentiary richness and narrative integrity in presenting a case." *Old Chief v. United States*, 519 U.S. 172, 183 (1997). Evidence that the *Yunus* was carrying weapons of mass destruction just months after the Houthis launched a campaign in response to the War in Gaza not only relates to the elements of the offense, but it also constitutes part of an "eventful narrative — a relevant part of the very transactions leading

45

to the defendant's arrest and indictment in this case." *United States v. Miller*, 61 F.4th 426, 429–30 (4th Cir. 2023) (cleaned up).  As the Fourth Circuit explained, "allowing the admission of contemporaneous evidence relevant both to the context and to the crime is not the type of prejudice that Federal Rule of Evidence 403 addresses." *United States v. Dunford*, 148 F.3d 385, 396 (4th Cir. 1998).  Because the challenged evidence relates to elements of the offense and the context in which the crime occurred, and the probative value is not substantially outweighed by the danger of unfair prejudice, the evidence will not be excluded under Rule 403.

However, even assuming that evidence related to weapons of mass destruction and events in the Middle East qualifies as irrelevant to Defendant Mazhar's case, "that evidence was offered of no relevance to [a defendant's] individual charges is not dispositive" as to severance.  *United States v. Vennie*, 790 F. App'x 506, 509 (4th Cir. 2019).  According to well-settled precedent, "a defendant is not entitled to severance merely because he might have had a better chance of acquittal in a separate trial." *United States v. Lighty*, 616 F.3d 321, 348 (4th Cir. 2010); *see also United States v. Campbell*, 963 F.3d 309, 318 (4th Cir. 2020) (observing that a defendant does not stand entitled to a severance merely because evidence against one defendant qualifies as "stronger or more inflammatory than the evidence against others").  A district court may employ less drastic measures than severance, such as limiting instructions, to cure any risk of prejudice. *Zafiro*, 506 U.S. at 539; *see also United States v. Blair*, 661 F.3d 755, 770 (4th Cir. 2011) (recognizing that limiting instructions substantially "mitigated any possible spillover of prejudicial evidence" (cleaned up)).

Here, any concerns of prejudicial spillover can be mitigated by explicit instructions that the jury must consider each Defendant and each count separately, while also emphasizing that it would be improper to permit the jury's emotions about the nature of the crimes to interfere with

the decision-making process.  *Campbell*, 963 F.3d at 319.  Indeed, limiting instructions have been used to cure potential prejudice in egregious cases, despite arguments that emotionally charged evidence renders a jury unable to compartmentalize such evidence.  *See Cuong Gia Le*, 316 F. Supp. at 784 (concluding that severance was not required even where one defendant was charged with capital murder); *United States v. Hall*, 93 F.3d 126, 131 (4th Cir. 1996), *abrogated on other grounds by Richardson v. United States*, 526 U.S. 813 (1999) (same).

In sum, because the challenged evidence qualifies as admissible against Defendant Mazhar, he cannot demonstrate prejudice from its introduction at a consolidated trial with Defendant Pahlawan.  Furthermore, any possible spillover of prejudice can be sufficiently cured by the Court's use of limiting instructions.  Because Defendant Mazhar has not met his burden of demonstrating a strong showing of prejudice, the Court will DENY his Motion to Sever (ECF No. 118).

### F.  Defendant Mazhar's Motion *in Limine* (ECF No. 96)

Defendant Mazhar seeks to exclude the Government's anticipated evidence related to weapons of mass destruction and recent events in the Middle East.  (ECF No. 96.)  The motion *in limine* presents the same arguments raised in Defendant Mazhar's Motion to Sever, and the Court incorporates its analysis from Section III.E here.  Accordingly, the Court will DENY Defendant Mazhar's Motion *in Limine* (ECF No. 96).

## IV.    CONCLUSION

The preceding analysis leads the Court to draw the following conclusions.

First, Defendant Pahlawan stands subject to the jurisdiction of the United States, because stateless vessels, such as the *Yunus*, fall within the jurisdictional provision of 18 U.S.C. § 832(a). In addition, the Court finds that the Second Superseding Indictment sufficiently alleges participation in or the provision of material support to a weapons of mass destruction program.

Second, the Court rejects Defendants' arguments that all counts must be dismissed for violating the presumption against extraterritoriality and their constitutional right to due process.

Third, 18 U.S.C. § 832(a) proves ambiguous as to its unit of prosecution, and such ambiguity must be resolved in favor of Defendant Pahlawan. Consequently, as it stands, Counts Three and Four qualify as multiplicitous. If a jury finds Defendant Pahlawan guilty of Counts Three and Four, the Court will merge these duplicative counts into a single conviction.

Fourth, Defendant Pahlawan's demand for a bill of particulars proves meritless, because the Second Superseding Indictment, discovery productions and information relayed in the Government's filings provide sufficient information on the nature of the charges against Defendant Pahlawan.

Lastly, Defendants will proceed with a consolidated trial, as Defendant Mazhar has not made the necessary showing of prejudice to warrant severance.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date: January 3, 2025