IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

      v.                                     Criminal No. 3:24cr41 (DJN)

MUHAMMAD PAHLAWAN, *et al.*,
      Defendants.

**MEMORANDUM OPINION**

This matter comes before the Court on two motions filed by Defendant Muhammad Pahlawan ("Pahlawan" or "Defendant"). First, Pahlawan filed a Motion to Dismiss Counts Seven and Eight ("Motion to Dismiss") (ECF No. 264), which argues that the Government violated his Sixth Amendment rights by amending Count Seven and adding Count Eight after completion of the material witness depositions. Pahlawan further contends that Federal Rule of Evidence 804(b)(1) prohibits the Government from introducing the material witness depositions at trial and that the Government violated Federal Rule of Criminal Procedure 15 by impermissibly using the material witness depositions as a discovery tool. Second, Pahlawan filed a Motion to Strike Material Witness Testimony or Alternatively Dismiss Counts Seven, Eight and Nine ("Motion to Strike") (ECF No. 267), which argues that the Government's late production of approximately 286 hours of recordings warrants striking the material witness testimony or dismissing Counts Seven, Eight and Nine.[1] The motions have been fully briefed, (ECF Nos. 264, 267, 273, 277, 283, 285), and the Court heard oral argument on the motions during a hearing on February 10, 2025. For the reasons set forth below, the Court will GRANT

---

[1] Defendant Mohammad Mazhar ("Mazhar") orally joined the Motion to Strike during the February 10, 2025 hearing.

IN PART and DENY IN PART Defendant's Motion to Dismiss (ECF No. 264) and will DENY

Defendant's Motion to Strike (ECF No. 267).

## I.    BACKGROUND

According to the Second Superseding Indictment, on January 11, 2024, United States

Central Command Navy forces (the "Boarding Team") boarded a maritime vessel (the "*Yunus*")

in international waters off the coast of Somalia.  (ECF No. 239 ¶ 1.)  The Government alleges

that Pahlawan served as the captain of the dhow and that the thirteen other mariners aboard the

*Yunus* formed his crew.  (*Id.*)  During the boarding, which lasted from January 11, 2024 through

January 13, 2024, the Boarding Team searched the dhow, seized Iranian advanced conventional

weaponry and interviewed the crew members.  (*Id*. at ¶¶ 1, 35, 40–47.)  Defendant allegedly

instructed his crew members not to identify him as the captain of the *Yunus*, and to instead

falsely identify him as the mechanic and state to the Boarding Team that the real captain, or

"naqwa," had departed the *Yunus* days earlier.  (*Id.* ¶¶ 1, 42.)  Defendant allegedly further

instructed his crew members to lie about the cargo on the dhow.  (*Id.* ¶ 43.)

By January 13, 2024, the Boarding Team transferred the mariners from the *Yunus* to the

*U.S.S. Lewis B. Puller* (the "*Puller*"), where the crew remained until approximately February 14,

2024.  (*Id*. ¶ 48.)  The Government alleges that, while aboard the *Puller*, Pahlawan threatened to

falsely inculpate multiple crew members and cause harm to them and their families if they told

the Boarding Team or federal law enforcement about Pahlawan's role as the captain, the cargo

and other information related to the voyage.  (*Id*. ¶ 49.)

From February 14, 2024 through February 21, 2024, Pahlawan and the other mariners

were detained at a naval support base in Manama, Bahrain.  (ECF No. 273 at 3–4.)  The United

States Navy housed the crew members in two — sometimes three — rooms.  (*Id.* at 4.)  The first

room housed the four defendants initially charged in this case, including Pahlawan.  (*Id.*)  The

second room contained the original material witnesses.  (*Id.*)  The third room remained available for medical isolation purposes and served as a temporary holding space while the mariners were interviewed or processed.  (*Id.*)  The FBI installed audio recording devices in each of the rooms and recorded the mariners' activities.[2]  Significant portions of the audio recordings are inaudible due to poor quality, crosstalk in different languages and background noise from a nearby air vent.  (ECF No. 273 at 4; ECF No. 283 at 6; ECF No. 267-1 at 1.)[3]

On February 11, 2024, the Government sought arrest warrants for Pahlawan and three other mariners and sought material witness arrest warrants for the remaining ten crew members. On February 22, 2024, the four original defendants made their initial appearances before United States Magistrate Judge Summer L. Speight.  From February 22, 2024 through February 26, 2024, the material witnesses made their initial appearances before United States Magistrate Judge Mark R. Colombell.  This Court subsequently ordered depositions of the material witnesses to take place before Judge Colombell in September 2024, pursuant to Federal Rule of Criminal Procedure 15.[4]  (ECF No. 38.)  The Court ordered the Government to provide all discovery necessary for the Rule 15 depositions no later than August 9, 2024.  (*Id.*)  The Court further ordered that the Government produce any *Jencks* and *Giglio* material pertaining to the material witnesses no later than September 9, 2024.  (ECF No. 87.)

---

[2]    The FBI also installed security cameras in each of the rooms.  However, because these cameras lacked the capability to record footage, no video recordings exist.

[3]    The parties disagree as to how many hours of recordings exist.  Pahlawan contends that the recordings extend for 286 hours, (ECF No. 267 at 3), whereas the Government submits that the recordings last approximately 148 hours, (ECF No. 273 at 4).

[4]    The Court originally ordered the Rule 15 depositions to occur in May 2024.  (ECF No. 30.)  Upon consideration of the Government's unopposed motion to extend the discovery deadline, the Court continued the depositions until September 2024.  (ECF No. 38.)

On March 14, 2024, the grand jury returned an Indictment charging Pahlawan with various crimes related to the transportation of weapons of mass destruction and making false statements, but no crimes related to witness tampering.  (ECF No. 21.)  In the following weeks, the Government began producing discovery to the defendants and the material witnesses, including FBI 302 reports detailing FBI interviews of the mariners on the *Puller*.  (ECF No. 277 at 3.)

Beginning on June 6, 2024, the Government met with various material witnesses.  (*Id.* at 4.)  On July 3, 2024, Mehandi Hassan ("Hassan") became the first material witness to detail Pahlawan's instructions to the crew members about lying to federal law enforcement officers on the *Yunus* and his threats to do so on the *Puller*.  (*Id.* at 5.)  The Government met with Hassan again on July 15, 2024, and during their meeting, Hassan provided more specific details about Pahlawan's instructions to lie and his threats to inculpate the other mariners, while expressing fear for himself and his family.  (*Id.*)  In July and August 2024, the Government produced discovery regarding its meetings with Hassan, including FBI 302 reports and other related materials.  (*Id.*)

On July 15, 2024, in light of the Government's prior indication that it intended to file a superseding indictment, the Court ordered that "[a]ny Superseding Indictment must be filed no later than August 16, 2024 to ensure that the depositions of the material witnesses can move forward as scheduled."  (ECF No. 69 at 2.)

