IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

     v.

MUHAMMAD PAHLAWAN, *et al.*,
    Defendants.

Criminal No. 3:24cr41 (DJN)

## MEMORANDUM OPINION

This matter comes before the Court on various pretrial motions.  First, Defendant Muhammad Pahlawan ("Pahlawan") moves to dismiss Counts Five and Six because of materially repugnant allegations.  (ECF No. 263.)  Second, Pahlawan moves to dismiss Count Two for multiplicity.  (ECF No. 262.)  Third, Pahlawan filed a motion *in limine*, which seeks to exclude: (1) any evidence regarding the deaths of two Navy SEALS during the boarding of the *Yunus*; (2) the use of the term "smuggling" to describe Pahlawan's activities; and (3) any evidence regarding Hamas-related activities.  (ECF No. 266.)  Fourth, the United States of America (the "Government") moves in *limine* to admit evidence of:  (1) a 2015 interdiction of a vessel owned by co-conspirator Shahab Mir'Kazei ("Shahab"); (2) Pahlawan's and Mohammad Mazhar's ("Mazhar") (collectively, "Defendants") 2023 Iranian arrest; and (3) Pahlawan's alleged threats against the material witnesses in January and February 2024.  (ECF No. 237.)  Lastly, Defendants move to dismiss their charges pursuant to 18 U.S.C. § 2237.  (ECF No. 94.)

For the reasons set forth below, the Court will DENY the motion to dismiss Counts Five and Six and the motion to dismiss all charges pursuant to 18 U.S.C. § 2237.  (ECF Nos. 94, 263.) The Court will GRANT the motion to dismiss Count Two for multiplicity.  (ECF No. 262.)  In

addition, the Court will GRANT IN PART and DENY IN PART the Motions *in Limine*. (ECF Nos. 237, 266.)

## I.    BACKGROUND

The Court assumes the reader's familiarity with the underlying proceedings. As the facts of this case have been related elsewhere, (*see* ECF Nos. 268, 302), this Memorandum Opinion recounts only the facts necessary to resolve the instant motions.

The charges against Defendants arise from a military operation conducted on January 11, 2024, to interdict a maritime vessel (the "*Yunus*") sailing off the coast of Somalia and in the Arabian Sea. (ECF No. 239 ("2d Sup. Ind.") ¶¶ 1–2.) On board the *Yunus*, United States Central Command Navy forces, including Navy SEALs, as well as members of the Coast Guard Maritime Safety and Security Team (collectively, the "Boarding Team"), discovered suspected Iranian-made advanced conventional weaponry. (*Id.* ¶ 1.)

The Second Superseding Indictment alleges that Pahlawan worked with two Iranian brothers who supported Iran and the Islamic Revolutionary Guard Corps ("IRGC") to smuggle weapons of mass destruction from Iran to various recipients, including the Houthi rebel forces in Yemen (the "Houthis"). (*Id.* ¶ 2.) The Government alleges that Pahlawan completed multiple smuggling voyages by traveling with cargo from Iran to the coast of Somalia and transporting that cargo to another vessel for a ship-to-ship transfer. (*Id.*)

According to the Second Superseding Indictment, Iran constitutes a "State Sponsor of Terrorism," and the IRGC constitutes "a foreign terrorist organization." (*Id.* ¶¶ 7–8.) The

Second Superseding Indictment further alleges that the IRGC supports various terrorist and insurgent groups, including the Houthis:[1]

> The IRGC is an Iranian military and counterintelligence agency under the authority of Iran's Supreme Leader, Ayatollah Ali Khamenei, and is composed of ground, naval, and air forces, as well as other components — including the IRGC Qods Force ("IRGC-QF"). The IRGC-QF is the IRGC's external operations force and is the Government of Iran's primary arm for executing its policy of supporting terrorist and insurgent groups, including Hamas. The IRGC-QF provides materials, logistical assistance, training, and financial support to militias and terrorist operatives throughout the Middle East and South Asia. The Government of Iran and its IRGC are among the principal supporters of various groups including both Hamas and the Houthi rebel forces in Yemen, providing significant financing, military training, military supplies and weapons, and diplomatic support.

(*Id.* ¶ 9.)

Beginning soon after the October 7, 2023 Hamas attack on Israel and continuing throughout 2024, the Houthis allegedly used Iranian weaponry to attack United States and allied military and commercial vessels in the Red Sea. (*Id.* ¶ 13.) The Houthis made clear that their attacks were designed to deter Israel from responding to the October 7, 2023 attack and to punish any supporters of Israel, including the United States. (*Id.*)

On December 4, 2024, the grand jury returned a Second Superseding Indictment against Defendants Pahlawan and Mazhar. Specifically, the grand jury charged Pahlawan with one count of conspiracy to provide material support to terrorists and one substantive count of providing material support to terrorists under 18 U.S.C. § 2339A; two counts of participating in weapons of

---

[1] According to the Second Superseding Indictment, the "Houthi rebel forces, also known as 'Ansarallah,' were designated by the United States Department of State as a foreign terrorist organization in Yemen in January 2021. In February 2021, the Houthis were de-designated as a foreign terrorist organization. On January 17, 2024, the United States Department of State designated the Houthis as a Specially Designated Global Terrorist group, effective on February 16, 2024." (2d Sup. Ind. ¶ 11.)

mass destruction threats to the United States under 18 U.S.C. § 832;[2] one count of conspiracy to commit maritime transport involving weapons of mass destruction and one substantive count of maritime transport involving weapons of mass destruction under 18 U.S.C. § 2280a; two counts of witness tampering through intimidation or threat under 18 U.S.C. § 1512;[3] and one count of providing materially false information to a federal law enforcement officer during a boarding of a vessel under 18 U.S.C. § 2237. (*Id.* at 12–20.) The grand jury charged Defendant Mazhar with one count of providing materially false information to a federal law enforcement officer during a boarding of a vessel under the same statute. (*Id.* at 21.)

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 12 provides for dismissal of an indictment "where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial." *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012). When considering a motion to dismiss, "the indictment allegations are presumed to be true, and the motion should not ordinarily be used as a vehicle to test the sufficiency of the evidence behind the allegations." *United States v. Treacy*, 677 F. App'x 869, 873 (4th Cir. 2017). "An indictment may legally fail to state an offense by omitting a necessary element." *United States v. Brewbaker*, 87 F.4th 563, 572 (4th Cir. 2023).

---

[2]      On January 3, 2025, the Court granted Pahlawan's Motion to Dismiss Count Three or Four for multiplicity. (ECF No. 268 at 37; ECF No. 269.) If a jury finds Defendant Pahlawan guilty of Counts Three and Four, the Court will merge these duplicative counts into a single conviction.

[3]      On February 11, 2025, the Court dismissed without prejudice Count Eight. (ECF No. 307.) As the Court explained in its February 10, 2025 Memorandum Opinion, Pahlawan's constitutional rights would be violated if he faced trial on Count Eight without a sufficient opportunity to confront the witnesses against him. (ECF No. 302 at 13–21.)

Alternatively, an indictment may fail to state an offense if "the allegations therein, even if true, would not state an offense." *United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004).

## III.    ANALYSIS

### A.    Pahlawan's Motion to Dismiss Counts Five and Six for Repugnancy (ECF No. 263)

Pahlawan submits that the Court must dismiss Counts Five and Six of the Second Superseding Indictment, because they contain repugnant or internally inconsistent allegations. Defendant's Motion has been fully briefed, (ECF Nos. 263, 276, 284), rendering it ripe for resolution. For the reasons set forth below, the Court will DENY Defendant's Motion to Dismiss (ECF No. 263). The Court also finds that the exceptions set forth in 18 U.S.C. § 2280a(c) constitute affirmative defenses against charges under § 2280a, not statutory elements. Defendant bears the burden of proof if he chooses to assert these affirmative defenses at trial.

The Court previously considered and denied Pahlawan's first motion to dismiss Counts Five and Six (ECF No. 90). There, Pahlawan submitted two arguments in support of dismissal. First, he argued that the Superseding Indictment failed to plead that Defendant's actions fell outside of 18 U.S.C. § 2280a's statutory exceptions for certain activities of armed and military forces, and that this failure constituted a fatal defect. (*Id.* at 2–7); *see* 18 U.S.C. § 2280a(c) (designating that § 2280a shall not apply to "(1) the activities of armed forces during an armed conflict, as those terms are understood under the law of war, which are governed by that law; or (2) activities undertaken by military forces of a state in the exercise of their official duties"). Without conceding any purported insufficiency, the Government indicated, in its opposition, that it would seek a Second Superseding Indictment to directly address the exceptions, which it later obtained. (ECF No. 160 at 1; 2d Sup. Ind. at 16–17.) Second, Pahlawan argued that the facts alleged in the Superseding Indictment established, as a matter of law, that Pahlawan's conduct

5

fell within the statutory exceptions, thus requiring dismissal of the relevant counts. The Court disagreed, finding that Pahlawan's arguments to this effect "raise factual questions embraced in the general issue, rather than legal insufficiencies," and denied Pahlawan's motion on these grounds. (ECF No. 270 at 5.)

After the return of the Second Superseding Indictment, Pahlawan filed the instant motion, seeking dismissal of Counts Five and Six on the basis of repugnancy. (ECF No. 263 ("Rep. Mot.").) Pahlawan argues that the added language addressing the statutory exceptions, which alleges that Defendant's actions "did not involve (1) the activities of armed forces during an armed conflict . . . or (2) activities undertaken by military forces of a state in the exercise of their official duties," stands "logically inconsistent [with] and contradictory" to the Government's claims, elsewhere in the Second Superseding Indictment, that Pahlawan "acted at the direction of IRGC agents . . . for the purpose of transporting Iranian weapons components." (2d Sup. Ind. at 16–17; Rep. Mot. at 2, 4.) Under the doctrine of repugnancy, Defendant argues, such "materially inconsistent allegations" render Counts Five and Six legally defective and mandate dismissal of these counts. (Rep. Mot. at 4, 7.)

The Government opposes Defendant's motion. (ECF No. 276 ("Rep. Opp.").) As a threshold matter, the Government maintains that it was not required to include the added language addressing the exceptions (and did so only out of an abundance of caution), because the exceptions constitute affirmative defenses, not elements that the Government must prove. (*Id.* at 3.) Proceeding to the merits of Pahlawan's repugnancy claim, the Government disputes the existence of material inconsistencies between its allegations surrounding Pahlawan's activities and the allegation that these actions did not constitute activities of armed or military forces as covered by the exceptions. In support, the Government submits that the IRGC, a designated

Foreign Terrorist Organization ("FTO") under United States law, "constitutes an external-operations terrorist unit," rather than a "conventional army and naval force[]," while Pahlawan served as a "civilian who allegedly conspired to smuggle weapons from one foreign designated terrorist organization to another terrorist organization," rather than as a member of "armed" or "military forces." (*Id.* at 11–12.) The Government also points to his vessel's statelessness and its lack of "designations of the Iranian Navy," as well as the fact that Pahlawan "was not wearing a military uniform" and did not "claim national or military status on behalf of Iran [or] the IRGC," as further evidence that Pahlawan's actions did not involve protected activities under the statutory exceptions, and that therefore, Counts Five and Six lack internal inconsistencies. (*Id.* at 13.)