On August 7, 2024, the grand jury returned a Superseding Indictment (ECF No. 79), which charged Pahlawan with one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(3), as follows:

> On or about January 11, 2024, in offenses committed outside of the jurisdiction of any particular State or district of the United States, the defendant MUHAMMAD

PAHLAWAN, who, after committing this offense was first brought to the Eastern District of Virginia, knowingly used intimidation, threatened, and corruptly persuaded another person, or attempted to do so, and engaged in misleading conduct toward another person, namely, Witness One, a dhow crewmember, with intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States of information relating to the commission or possible commission of a Federal offense.

(*Id.* at 19.)

From August 14, 2024 through August 30, 2024, the Government met with nine material witnesses — Umar Farooq ("Farooq"), Mohammed Asif ("Asif"), Hassan, Muhammad Kashif ("Kashif"), Muhammad Bilal Zafar ("Zafar"), Zulfiqar Ali ("Zulfiqar"), Muhammad Rashid ("Rashid"), Musawir Ahmad ("Ahmad") and Muhammad Aslam Hyder ("Hyder").  (ECF No. 277 at 6–7.)  During those proffer sessions, every material witness, except Kashif, detailed Pahlawan's instructions to lie to law enforcement on the *Yunus* and his threats against the crew and their families on the *Puller*.  (*Id.* at 7.)

By September 3, 2024, the Government recognized that it would potentially have insufficient time to add additional counts to the Superseding Indictment based on the material witness proffers before the scheduled material witness depositions would take place.  (*Id.* at 8.)  In an email to defense counsel, the Government stated that:

> [T]he government has now learned of evidence that Pahlawan may be subject to seven additional counts of witness intimidation pursuant to Section 1512(b)(3) after completing last week's proffers.  These would include the following victims: Zulfiqar Ali, Umar Farooq, Musawir Ahmad, Muhammad Bilal Zafar, Mohammad Asif, Muhammad Rashid, and Muhammad Aslam Hyder.  *The government may not have time to supersede before the depositions, but we are providing notice now so that you are aware of that likely development as you plan your cross examinations for the depositions*.

(*Id.* (emphasis in original).)  The Government also attached the FBI 302 reports of the proffer sessions to its email and provided them to defense counsel.  (*Id.* at 9.)  That same day, defense counsel acknowledged the Government's update and suggested that the Government "consider

admitting evidence of such conduct in support of its existing 1512 count rather than adding additional counts, particularly since the unit of prosecution for 18 U.S.C. 1512 appears to turn on the defendant's obstructive conduct and intent rather than the number of people affected." (*Id.*)

From September 3, 2024 through September 11, 2024, the Government presented seven witnesses to the grand jury, all of whom testified about Pahlawan's alleged efforts at witness tampering. (*Id.*) The Government ordered the grand jury transcripts on an expedited basis and produced them to Pahlawan before the depositions began. (*Id.* at 7–8.)

On September 23, 2024, the day that the material witness depositions were scheduled to begin, the Government discovered that it had not produced the audio recordings from the detention facility in Bahrain. (ECF No. 273 at 5.) Although the Government had produced an FBI serial that detailed the audio recordings on May 17, 2024, the Government did not produce the actual recordings themselves until September 27, 2024. (*Id.*) The day before, on September 26, 2024, the Government produced summary translations of some of the audio recordings. (*Id.*) Those summary translations included a translator's note, stating that "[g]eneral activities that the individuals engage in throughout the various recordings appear to be: playing cards; praying; using the rest room; chitchat; singing, laughing; exchanges with the individuals who enter the room about various medical needs; trimmer machine; etc." (ECF No. 273-1.) The Government's summary translations did not include any references to threats by Pahlawan. (*Id.*)

Judge Colombell continued the start of the depositions to September 25, 2024. The material witness depositions took place as follows: September 25 (Farooq), September 27 (Ahmad), October 2 (Rashid), October 4 (Zulfiqar), October 7 (Hyder), October 8 (Hassan), October 16 (Zafar), October 18 (Asif), December 2 (Izhar Muhammad) and December 3

(Ghufran Ullah).  Judge Colombell presided over each material witness deposition, and each deposition was transcribed and video recorded.

On October 23, 2024, Pahlawan filed a motion to either compel the Government to provide translations of the audio recordings or provide additional time for Pahlawan to obtain translations of the recordings to determine whether additional depositions were necessary.  (ECF No. 188.)

On October 25, 2024, the Court held a hearing to address Pahlawan's motion and its implications for the material witnesses.  (ECF No. 265 ("Hr'g Tr.").)  During that hearing, the Court found that the Government had not acted in bad faith in failing to timely produce the audio recordings.  (*Id.* at 7:15–21; 10:23–24; 29:10–11.)  The Court also emphasized the importance of releasing the material witnesses no later than November 15, 2024, to ensure that "innocent people who have been in custody since January in a foreign land" were not detained longer than necessary.  (*Id.* at 7:3–8.)  During the hearing, defense counsel acknowledged that it was "simply not possible" to obtain translations in time to re-depose any of the material witnesses and withdrew Pahlawan's objection to Farooq's release, seeking to pursue other remedies instead.[5] (*Id.* at 9:12–25; ECF No. 193.)  However, Pahlawan preserved all of his objections resulting from the late production of discovery.  (ECF No. 193.)  The Court then provided eight weeks for Pahlawan to prepare translations of the room recordings and file any additional motions by December 18, 2024.  (*Id.*; *see also* Hr'g Tr. 12:8–9 (requesting "at least six to eight weeks for translations"); *id.* 18:19–25, 24:21–25:6 (rejecting the Court's offer to continue the case until May to provide additional time for translations and briefings).)  The Court also set a hearing on

---

[5]    After the October 25, 2024 hearing, the Court ordered the immediate release of Farooq and Ahmad and directed Judge Colombell to effectuate the release of the other detained material witnesses upon certification of their transcripts.  (ECF No. 193.)

January 21, 2025, which was subsequently continued to February 10, 2025, to address any issues related to the material witnesses and the Government's late production of discovery. (ECF No. 193; ECF No. 279 at 1.)

On December 4, 2024, the grand jury returned a Second Superseding Indictment. (ECF No. 239.) In relevant part, Count Seven of the Second Superseding Indictment charges Pahlawan with witness tampering against five victims on the *Yunus* from on or about January 11, 2024 through on or about January 13, 2024. (*Id.* at 18.) The Second Superseding Indictment also included a new Count Eight, charging Pahlawan with threats against five victims on the *Puller* from on or about January 13, 2024 through on or about February 14, 2024. (*Id.* at 19.) Counts Seven and Eight allege the following:

### COUNT SEVEN

From on or about January 11, 2024, and continuing through on or about January 13, 2024, on a dhow, in offenses committed outside of the jurisdiction of any particular State or district of the United States, the defendant MUHAMMAD PAHLAWAN, who, after committing this offense was first brought to the Eastern District of Virginia, knowingly used intimidation, threatened, and corruptly persuaded another person, or attempted to do so, and engaged in misleading conduct toward another person — namely, M.H, Z.A., U.F., M.A., and MU.A. — dhow crewmembers, with intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of a Federal offense.