### 1.    Counts Five and Six do not contain repugnant allegations.

Counts of an indictment may be "repugnant" if they contain "contradiction[s] between material allegations" within a given count. *United States v. Cisneros*, 26 F. Supp. 2d 24, 52 (D.D.C. 1998). While the term "repugnancy" appears to have fallen out of favor, modern courts continue to dismiss counts where they contain "mutually exclusive" or "internally inconsistent" allegations. *United States v. Rajaratnam*, 2014 WL 1554078, at *7 (S.D.N.Y. Apr. 17, 2014); *United States v. Conde*, 309 F. Supp. 2d 510, 511 (S.D.N.Y. 2003). The doctrine of repugnancy stems from the general principle that criminal defendants must receive sufficient notice of the charges against them to adequately prepare a defense. *See* Fed. R. Crim. P. 7(c)(1) (requiring that an indictment "be a plain, concise, and definite written statement of the essential facts constituting the offense charged"); *United States v. Cantrell*, 612 F.2d 509, 511 (10th Cir. 1980) ("[W]hen a defendant is charged with apparently inconsistent counts in a single indictment . . . we cannot say that the defendant could . . . have anticipated what the evidence would be at

trial."). Dismissal of the repugnant counts serves as the ordinary remedy in such cases. *Cisneros*, 26 F. Supp. 2d at 52.

Turning to Counts Five and Six, the Court notes that the general allegations contained in the Second Superseding Indictment are "fully incorporated . . . by reference" into these counts. (2d Sup. Ind. at 16–17.) As relevant here, that includes the allegation that Defendant "worked with" two co-conspirators who "supported" and "worked . . . for" the IRGC, an "Iranian military and counterintelligence agency . . . composed of ground, naval, and air forces" whose Qods Force serves as the Iranian government's "primary arm for executing its policy of supporting terrorist and insurgent groups." (*Id.* ¶¶ 2, 4, 5, 8, 9.) Pahlawan's "work," which was "coordinated and funded by" these two co-conspirators, involved captaining the *Yunus*, an allegedly stateless vessel, and smuggling weapons aboard that ship from Iran to the Houthis. (*Id.* ¶¶ 1–2, 15–40.) To assess the merits of Pahlawan's repugnancy claim, the Court must consider whether these facts qualify as materially inconsistent with the allegation, in Counts Five and Six, that Pahlawan was neither a member of "armed forces during an armed conflict" nor "military forces of a state in the exercise of their official duties."

The Court finds no material inconsistency or repugnancy in Counts Five and Six. While the Government alleges that the two co-conspirators directing Pahlawan's activities were affiliated with the IRGC, this allegation does not create a necessary inference that Pahlawan's activities qualify as those of "armed forces" or "military forces of a state." Nor do the above allegations establish, without more, that the activities of any of the alleged co-conspirators involved the "exercise of . . . official duties" of military forces. While the indictment acknowledges that the IRGC constitutes a "military and counterintelligence agency" directed by the Iranian government, such allegations alone fail to establish that the IRGC constitutes "armed

forces" or "military forces of a state" for purposes of § 2280a(c). The Government's allegations concerning Pahlawan's activities are therefore not materially inconsistent with the claim that his actions did not involve the activities of "armed forces during an armed conflict" or "military forces of a state in the exercise of their official duties." While Pahlawan may argue to the jury that the facts support a finding that his actions fall within the statutory exceptions, such a fact-driven argument is best suited for presentation at trial, not in a Rule 12 motion. *See Treacy*, 677 F. App'x at 873 (recognizing that Rule 12 motions should not be used "as a vehicle to test the sufficiency of the evidence behind the allegations").

For the foregoing reasons, the Court will DENY Defendant's Motion to Dismiss Counts Five and Six on the basis of repugnancy. (ECF No. 263.)

### 2. The exceptions set forth in 18 U.S.C. § 2280a(c) constitute affirmative defenses.

Throughout the parties' briefing on both Pahlawan's first motion to dismiss Counts Five and Six and the instant motion, (ECF Nos. 90, 263), Pahlawan and the Government present opposing views on a question germane to, but not essential to the resolution of, this motion: which party bears the burden of pleading and proving the statutory exceptions, contained in 18 U.S.C. § 2280a(c), for "activities of armed forces during an armed conflict" and "activities undertaken by military forces of a state in the exercise of their official duties." 18 U.S.C. § 2280a(c). Pahlawan maintains that the exclusions constitute statutory elements that the Government must plead and prove beyond a reasonable doubt, while the Government submits that the exceptions create affirmative defenses that Pahlawan may raise and, if so, must plead and prove himself. This presents a question of first impression. Given that this issue must be resolved before trial, and given that both parties have sufficiently briefed their respective positions, (ECF No. 90 at 2–7; Rep. Opp. at 4–11; ECF No. 284 ("Rep. Reply") at 6–12), the

Court proceeds to resolve the issue now.  For the reasons set forth below, the Court finds that the statutory exceptions in 18 U.S.C. § 2280a(c) constitute affirmative defenses to charges under § 2280a, not necessary elements of the offense.

The relevant portions of § 2280a provide as follows:

(a) Offenses —

      (1) In general. — Subject to the exceptions in subsection (c), a person who unlawfully and intentionally . . .

          (B) transports on board a ship —

              (i) any explosive . . .  knowing that it is intended to be used to cause, or in a threat to cause, death to any person or serious injury or damage for the purpose of intimidating a population, or compelling a government or an international organization to do or to obtain from doing any act; . . .

shall be fined under this title, imprisoned not more than 20 years, or both; . . .

(c) Exceptions. — This section shall not apply to —

      (1) the activities of armed forces during an armed conflict, as those terms are understood under the law of war, which are governed by that law; or

      (2) activities undertaken by military forces of a state in the exercise of their official duties.

18 U.S.C. § 2280a(a), (c).

The Fourth Circuit most recently examined whether an exception set forth in a criminal statute constitutes an affirmative defense or a statutory element in *United States v. Rafiekian*, 991 F.3d 529 (4th Cir. 2021).  Citing well-established Supreme Court precedent, the Fourth Circuit emphasized the "rule of thumb" that, where an exception is set forth in a "proviso or other distinct clause," an indictment "need not negative" such an exception, and the burden of claiming it "generally falls to the defendant."  *Id.* at 541 (citing *McKelvey v. United States*, 260 U.S. 353, 357 (1922)); *see also United States v. First City Nat. Bank of Hous.*, 386 U.S. 361, 366 (1967)

10

("[T]he burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits"). The Fourth Circuit follows this "longstanding convention" unless "compelling reasons to think that Congress meant to put the burden . . . on the other side" exist. *Rafiekian*, 991 F.3d at 541 (citing *Meachem v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 91–92 (2008)).

The *Rafiekian* Court acknowledged that determining whether an exception constitutes a statutory element or an affirmative defense is "not an exact science" and employed a broader inquiry that extended beyond the structure of the statutory text.[4] *Id.* at 542. Looking to the substantive relationship between the offense and the statutory exception, the Fourth Circuit cited Supreme Court and sister circuit precedent for the principle that, where an offense "may be accurately and clearly defined without any reference to the . . . exception," such exception "is more likely an affirmative defense." *Id.* at 542–43 (citing *United States v. Cook*, 84 U.S. (17 Wall.) 168, 173–74 (1872); *United States v. McArthur*, 108 F.3d 1350, 1353 (11th Cir. 1997)). Additionally, courts may consider which party stands best positioned to prove an exception when assessing whom Congress likely intended to shoulder that burden. *See McArthur*, 108 F.3d at 1355 (observing that "courts often consider whether the government or the defendant is in the best position to prove facts necessary to trigger the exception" when determining whether a statutory exception constitutes an element or an affirmative defense); *see also* Model Penal Code § 1.12(3) ("A ground of defense is affirmative" when it "involves a matter of excuse or justification peculiarly within the knowledge of the defendant on which he can fairly be required

---

[4]    Other circuits have similarly highlighted that *McKelvey*'s "general provision" should be viewed as an "interpretative aid . . . in parsing statutes," not as a hard-and-fast rule, and that the structure of the statutory text must be considered along with "other indications of legislative will evident in the statute." *United States v. Prentiss*, 256 F.3d 971, 979 (10th Cir. 2001); *United States v. McArthur*, 108 F.3d 1350, 1354 (11th Cir. 1997).

to adduce supporting evidence."); *Commonwealth v. Hart*, 65 Mass. 130, 137 (Mass. 1853) ("It is an elementary principle of pleading . . . that it is not necessary to allege matter which would come more properly from the other side.").

The Court begins by noting that the parties disagree as to whether the statutory exceptions set forth in § 2280a(c) constitute a "proviso or other distinct clause." By inserting the words "subject to the exceptions in subsection (c)" into subsection (a) — the same subsection that defines the proscribed criminal conduct — Pahlawan argues that Congress incorporated the exceptions into its description of the offense and sought to explicitly limit the offense to "only those [acts] which do not fall within the statutory exceptions." (Rep. Mot. at 6 (citing *United States v. Vuitch*, 402 U.S. 62, 70 (1971)).) Pahlawan points for support to *Vuitch*, where the Supreme Court held that, as a "general guide to the interpretation of criminal statutes," an exception that "is incorporated in the enacting clause of a statute" imposes a burden on the prosecution "to plead and prove" the inapplicability of the exception. 402 U.S. at 70. The Government, by contrast, points to the fact that the statutory exceptions "plainly lie[] in a distinct clause" — subsection (c) — to argue that *Rafiekian* and its "rule of thumb" construing exceptions in distinct provisions as affirmative defenses should govern. (Rep. Opp. at 7–8.)

The Court finds the parties' arguments concerning the statute's structure unhelpful to resolving the present inquiry, because § 2280a falls within the ambit of both default rules: the statutory exceptions are set forth in a "proviso or other distinct clause," *see* § 2280a(c), *and* incorporated in the statute's enacting clause, *see* § 2280a(a)(1). Nor does the case law cited by the parties on this point definitively counsel for one approach over the other, given conflicting rulings, across different circuits, concerning statutes that are meaningfully different from the provision before the Court today.

12

Looking first to Defendant's arguments, the Court does not stand persuaded by Defendant's reliance on *Vuitch*, *Hale v. United States*, 89 F.2d 578 (4th Cir. 1937), and *Hanks v. United States*, 97 F.2d 309 (4th Cir. 1938), in support of his position that, where the enacting clause of a criminal statute incorporates an exception, the burden to plead and prove that exception falls to the Government. *Vuitch*, 402 U.S. at 71; *Hale*, 89 F.2d at 579–80; *Hanks*, 97 F.2d at 311.  Unlike § 2280a, which merely references the exceptions in the enacting clause (and sets them forth in a separate subsection), the statutes in these three cases contain the statutory exception *in full* within the enacting clause. *See, e.g.*, *Vuitch*, 402 U.S. at 67–68 ("Whoever . . . procures or produces, or attempts to procure or produce an abortion or miscarriage on any woman, *unless the same were done as necessary for the preservation of the mother's life or health and under the direction of a competent licensed practitioner of medicine*, shall be imprisoned . . . ." (emphasis added)) (citing D.C. Code § 22–201).  This significant structural difference between § 2280a and the statutes cited by Defendant renders these authorities inapposite here.[5]

---

[5]     Defendant also cites case law concerning 21 U.S.C. § 841, which courts have long interpreted to impose on the Government the burden to prove that a defendant's actions were "not for legitimate medical purposes in the usual course of [defendant's] professional medical practice or were beyond the bounds of medical practice," pursuant to the enacting clause's first line, which reads "Except as authorized by this subchapter . . . ." 21 U.S.C. § 841(a); *United States v. Hurwitz*, 459 F.3d 463 (4th Cir. 2006); *United States v. Daniel*, 3 F.3d 775 (4th Cir. 1993). 21 U.S.C. § 841 does not provide a helpful analogue to § 2280a. For one, none of the cases that Defendant cites directly advances his argument for the rule of statutory construction (articulated in *Vuitch*) that he seeks here.  Second, as articulated in earlier case law concerning the statute, the import of the statutory exception for professional conduct in § 841 lies rooted in "the scheme of the statute" and "the background of the legislative history," as well as the Harrison Act of 1914, § 841's predecessor statute, which employed different statutory language altogether. *United States v. Moore*, 423 U.S. 122, 135–36, 140 (1975); *Jin Fuey Moy v. United States*, 254 U.S. 189 (1920) (overruled on other grounds).  This multifaceted jurisprudence concerning multiple statutes does not meaningfully support the principles of statutory construction that Defendant asks the Court to adopt here.