### COUNT EIGHT

From on or about January 13, 2024, and continuing through on or about February 14, 2024, on a United States Navy vessel, in offenses committed outside of the jurisdiction of any particular State or district of the United States, the defendant MUHAMMAD PAHLAWAN, who, after committing this offense was first brought to the Eastern District of Virginia, knowingly used intimidation, threatened, and corruptly persuaded another person, or attempted to do so, and engaged in misleading conduct toward another person — namely, M.H, Z.A., U.F., M.A., and MU.A. — dhow crewmembers, with intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of a Federal offense.

(*Id*. at 18–19.)

On December 10, 2024, Pahlawan filed a motion to halt the removal proceedings against the alleged victims identified in Counts Seven and Eight of the Second Superseding Indictment. (ECF No. 255.)  In support, Pahlawan argued that the Government "significantly altered the witness tampering allegations against" Pahlawan, in violation of his constitutional rights.  (*Id.* at 1.)  On December 11, 2024, the Court denied Pahlawan's motion, "[b]ecause the continued detention of material witnesses does not constitute the proper remedy."  (ECF No. 256.)  Instead, the Court directed Pahlawan to address any issues that arose due to the December 4, 2024 filing of the Second Superseding Indictment in Pahlawan's forthcoming motions related to the material witnesses.  (*Id.*)

## II.    LEGAL OVERVIEW

The Court begins by reviewing the interplay between Federal Rule of Criminal Procedure 15, the Sixth Amendment and Federal Rule of Evidence 804(b)(1).  Rule 15 permits a material witness to "be deposed in order to preserve testimony for trial . . . because of exceptional circumstances and in the interest of justice."  Fed. R. Crim. P. 15(a)(1).  Because federal courts often lack the authority to compel a foreign national's attendance at trial, Rule 15 "may offer the only practicable means of procuring critical evidence" in criminal trials involving foreign witnesses.  *United States v. McKeeve*, 131 F.3d 1, 8 (1st Cir. 1997).

By contrast, the Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend VI.  This clause "bars the admission of 'testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'"  *United States v. Dargan*, 738 F.3d 643, 650

(4th Cir. 2013) (quoting *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004)).  The Confrontation Clause generally requires a "full and fair opportunity to probe and expose" infirmities of a witness's statements through "meaningful" and "effective" cross-examination. *United States v. Owens*, 484 U.S. 554, 558, 562 (1988).

As the Fourth Circuit explained, "the carefully-crafted provisions of Rule 15 . . . were designed to protect defendants' rights to [a] physical face-to-face confrontation."  *United States v. Smith*, 117 F.4th 584, 601 (4th Cir. 2024) (quoting *United States v. Yates*, 438 F.3d 1307, 1315 (11th Cir. 2006)).  Nonetheless, a tension exists between the Government's need to preserve evidence and a defendant's Sixth Amendment confrontation rights.  *See, e.g.*, *United States v. Drogoul*, 1 F.3d 1546, 1552 (11th Cir. 1993) (recognizing "the law's normal antipathy toward depositions in criminal cases" due to "the factfinder's usual inability to observe the demeanor of deposition witnesses, and the threat that poses to the defendant's Sixth Amendment confrontation rights"); *see also United States v. Abu Ali*, 528 F.3d 210, 243 (4th Cir. 2008) (finding no Sixth Amendment violation where Saudi Mabahith officials were deposed in Saudi Arabia without the defendant being physically present).

Federal Rule of Evidence 804(b)(1) constitutes a procedural safeguard designed to preserve a defendant's Confrontation Clause right.  *See United States v. Yida*, 498 F.3d 945, 950 (9th Cir. 2007) ("Rule 804(b)(1) implements the command of the Sixth Amendment's Confrontation Clause.").  Rule 804(b)(1) creates an exception to the rule against hearsay for former testimony by an unavailable witness.  Fed. R. Evid. 804(b)(1).  However, this exception contains strict limits and requires the testimony in question to satisfy three requirements.  First, "the declarant [must be] unavailable as a witness."  Fed. R. Evid. 804(b).  Second, the statements must have been "given as a witness at a trial, hearing, or lawful deposition."  Fed. R. Evid.

804(b)(1)(A).  Third, the statements must be "now offered against a party who had . . . an

opportunity and similar motive to develop [the statements] by direct, cross-, or redirect

examination."  Fed. R. Evid. 801(b)(1)(B).  This third requirement proves integral to protecting a

defendant's confrontation right.

In *United States v. Huskey*, 90 F.4th 651 (4th Cir. 2024), the Fourth Circuit adopted the

Second Circuit's standard, as set forth in *United States v. DiNapoli*, 8 F.3d 909 (2d Cir. 1993)

(en banc), for determining whether a party had a similar motive for purposes of Rule 804(b)(1).

*Huskey*, 90 F.4th at 669.  As the Second Circuit explained:

> The test must turn not only on whether the questioner is on the same side of the
> same issue at both proceedings, but also on whether the questioner had a
> substantially similar interest in asserting that side of the issue.  If a fact is critical to
> a cause of action at a second proceeding but the same fact was only peripherally
> related to a different cause of action at a first proceeding, no one would claim that
> the questioner had a similar motive at both proceedings to show that the fact had
> been established (or disproved).

*DiNapoli*, 8 F.3d at 912.  The ultimate question in this fact-specific inquiry asks "whether the

party resisting the offered testimony at a pending proceeding had at a prior proceeding an

*interest of substantially similar intensity* to prove (or disprove) the same side of a substantially

similar issue."  *Id.* at 914–15 (emphasis added).

The Sixth Amendment also provides, in relevant part, that "[i]n all criminal prosecutions,

the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation."

U.S. Const. amend VI.  In this regard, the Sixth Amendment and Due Process Clause "provide

essentially the same protection to defendants."  *Hartman v. Lee*, 283 F.3d 190, 194 (4th Cir.

2002) ("Elementary principles of due process require that an accused be informed of the specific

charge against him.").  "Reasonable notice 'sufficiently apprises the defendant of what he must

be prepared to meet.'"  *Stroud v. Polk*, 466 F.3d 291, 296 (4th Cir. 2006) (quoting *Russell v.*

*United States,* 369 U.S. 749, 763 (1962)). "It has long been 'fundamental in the law of criminal procedure . . . that the accused must be apprised . . . with reasonable certainty . . . of the nature of the accusation against him, to the end that he may prepare his defence.'" *Id.* (citing *United States v. Simmons*, 96 U.S. 360, 362 (1878)).

### III.    ANALYSIS

#### A.    Motion to Dismiss

As the procedural history demonstrates, while the material witness depositions were ongoing, Pahlawan faced only one count of threatening one crew member on the *Yunus* but was not facing any charges for witness tampering with regard to purported threats made on the *Puller*. After the material witness depositions had concluded, the Government filed the Second Superseding Indictment, amending Count Seven to include threats against four additional individuals while on the *Yunus* between January 11, 2024 and January 13, 2024. In addition, the Second Superseding Indictment added an entirely new charge — Count Eight — which alleges that Pahlawan threatened the same five individuals on the *Puller* between January 13, 2024 and February 14, 2024.