The Government's case law proves similarly unhelpful. In its submissions, the Government relies heavily on *Rafiekian* and *United States v. Royal*, 731 F.3d 333, 338 (4th Cir. 2013). Yet unlike § 2280a, the statutes discussed in these cases set forth the relevant exception in a separate clause with no reference in the enacting clause. 18 U.S.C. §§ 921(a)(3), 951(d). While the Fifth Circuit's opinion in *United States v. Santos-Riviera*, 183 F.3d 367 (5th Cir. 1999), endorses the Government's preferred rule of statutory construction by considering a subsequent exception as "separate" for purposes of *McKelvey* despite incorporation by reference in the enacting clause, Pahlawan raises valid questions about the propriety of *Santos-Riviera*'s resolution of this question given the exception's jurisdictional implications. (Rep. Reply at 8–9; *see also Torres v. Lynch*, 578 U.S. 452, 467 (2016) (stating that jurisdictional elements "must be proved to a jury beyond a reasonable doubt"). Accordingly, the Government's cited case law

---

The statutes discussed in Defendant's best cases, *Commonwealth v. Hart*, 65 Mass. 130 (Mass. 1853), and *United States v. English*, 139 F.2d 885 (5th Cir. 1944), present the same scenario as § 2280a: an exception incorporated by reference into the statute's enacting clause and set forth, in full, in a subsequent provision. *Hart*, 65 Mass. at 130; *Eng.*, 139 F.2d at 885. In both cases, the courts found, as a matter of law, that such incorporation by reference imposes on the Government the burden to plead and prove the exception. *See Hart*, 65 Mass. at 137 ("[W]here the exception is not, in express terms, introduced into the enacting clause, but only by reference to some subsequent or prior clause . . . all circumstances of exemption and modification . . . which are incorporated by reference with the enacting clause, must be distinctly negatived."); *Eng.*, 139 F.2d at 886 (stating that a statute beginning with a reference to a subsequent exception "must be construed to indicate the legislative intent that the exceptions referred to should be read into and construed with the affirmative definition of the offense"). Setting aside that these cases date back more than 80 and 170 years, respectively, and that neither opinion binds this Court, the Court finds that ensuing Supreme Court and Fourth Circuit jurisprudence largely repudiates such a technical approach to construing Congressional intent. Rather, as discussed *infra*, the subsequent case law demonstrates that courts consider a host of indicia — not just whether an exception was or was not incorporated by reference into an enacting clause — to ascertain what party should bear the burden of pleading and proving a statutory exception. *See, e.g., Rafiekian*, 991 F.3d at 542–43 (considering the statutory scheme, legislative history and purpose). On this basis, the Court finds Defendant's invocation of *Hart* and *English* unpersuasive.

14

does not support its position that the "rule of thumb" construing exceptions in distinct provisions as affirmative defenses governs here.

To properly ascertain Congress' intent, the Court must instead broaden its inquiry and look to the other factors that courts regularly assess in making similar determinations. The Court begins by examining the role of § 2280a(c)'s exceptions within the definition of the overall offense, looking to the Supreme Court's seminal opinion in *United States v. Cook* for guidance. Defendant invokes *Cook*'s proposition that the Government must plead a statutory exception where that exception is "so incorporated with the substance of the clause defining the offence" that it "constitute[s] a material part of the description of the [criminal] acts." *Cook*, 84 U.S. at 176. The *Cook* Court set a high bar for what it means to constitute a "material part of the description of the acts": namely, for an exception to rise to this level, it must be "impossible [for the government] to frame the actual statutory charge . . . without an allegation showing that the accused was not within the exception." *Id.* at 175. In such a scenario, an exception "must be pleaded" by the government, since otherwise, the indictment "would not present the actual statutory accusation" with sufficient clarity and certainty. *Id.*; *see McArthur*, 108 F.3d at 1353 (invoking similar analysis); *Rafiekian*, 991 F.3d at 542–43 (same).

The Court finds that § 2280a(c)'s exceptions fall below this high standard. Section 2280a(a)(1) criminalizes a wide range of acts, including using or discharging weapons, transporting substances or persons by boat, and injuring or killing persons in conjunction with any of these activities. 18 U.S.C. § 2280a(a)(1). As a matter of pleading, the Government can easily frame, with sufficient clarity, an indictment alleging such charges without needing to plead that the accused was *not* within the military- or armed-forces exceptions. This finding holds no less true in Pahlawan's case: his alleged offense of conspiring to "transport on board a

15

ship an explosive material, knowing that it was intended to be used to cause, or in a threat to cause, death . . . or serious injury or damage" for terrorist purposes stands "accurately and clearly defined" without requiring any reference to § 2280a(c)'s exceptions. (2d Sup. Ind. at 16–17); *Rafiekian*, 991 F.3d at 542. Nor does anything in the indictment or Pahlawan's briefing support the contrary view that Pahlawan's purported affiliation with, or direction by, members of the IRGC is "so incorporated with the substance" of § 2280a's maritime terrorism-related offenses that this narrow issue "constitute[s] a material part of the description" of Pahlawan's purported actions, or that its absence from a pleading would render a charge insufficiently clear or certain. *Cook*, 84 U.S. at 175–76. While the exceptions may narrow the statute's reach, they do not alter the substance of the offense. For all of these reasons, this factor weighs heavily in favor of finding that the exceptions set forth in § 2280a(c) constitute affirmative defenses, not essential elements of the statute.

Section 2280a's legislative backdrop and purpose further support such a finding. Congress created § 2280a as part of the 2016 USA Freedom Act to implement the Protocol of 2005 to the Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation ("2005 SUA Protocol"), which the United States signed on February 17, 2006. 2015 U.S.C.C.A.N. 5, 31. The United States pursued negotiation of this treaty in the aftermath of the September 11, 2001 attacks, with an eye to combating "maritime terrorism" and improving the ability to "conduct maritime interdictions of weapons of mass destruction." S. Treaty Doc. No. 110-8, *Letter of Transmittal by President George W. Bush* (Oct. 1, 2007) at VI. The 2005 SUA Protocol contained the same statutory exceptions that Congress codified in § 2280a(c). 2015 U.S.C.C.A.N. 5, 33. The purpose of including these exceptions in the treaty was twofold: to ensure that any implementing regime would comply with international law and to "protect[] the

16

flexibility of the United States to conduct legitimate activities against all lawful targets." S. Treaty Doc. No. 110-8 at IX–X.

Based on the above discussion, the Court finds it evident that the 2005 SUA Protocol's core purpose (and, by extension, Congress' purpose in implementing it) was to prevent precisely the types of activities that Pahlawan stands accused of: providing weapons of mass destruction to potential terrorist actors. While the treaty included § 2280a(c)'s exceptions to minimize unnecessary interference with sovereigns' abilities to conduct legitimate military activities and avoid conflicts with established bodies of international law, nothing in the treaty's text or legislative record suggest that, in implementing § 2280a(c)'s narrow exceptions, Congress sought to alter its broad animating purpose of combating maritime terrorist activity, let alone narrow or otherwise change the definition of the crimes themselves. Thus, the legislative backdrop and purpose underlying Congress' creation of § 2280a support a finding that the statutory exceptions constitute affirmative defenses, not statutory elements that the Government must prove.

Finally, informational asymmetries between potential defendants and the Government also counsel in favor of construing the § 2280a(c) exceptions as affirmative defenses. To establish the applicability (or inapplicability) of the statutory exceptions, the relevant party would need to make a showing concerning the accused's affiliation with an armed or military force and the nature of that person's activities within such a force. A defendant under § 2280a who legitimately falls within the exceptions' ambit would readily possess such information. By contrast, obtaining such information about foreign citizens and foreign armed services would prove significantly more challenging, if not impossible, for the United States Government. This informational asymmetry holds true in Defendant's case: to the extent Pahlawan claims that he

was a member of the IRGC and performed activities comprising "official duties," or served at the direction of co-conspirators performing such activities, he would possess first-hand knowledge of these facts himself and could establish them accordingly. The same would prove a much taller order for the Government. Thus, this factor, too, tilts the Court's analysis in favor of a finding that the statutory exceptions constitute affirmative defenses, not statutory elements.

In sum, the Court finds no evidence of Congressional intent — based on the statute's text, structure, legislative history, and purpose — supporting a finding that the exceptions set forth in 18 U.S.C. § 2280a(c) constitute statutory elements that the Government must plead and prove. The Court therefore finds that the § 2280a(c) statutory exceptions constitute affirmative defenses that Pahlawan may assert, but that impose no further pleading requirements on the Government.

### 3. Pahlawan bears the burden of proof on the affirmative defenses.

Having found that the § 2280a(c) exceptions constitute affirmative defenses, the Court must determine which party bears the burden of proof if Pahlawan chooses to assert the defenses.[6] For the reasons set forth below, the Court finds that Pahlawan shall bear both the burden of production and the burden of persuasion for these affirmative defenses. Should he assert the defense, Defendant must prove by a preponderance of the evidence that his actions fall within one of the exceptions to prevail.

---

[6] Where Congress fails to expressly assign the burden of proof, courts must make this determination. *See United States v. Alvarez*, 755 F.2d 830, 842 n.12 (11th Cir. 1985) (noting that the ultimate burden of persuasion on affirmative defenses "may fall on either the government or the defendant, as determined by statute or court decision"); *see, e.g.*, *United States v. Hartsock*, 347 F.3d 1, 8–9 (1st Cir. 2003) (determining the burden of proof for a statutory exception to 18 U.S.C. § 922).

Section 2280a contains no express indication by Congress concerning subsection (c)'s standard and burden of proof. Absent such an indication, the Court looks to Supreme Court case law for guidance. The rule at common law commanded that the burden to raise and prove an affirmative defense rested with the defendant. *Patterson v. New York*, 432 U.S. 197, 202 (1977). Where Congress did not expressly contravene the common law rule, courts presume that it intended to follow that rule and assign the burden of proof accordingly. *Dixon v. United States*, 548 U.S. 1, 17 (2006) ("[A]s will usually be the case, given the long-established common-law rule — we presume that Congress intended the petitioner to bear the burden of proving [the affirmative defense.]"); *id.* (Kennedy, J., concurring) ("When issues of congressional intent with respect to the nature, extent, and definition of federal crimes arise, we assume Congress acted against certain background understandings set forth in judicial decisions in the Anglo-American legal tradition."); *see also United States v. Romans*, 823 F.3d 299, 320 (5th Cir. 2016) ("Because Congress did not address the burden of proof[,] . . . we presume that Congress intended to preserve the common-law rule that affirmative defenses are matters for the defendant to prove.").

The common law rule requires defendants to initially raise an affirmative defense by "more than a scintilla of evidence," and then, if sufficiently raised, prove its applicability by a preponderance of the evidence. *Royal*, 731 F.3d at 339; *Mathews v. United States*, 485 U.S. 58, 63 (1988); *Dixon*, 548 U.S. at 17. This rule comports with the constitutional requirement that the government prove all elements of a crime at trial, so long as the affirmative defense does not serve to negate an element of the crime. *See Patterson*, 432 U.S. at 211 (finding it "constitutionally permissible to provide that various affirmative defenses [are] to be proved by the defendant," so long as the prosecution continues to "prove beyond a reasonable doubt all of the elements included in the definition of the offense"); *Smart v. Leeke*, 873 F.2d 1558, 1562 (4th

19

Cir. 1989) (recognizing that, while the government "bears the burden of proving beyond a reasonable doubt every element of the crime charged," a defendant may be required to prove "a separate issue which may or may not overlap with proof of the alleged crime"). In determining who should bear the burden of proof for an affirmative defense, courts may also consider informational asymmetries and whether one party stands better positioned to obtain the relevant evidence. *See Smith v. United States*, 568 U.S. 106, 112 (2013) (finding that, "where the facts with regard to an issue lie peculiarly in the knowledge of a party," that party "is best situated to bear the burden of proof"); *see, e.g.*, *United States v. Dodd*, 225 F.3d 340, 350 (3d Cir. 2000) (imposing the burden of persuasion on the defendant for a justification defense to a felon-in-possession charge, in part, because "the facts necessary to allege and to prove" this defense "are more easily accessible to the defendant than to the government").