Pahlawan now moves to both dismiss Counts Seven and Eight of the Second Superseding Indictment and bar the admission of the material witness depositions at trial. (ECF No. 264.) First, he argues that the testimony for all nine material witnesses must be excluded, because it fails to satisfy Federal Rule of Evidence 804(b)(1). (*Id.* at 6–9.) Second, Pahlawan contends that Counts Seven and Eight should be dismissed, because he lacked sufficient notice of the charges and an opportunity to confront adverse witnesses, in violation of his Sixth Amendment rights. (*Id.* at 9–11.) Finally, Pahlawan submits that the Government violated Federal Rule of Criminal Procedure 15 by seeking additional charges after the material witness depositions, warranting dismissal of these counts.

As to Count Eight, for the reasons set forth below, the Court finds that Pahlawan's constitutional rights would be violated if he faced trial on Count Eight without an opportunity to confront the witnesses against him. As to Count Seven, however, the Court finds no constitutional violation justifying dismissal. Pahlawan possessed actual notice of the nature and scope of the charge before conducting his material witness depositions, and therefore, he had both an opportunity and similar motive to develop the material witnesses' testimony as to his alleged witness tampering on the *Yunus*. In addition, the Court finds no violation of Rule 15.

### 1.    Count Eight

Pahlawan contends that the Government violated his constitutional rights by adding Count Eight after the material witness depositions concluded. In Pahlawan's view, because he was not advised of the full scope of the witness tampering charges before the material witness depositions occurred, the Government deprived him of his Sixth Amendment rights to receive notice of the charges against him and to confront adverse witnesses.

In response, the Government argues that Pahlawan "*did* have notice of the charges against him regarding witness tampering — both because the indictment as it stood at the time of the depositions was sufficient to warrant admitting testimony about *all* of his witness tampering under theories of consciousness of guilt and Rule 404(b), and because the government repeatedly provided explicit and clear notice of the impending charges prior to the depositions in the form of discovery, communications, public filings, and direct examination." (ECF No. 277 at 23 (emphasis in original).) According to the Government, "the clearest evidence that [Pahlawan] had sufficient notice of the charges against him to confront his witnesses regarding witness tampering is the fact that he, in fact, confronted them." (*Id.* at 23–24.)

The Court finds that Pahlawan had insufficient notice, for purposes of the Sixth Amendment, to prepare his defense as to Count Eight. The record establishes that this new

charge, which alleges that Pahlawan threatened five crew members while they were aboard the *Puller* from January 13, 2024 through February 14, 2024, was added after the material witness depositions were completed.  Count Eight substantially expanded the scope of the witness tampering charge in existence at the time of the material witness depositions to encompass conduct that occurred at an entirely different time and place.  Meanwhile, nothing in the Superseding Indictment indicated that Pahlawan would have to defend against additional witness tampering charges based on purported conversations that occurred up to a month later, and on the *Puller*.  (*See* ECF No. 79 at 19 (charging Pahlawan with witness tampering "[o]n or about January 11, 2024"); *id.* ¶ 1 (alleging that Pahlawan threatened crew members to lie to the Boarding Team "[d]uring the interdiction").)  Accordingly, the formal charging instrument in effect at the time of the material witness depositions failed to provide Pahlawan with sufficient notice to prepare a defense as to Count Eight.

The Court notes that it set an August 16, 2024 deadline for filing a superseding indictment to avoid this very issue.  (ECF No. 69 at 2.)  In doing so, the Court devised a deadline that would both protect the Confrontation Clause rights of the defendants and ensure that the material witnesses were not detained for any longer than necessary.  (*See* Hr'g Tr. 7:3–8 (emphasizing the importance of releasing the material witnesses no later than November 15, 2024, because "innocent people . . . have been in custody since January in a foreign land").)  Although there exists no evidence of bad faith, the Government failed to meet the Court's August 16, 2024 deadline.  This alone warrants dismissal of Count Eight.

Nonetheless, the Government contends that it provided Pahlawan with the constitutionally required notice by providing actual notice of additional charges.  Specifically, the Government relies on communications with defense counsel to argue that Pahlawan had

actual notice of the charged conduct in Count Eight.  As referenced above, on September 3, 2024, the Government informed defense counsel, in relevant part, that:

> [T]he government has now learned of evidence that Pahlawan may be subject to seven additional counts of witness intimidation pursuant to Section 1512(b)(3) after completing last week's proffers.  These would include the following victims: Zulfiqar Ali, Umar Farooq, Musawir Ahmad, Muhammad Bilal Zafar, Mohammad Asif, Muhammad Rashid, and Muhammad Aslam Hyder.  *The government may not have time to supersede before the depositions, but we are providing notice now so that you are aware of that likely development as you plan your cross examinations for the depositions.*

(ECF No. 277 at 8 (emphasis in original).)  Defense counsel acknowledged the Government's update that same day.  (*Id.* at 9.)

The Government's argument that its September 3, 2024 email provided Pahlawan with actual notice sufficient to satisfy the Sixth Amendment falls flat on several grounds.  Critically, while the Government's email identifies additional victims, it makes no reference whatsoever to the Government's new theory that, in addition to instructing crew members to lie on the *Yunus*, Pahlawan threatened crew members to do so on the *Puller*.  The Government's claim that defense counsel possessed actual notice of the Government's intent to charge Pahlawan with witness tampering on the *Puller* is also belied by Pahlawan's repeated objections, during the material witness depositions, to lines of questioning involving conduct aboard the *Puller*:

> [Counsel for Defendant]:  Judge, I'm just going to object to the line of questions about the threats on the Puller.  Mr. Pahlawan is charged with threatening one witness on the launch, but not on the Puller.  So I'm objecting to relevance.
>
> The Court:  To relevance.  The Court will note the objection as to relevance and will permit the line of questioning.
>
> [Counsel for the Government]:  Just for the record, Your Honor, it goes to consciousness of guilt.

(Zulfiqar Dep. at 26:4–11; *see also* Hyder Dep. at 86:1–6 (objecting pursuant to Rules 402, 403 and 404, because "Pahlawan is not charged with threatening anyone on the *Puller*"); *id.* at

86:24–87:2 (same).)  Moreover, the Government's above-quoted submission that questions concerning events aboard the *Puller* were relevant because they "go[] to consciousness of guilt" — not charged conduct — would only serve to further affirm Pahlawan's presumption that the scope of the witness tampering charge, as it appeared in the Superseding Indictment, remained limited to Pahlawan's conduct on the *Yunus* during the boarding.[6]  Notably, the Government made no attempt to cure the notice issue at that time.