Given Congress' silence here, the Court follows *Dixon* in presuming that Congress intended to impose the burden of proof for § 2280a(c)'s exceptions on the defendant. Nothing before the Court counsels for a contrary outcome. Under *Patterson*, there exists no constitutional problem with assigning this burden to Pahlawan, rather than the Government, because successfully asserting the § 2280a(c) exceptions would not disprove any of the statutory elements but would merely speak to a "separate issue" excusing his guilt. *Leeke*, 873 F.2d at 1562.[7] As already analyzed by the Court, informational asymmetries between the Government and Pahlawan concerning the evidence necessary to establish the § 2280a(c) exceptions further support this finding. *See supra* Section III.A.2. Although a defendant who legitimately falls

---

[7]     The Court notes Defendant's argument that the statute's "unlawful and intentional" mens rea "requires proof" that Defendant "subjectively acted outside of [the § 2280a(c)] exceptions." (ECF No. 90 at 6.) The Court finds this argument without merit, based on the plain meaning of the statutory text.

within these exceptions would readily possess such information, the Government could not practically prove a foreign citizen's non-membership in foreign armed or military forces or the non-official nature of his activities anytime that a defendant provides "more than a scintilla of evidence" to the contrary. Shifting this burden to the Government would undercut Congress' purpose in passing the statute by significantly hampering the Government's ability to prosecute terrorist actors and their supporters under 18 U.S.C. § 2280a. *See id.* Finding that Congress intended such a result defies common sense.

For all of these reasons, the Court finds that Pahlawan bears the burden of proof for the affirmative defenses set forth in 18 U.S.C. § 2280a(c). Specifically, and in line with the common law presumption, the Court finds that Pahlawan must produce "more than a scintilla" of evidence that he qualifies for the exceptions to send the question to the jury. Having met this initial burden, Pahlawan then must prove the exceptions' applicability by a preponderance of the evidence to prevail.[8]

### B.    Pahlawan's Motion to Dismiss Count Two for Multiplicity (ECF No. 262)

The Court next addresses Pahlawan's Supplemental Motion to Dismiss Count Two for Multiplicity. (ECF No. 262 ("Mult. Mot.").) Defendant seeks dismissal of Count Two, because it "requires no proof beyond what is necessary to prove Counts Three and Four" and therefore alleges the same offense, in violation of the Fifth Amendment's Double Jeopardy Clause. (*Id.* at 3–4.) The Government filed its Opposition (ECF No. 275 ("Mult. Opp.")), and Defendant

---

[8]    The Court previously ordered the parties to jointly file their requested jury instructions no later than April 18, 2025. (ECF No. 279 at 2–3.) Should Pahlawan decide to assert the affirmative defense provided for under 18 U.S.C. § 2280a(c), and should the parties fail to find agreement as to an appropriate jury instruction concerning this affirmative defense, the Court directs the parties to submit briefing in support of their positions and address, in particular, any proffered definitions of legal terms within the text of subsection (c).

replied (ECF No. 282 ("Mult. Reply")), rendering this motion ripe for the Court's review.  For the reasons set forth below, the Court will GRANT Defendant's Multiplicity Motion and will DISMISS Count Two of the Second Superseding Indictment.

"The rule against multiplicity is rooted in the Double Jeopardy Clause of the Fifth Amendment." *United States v. Smith*, 54 F.4th 755, 763 (4th Cir. 2022).  This clause "protects against multiple punishments for the same offense." *United States v. Ayala*, 601 F.3d 256, 264 (4th Cir. 2010).  "A multiplicitous indictment is one that charges a single offense in multiple counts." *United States v. Slocum*, 106 F.4th 308, 312 (4th Cir. 2024).  "The 'signal danger' of a multiplicitous indictment is that a defendant might thereby receive multiple punishments for the same crime." *Id.* at 312–13.  However, the Double Jeopardy Clause "doesn't prohibit Congress from punishing the same course of conduct under different statutes." *United States v. Wiley*, 93 F.4th 619, 632 (4th Cir.), *cert. denied*, 144 S. Ct. 2648 (2024).  Consequently, a court imposing multiple punishments does not violate the Fifth Amendment so long as "Congress authorizes it to do so." *Id.*

To determine Congressional intent for double jeopardy purposes, courts apply the test formulated in *Blockburger v. United States*, 284 U.S. 299 (1932).  Under the *Blockburger* test, courts consider the two statutory provisions under which a defendant stands charged and ascertain "whether each provision requires proof of a fact which the other does not." *Id.* at 304 (cleaned up).  If each provision contains a unique element, courts in the Fourth Circuit presume that Congress intended to authorize multiple punishments. *Wiley*, 93 F.4th at 632.  The Supreme Court has emphasized that the *Blockburger* test "involve[s] only a question of statutory construction," not an analysis of the underlying factual predicate. *United States v. Dixon*, 509 U.S. 688, 745 (1993) (Souter, J., concurring in part); *see Wiley*, 93 F.4th at 632–33 ("In applying

22

*Blockburger*, we look at the elements of the statutory provisions in question — not the particular facts offered to convict."). Where "there is a clear indication of contrary legislative intent," the *Blockburger* test "should not be controlling." *Albernaz v. United States*, 450 U.S. 333, 340 (1981).

Count Two of the Second Superseding Indictment charges Pahlawan with a violation of 18 U.S.C. § 2339A for providing material support or resources to terrorists. (2d Sup. Ind. at 13.) Section 2339A specifies that "[w]hoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out" a violation enumerated by the statute or listed in 18 U.S.C. § 2332b(g)(5)(B), "or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act," shall be fined or imprisoned. 18 U.S.C. § 2339A(a). The statute provides an express definition of the term "material support or resources." 18 U.S.C. § 2339A(b)(1). Count Two specifies that 18 U.S.C. § 832(a) constitutes the relevant predicate offense for purposes of this charge.[9] (2d Sup. Ind. at 13.)

Counts Three and Four, in turn, charge Pahlawan with substantive violations of 18 U.S.C. § 832(a) for participating in weapons of mass destruction threats to the United States. (*Id.* at 14–15.)[10] That statute specifies that "[w]hoever, within the United States or subject to the

---

[9]     § 832(a) constitutes one of the enumerated statutes in 18 U.S.C. § 2332b(g)(5)(B) and may therefore serve as a predicate offense for a conviction under § 2339A. *See* 18 U.S.C. § 2339A(a) (incorporating "any offense listed in section 21332b(g)(5)(B)").

[10]     The Court previously granted Pahlawan's Motion to Dismiss Count Three or Four of the Superseding Indictment for Multiplicity. (*See* ECF No. 269.) In its Order, the Court specified that, rather than dismiss either count before trial, it "will merge these duplicative counts into a single conviction" if a jury finds Pahlawan guilty of both counts. (*Id.*) Consequently, for the purposes of the present motion, the Court considers Counts Three and Four as separate counts.

jurisdiction of the United States, willfully participates in or knowingly provides material support

or resources (as defined in section 2339A) to a nuclear weapons program or other weapons of

mass destruction program of a foreign terrorist power, or attempts or conspires to do so" shall be

imprisoned.  18 U.S.C. § 832.

As a threshold matter, the Court finds it proper to consider the elements of § 832(a)

incorporated into § 2339A for purposes of its multiplicity analysis.  Section 2339A's title,

"Providing material support to terrorists," suggests two key components to the statute's focus:

the provision of material support and its provision occurring in support of terrorism.  The

predicate offenses that § 2339A incorporates provide the statute's "terrorist" component; the

statutory text does not otherwise specify the targets of material support that it seeks to prohibit.

Because the Court primarily focuses its multiplicity analysis on the *offense* being punished, and

because the predicate crimes that § 2339A incorporates form an integral part of the offense being

criminalized under that statute, the Court will consider § 832(a)'s elements as incorporated for

the purposes of this analysis.  This approach, which the Government does not oppose, comports

with Supreme Court precedent.  *See Dixon*, 509 U.S. at 717 (Rehnquist, C.J., concurring in part)

(discussing the Court's approach to analyzing a felony-murder statute in *Harris v. Oklahoma*,

433 U.S. 682 (1977) (per curiam), where the Court construed the statute's requirement of

"commission of *some* felony" as "incorporating the statutory elements of the various felonies

upon which a felony-murder conviction could rest").

Simultaneously, the Court recognizes that § 2339A's reliance on predicate crimes does

not *per se* create a double jeopardy problem where prosecutors charge defendants under both

§ 2339A and the relevant predicate crime.  For example, in *United States v. Abu Khatallah*, 151

F. Supp. 3d 116 (D.D.C. 2015), the trial court found no multiplicity problem where a defendant

was charged both with providing material support under § 2339A and with substantive charges under statutes that served as predicates for the § 2339A violations.[11]  There, the Court highlighted that § 2339A requires the government to prove "material support" (which the relevant predicate offenses do not), while the predicate offenses require actual or attempted commission of the violation (which § 2339A does not), thus satisfying the *Blockburger* test.  *Id.* at 142–43.  The Eleventh Circuit came to a similar conclusion in *United States v. Hassoun*, 476 F.3d 1181 (11th Cir. 2007), which involved charges under § 2339A and 18 U.S.C. § 956, a predicate crime for § 2339A.  *Id.* at 1187–88.[12]

With regard to how the two statutes are charged in the Second Superseding Indictment, the parties do not dispute that the elements of § 2339A (here incorporating § 832(a)) and § 832(a) itself are virtually indistinguishable.  As the statutory text demonstrates, § 832(a) criminalizes knowingly providing material support or resources to a weapons of mass destruction program of a foreign terrorist power, while § 2339A criminalizes providing material support or resources knowing that it would be used in a weapons of mass destruction program of a foreign terrorist power.  The direct overlap stands evident in the Second Superseding Indictment, where Counts Three and Four allege violations of § 832(a) for knowingly providing material support to Iran or the IRGC, while Count Two alleges that Defendant provided material support knowing that it would be used in support of Iran or the IRGC.  (ECF No. 239 at 13–15.)

Rather, the parties' core disagreement here centers on whether Congress, irrespective of the charges in this case, intended § 2339A to necessarily create a separate offense from that of its

---

[11]    Abu Khatallah was charged with, among others, violations of 18 U.S.C. §§ 844(f)(1) and (3), 930(c), 1111, 1113, 1114, 1116 and 1363. *Abu Khatallah*, 151 F. Supp. 3d at 122.

[12]    The Court notes that neither *Abu Khatallah* nor *Hassoun* involved charges for violations of § 832(a).

25

predicate offenses. That disagreement, in turn, stems from the parties' conflicting views on how this Court should apply the *Blockburger* test to the statutes at hand. The Government argues that the *Blockburger* test requires this Court to look at the statutory provisions *in their entirety*, not just the provisions applicable to this case. According to the Government, since the statutory text of both § 832 and § 2339A provides several paths to establishing liability — i.e., § 2339A criminalizes providing material support or resources *or* concealing or disguising the nature, location, source or ownership of such support, whereas § 832(a) criminalizes providing material support or resources to, *or* willful participation in, a prohibited weapons program — no double jeopardy problem exists, because "one can violate Section 2339A in distinctly different ways than violating Section 832(a), regardless of how it is charged." (Mult. Opp. at 4.) Stated differently, the Government argues that, because "the two statutes do not overlap completely . . . they are not multiplicitous." (*Id*. at 5.)