The Government further argues that the FBI 302 reports included with its September 3, 2024 email to defense counsel cure its deficient notice as to Count Eight.  As discussed above, the Government conducted proffers with nine material witnesses between August 14, 2024 and September 11, 2024, all but one of whom detailed Pahlawan's instructions to lie on the *Yunus* and his threats against the crew members and their families on the *Puller*.  (ECF No. 277 at 7.)  By producing the reports of these proffer sessions to Pahlawan in advance of the material witness depositions, the Government argues that it provided Pahlawan with sufficient notice of the additional witness tampering charges aboard the *Puller*.  The Court disagrees.  The fact that the Government turned over certain new information in discovery does not necessarily or sufficiently communicate the Government's intent to prosecute Pahlawan under a new theory.  As the Government rightfully notes, Pahlawan's alleged threats on the *Puller* would have remained relevant even in the absence of additional charges, as they tend to demonstrate consciousness of guilt.  *See United States v. Hart*, 91 F.4th 732, 741 (4th Cir. 2024) ("[W]e have

---

[6]    The Government argues that Pahlawan possessed sufficient notice of the nature of the accusation against him in Count Eight, because the "indictment as it stood at the time of the depositions was sufficient to warrant admitting testimony about *all* of his witness tampering under theories of consciousness of guilt and Rule 404(b)."  (ECF No. 277.)  This argument actually undermines the Government's position, since an understanding that the evidence constituted Rule 404(b) evidence, rather than direct evidence, necessarily implies that any testimony related to threats on the *Puller* would not qualify as charged conduct.

repeatedly held that evidence of witness intimidation is admissible under Rule 404(b) to prove consciousness of guilt and criminal intent."). Thus, Pahlawan had no reason to presume, without more, that the Government intended to supersede with charges for witness tampering on the *Puller* merely because evidence of such conduct existed somewhere in the "reams of discovery." (ECF No. 277 at 1.) Accordingly, the Court finds that the Government's production of FBI 302 reports failed to inform Pahlawan of the nature and cause of the charges in Count Eight to permit adequate preparation of a defense.

Without sufficient and timely notice from the Government of the additional charge, Pahlawan also lacked a "prior opportunity for [effective] cross-examination" of the material witnesses, which would violate his rights under the Sixth Amendment's Confrontation Clause if the depositions were admitted at trial. *Crawford*, 541 U.S. at 54; *Owens*, 484 U.S. at 562. The Government contends that "[n]othing in the Supreme Court's decision in *Crawford* increased the requirement beyond anything more than "an opportunity to cross-examine." (ECF No. 277 at 22 (citing *Crawford*, 541 U.S. at 57).) The Court again disagrees. Supreme Court precedent requires not just an opportunity to cross examine, but an *adequate* opportunity to confront adverse witnesses. *Crawford*, 541 U.S. at 57 (recognizing the Court's earlier holding "that prior trial or preliminary hearing testimony is admissible only if the defendant had an adequate opportunity to cross-examine"); *see also Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 380 (3d Cir. 2018) ("A criminal defendant's right to cross-examination is not satisfied simply because a witness appears and takes the stand at the defendant's trial."). For Pahlawan to enjoy a meaningful opportunity to cross-examine the material witnesses, he needed proper notice of the nature of his charges. *See Owens*, 484 U.S. at 562 (recognizing that a defendant must have an opportunity for "meaningful" cross-examination). Receiving none, the Court cannot find that

Pahlawan's opportunity to cross-examine the material witnesses was sufficiently meaningful to satisfy his confrontation rights.

The Court's conclusion stands supported by its additional finding that the material witness testimony fails to satisfy the requirements for admission under Rule 804(b)(1), because Pahlawan lacked an interest of substantially similar intensity to disprove Count Eight during the depositions compared to the interest that he would have had at trial. Under the indictment in effect at the time of the material witness depositions, Pahlawan faced one count of threatening one crew member on the *Yunus* during the boarding, but no charges for witness tampering in conjunction with any threats made on the *Puller*. Thus, throughout the depositions, any evidence of Pahlawan's alleged witness tampering aboard the *Puller* was only "peripherally related" to the charges stemming from his conspiracy to transport weapons of mass destruction; to the extent that it bore any relevance at all, it did so only with regard to Pahlawan's consciousness of guilt. That same testimony becomes "critical" after return of the Second Superseding Indictment, however, because it now constitutes direct evidence of the charged conduct. Yet by this point, the material witness depositions are complete and Pahlawan has lost his opportunity to cross-examine the witnesses as to his new charge. Because Pahlawan has a far greater interest in disproving or undermining the material witnesses' testimony as to events on the *Puller* under the Second Superseding Indictment than he possessed at the time that the depositions were taken, the Government cannot establish that Pahlawan possessed the "similar motive" required to admit such hearsay evidence under Rule 804(b)(1)(B).[7]

---

[7] The Government argues, in a footnote, that "the material witness testimony is also potentially admissible under the forfeiture-by-wrongdoing exception to hearsay under Federal Rule of Evidence 804(d)(6)." (ECF No. 277 at 20 n.7.) The Court refrains from addressing this argument for two reasons. First, the Fourth Circuit "warn[s] against ruling on a 'minimally addressed' issue based on arguments only raised in a footnote, as it is 'unfair' to the opposing

The Government resists this outcome by arguing that "the clearest evidence of [similar motive] is that the defendant *did* cross-examine all of the material witnesses, including crossing some witnesses *about his witness tampering* on the [*Yunus*] and *Puller*." (ECF No. 277 at 18 (emphasis in original).) However, this argument cuts in both directions. As a threshold matter, the Court agrees with the *DiNapoli* court that prior cross-examination — "both what was undertaken and what was available but forgone — will be relevant though not conclusive on the ultimate issue of similarity of motive." *DiNapoli*, 8 F.3d at 912; *see also Huskey*, 90 F.4th at 669 (rejecting "any per se rule[s]"). And while the Government correctly notes that defense counsel did, in fact, ask some of the material witnesses questions about witness tampering on the *Puller*, she did so in a limited fashion with select witnesses, and did not resist Hassan's and Asif's offered testimony at all. (*See* ECF No. 277 at 10, 12 (acknowledging that Pahlawan "did not cross-examine the[se] material witness[es] regarding the defendant's witness tampering").) If Pahlawan had sufficient notice that he faced charges for witness tampering on the *Puller*, he may well have employed a different tactic. Based on the record before it, the Court finds that Pahlawan's largely forgone cross-examination of the material witnesses on issues of witness tampering supports, rather than undermines, the conclusion that Pahlawan lacked a substantially similar degree of interest in disproving Count Eight.

The Government further argues that Pahlawan had the opportunity and motive to cross-examine the material witnesses as to all of his witness tampering "*regardless* of the Superseding Indictment," because such evidence would be admissible as evidence of his consciousness of

---

party 'and would risk an improvident or ill-advised opinion on the legal issues raised." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 278 (4th Cir. 2022). Second, even if the material witness testimony falls under another hearsay exception, Count Eight still violates Pahlawan's Sixth Amendment rights, mandating an appropriate remedy.

guilt. (ECF No. 277 at 19.) Moreover, in the Government's view, "much of the cross-examination focused on rebutting any evidence of consciousness of guilt looks the same as that focused on rebutting specific evidence of a witness tampering charge." (*Id.*) Even if true, these arguments fail to establish an interest of substantially similar intensity. Pahlawan formed a strong motive to develop testimony related to threats on the *Puller* only once such testimony became "critical" as directly probative of charged conduct under the Second Superseding Indictment. Therefore, the material witness depositions constitute inadmissible hearsay as to Count Eight and do not fall within Rule 804(b)(1)'s exception.