The Government rests its position in part on the frequently cited proposition that courts, under *Blockburger*, may consider only statutory elements for their analysis, not the facts of a given case. (*See* Mult. Opp. at 4 (citing the Fourth Circuit's finding in *Ayala*, 601 F.3d at 265, that, "[w]hen applying [*Blockburger*] in multiple punishment cases, our exclusive focus is upon the elements of the statutory provisions in question, not the particular facts of the underlying case") (internal quotations omitted).) The Government also relies on *United States v. Hassoun*, 476 F.3d 1181 (11th Cir. 2007), where the Eleventh Circuit, in dicta, asserts that the proper *Blockburger* inquiry ought to look at whether "a scenario exist[s] where the *hypothetical* defendant might violate one section without violating the other," in which case "cumulative punishments are constitutional." *Id.* at 1189 (emphasis added).

The Court rejects the Government's proposed *Blockburger* inquiry for several reasons. The Government's interpretation of the *Blockburger* test would force courts to ignore not just the specific facts of the matter at hand, but in cases involving multi-faceted statutes that provide various paths to liability, to also ignore the statutory elements that the Government must actually prove to attain a verdict of guilty under its charging theory. Such an interpretation cannot be reconciled with *Blockburger*'s plain text. There, the Court set forth the necessary inquiry as follows: "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether *each provision requires proof of a fact which the other does not.*" *Blockburger*, 284 U.S. at 304 (emphasis added). In so doing, the *Blockburger* Court expressly refers to "statutory provisions," not statutes, which undermines the Government's contention that the statutes in question must "overlap completely" for a count to be multiplicitous. (Mult. Oppo. at 5); *cf.* Black's Law Dictionary (12th ed. 2024) (defining "provision" as "a clause in a statute, contract, or other legal instrument"). Moreover, the use of the phrase "each provision" in conjunction with the phrase "which *the other* does not" strongly suggests that the Court should compare only two provisions — one in statute A, and one in statute B — rather than the statutory provisions in their entirety, as the Government's theory would suggest.

The Court's reading of *Blockburger* also comports much more readily with Supreme Court case law than does the Government's proposed approach. The *Dixon* Court's discussion of its *per curiam* opinion in *Harris v. Oklahoma* is instructive on this point. In finding that the Double Jeopardy Clause barred prosecution of the defendant for both armed robbery and felony murder under Oklahoma law, the Court implicitly acknowledged that the specific elements of the predicate felony *as charged* constituted the relevant elements for its *Blockburger* analysis, not

the felony murder statute's general provisions that merely incorporate a host of felonies as predicate crimes. *See Dixon*, 509 U.S. at 717–18 (Rehnquist, C.J., concurring in part) (construing armed robbery as the relevant lesser included offense for *Blockburger* purposes, even "[t]hough the felony-murder statute in *Harris* did not require proof of armed robbery"). Had the Supreme Court adopted the Government's proposed approach and ignored the specific charging context, it would have found no double jeopardy problem in *Harris*, because Oklahoma's felony-murder statute does not require prosecutors to "always prove the elements" of armed robbery to obtain a conviction.[13] *Harris* and *Dixon* thus support the Court's interpretation of *Blockburger*.

The Court's charge-specific approach further comports with case law from other jurisdictions on the same question. *See, e.g.*, *United States v. Cabrera-Umanzor*, 728 F.3d 347, 353 (4th Cir. 2013) (characterizing Maryland state court opinion as holding that, "when Double Jeopardy issues are raised in cases involving [crimes with multiple paths to conviction] . . . the elements of the crime are the particular alternative elements implicated by the facts of the case" (citing *Vogel v. State*, 543 A.2d 398, 401–02 (Md. Ct. Spec. App. 1988); *see also United States v. Herrold*, 883 F.3d 517, 528–29 (5th Cir. 2018), *overruled on other grounds*, 139 S. Ct. 2712 (2019) ("When statutory alternatives require proof of different facts, they lead to different outcomes under the *Blockburger* test."). By contrast, the Government offers no authoritative case law supporting either its assertion that, where "two statutes do not overlap completely . . .

---

[13]     In rendering an opinion as to the case before it, the *Dixon* Court could not agree as to whether the District of Columbia's criminal contempt statute was similarly susceptible to a charge-specific analysis. While Justices Scalia and Kennedy held that the crime of criminal contempt "cannot be abstracted from" the elements of the specific underlying violation, Chief Justice Rehnquist opined that, in the context of criminal contempt, underlying offenses are "separate and distinct for double jeopardy purposes." *Dixon*, 509 U.S. at 719 (Rehnquist, C.J., concurring in part). Significantly, however, both opinions endorse the Court's approach in *Harris* discussed above.

they are not multiplicitous," or its claim that, where a defendant can violate one statute without necessarily violating the other, "two statutes are not multiplicitous." (Mult. Opp. at 5, 7.)[14]

The Government's preferred approach to *Blockburger* would also permit a dangerous erosion of double jeopardy protections under statutes, like § 2339A and § 832(a), that provide alternative means or elements to obtain a conviction. By the Government's logic, anyone convicted under such a statute could be subsequently tried and convicted for the exact same offense under a similarly worded statute, so long as that other statute incorporates optional provisions, since the two laws would "not overlap completely." This result clearly flies in the face of the Supreme Court's oft-repeated pronouncement that "no man shall be twice punished by judicial judgments for the same offence," *Ex parte Lange*, 85 U.S. 163, 164 (1873), and would directly undermine the Double Jeopardy Clause's core purpose of "protect[ing] against multiple punishments" for one crime. *Smith*, 54 F.4th at 763. The Court declines the Government's invitation to adopt such an approach.

The Court instead proceeds to conduct its *Blockburger* analysis by comparing only the statutory provisions of § 832(a) and § 2339A that stand relevant to the Second Superseding Indictment. Section 832(a) requires the Government to prove that Pahlawan (1) knowingly (2) provided and attempted to provide material support or resources (and aided and abetted others) to, and willfully participated in, (3) a weapons of mass destruction program of a foreign

_____

[14]    The Government's reliance on *Hassoun*, an Eleventh Circuit case, falls short in this regard. As discussed above, the Government cites dictum from that opinion asserting that, under *Blockburger*, courts must seek to ascertain whether "a scenario exist[s] where the hypothetical defendant might violate one section without violating the other," in which case "cumulative punishments are constitutional." *Hassoun*, 476 F.3d. at 1189. The Eleventh Circuit offers no case law in support of this *sua sponte* reformulation of *Blockburger*, which, by its own admission, was not required to resolve the case before it. *Id.* at 1188. In the face of *Blockburger*'s text and its application by other courts, this Court stands unpersuaded by the Eleventh Circuit's novel approach.

terrorist power. Comparing these elements to the relevant elements for Pahlawan's charges under § 2339A, which include (1) providing material support or resources (2) knowing and intending that they be used in preparation for or carrying out a violation of § 832(a) (providing material support or resources to a weapons of mass destruction program of a foreign terrorist power), the Court finds that § 2339A does not "require[] proof of a fact which [§ 832(a)] does not." *Blockburger*, 284 U.S. at 304. If anything, as the Government points out, § 2339A requires *less* than § 832(a), since § 2339A criminalizes not just the provision of material support for carrying out a § 832(a) violation, but also the provision of material support for *preparing* to commit such a violation. 18 U.S.C. § 2339A(a); (Mult. Opp. at 5). Because no additional elements are required for a conviction under § 2339A (when based on § 832(a) as its predicate offense) in the present context, the Court finds that Pahlawan's charges under § 2339A and § 832(a) constitute the same offense and therefore run afoul of the Double Jeopardy Clause.

While the Government makes no argument to this effect, the Court remains mindful that *Blockburger* serves only as a tool for ascertaining congressional intent, and that its results must give way where "a clear indication of contrary legislative intent" exists. *Allen*, 13 F.3d at 108. The Court finds nothing to support such a finding here. The Eleventh Circuit stated as much in *Hassoun*, finding that nothing in its review of § 2339A's legislative history "provides the clear indication of contrary legislative intent necessary to obviate the Blockburger analysis." *Hassoun*, 476 F.3d at 1185. The Court's own review of the legislative history corroborates the Eleventh Circuit's finding. Section 2339A came into existence as part of a wide-ranging anti-crime bill involving thirty-three separate titles and has been subsequently amended (and seen its incorporated subsections from other statutes similarly amended) on numerous occasions; to the extent any clear legislative intent as to § 2339A governed at its inception, such intent has been

30

rendered decidedly amorphous by this point. Pub. L. No. 103-322, § 120005, 108 Stat. 2022 (1994); Pub. L. No. 104-132, §§ 323, 303, 110 Stat. 1255, 1250; Pub. L. No. 108-458, § 6603, 118 Stat. 3762 (2006).  For these reasons, the Court finds that no clear legislative intent exists to justify setting aside the results of its *Blockburger* analysis.[15]

Accordingly, the Court finds that Count Two of the Second Superseding Indictment, which charges Defendant Pahlawan with a violation of 18 U.S.C. § 2339A (predicated on a violation of 18 U.S.C. § 832(a)), is multiplicitous with Counts Three and Four, which charge Pahlawan with substantive violations of § 832(a).  The Court will therefore GRANT Pahlawan's Multiplicity Motion and DISMISS Count Two of the Second Superseding Indictment.[16]

### C.    Pahlawan's Motion *in Limine* (ECF No. 266)

The Court next considers Pahlawan's Motion *in Limine* (ECF No. 266 ("Def.'s MIL")), which seeks to exclude:  (1) any evidence or testimony regarding the deaths of two Navy SEALs during the boarding of the *Yunus*; (2) the use of the term "smuggling" to describe Pahlawan's activities; and (3) any evidence or testimony regarding Hamas-related activities.  The Government agrees not to introduce evidence or testimony regarding the deaths of the two Navy SEALs.  (ECF No. 274 ("Opp. to Def.'s MIL") at 1.)  Accordingly, the Court will DENY AS

---

[15]    The rule of lenity also supports the Court's finding here. *See Bell v. United States*, 349 U.S. 81, 83 (1955) (stating that, "[w]hen Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity" to the defendant).

[16]    Having considered the parties' arguments concerning remedies, the Court sees no reason to delay dismissal of Count Two until after a potential conviction of Pahlawan.  Given the near-total identity of elements between these statutes, the Court does not face the scenario lamented in *Ohio v. Johnson*, 467 U.S. 493 (1984), where the Supreme Court held that pre-trial dismissal of a more serious offense on double jeopardy grounds was improper. *Id.* at 499–500.  By contrast, the similarity between the charges under § 2339A and 832(a) counsels for dismissal of Count Two at this stage, given the important interest in avoiding juror confusion and potential prejudice to the defendant at trial.

MOOT Pahlawan's Motion *in Limine* to the extent that it seeks to exclude any evidence

regarding the deaths of two Navy SEALs during the boarding of the *Yunus* and focuses its

analysis on the two remaining issues.  For the reasons stated below, the Court will GRANT IN

PART and DENY IN PART Pahlawan's Motion *in Limine* as to these two issues (ECF No. 266).

### 1. The Government and its witnesses will be permitted to use the term "smuggling."

Pahlawan seeks to prohibit the Government and its witnesses from using the term

"smuggling" to describe his activities.  (Def.'s MIL at 1.)  In his view, whether Pahlawan

*smuggled* weapons of mass destruction stands irrelevant to the charged offenses, because he does

not face charges for smuggling goods into the United States under 18 U.S.C. § 545.  (*Id.* at 3–4.)

Moreover, according to Pahlawan, smuggling "implies intentional misconduct," rendering the

use of such a term unfairly prejudicial in his case.  (*Id.* (quoting *Dunbar v. United States*, 156

U.S. 185, 193 (1895)).)  Pahlawan further argues that the term "smuggling" risks misleading the

jury into determining Pahlawan's guilt based on the offense of smuggling rather than his charged

offenses.  (ECF No. 286 at 4.)