In sum, although the Government may have attempted to provide notice of the impending charges before the material witness depositions, Pahlawan lacked sufficient notice that the scope of his witness tampering charges would extend to his conduct on the *Puller* from January 13, 2024 through February 14, 2024. Without the constitutionally required notice, Pahlawan lacked a meaningful opportunity to effectively cross-examine the material witnesses as to the conduct charged in Count Eight. To avoid these very Sixth Amendment issues, the Court previously ordered the Government to file "[a]ny Superseding Indictment . . . no later than August 16, 2024." (ECF No. 69 at 2.) By instead waiting until December 4, 2024 to file the Second Superseding Indictment, and by adding a new charge for previously uncharged conduct on the *Puller* after the material witness depositions concluded, the Government would violate Pahlawan's rights to notice of the charges and to confront the witnesses against him if it introduced the material witness testimony at trial, thus requiring the Court to provide an appropriate remedy for Defendant.

During the hearing on February 10, 2025, the Court provided the Government with two options: exclusion of the material witness testimony or dismissal of Count Eight. The

Government selected the latter option.[8]  Accordingly, the Court will GRANT Pahlawan's Motion

to Dismiss as to Count Eight.[9]  The Government may still admit the material witnesses'

testimony about Pahlawan's purported threats on the *Puller* to establish consciousness of guilt as

to all the remaining charges, including Count Seven, under Federal Rule of Evidence 404(b).

*See Hart*, 91 F.4th at 741 ("[W]e have repeatedly held that evidence of witness intimidation is

admissible under Rule 404(b) to prove consciousness of guilt and criminal intent.").

### 2.    Count Seven

Pahlawan advances a similar set of arguments concerning Count Seven, which the

Government amended after the material witness depositions had been conducted.  In his view,

the Government violated Pahlawan's Sixth Amendment rights, because the Second Superseding

Indictment expanded the timeframe of Count Seven by two days and added four new alleged

victims, depriving him of notice and an adequate opportunity to cross-examine the material

witnesses before their release.  (*Compare* ECF No. 79 at 19 (alleging threats against "Witness

One" "[o]n or about January 11, 2024"), *with* ECF No. 239 at 18 (alleging threats against five

crew members from January 11, 2024 through January 13, 2024).)  Pahlawan further contends

that, in light of these facts, the material witness depositions fail to meet the requirements for Rule

804(b)(1)'s hearsay exception.  In addition, he claims that the Government violated Federal Rule

---

[8]    The Government indicated that it intends to file a motion to dismiss Count Eight pursuant to Federal Rule of Criminal Procedure 48(a) and seeks to dismiss this count without prejudice.  *See United States v. Goodson*, 204 F.3d 508, 512 (4th Cir. 2000) (directing courts to grant the Government's Rule 48(a) motion "unless the court concludes that to grant it would be clearly contrary to manifest public interest, determined by whether the prosecutor's motion to dismiss was made in bad faith").  Consequently, the Court will dismiss Count Eight without prejudice.

[9]    In light of the Court's finding that Count Eight would violate Pahlawan's Sixth Amendment rights, thereby warranting dismissal, the Court does not need to consider Pahlawan's Rule 15 argument as to this count.

of Criminal Procedure 15 by using the material witness depositions as a discovery tool.  The Court rejects these arguments as to Count Seven and denies Pahlawan's motion accordingly.

Looking first to Rule 804(b)(1), the Court finds that Pahlawan had a sufficient opportunity and similar motive to cross-examine the material witnesses about any alleged witness tampering on the *Yunus*.  Although Count Seven originally charged Pahlawan with witness tampering "[o]n or about January 11, 2024," the Superseding Indictment also alleged that Pahlawan threatened crew members to lie to the Boarding Team "[d]uring the interdiction," (ECF No. 79 ¶ 1), which extended from January 11, 2024 through January 13, 2024.  Thus, the Government did not "vastly increase[]" the scope of Count Seven, (ECF No. 264 at 6); it merely amended the indictment to accurately reflect the dates of the boarding.  As to the additional victims, the Government provided actual notice that the scope of the witness tampering charges would reflect the growing number of alleged victims.  (ECF No. 277 at 8 (providing notice that Pahlawan "may be subject to seven additional counts of witness intimidation," which "would include the following [seven] victims"); *id.* at 9 (defense counsel acknowledging the "number of people affected").)  Because Pahlawan faced one count for witness tampering during the boarding of the *Yunus* at the time of the material witness depositions, and because the Government provided actual notice of additional victims before the depositions began, Pahlawan had an opportunity and similar motive to develop the material witnesses' testimony by cross-examination as to Count Seven.  Assuming the witnesses remain unavailable for trial, their deposition testimony therefore remains admissible under Rule 804(b)(1)'s hearsay exception for former testimony.

For the same reasons, the Court finds that Pahlawan had sufficient notice to prepare his defense and an opportunity for effective cross-examination as required by the Sixth Amendment.

The Court rejects Pahlawan's argument that sufficient notice can only be provided through a formal charging document.  (ECF No. 285 at 6.)  Although the Sixth Amendment and due process require sufficient notice to allow a reasonable defendant to prepare for trial, the charging document does not constitute "the only constitutionally sufficient means of providing the notice required by the Sixth and [Fifth] Amendments." *Hartman*, 283 F.3d at 195 ("[Defendant] argues that . . . a prosecution comports with the Due Process Clause only when the defendant is notified of the elements of the charged offense *in the charging document*.  We disagree."); *see also Gautt v. Lewis*, 489 F.3d 993, 1009 (9th Cir. 2007) (noting that "a court can examine sources other than the information for evidence that the defendant did receive adequate notice").  In light of the Court's earlier finding that Pahlawan had actual notice of the nature of his charge under Count Seven of the Second Superseding Indictment, the Court finds that the Government did not violate Pahlawan's Sixth Amendment right to notice and the right to confront adverse witnesses.  Dismissal of Count Seven thus remains unwarranted.

Nor did the Government violate Federal Rule of Criminal Procedure 15.  Pursuant to Rule 15, a material witness may "be deposed in order to preserve testimony for trial."  Fed. R. Crim. P. 15(a)(1).  "The scope and manner of the deposition examination and cross-examination must be the same as would be allowed during trial."  Fed. R. Crim. P. 15(e)(2).  Pahlawan contends that the Government "flouted the purpose of Rule 15" by using the material witness depositions as an investigative tool and later seeking additional charges from the grand jury on the basis of information obtained during these depositions.  (ECF No. 264 at 11.)  However, Pahlawan fails to identify any line of questioning in the material witness depositions that fell outside the scope of what would have been allowed during trial.  (*See* ECF No. 264 at 11–12 (failing to identify any impermissible material witness testimony); ECF No. 285 at 17–18 (citing

to portions of Asif's grand jury testimony, not his material witness testimony).)  As the Court previously explained, testimony pertaining to Pahlawan's threats on the *Puller* qualifies as relevant to his charges stemming from his conspiracy to transport weapons of mass destruction; as such, any Government questioning concerning activities in this time period clearly falls within the scope of what "would be allowed during trial," even under the Superseding Indictment. Because the material witness testimony about Pahlawan's threats on the *Puller* would be permissible during trial even in the absence of Counts Seven and Eight, Pahlawan cannot demonstrate that the Government violated Rule 15 here.