In response, the Government argues that it "is not limited to using terminology in the

United States Code to describe Pahlawan's conduct" and that Pahlawan "seeks to gag the

government and its witnesses from calling Pahlawan's conduct what it is:  smuggling."  (Opp. to

Def.'s MIL at 1, 9.)  The Government intends to introduce expert testimony detailing the IRGC's

maritime smuggling operations to provide lethal aid and other supplies to the Houthis, as well as

evidence that Pahlawan engaged in maritime smuggling on behalf of the IRGC.  (*Id.* at 5.)

According to the Government, the evidence will demonstrate that "Pahlawan ordered his crew to:

(1) load missile components and other cargo at night; (2) hide that cargo in the net hold of the

dhow; and (3) transfer the cargo from his dhow to another vessel at night off the coast of

Somalia." (*Id.* at 10.) Furthermore, Pahlawan operated a civilian fishing vessel "to camouflage his vessel with routine maritime traffic" in the Arabian Sea. (*Id.*) In the Government's view, as illustrated by the various steps that Pahlawan took to conceal his conduct, "smuggling is an appropriate word to describe [his] conduct without unfairly prejudicing him." (*Id.* at 1.)

As the First Circuit aptly noted, "[i]t is hard to lay down a general rule as to epithet and rhetoric because the considerations are matters of degree." *United States v. Felton*, 417 F.3d 97, 103 (1st Cir. 2005). In exercising its broad discretion to assess whether a party's use of a term at trial would be improper, a trial court may consider a host of factors including the "accuracy in description, threat of unfair prejudice, frequency of use, and alternative means of description." *Id.*

Here, Pahlawan's conduct can accurately be characterized as smuggling in the lay sense of the term. The term "smuggle" is defined as "to convey or introduce surreptitiously." *Smuggle*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/smuggle [https://perma.cc/RK64-RJQN] (last visited Mar. 6, 2025). Pahlawan has been charged with providing (or conspiring to provide) material support or resources, namely "personnel . . . and services (including *smuggling* and transportation of lethal aid and other materials)," to terrorists. (2d Sup. Ind. at 12–15 (emphasis added).) Upon hearing evidence that Pahlawan instructed his crew to hide missile components in the net hold of the *Yunus*, camouflaged as a fishing vessel, for night-time transport to a location off the coast of Somalia for ship-to-ship transfer, the jury could easily understand the lay use of the term "smuggling" to accurately describe the central conduct with which Pahlawan stands charged.

Moreover, there exists no risk of unfair prejudice. Although "smuggling" may carry a connotation that gives rise to a prejudicial effect, as does any evidence tending to show a

defendant's guilt, this results from the acts that Pahlawan engaged in, not the Government's description of those acts.  The instant case does not present a "situation[] in which an epithet carries connotations well beyond the crime charged (e.g., 'murderer' in a case of negligent homicide), or . . . in which the description is gratuitously inflammatory." *Felton*, 417 F.3d at 103.  The term smuggling captures the essence of Pahlawan's charged conduct; as such, the Court finds nothing improper about the Government using a term that accurately summarizes its position.

The Court rejects the argument that the balance should be struck in Pahlawan's favor, because the Government "could simply use the terms 'transported' or 'moved'" to describe his activities.  (ECF No. 286 at 5.)  The Federal Rules of Evidence "do[] not generally require the government to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone." *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998); *see also United States v. Bates*, 865 F.2d 255 (4th Cir. 1988) ("Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing.").  As the Ninth Circuit astutely explained:

> [W]hen the prosecutor has obtained an indictment charging the defendant with a crime, and has in his opening statement told the jury that the defendant will be proved guilty of that crime, and has offered evidence that the crime did in fact occur, there is no rule of evidence or ethics that forbids the prosecutor from referring to the crime by its common name when examining a witness. There is no rule requiring the prosecutor to use a euphemism for it or preface it by the word "alleged."

*People of Territory of Guam v. Torre*, 68 F.3d 1177, 1180 (9th Cir. 1995).  Indeed, federal courts routinely permit the use of more inflammatory terminology than the term "smuggling." *See, e.g.*, *id.* (finding that no objection to the prosecutor's and witness' use of the term "rape" would have been sustained where the defendant faced charges of first- and second-degree criminal sexual

34

conduct); *Felton*, 417 F.3d at 103 (permitting the Government to characterize the defendant as a "terrorist" throughout trial even when he was "not charged with offenses so labeled"). Consequently, the Government need not sanitize its vocabulary to present its view of the evidence in this case.

Lastly, Pahlawan argues that allowing the Government and its witnesses to use the term "smuggling" would mislead the jury into determining Pahlawan's guilt based on a separate federal crime for the smuggling of goods. (ECF No. 266 at 4; ECF No. 286 at 4.) The Court easily rejects this argument. The jury will receive careful instructions from the Court as to the charges against Pahlawan, including the elements that the Government must prove beyond a reasonable doubt. The instructions will eliminate any risk that the jury would determine Pahlawan's guilt based on any other non-charged offense.

For these reasons, the Court will DENY Pahlawan's Motion *in Limine* to the extent that it seeks to preclude the Government and its witnesses from using the term "smuggling."

### 2. The Government will be permitted to admit Hamas-related evidence, except for evidence of acts of sexual violence or mutilation.

Pahlawan also seeks to exclude any evidence or testimony regarding Hamas. According to the Second Superseding Indictment, Iran and the IRGC support various terrorist groups, including Hamas and the Houthis, by providing "significant financing, military training, military supplies and weapons, and diplomatic support." (2d Sup. Ind. ¶ 9.) The Second Superseding Indictment describes the October 7, 2023 Hamas attack on Israel, where "hundreds of civilians, including numerous Americans and Israeli soldiers, were killed and wounded," while others were kidnapped and taken hostage. (*Id.* ¶ 12.) The Government alleges that beginning soon after the October 7, 2023 attack and continuing through the time of filing, the Houthis have used Iranian weaponry to engage in "numerous maritime attacks on United States and allied military and

commercial vessels throughout a critical global transportation route in the Red Sea." (*Id.* ¶ 13.) According to the Government, the "Houthi rebel forces have made clear [that] their attacks are to deter Israel from responding to the October 7 attack and to punish anyone who supports Israel, including the United States." (*Id.*)

In light of Pahlawan's charged offenses and the defenses that he has indicated that he may raise at trial, the Government anticipates introducing expert testimony about the IRGC and members of the so-called "axis of resistance": the Houthis, Hezbollah and Hamas. (*Id.* at 6.) This testimony will "describe the October 7, 2023 terrorist attack at a higher level" to provide context for the regional conflict related to Israel, Iran, Hamas and the Houthis. (*Id.* at 17.) In addition, the Government intends to introduce expert testimony regarding the status and conduct of the IRGC to rebut Pahlawan's argument that he qualifies for immunity from prosecution under § 2280a. (*Id.* at 6–7.) Specifically, the Government intends to introduce evidence that the IRGC has violated international humanitarian law, for example, by "using drones to attack commercial vessels in the Persian Gulf and the training, deployment, and use of children soldiers in Syria." (*Id.* at 7.) Moreover, the Government intends to explain how the IRGC's support of its proxies (the Houthis, Hezbollah and Hamas) further the proxies' violations of international humanitarian law. (*Id.*) As to the October 7, 2023 Hamas attack on Israel, the Government also intends to introduce "brief testimony about the targeting of civilian populations, the use of sexual violence by Hamas against victims, hostage taking, willfully killing civilians in Hamas's custody, and mutilating human bodies." (*Id.* at 6–7.) As for Hezbollah, the Government "intends to introduce testimony regarding Hezbollah's indiscriminate attack on civilian populations in Israel, such as by using unguided rockets." (*Id.* at 7.) The Government acknowledges the "graphic nature of this testimony" and expects that the descriptions will be "brief and high-level." (*Id.*)

Pahlawan argues that Hamas-related evidence should be excluded under Rules 401 and 403. Although the Government included information regarding Hamas in the Second Superseding Indictment, Pahlawan has not been charged with providing support to Hamas. (Def.'s MIL at 6.) Rather, the Government alleges that Pahlawan provided material support to Iran and the IRGC's weapons of mass destruction program by transporting weapons to the Houthis (Counts Three and Four) and transported explosive material on board a ship "knowing that it was intended to be used to cause, or in a threat to cause, death to any person or serious injury or damage for the purpose of intimidating a population, or compelling a government or an international organization to do or to abstain from doing any act" (Counts Five and Six). (2d Sup. Ind. at 14–17.) Thus, Pahlawan contends that evidence regarding Hamas' terrorist activities, including its October 7, 2023 attack on Israel, bears no relevance and, even if marginally relevant, should be excluded under Rule 403. (Def.'s MIL at 6.)

The Government responds by arguing that Hamas-related evidence qualifies as relevant to: (1) Counts Five and Six, which requires the Government to prove that the warhead on the *Yunus* was intended to be used for terroristic purposes; (2) whether Pahlawan qualifies for the statutory exceptions set forth in § 2280a(c); and (3) Counts One through Four, which requires the Government to prove that Pahlawan provided material support to Iran and the IRGC's weapons of mass destruction program. (Opp. to Def.'s MIL at 1–2.) The Government also notes that the Court previously determined that Hamas-related evidence qualifies as admissible against Defendant Mohammad Mazhar and that the same reasoning applies with greater force to Pahlawan, who faces charges and has raised defenses that put Hamas at issue. (*Id.* at 2.)

The Court begins with the general rule that relevant evidence is admissible. Fed. R. Evid. 402. Evidence qualifies as relevant if "it has any tendency to make a fact more or less probable

than it would be without the evidence[] and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. However, even relevant evidence may be excluded under Rule 403 "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues [or] misleading the jury." Fed. R. Evid. 403.

To begin, the Court notes that it previously denied Defendant Mazhar's motion *in limine* to exclude any evidence of events in the Middle East, including the October 7, 2023 attack, pursuant to Rules 401 and 403. (ECF No. 96; ECF No. 268 at 47.) In rejecting Mazhar's arguments, the Court recognized that these events — events that Defendants claimed to know nothing of — may demonstrate consciousness of guilt. (ECF No. 268 at 45); *see also United States v. Elsheikh*, 578 F. Supp. 3d 752, 780 (E.D. Va. 2022), *aff'd*, 103 F.4th 1006 (4th Cir. 2024) (recognizing that "the making of false exculpatory statements . . . is probative of a Defendant's knowledge of his wrongdoing"). Evidence that the *Yunus* was carrying weapons of mass destruction just months after the Houthis launched a campaign in response to the October 7 attack and the ensuing war in Gaza not only relates to the elements of the offense with which Mazhar stands charged, but it also constitutes part of an "eventful narrative — a relevant part of the very transactions leading to the defendant's arrest and indictment in this case." *United States v. Miller*, 61 F.4th 426, 429–30 (4th Cir. 2023) (cleaned up). The same holds true as applied to Pahlawan, who stands charged under the same statute as Mazhar in Count Nine.

Moreover, testimony related to the October 7, 2023 Hamas attack also proves relevant to Counts Five and Six, which require the Government to prove that the warhead discovered on the *Yunus*, a component for an antiship ballistic cruise missile, was intended for terroristic purposes. *See* 18 U.S.C. § 2280a(a)(1)(B)(i) (criminalizing the transport on board a ship of an explosive material "knowing that it was intended to be used to cause, or in a threat to cause, death to any

person or serious injury or damage for the purpose of intimidating a population, or compelling a government or an international organization to do or to abstain from doing any act"). According to the Government, in response to Israel's invasion of Hamas-controlled Gaza after the October 7, 2023 attack, the Houthis began a campaign of launching missiles, including antiship ballistic cruise missiles, at military and commercial vessels in the Red Sea. These attacks were designed to deter Israel from responding to the Hamas attack and to punish supporters of Israel. Thus, the Government must be permitted to discuss Hamas' October 7, 2023 attack to explain the intended purpose for the warhead found on the *Yunus*. Because evidence of the October 7, 2023 Hamas attack relates directly to elements of the offense and the context in which the crime occurred, and because the danger of unfair prejudice resulting from this evidence does not substantially outweigh the significant probative value of this evidence, the Court will deny Pahlawan's motion *in limine* to the extent that it seeks to exclude evidence related to the October 7, 2023 attack.