For these reasons, the Court will DENY Pahlawan's Motion to Dismiss as to Count Seven.

**B.    Motion to Strike**

The Court proceeds to consider Pahlawan's Motion to Strike, which asks the Court to either strike the material witness testimony in its entirety or dismiss Counts Seven, Eight and Nine based on the Government's failure to timely disclose audio recordings from the temporary detention facility in Bahrain.  (ECF No. 267.)  The Court briefly recaps the relevant facts.

From February 14, 2024 through February 21, 2024, Pahlawan and the other mariners were detained in several rooms at a naval support base in Bahrain, each of which contained FBI-installed audio recording devices.  On May 17, 2024, the Government produced an FBI serial to defense counsel that detailed the audio recordings in the temporary detention facility, but did not produce the actual audio recordings from the detention facility.  The Government discovered its error during the week of September 23, 2024, and on September 26, 2024, the Government produced a draft translation of some of the audio recordings.  On September 27, 2024, the Government provided defense counsel with copies of the audio recordings from the temporary detention facility.  Pahlawan contends that this delayed disclosure deprived him of the

24

opportunity to effectively use the recordings to cross-examine the material witnesses, in violation of his rights to due process, effective assistance of counsel and to confront adverse witnesses. (*Id.* at 10–11.)  On that basis, he seeks exclusion of the material witness testimony or dismissal of Counts Seven, Eight and Nine.

In fashioning a suitable remedy where the Government failed to timely disclose material evidence to a defendant, a court must consider several factors:  "the reason for the government's delay, and whether the government acted intentionally or in bad faith; the degree of prejudice, if any, suffered by the defendant; and whether any less severe sanction will remedy the prejudice to the defendant and deter future wrongdoing by the government."  *United States v. Sterling*, 724 F.3d 482, 512 (4th Cir. 2013).  Absent bad faith, a district court should exclude evidence in only "rare case[s]."  *Id.*  Here, even assuming that the late disclosure amounted to a discovery violation, the Court will not impose either of Pahlawan's proposed sanctions, because the Government did not act in bad faith, Pahlawan has established no prejudice resulting from the late disclosure and less severe remedies exist.

Despite Pahlawan's claim that the Government "brazenly violated" this Court's discovery orders, (ECF No. 267 at 1), the Court again finds no evidence to support a finding of bad faith. The Government concedes that it produced the at-issue audio recordings after the Court's August 9, 2024 discovery deadline for the material witness depositions and the September 9, 2024 deadline for *Jencks* material.  (ECF No. 273 at 1.)  The record demonstrates that when the Government discovered its mistake, it immediately sought to remedy that error.  As the Court found during the October 25, 2024 hearing, the Government's error derived from the sheer volume of discovery materials in this case — not from any bad faith.  (Hr'g Tr. 7:15–21.)

Pahlawan provides no facts that suggest otherwise. Consequently, the Court finds no basis for revisiting its earlier finding that the Government's delay did not result from bad faith.

Moreover, Pahlawan has not established any prejudice against him resulting from the delay. Pahlawan identifies several portions of the summary translations that purportedly demonstrate the lack of any threats from, or fear of, Pahlawan. (*See* ECF No. 267 at 3–4 (explaining that the crew members discussed "Pahlawan and his brother's physiques[] and how much they could eat" and "made fun of Mr. Pahlawan and the noises he would make"); *id.* at 5 (noting that the crew members "appear to be playing cards, chitchatting, laughing, singing, and dancing").) According to Pahlawan, the translations also reveal that several of the crew members expressed concern for Pahlawan's welfare. (*Id.* at 4.) Thus, in Pahlawan's view, the recordings undermine the material witnesses' testimony that Pahlawan threatened them and support the proposition that the witnesses fabricated their testimony on this subject. Pahlawan submits that, consequently, his inability to cross-examine the witnesses about the contents of the recordings prejudices his ability to defend himself against the Government's charges.

In so arguing, however, Pahlawan disregards the fact that the Government provided him with summary translations on September 26, 2024, allowing him to question all but one of the material witnesses about the veracity of their statements. The Government's summary translations, like Pahlawan's "more detailed translations," illustrate that the crew members appeared unafraid of Pahlawan as they engaged in casual activities, such as "playing cards," "chitchat[ting]," "singing" and "laughing." (ECF No. 273-1 at 1; *see* ECF No. 267 at 5 ("[I]n both the defense translations and the government translations, the men appear to be playing cards, chitchatting, laughing, singing, and dancing in the 9/10-person room. No one mentions being threatened by Mr. Pahlawan or fearing for their safety because of any purported threat

from Mr. Pahlawan.").)  Pahlawan fails to highlight any additional material in the audio recordings that qualifies as impeachment evidence, aside from what was already contained in the Government's summary translations.  Because the Government's summary translations enabled Pahlawan to cross-examine the material witnesses on the same topics that Pahlawan now identifies, Pahlawan cannot demonstrate any prejudice based on the Government's late disclosure of the audio recordings.

Defense counsel's cross-examination of material witness Ahmad supports the Court's finding.  One day after the Government produced the summary translations, defense counsel confronted Ahmad about Pahlawan's alleged threats:

> Q:  When was the first time that you told anyone that Mr. Pahlawan threatened you, sir?
> A:  I told them here while they were interviewing me.
> Q:  You told them after you had been in the jail for several months, right?
> A:  Yes.
> Q:  You told them that Mr. Pahlawan threatened you and that was after you had a lawyer, right?
> A:  Yes.

(Ahmad Dep. 119:17–25.)  As this line of questioning demonstrates, during the material witness depositions, Pahlawan was able to discredit witnesses by eliciting testimony that suggested that the witnesses fabricated their stories and undermined any claims that Pahlawan threatened the crew members.  This fact significantly undercuts Pahlawan's claim of prejudice on this very point.

As to Farooq — the only material witness whose deposition occurred before the Government produced the summary translations — Pahlawan similarly cannot demonstrate any prejudice, because in this instance, the audio recordings qualify as cumulative of other evidence. *See United States v. Marashi*, 913 F.2d 724, 732 (9th Cir. 1990) (holding that "merely cumulative" impeachment evidence does not give rise to a *Brady* violation).  Before Farooq's

deposition, the Government produced an FBI 302 report that documents a recorded interview with Farooq on January 30, 2024.  During his January 30, 2024 interview, Farooq affirmatively denied that Pahlawan had threatened him and indicated that he was not afraid of Pahlawan. (ECF No. 273 at 16 ("The serial stated, 'FAROOQ said that Pahlawan had not threatened FAROOQ and that FAROOQ was not afraid of Pahlawan.'").)  This evidence enabled defense counsel to probe Farooq on a fabrication theory in much the same way that access to the audio recordings would have done.[10]  Thus, because the audio recordings qualify as merely cumulative, Pahlawan cannot establish that he was prejudiced by the Government's late disclosure of the audio recordings regarding his ability to examine Farooq.