The Court further finds that evidence regarding violations of international humanitarian law by the IRGC and its proxies, including Hamas, is highly probative of whether the IRGC constitutes a "military force of a state" within the meaning of § 2280a(c), and whether its "official duties" include providing military supplies and weapons to terrorist groups. *See* 18 U.S.C. § 2280a(c)(2) (designating that § 2280a shall not apply to "activities undertaken by military forces of a state in the exercise of their official duties"). The fact that Hezbollah uses unguided rockets to indiscriminately attack civilian populations in Israel, for instance, tends to establish that the IRGC is not engaging in official duties as a military force of a state when it arms its proxies. Likewise, evidence that the IRGC — a designated foreign terrorist organization — uses drones to attack commercial vehicles in the Persian Gulf and deploys children soldiers to Syria tends to make it less probable that the IRGC constitutes a "military

force of a state" for purposes of § 2280a(c).  Any comparable evidence of what Pahlawan terms "Hamas's terrorist activities" would be similarly probative of Pahlawan's ineligibility for the § 2280a(c) exceptions.  (Def.'s MIL at 6.)  Although the Court acknowledges the potentially prejudicial effect of introducing such evidence at trial if left uncabined, the Court stands unconvinced that such prejudice would be "unfair," as Rule 403 requires, or that it would substantially outweigh the evidence's highly probative nature when the Court places limits on the extent of the evidence and also issues cautionary instructions that the parties may offer.  As such, because evidence that the IRGC and its proxies (including Hamas) violate international humanitarian law relates to whether Pahlawan qualifies for the affirmative defenses listed in § 2280a(c), and because its probative value is not substantially outweighed by the danger of unfair prejudice, Rules 401 and 403 do not bar admission of such evidence relating to Hamas.

However, the Court will impose boundaries on this evidence.  For example, the Government may not introduce evidence that Hamas committed sexual violence against victims and mutilated human bodies.  Such evidence stands irrelevant to whether the Iranian weapons transported aboard the *Yunus* would be used for terrorist purposes or whether Pahlawan provided material support to Iran and the IRGC's weapons of mass destruction program.  Nor do the details of Hamas' sexual violence and mutilation meaningfully bear on whether the IRGC engages in official duties when it provides weapons to terrorist groups.  Even if evidence of such atrocities possesses marginal probative value, its graphic and inflammatory nature creates a "genuine risk that the emotions of a jury will be excited to irrational behavior." *Hassan*, 742 F.3d at 132; *see also* Opp. to Def.'s MIL at 7 (acknowledging the "graphic nature" of this evidence).  To be sure, as the Court previously explained, evidence demonstrating that the IRGC and its proxies violate international humanitarian law is relevant to rebutting § 2280a(c)'s

40

affirmative defenses. However, this logic does not extend to every attenuated act of terrorism committed by members of the "axis of resistance." Because evidence that Hamas committed sexual violence and mutilated bodies does not sufficiently relate to the Iranian weapons that Pahlawan has been charged with transporting, and because such evidence proves likely to incite the emotions of the jury, Rules 401 and 403 prohibit its admission at trial.

For the reasons stated above, the Court will DENY Pahlawan's Motion *in Limine* to the extent that it seeks to exclude any testimony describing the October 7, 2023 attack. The Government's expert witness will be permitted to "describe the October 7, 2023 terrorist attack at a higher level" to provide the necessary context for the regional conflict. (Opp. to Def.'s MIL at 17.) In addition, the Government will be permitted to introduce evidence that the IRGC and its proxies (the Houthis, Hezbollah and Hamas) have violated the law of armed conflict to rebut Pahlawan's affirmative defenses. However, the Court will GRANT Pahlawan's Motion *in Limine* to the extent that it seeks to exclude evidence that Hamas committed sexual violence against victims and mutilated human bodies.[17]

### D.    The Government's Motion *in Limine* (ECF No. 237)

The Court proceeds to consider the Government's Motion *in Limine* to Admit Certain Evidence, wherein the Government seeks to admit three sets of evidence. (ECF No. 237 ("Gov't's MIL").) First, the Government seeks to introduce evidence of an interdiction conducted by United States coalition forces in September 2015, during which the military interdicted a dhow off the coast of Somalia that Defendant Shahab Mir'Kazei owned and used to smuggle Iranian advanced conventional weaponry from Iran to Yemen through Somalia.

---

[17]    Should Defendants seek a cautionary instruction when this evidence is offered at trial, they must submit any proposed instruction together with all other jury instructions. These instructions remains due no later than April 18, 2025.

Second, the Government moves for admission of evidence concerning the December 2023 arrest

of Pahlawan and his crew by authorities in Iran, who were only released after Pahlawan

contacted Shahab and his brother, Yunus Mir'Kazei.  Third, the Government seeks to introduce

evidence of Pahlawan's January and February 2024 instructions to other crew members to lie to

federal authorities about material facts, and Pahlawan's later threats to harm crew members and

their families if they told the truth.  Pahlawan opposes the Government's Motion.[18]  (ECF No.

259 ("Opp. to Gov't's MIL").)  The Government elected not to file a reply, and the time to do so

has elapsed, rendering the motion ripe for resolution.

For the reasons stated below, the Court will GRANT IN PART and DENY IN PART the

Government's Motion *in Limine* (ECF No. 237).  The Government is precluded from presenting

evidence of the 2015 interdiction of Shahab's vessel.  However, the Government may admit

evidence of Defendants' Iranian arrest and Pahlawan's threats against the crew members.

### 1.    The Government will be precluded from introducing evidence of the September 2015 interdiction of Shahab Mir'Kazei's vessel.

The Government seeks to introduce evidence of a 2015 interdiction of a vessel owned by

Shahab.  According to the Government, United States coalition forces conducted a flag

verification boarding of a stateless vessel traveling in the Arabian Sea.  (Gov't's MIL at 4.)  The

boarding team searched the vessel and discovered over 100 cases of Iranian advanced

conventional weaponry in the vessel's net hold.  (*Id.* at 4–5.)  According to the Government, the

crew members on the vessel — none of whom are standing trial before this Court — detailed

Shahab's *modus operandi* for smuggling weapons between Iran and Yemen as follows.  (*Id.* at

5.)  Shahab, as the owner of the vessel, instructed the captain to transport weapons aboard the

---

[18]    Mazhar elected not to file a response.  Nonetheless, the Court will assume, for the
purposes of this Opinion, that Mazhar adopts Pahlawan's opposition.

vessel and recruit fourteen crew members for catching and selling fish. (*Id.*) Shahab instructed the captain of the vessel to load the weapons at night and provided coordinates for a ship-to-ship transfer off the coast of Somalia. (*Id.* at 6.) After unloading the weapons, the captain would instruct his crew to catch fish before returning to Iran. (*Id.*) The captain and crew members anticipated payment of significant sums of money for these smuggling voyages. (*Id.*) The Government intends to present evidence of this 2015 interdiction at Pahlawan's trial to establish that Pahlawan knew that he was smuggling Iranian weapons for Iran or the IRGC.

Federal Rule of Evidence 404(b) prohibits the use of evidence of other crimes, wrongs or acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident. Fed. R. Evid. 404(b)(2). This list of permissible purposes for Rule 404(b) or prior bad acts evidence "is not exhaustive." *United States v. Sterling*, 860 F.3d 233, 246 (4th Cir. 2017).

Rule 404(b), however, "does not regulate acts intrinsic to the conduct charged." *United States v. Underwood*, 95 F.4th 877, 891 (4th Cir. 2024). The Fourth Circuit has held that intrinsic acts include, among other things, those that are involved in the "same series of transactions as the charged offense, or [that are] necessary to complete the story of the crime on trial." *United States v. Webb*, 965 F.3d 262, 266 (4th Cir. 2020) (cleaned up). Moreover, in conspiracy cases, "the government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment." *United States v. Janati*, 374 F.3d 263, 270 (4th Cir. 2004).

Evidence of other acts that are "extrinsic" to the one charged fall under Rule 404(b)'s limitations. *Underwood*, 95 F.4th at 891. The Fourth Circuit has articulated a four-prong test to assess the admissibility of evidence pursuant to Rule 404(b). *United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997). Under this test, evidence of prior bad acts becomes admissible if it satisfies the following criteria: (1) the "evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant"; (2) the "act must be necessary in the sense that it is probative of an essential claim or an element of the offense"; (3) "the evidence must be reliable"; and (4) "the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice." *Id.* The Government "bears the burden of establishing that evidence of a defendant's prior bad acts is admissible for a proper purpose." *United States v. Hall*, 858 F.3d 254, 266 (4th Cir. 2017).

The Government does not argue that evidence of the 2015 interdiction qualifies as intrinsic evidence. (Gov't's MIL at 6.) Instead, the Government contends that Shahab's prior bad acts qualify as admissible extrinsic evidence pursuant to Rule 404(b). (*Id.*) In the Government's view, evidence of Shahab's "*modus operandi* of informing and instructing dhow captains about the details of his smuggling operations" demonstrates that "Pahlawan *knew* he was smuggling advanced conventional weaponry for Shahab and Iran." (*Id.* at 6–7 (emphasis in original).) Yet, the Government highlights its own argument's weakness by acknowledging that "this evidence is about co-conspirator Shahab's prior conduct as it relates to Pahlawan's intent" and therefore is "one step removed from traditional *modus operandi* evidence of a *defendant's* own prior conduct." (*Id.* at 7 (emphasis in original).)

The Court finds that the Government fails to establish the admissibility of the 2015 interdiction under Rule 404(b). Under the first step of the Rule 404(b) inquiry, the "evidence

44

must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant." *Queen*, 132 F.3d at 997. In the Rule 404(b) context, prior bad acts evidence qualifies as relevant only if the jury can "reasonably conclude that the act occurred and that the defendant was the actor." *Sterling*, 860 F.3d at 248 (quoting *Huddleston v. United States*, 485 U.S. 681, 689 (1988)). Here, no nexus exists between the charged conduct and the prior activity, because Pahlawan had no involvement with the 2015 interdiction. The prior criminal activity that the Government seeks to introduce against Pahlawan involved an entirely different crew on an entirely different vessel nearly a decade before the events in question. Because Pahlawan was not an actor in the 2015 interdiction, any prior bad acts possess no relevance to his charged conduct.

Even assuming that evidence of Shahab's prior bad acts qualifies as relevant to Pahlawan's intent, the prejudicial effect of introducing such evidence substantially outweighs any potential relevance. *See Queen*, 132 F.3d at 997 (recognizing that evidence sought to be admitted under Rule 404(b) must also satisfy Rule 403). Testimony that a different captain knowingly smuggled weapons for Shahab from Iran to a location off the coast of Somalia under the guise of a fishing voyage unfairly attributes knowledge to Pahlawan, who was not associated with the 2015 interdiction in any way. Pahlawan has a right to be tried based on the evidence against him, not on the prior criminal activity of another. Because testimony regarding the 2015 interdiction unfairly imputes specific knowledge to Pahlawan, Rule 403 bars such evidence.

In sum, the Government fails to meet its burden of establishing that evidence of the 2015 interdiction is admissible under Rule 404(b). *Hall*, 858 F.3d at 266. Accordingly, the Court will DENY the Government's Motion *in Limine* on this ground.