Pahlawan further contends that he was unable to confront material witness Zulfiqar with a materially inconsistent statement as a result of the Government's late disclosure.  Specifically, Pahlawan cites to his summary translations to argue that, contrary to Zulfiqar's deposition testimony, Zulfiqar stated, while held in Bahrain, that he had "taken three trips [with Pahlawan] before."  (ECF No. 267 at 4; *compare* ECF No. 267-1 at 3 ("UM shares that he traveled with someone three times."), *with* Zulfiqar Dep. 19:21–23 (stating that "[t]his is my first trip" with Pahlawan).)  Presumably, this information was not included in the Government's summaries, thereby making cross-examination of Zulfiqar on this statement impossible.  However, as the Government rightfully notes, Pahlawan cannot demonstrate that Zulfiqar constitutes the "UM"

---

[10]    In his Reply, Pahlawan contends that "impeaching a witness on his statements during an FBI interview and impeaching him on his statements and behavior in private, among friends is not the same line of cross-examination."  (ECF No. 283 at 11.)  According to Pahlawan, "[w]itnesses undoubtedly behave differently and may speak less candidly or truthfully in a formal FBI interview than among comrades in an isolated room."  (*Id.* at 8.)  The Court rejects this argument.  In the Court's view, the fact that a person faces criminal charges for providing materially false information to a federal law enforcement officer creates a sufficiently strong incentive to be truthful during an FBI interview.  *See* 18 U.S.C. § 1001; *id.* § 2237.

(Unknown Male) who spoke these words on the recording; in addition, it remains entirely unclear whether the "someone" that the speaker referred to was, in fact, Pahlawan. Pahlawan himself concedes that "it is difficult to identify who is speaking on the recordings." (ECF No. 283 at 12.) In light of these facts, the Court finds that Defendant fails to establish that he suffered any prejudice regarding his ability to examine material witness Zulfiqar.

The Court does not stand persuaded by Pahlawan's reliance on *United States v. Djibo*, 730 F. App'x 52 (2d Cir. 2018). There, the defendant argued that the Government's late disclosure of a cooperating witness's cellphone records, which contained hundreds of pages of conversations in Swahili, violated his rights under *Brady* and *Giglio*. The district court repeatedly ignored the defendant's request for resources to hire a Swahili translator and granted a mere one-day adjournment of trial for defense counsel to review potentially significant exculpatory evidence. In an unpublished opinion, the Second Circuit concluded that it could not evaluate whether the defendant suffered prejudice by the Government's late disclosure without the complete translation of the cellphone records. Here, by contrast, the Court provided eight weeks — as requested by Pahlawan — for Defendant to translate the audio recordings and file motions related to the late disclosure. (*See* Hr'g Tr. 12:8–9 (requesting "at least six to eight weeks for translations"); *id.* 18:19–25, 24:21–25:6 (rejecting the Court's offer to continue the case until May to provide additional time for translations and briefings).) Pahlawan had access to translators but nonetheless remains unable to present new impeachment evidence contained in the low-quality audio recordings. The instant case proves readily distinguishable from *Djibo*; accordingly, that case does not impact the Court's analysis here.

Even if Pahlawan were to demonstrate prejudice (which he has not), the Court notes that less severe remedies remain available. *See Sterling*, 724 F.3d at 512 (instructing courts to

consider "whether any less severe sanction will remedy the prejudice to the defendant").  The

Government represents that it "does not intend to introduce any portions of the material witness

recordings from the temporary detention facility during its case-in-chief in trial."  (ECF No. 273

at 6.)  In light of this representation by the Government, and to cure any possibility of prejudice,

the Court will bar the Government from affirmatively using the audio recordings at trial.

Moreover, any remaining purported prejudice can be cured with a stipulation or by introducing

the audio recordings themselves.  Accordingly, within 21 days of the accompanying Order,

Pahlawan may either submit a joint stipulation as to the relevant content of the audio recordings

or elect to introduce the audio recordings at trial.  If Pahlawan elects the latter option, Pahlawan

must identify the precise portion of the audio recording that he seeks to introduce and who the

speaker is, as well as detail the exculpatory value and why the audio recording would be

admissible at trial.

In sum, the Court declines to impose the extreme sanctions for the Government's late

production of the audio recordings that Pahlawan seeks, because the Government did not act in

bad faith, Pahlawan has not established any prejudice resulting from the delay and less severe

remedies exist.[11, 12]  The Court therefore will DENY Defendant's Motion to Strike (ECF No.

---

[11]    The Court acknowledges that Pahlawan identifies additional statements that purportedly qualify as impeachment evidence.  Pahlawan mentions that crew members discussed "large sums of money and being able to afford to buy two buffalos"; their desires to "work here for a year and earn enough money to invest in a business or for marriages"; and concerns that "if these interrogators free them the other ones will capture them again."  (ECF No. 267 at 4–5.)  Because these statements stand irrelevant to the charges against him or as impeachment evidence, Pahlawan was not prejudiced by his delayed access to these recorded statements.  (*See* ECF No. 283 at 13 (conceding that the "statements' substantive content" "seem to have little to do with the merits of the case").)

[12]    On February 7, 2025, Pahlawan filed a Notice of Evidence in Support of his Motion to Strike Material Witness Testimony (ECF No. 299), in which he raises two additional arguments.  First, Pahlawan claims that portions of the audio recordings imply that other crew members —

267) and provides Defendant the option to stipulate to the content of the recordings or introduce

them at trial, subject to the requirements detailed above.

## IV.    CONCLUSION

For the reasons articulated above, the Court will GRANT IN PART and DENY IN PART

Defendant's Motion to Dismiss (ECF No. 264).  Specifically, the Court will DISMISS

WITHOUT PREJUDICE Count Eight but DENY any relief as to Count Seven.  The Government

may still admit the material witnesses' testimony about Pahlawan's purported threats on the

*Puller* to establish consciousness of guilt as to all the remaining charges, including Count Seven.

In addition, the Court will DENY Defendant's Motion to Strike (ECF No. 267), because

the Government did not act in bad faith and Pahlawan has not established any prejudice resulting

from the delay.  However, out of an abundance of caution, the Court will bar the Government

from affirmatively using the audio recordings at trial.  Moreover, within 21 days of the

accompanying Order, Pahlawan may either submit a joint stipulation or elect to introduce the

audio recordings at trial.  If Pahlawan elects the latter option, Pahlawan must identify the precise

portion of the audio recording that he seeks to introduce and who the speaker is, as well as detail

the exculpatory value and why the audio recording would be admissible at trial.  The

Government may file a response no later than 7 days thereafter, and Pahlawan may file a reply

---

not Pahlawan — instructed the crew members to lie.  (*Id.* at 1.)  Second, Pahlawan argues that
some of the crew members misrepresented themselves as "poor, inexperienced seamen with no
direct affiliation with Shahab Mir'kazei" during their depositions.  (*Id.* at 2.)  For the reasons
stated during the hearing on February 10, 2025, the Court finds that Pahlawan has not established
that he suffered any prejudice.

no later than 3 days after the filing of the Government's response.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all

counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  February 10, 2025