### 2. The Government may introduce evidence of Defendants' December 2023 Iranian arrest.

The Government also anticipates introducing evidence demonstrating that Iranian authorities arrested Defendants and other crew members upon their return from a smuggling voyage in December 2023. (Gov't's MIL at 11.) Pahlawan purportedly steered his dhow into Konarak, Iran without proper clearance, and none of the crew members possessed the necessary paperwork to legitimately operate as fishermen in Iran. (*Id.*) The Iranian authorities detained Defendants and the rest of the crew in a detention center for approximately twenty-four hours, and the detainees faced the risk of deportation back to Pakistan. (*Id.*) Pahlawan allegedly called Shahab and Yunus Mir'Kazei (collectively, the "Mir'Kazeis"), who arrived at the detention center and facilitated Defendants' immediate release. The Mir'Kazeis then transported Defendants and the other crew members back to the *Yunus* in Konarak, Iran. (*Id.*) According to the Government, Defendants departed on another smuggling voyage within approximately two weeks. (*Id.*) The Government asserts that such evidence qualifies as intrinsic to the charged crimes. (*Id.*) Pahlawan's briefing does not meaningfully engage with the Government's argument. (*See* Opp. to Gov't's MIL at 7–8 (asking the Court to "defer ruling on the admissibility of evidence of the Iranian arrests until trial").)

The Court finds that evidence of Defendants' Iranian arrests constitutes intrinsic evidence and may therefore be admitted in the Government's case-in-chief. These acts, which occurred during the charged conspiracy, establish the extent of the Mir'Kazeis' influence in Iran. Indeed, various crew members referenced this event in their deposition testimony as an indication of the Mir'Kazeis' ability to carry out Pahlawan's alleged threats to his crew members if they told law enforcement the truth. Moreover, by facilitating Defendants' immediate release from the Iranian detention facility, the Mir'Kazeis acted in furtherance of the conspiracy charged in Count One,

allowing Defendants to depart on their next smuggling voyage two weeks later.  Because

evidence of Defendants' 2023 Iranian arrest completes the story of the charged crimes, such

evidence qualifies as intrinsic and is not governed by Rule 404(b).  Accordingly, the Court will

GRANT the Government's Motion *in Limine* as to this evidence.

> **3.** **The Government may introduce evidence of Pahlawan's January and February 2024 instructions and threats.**

Finally, the Government seeks to present evidence that Pahlawan instructed multiple

crew members to lie to federal law enforcement while on the *Yunus* in January 2024, and later

threatened those crew members to lie about material facts on the *U.S.S. Puller* in February 2024.

Evidence that Pahlawan threatened crew members on the *Yunus* by leveraging his relationship

with the Mir'Kazeis qualifies as intrinsic to the witness tampering charge in Count Seven.  (2d

Sup. Ind. at 18.)  Moreover, the Court has already determined that evidence of Pahlawan's

alleged threats on the *U.S.S. Puller* are admissible to establish consciousness of guilt.  (ECF No.

302 at 21); *see United States v. Hart*, 91 F.4th 732, 741 (4th Cir. 2024) ("[W]e have repeatedly

held that evidence of witness intimidation is admissible under Rule 404(b) to prove

consciousness of guilt and criminal intent.").  Accordingly, the Court will GRANT the

Government's Motion *in Limine* on this ground.

> **E.** **Defendants' Motion to Dismiss for Lack of Jurisdiction (ECF No. 94)**

Lastly, the Court considers Defendants' motion to dismiss their charges pursuant to 18

U.S.C. § 2237.  (ECF No. 94.)[19]  First, Defendants argue that the *Yunus* was "Iranian registered"

---

[19] Ghufrun Ullah originally filed a Motion to Dismiss Counts Ten and Eleven of the Superseding Indictment.  (ECF No. 94.)  Defendants Pahlawan and Mazhar then adopted Ullah's Motion.  (ECF Nos. 116, 119.)  Thereafter, the grand jury returned a Second Superseding Indictment.  (ECF No. 239.)  The parties agree that the issues raised in the instant Motion remain ripe for resolution.  (ECF Nos. 252, 254, 257.)  The Court therefore considers Defendants' arguments relative to the Second Superseding Indictment.

and thus did not constitute a "vessel subject to the jurisdiction of the United States." Second, Defendants submit that the extraterritorial application of § 2237 qualifies as arbitrary and fundamentally unfair in violation of their due process rights. The Court previously rejected similar arguments made by Pahlawan regarding Counts One through Four of the Second Superseding Indictment. (ECF No. 268.) For the reasons set forth in the Court's January 3, 2025 Memorandum Opinion (ECF No. 268), and as reiterated below, the Court will DENY Defendants' Motion to Dismiss (ECF No. 94).

       **1.**    **The *Yunus* qualifies as a stateless vessel, rendering Defendants subject to the jurisdiction of the United States.**

Pursuant to 18 U.S.C. § 2237(a)(2)(B), "[i]t shall be unlawful for any person on board . . . a vessel subject to the jurisdiction of the United States" to "provide materially false information to a Federal law enforcement officer during a boarding of a vessel regarding the vessel's destination, origin, ownership, registration, nationality, cargo, or crew." Congress expressly adopted a definition of the term "vessel subject to the jurisdiction of the United States" as provided under the Maritime Drug Law Enforcement Act ("MDLEA"). 18 U.S.C. § 2237(e)(3); 46 U.S.C. § 70502(d)(1). Section 70502(d)(1) defines "vessel without nationality" to include, in relevant part:

> (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; [and] . . .

> (D) a vessel aboard which no individual, on request of an officer of the United States . . . claims to be the master or is identified as the individual in charge, and that has no other claim of nationality or registry under paragraph (1) or (2) of subsection (e).

46 U.S.C. § 70502(d)(1)(B), (D). The reference to "other claim[s] of nationality or registry" in subsection (D) concerns claims of nationality based on either: (1) "possession on board the

vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas" or (2) "flying its nation's ensign or flag." 46 U.S.C. § 70502(e)(1), (2).

Based on the facts proffered by the Government, the Court finds that the *Yunus* qualifies as a vessel without nationality under the MDLEA's definition. The Boarding Team included officers of the United States with the appropriate authority (i.e., members of the United States Coast Guard Maritime Safety and Security Team). (2d Sup. Ind. ¶ 1.) According to the Second Superseding Indictment, Defendant Pahlawan, who served as the captain of the *Yunus*, failed to identify himself as such. (*Id.* ¶¶ 1, 3, 45.) And neither he nor any crew members made a "claim of nationality or registry" for the dhow. (ECF No. 159 at 27; 2d Sup. Ind. ¶¶ 1, 37.) These facts suffice to establish that Defendant's vessel was stateless under the criteria set forth in § 70502(d)(1)(B). As to § 70502(d)(1)(D), the Government additionally proffers that no paperwork "evidencing the vessel's nationality" was provided or found on board; rather, Defendant Pahlawan told the Boarding Team that the paperwork was no longer available. (ECF No. 159 at 27–28; ECF No. 239 ¶ 45 (alleging that Defendant Pahlawan stated "that the captain had departed their dhow for another dhow while at sea and took with him all of their dhow's paperwork").) Nor did the boat fly any flag or bear any markings. (ECF No. 159 at 27; 2d Sup. Ind. ¶¶ 1, 37.) In sum, nothing on board served to identify the vessel's nationality, and despite the requests of authorized federal officers, nobody on board made any effort to do so, either. For these reasons, the Court finds that the *Yunus* qualified as stateless for purposes of § 2237.

Defendants contend that there exists evidence of a "verbal claim of nationality or registry by the master or individual in charge" to make a claim under 46 U.S.C. § 70502(e)(3), because information in discovery illustrates that the *Yunus* had been registered to Iran in at least one

database. (ECF No. 217.) Even assuming its truth, this registration does not change the Court's outcome. 46 U.S.C. § 70502(e) sets forth an exhaustive list for making a "claim of nationality or registry." *See* 46 U.S.C. § 70502(e) (stating that "[a] claim of nationality or registry under this section includes *only*" three criteria (emphasis added)). Registration by electronic means does not amount to a "verbal claim" by Defendant Pahlawan, as required by § 70502(e)(3). *See Verbal*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining verbal as "[o]f, relating to, or expressed in words" or "[l]oosely, of, relating to, or expressed in spoken words"). Nor does such registration satisfy any of the other criteria required to make a claim of nationality or registry.

Likewise, an AIS broadcast indicating Iranian registry does not amount to a "verbal claim of nationality or registry by the master or individual in charge" sufficient to make a claim under 46 U.S.C. § 70502(e)(3). AIS is a system used on vessels that automatically broadcasts information, such as a vessel's identity, position and speed, via a VHF transmitter.[20] These AIS broadcasts are not "expressed in words," as required to make a verbal claim; instead, such information is propagated through electronic signals. In addition, these signals are transmitted in the background automatically and thus do not constitute a claim *made by* the master or individual in charge. Nor does the AIS broadcast satisfy the other two criteria under 46 U.S.C. § 70502(e) to make a claim of nationality or registry based on possession and production of documents or flying a nation's flag.

The Court therefore finds that the *Yunus* satisfies the requirements of a vessel without nationality as articulated by Congress and that Defendants stand subject to the jurisdiction of the

---

[20]    NATO, *AIS (Automatic Identification System) Overview*, https://shipping.nato.int/nsc/operations/news/2021/ais-automatic-identification-system-overview [https://perma.cc/E9FS-SAND] (last visited Mar. 6, 2025).

United States.  Thus, the Court will DENY Defendants' Motion to Dismiss on jurisdictional grounds.

### 2.      Extraterritorial application of § 2237 to Defendants would not be arbitrary or fundamentally unfair.

The Court also finds that Defendants' arguments concerning alleged violations of their due process rights lack merit.  As the Court explained in its January 3, 2025 Memorandum Opinion, (ECF No. 268 at 26–32), the Government does not need to establish a "nexus" between Defendants and the United States where Defendants perform criminal acts aboard a stateless vessel.  By acting aboard such a vessel, Defendants also possessed sufficient notice that any self-evidently criminal conduct subjected them to prosecution by any country, including the United States.  (*Id.* at 31.)  Given that Defendants' actions in lying to law enforcement officials were self-evidently criminal and given this Court's earlier determination that the *Yunus* qualified as stateless, this Court finds that it would be neither arbitrary nor fundamentally unfair to prosecute Defendants under § 2237.  For these reasons, the Court will DENY Defendants' Motion to Dismiss on due process grounds.

## IV.    CONCLUSION

The preceding analysis leads the Court to draw the following conclusions.

First, the Court finds the allegations contained in Counts Five and Six of the Second Superseding Indictment not materially inconsistent or repugnant.  The Court therefore rejects Defendant's arguments for dismissal on these grounds.

Second, the Court finds that the exceptions set forth at 18 U.S.C. § 2280a(c) constitute affirmative defenses against charges under § 2280a, not a statutory element.  Pahlawan bears the burden of proof if he chooses to assert these affirmative defenses.  To prevail, he must prove that he falls within the statutory exception by a preponderance of the evidence.

Third, the Court finds that Pahlawan's charges under § 2339A and § 832(a) constitute the same offense and therefore run afoul of the Double Jeopardy Clause, because no additional elements are required for a conviction under § 2339A (when based on § 832(a) as its predicate offense) in the present context.

Fourth, the Government and its witnesses will be permitted to use the term "smuggling" to describe Pahlawan's activities. In addition, the Government will be permitted to describe the October 7, 2023 attack to provide the necessary context for the regional conflict and introduce evidence that the IRGC and its proxies, including Hamas, have violated the law of armed conflict to rebut Pahlawan's affirmative defenses. However, the Government may not admit any evidence that Hamas committed sexual violence against victims and mutilated human bodies.

Fifth, the Government will be precluded from presenting evidence of the 2015 interdiction of Shahab's vessel. However, the Government may admit evidence of Defendants' 2023 Iranian arrest and Pahlawan's instructions to lie and alleged threats against his crew members.

Lastly, the Court finds that the *Yunus* qualifies as a stateless vessel, rendering Defendants subject to the jurisdiction of the United States. Furthermore, extraterritorial application of 18 U.S.C. § 2237 does not qualify as arbitrary or fundamentally unfair.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Alexandria, Virginia
Date: March 14, 2025