IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

      v.                                 Criminal No. 3:24cr41 (DJN)

MUHAMMAD PAHLAWAN, *et al.*,
      Defendants.

**MEMORANDUM OPINION**

This matter comes before the Court on various pretrial motions filed by Defendants

Muhammad Pahlawan ("Pahlawan") and Mohammad Mazhar ("Mazhar") (collectively,

"Defendants").[1]  First, Defendants Pahlawan and Mazhar move to suppress un-*Mirandized*

statements made to Chief Petty Officer Justin Mulkey ("Mulkey") during both their group and

individual interviews on board the *Yunus*, and Defendant Pahlawan additionally moves to

suppress his *Mirandized* statements made to FBI agents on board the *USS Lewis B. Puller* (the

"*USS Puller*").  (ECF Nos. 113, 117.)  Second, Defendants filed a motion to dismiss pursuant to

Federal Rule of Criminal Procedure 5(a), which sought dismissal of their charges due to an

---

[1]      The original motions referenced classified material.  To protect all classified information, the Court implemented and followed the procedures set forth in the Classified Information Procedures Act ("CIPA").  The Court conducted a CIPA section 6(a) hearing, as a result of which the Court accepted certain unclassified substitutes for classified documents, because these substitutes "provide the defendant with substantially the same ability to make his defense as would disclosure of the specific classified information."  CIPA § 6(c); (ECF No. 308).  For purposes of resolving the instant motions, the Court utilizes these unclassified substitutes.

      In addition, the instant motions originally sought dismissal or suppression of certain statements in relation to the Superseding Indictment.  (ECF No. 79.)  The grand jury subsequently returned a Second Superseding Indictment.  (ECF No. 239.)  The parties confirmed that the issues raised in the instant motions remain ripe under the Second Superseding Indictment.  (ECF No. 252 at 1; ECF No. 257 at 2; ECF No. 254 at 2–3.)  The Court therefore considers the arguments put forward in Defendants' motions relative to the Second Superseding Indictment.

unreasonable delay in presentation. (ECF No. 103 ("Rule 5(a) Motion").)[2] Defendants later renewed their Rule 5(a) Motion with a different requested remedy, now seeking suppression of all statements made on the *Yunus* and the *USS Puller*, as well as all evidence extracted from electronic devices, rather than dismissal of the indictment. (ECF No. 360 ("Pahlawan 2d Suppl. Br.") at 12.)[3] Lastly, Defendants filed a motion to dismiss all charges for destruction of evidence in violation of their rights to due process. (ECF No. 104 ("Spoliation Motion").)[4] According to Defendants, they stand entitled to relief for the Government's failure to preserve the *Yunus*, because its exterior markings and dimensions, along with its physical condition and information aboard the vessel concerning its route of travel, contained exculpatory value. (*Id.* at 12–16.)

The motions have been fully briefed, and the parties submitted supplemental briefing regarding the suppression and presentment issues. (ECF Nos. 300, 311, 314, 326.) The Court conducted an evidentiary hearing from March 25, 2025 to March 28, 2025, (ECF Nos. 351–53 ("Hr'g Tr.")), and the parties submitted further supplemental briefing to address additional issues that arose during the evidentiary hearing, (ECF Nos. 358, 360, 361), rendering the issues ripe for resolution. For the reasons set forth below, the Court will DENY Defendants' Motions to Suppress, Rule 5(a) Motion and Spoliation Motion. (ECF Nos. 103, 104, 113, 117.)

---

[2]    Pahlawan originally filed the Rule 5(a) Motion, and Mazhar subsequently adopted both the motion and Pahlawan's "further briefing in support of this issue." (ECF Nos. 121, 152; ECF No. 311 at 17.) Consequently, for purposes of this analysis, the Court will consider all arguments as though raised by both Defendants.

[3]    The Court employs the pagination assigned to the parties' submissions by the CM/ECF docketing system.

[4]    Pahlawan originally filed the Spoliation Motion, and Mazhar subsequently adopted the motion. (ECF Nos. 122, 152.)

# I.    BACKGROUND

Pahlawan, a Pakistani citizen who lived in Iran, purportedly worked with two Iranian brothers, Shahab Mir'Kazei and Yunus Mir'Kazei, who supported Iran and the Islamic Revolutionary Guard Corps ("IRGC"), to smuggle materials from Iran to various recipients, including the Houthi rebel forces (the "Houthis") in Yemen.  (ECF No. 239 ("2d Sup. Ind.") ¶ 2.) From August 2023 through January 2024, Pahlawan and members of his crew, which included Mazhar, purportedly completed multiple smuggling voyages, traveling with cargo from Iran to the coast of Somalia and transporting that cargo to another vessel for a ship-to-ship transfer.  (*Id.*)

On January 5, 2024, Pahlawan allegedly departed Konarak, Iran on a maritime vessel (the "*Yunus*" or "dhow") and traveled to Chabahar, Iran.  (*Id.* ¶ 34.)  According to the Government, Pahlawan — as the captain of the *Yunus* — instructed his crew of thirteen mariners, including Mazhar, to load cargo into the net hold of the *Yunus* while docked in Chabahar.  (*Id.* ¶ 35.)  As directed, the crew loaded several blue and white bags, along with two large black corrugated tubes.  (*Id.* ¶¶ 46–47.)  These bags and tubes contained missile components, including a warhead and propulsion and guidance components for medium-range ballistic missiles and anti-ship cruise missiles.  (*Id.* ¶ 47.)  After loading the cargo, the mariners departed Chabahar on the *Yunus* and headed south towards the coast of Somalia.  (*Id.* ¶¶ 36, 38.)

The charges against Defendants arise from a military operation conducted on January 11, 2024 to interdict the *Yunus*.  (*Id.* ¶¶ 1–2.)  On board the *Yunus*, United States Central Command Navy forces, including Navy SEALs, as well as members of the Coast Guard Maritime Safety and Security Team (collectively, the "Boarding Team"), discovered suspected Iranian-made advanced conventional weaponry ("ACWs").  (*Id.* ¶ 1.)  During the interdiction, Pahlawan allegedly instructed his crew members not to identify him as the captain of the vessel, and to instead falsely identify him as a mechanic and to lie about the cargo on the vessel.  (*Id.* ¶¶ 1, 42–

3

43.)  The Government alleges that several crew members, including Mazhar, subsequently lied to the Boarding Team about the vessel's cargo, the identity of the captain and the vessel's origin. (*Id.* ¶ 44.)

As relevant to Defendants' suppression and Rule 5(a) motions, the Government seeks to introduce statements made by Defendants in several interviews, both during and after the interdiction.   Specifically, the Government intends to admit the following exchanges:

- From a January 12, 2024 un-*Mirandized* group interview aboard the *Yunus*:  Mazhar's statements (or lack of response) and Pahlawan's silence in the face of Chief Mulkey's questions regarding the identity of the "captain" of the dhow;

- From January 13, 2024 un-*Mirandized* individual interviews with Mazhar and Pahlawan aboard the *Yunus*:  the entire exchange between Chief Mulkey and Mazhar, and the entire exchange between Chief Mulkey and Pahlawan;

- From January 31 and February 1, 2024 *Mirandized* substantive interviews with Mazhar and Pahlawan aboard the *USS Puller*:  both sets of exchanges between federal agents and Pahlawan, and the entire exchange between federal agents and Mazhar.

In addition, the Government seeks to introduce statements from its February 4, 2024 interviews with Defendants Pahlawan and Mazhar concerning device attribution.  The Government does not seek to introduce in its case-in-chief any statements made by Pahlawan or Mazhar during un-*Mirandized* intelligence interviews conducted by Department of Defense ("DOD") officials aboard the *USS Puller* between January 27 and 29, 2024.

### A.    Factual Findings

During the Court's evidentiary hearing from March 25, 2025 to March 28, 2025, the Government called the following witnesses, whose testimony the Court finds credible:  (1) Chief

Petty Officer Justin Mulkey, United States Coast Guard; (2) Ryan Marangola, former United States Navy SEAL; (3) Special Agent ("SA") Joseph Ahonen, Federal Bureau of Investigation ("FBI"); (4) Supervisory Special Agent Eric Larsen, FBI; (5) Acting Director Christopher Deutsch, United States Department of State ("DOS"); and (6) former Principal Deputy Assistant Attorney General ("AAG") David Newman, Department of Justice ("DOJ"). Moreover, Defendants introduced material witness testimony from several of the *Yunus* crew members, whose testimony regarding the conditions of their custody the Court finds credible as well. For purposes of the evidentiary hearing, the parties stipulated that all exhibits would be admitted but reserved their right to object as to their use. The Court overruled all such objections, leaving all exhibits admitted and available for the Court's consideration. After considering all of the evidence admitted during the hearing and otherwise in the record, the Court makes the following findings of fact.

### 1. October 7, 2023 Hamas Attack on Israel and its Aftermath[5]

On or about October 7, 2023, Hamas breached the border between the Gaza Strip and Israel, infiltrated Israel and launched a wave of attacks on civilians by land, sea and air.[6] More than 1,200 Israelis and foreign nationals, including 46 Americans, were killed.[7] Others, including Americans, were kidnapped, taken hostage and brought into Gaza by Hamas.[8]

---

[5]    During the evidentiary hearing, the Court heard testimony from several witnesses concerning the volatility in the region where the *Yunus* and the *USS Puller* operated, as well as the violent attacks on international vessels that permeated the area during this time.  (Hr'g Tr. 22:19–24:15, 368:23–369:17, 293:18–22.)  According to the witnesses, and as discussed more fully below, these attacks stemmed in large part from the ongoing conflict between Israel and Hamas and the ensuing efforts by the Houthis to influence the outcome of this conflict by firing Iranian-provided weapons at vessels in the region.  (*Id.*)  In an effort to provide a more complete factual picture concerning the backdrop to the events of this case, and because it finds these facts not reasonably in dispute, the Court hereby takes judicial notice of specific events in the region during the relevant timeframe, along with related statements by key players in the conflict, as laid out in the following section.  Fed. R. Evid. 201(b), (c)(1) (permitting a court to judicially notice facts *sua sponte* where these facts are "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Davis v. United States*, 2011 WL 13192740, at *3 (E.D. Va. Dec. 15, 2011) (finding that the court's use of judicial notice in the context of a suppression hearing was proper, because the noticed fact was "not subject to reasonable dispute" and could be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned," and because judicial notice "may be taken *sua sponte*").  The Court notes that several of these facts were already referenced in the Government's briefing and remained unchallenged by Defendants in their subsequent responses.  (*See* ECF No. 300 ("Gov't Suppl. Br.") at 70–76; ECF No. 314 ("Pahlawan Suppl. Br.") at 39.)  Under Federal Rule of Evidence 201(e), the parties have a right to be heard, upon timely notice, on the propriety of the Court's taking judicial notice and the nature of the facts so noticed.  Fed. R. Evid. 201(e).  Therefore, any party disputing the judicially noticed facts may file a notice with the Court within seven (7) days of this Opinion, stating their objections and any reasons in support.

[6]    Jim Zanotti & Jeremy M. Sharp, Cong. Rsch. Serv., R47828, Israel and Hamas Conflict In Brief:  Overview, U.S. Policy, and Options for Congress (2024), https://www.congress.gov/crs-product/R47828 [https://perma.cc/JL8D-VG8R].

[7]    *Id.*

[8]    *Id.*

Beginning soon after the October 7, 2023 attack on Israel and continuing through the present, the Houthis have engaged in numerous maritime attacks on United States and allied military vessels, as well as commercial vessels from all over the world, throughout a critical global transportation route in the Red Sea.  (Hr'g Tr. 22:19–24:15, 368:23–369:9.)  The Houthis are believed to have repeatedly used Iranian weaponry in these attacks.  (*Id.* 293:18–22, 369:10–13.)  The Houthis were launching missiles and drones at ships in the Red Sea in purported support of the Palestinians in light of the Gaza conflict and the war between Israel and Hamas.  (*Id.* 22:19–23.)  The Houthis have made clear that their attacks seek to deter Israel from responding to the October 7, 2023 attack and to punish anyone who supports Israel, including the United States.  (*Id.* 369:14–17.)  The Court proceeds to outline some of the specific incidents comprising this coordinated campaign of intimidation, harassment and terrorism.

Beginning in and around mid-October 2023, the Houthis began launching attacks against Israeli interests in a purported effort to stop Israel's military efforts against Hamas forces in and around Gaza.[9]  During this time, the *USS Carney*, an American military vessel operating in the area, shot down various Houthi missiles and drones launched in the direction of Israel.[10]

On or around November 8, 2023, the Houthis shot down an American MQ-9 Reaper drone, claiming that the drone was operating in the area off the coast of Yemen.[11]

---

[9]     JIM ZANOTTI & JEREMY M. SHARP, CONG. RSCH. SERV., R47754, ISRAEL AND HAMAS OCTOBER 2023 CONFLICT:  FREQUENTLY ASKED QUESTIONS (FAQS) (2023), https://www.congress.gov/crs-product/R47754 [https://perma.cc/52K7-D5XZ].

[10]     Austin Rooney, *USS Carney:  A Destroyer at War*, U.S. NAVY (Dec. 4, 2024) https://www.navy.mil/Press-Office/News-Stories/Article/3984206/uss-carney-a-destroyer-at-war/ [https://perma.cc/27RY-LF68].

[11]     Eric Schmitt, *Houthi Rebels Shot Down a U.S. Drone Off Yemen's Coast, Pentagon Says*, N.Y. TIMES (Nov. 8, 2023), https://www.nytimes.com/2023/11/08/world/middleeast/yemen-houthi-us-drone.html [https://perma.cc/H6C2-SQ4G].

On November 19, 2023, the Houthis, using a helicopter, attacked and captured the *Galaxy Leader*, an Israeli-linked cargo ship in the Red Sea, and brought the ship and its crew members to a port on the Yemeni coast.[12]  The Houthis released a video of their attack and capture of the *Galaxy Leader*.[13]

On November 29, 2023, the *USS Carney*, while operating in the Red Sea, shot down an Iranian-produced KAS-04 unmanned aerial vehicle ("UAV") launched from Houthi-controlled areas of Yemen.[14]  Although its intentions are unknown, the UAV was heading in the direction of the warship.[15]

On December 3, 2023, the Houthis launched four attacks against three separate commercial vessels operating in international waters in the southern Red Sea.[16]  At approximately 9:15 a.m. Sanaa time, the *USS Carney* detected an anti-ship ballistic missile fired

---

[12]     Isabel Debre & Jon Gambrell, *Yemen's Houthi Rebels Hijack an Israeli-Linked Ship in the Red Sea and Take 25 Crew Members Hostage*, AP NEWS (Nov. 20, 2023, 5:56 AM), https://apnews.com/article/israel-houthi-rebels-hijacked-ship-red-sea-dc9b6448690bcf5c70a0baf7c7c34b09 [https://perma.cc/Z7UX-Z9P6].

[13]     Jonathan Josephs & David Gritten, *Yemen's Houthis Release Crew of Seized Cargo Ship Galaxy Leader*, BBC (Jan. 22, 2025), https://www.bbc.com/news/articles/c9d5q0jn067o [https://perma.cc/JJS5-6ETN].

[14]     *USS Carney Shoots Down UAV*, U.S. CENT. COMMAND (Nov. 29, 2023), https://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/3604054/uss-carney-shoots-down-uav/ [https://perma.cc/9LAE-XDDD].

[15]     *Id.*

[16]     *Houthi Attacks on Commercial Shipping in International Water Continue*, U.S. CENT. COMMAND (Dec. 3, 2023), https://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/3605010/houthi-attacks-on-commercial-shipping-in-international-water-continue/ [https://perma.cc/FV6Y-2YLV].

from Houthi-controlled areas of Yemen toward the *M/V Unity Explorer*, a bulk cargo ship crewed by sailors from two nations, which impacted in the vicinity of the vessel.[17]

A few hours later, at approximately 12:00 p.m. Sanaa time, the *USS Carney* engaged and shot down a UAV launched from Houthi-controlled areas in Yemen.[18]  The drone was headed toward the *USS Carney*, although its specific target was unclear.[19]  Then, at approximately 12:35 p.m. Sanaa time, the *Unity Explorer* reported that it was struck by a missile fired from Houthi-controlled areas in Yemen.[20]  The *USS Carney* responded to the distress call.[21]  While assisting with the damage assessment, the *USS Carney* detected another inbound UAV and destroyed the drone without sustaining any damage or injuries aboard either ship.[22]

Roughly three hours later, at approximately 3:30 p.m. Sanaa time, the *M/V Number 9*, another bulk carrier, was struck by a missile fired from Houthi-controlled areas in Yemen while operating in international shipping lanes in the Red Sea.[23]  The bulk carrier reported damage and no casualties.[24]  Finally, at approximately 4:30 p.m. Sanaa time, the *M/V Sophie II*, a Panamanian-flagged bulk carrier crewed by sailors from at least eight countries, sent a distress

---

[17]     *Id.*

[18]     *Id.*

[19]     *Id.*

[20]     *Id.*

[21]     *Id.*

[22]     *Id.*

[23]     *Id.*

[24]     *Id.*

call stating that it had been struck by a missile.[25]  The *USS Carney* again responded to the distress call and reported no significant damage.[26]  While enroute to render support, the *USS Carney* shot down another UAV headed in its direction.[27]

After these attacks, Ali al-Qahoum, a member of Houthi leadership, stated in an interview that:  "[t]he Houthis will not abandon the Palestinian cause, regardless of any U.S., Israeli or Western threats."[28]  Indeed, the Houthis announced on December 9, 2023, that they were expanding their list of potential maritime targets to include all ships of any nationality that are heading to Israeli ports.[29]

By December 18, 2023, the United States assumed a more active role in preventing further Houthi violence in the region, announcing "Operation Prosperity Guardian" — a multinational initiative focused on security in the Red Sea.  (Hr'g Tr. 292:9–12.)[30]  The Houthis,

---

[25]    *Id.*

[26]    *Id.*

[27]    *Id.*

[28]    *Any Hostile Move Against Yemen Will Have Dire Consequences*, REUTERS (Dec. 15, 2023, 10:11 PM), https://www.reuters.com/world/middle-east/any-hostile-move-against-yemen-will-have-dire-consequences-houthi-official-al-2023-12-16/ [https://perma.cc/A6LB-AALS].

[29]    Mohammed Alghobari, *Yemen's Houthis Warn They Will Target All Ships Headed to Israel*, REUTERS (Dec. 9, 2023, 12:50 PM), https://www.reuters.com/world/middle-east/yemens-houthis-say-they-will-target-ships-red-sea-en-route-israel-2023-12-09/ [https://perma.cc/5NNX-BY52].

[30]    *See also* Lloyd J. Austin, III, *Statement from Secretary of Defense Lloyd J. Austin III on Ensuring Freedom of Navigation in the Red Sea*, U.S. DEP'T OF DEF. (Dec. 18, 2023), https://www.defense.gov/News/Releases/Release/Article/3621110/statement-from-secretary-of-defense-lloyd-j-austin-iii-on-ensuring-freedom-of-n/ [https://perma.cc/EQK5-FDD8].

however, continued their aggression against ships in the region, including attacks against the merchant vessel *Swan Atlantic* and bulk cargo ship *M/V Clara* on December 18, 2023.[31]

On January 12, 2024, while the interdiction of the *Yunus* was ongoing, U.S. Central Command ("CENTCOM") forces, in coordination with the United Kingdom and with support from Australia, Canada, the Netherlands and Bahrain, conducted joint strikes on Houthi targets aimed at degrading their capability to continue attacks on United States and international vessels in the Red Sea.[32]  This multinational action targeted radar systems, air defense systems, and storage and launch sites for one-way attack drones, cruise missiles and ballistic missiles.[33]  At the time of these first United States strikes on the Houthis, CENTCOM emphasized that, "[s]ince Oct. 17, 2023, Iranian-backed Houthi militants have attempted to attack and harass 27 ships in international shipping lanes.  These illegal incidents include attacks that have employed anti-ship ballistic missiles, unmanned aerial vehicles and cruise missiles in the Red Sea and the Gulf of Aden."[34]

The Houthis began responding to these attacks on January 14, 2024, when an anti-ship cruise missile was fired from Houthi-controlled areas of Yemen toward the *USS Laboon*, which

---

[31]     Haley Britzky, *US Warship Responds to an Attack on Commercial Ship in Red Sea*, CNN (Dec. 18, 2023), https://www.cnn.com/2023/12/18/politics/uss-carney-red-sea/index.html [https://perma.cc/95XW-VCKG].

[32]     *U.S. Forces, Allies Conduct Joint Strikes*, U.S. CENT. COMMAND (Jan. 11, 2024), https://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/3643866/us-forces-allies-conduct-joint-strikes/ [https://perma.cc/G97Z-D8GQ].

[33]     *Id.*

[34]     *Id.*

was operating in the Southern Red Sea.[35]  The missile was shot down in the vicinity of the coast of Al Hudaydah, Yemen by a United States fighter aircraft.[36]

One day later, on January 15, 2024, the Houthis fired an anti-ship ballistic missile from Houthi-controlled areas of Yemen and struck the *M/V Gibraltar Eagle*, a Marshall Islands-flagged, American-owned and operated container ship.[37]  In claiming responsibility for this attack, Houthi military spokesman Yahya Saree reiterated that the Houthis "consider all American and British ships and warships participating in the aggression against our country as hostile targets."[38]

Earlier that same day, United States forces had already detected an anti-ship ballistic missile fired toward the Southern Red Sea commercial shipping lanes.[39]  That missile failed in flight and impacted on land in Yemen.[40]

---

[35]    *Houthis Fire Anti-Ship Cruise Missile Toward U.S. Warship*, U.S. CENT. COMMAND (Jan. 14, 2024), https://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/3645091/houthis-fire-anti-ship-cruise-missile-toward-us-warship/ [https://perma.cc/DN8S-6FUL].

[36]    *Id.*

[37]    *Houthis Strike Commercial Vessel in Southern Red Sea*, U.S. CENT. COMMAND (Jan. 15, 2024), https://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/3645588/houthis-strike-commercial-vessel-in-southern-red-sea/ [https://perma.cc/BLV2-JKEY].

[38]    Jon Gambrell, *Houthi Rebels Strike a U.S.-Owned Ship Off the Coast of Yemen in the Gulf of Aden*, PBS NEWS (Jan. 15, 2024, 2:39 PM), https://www.pbs.org/newshour/world/houthi-rebels-strike-a-u-s-owned-ship-off-the-coast-of-yemen-in-the-gulf-of-aden [https://perma.cc/283N-RBSQ].

[39]    *Id.*

[40]    *Id.*

On January 17, 2024, a one-way attack drone was launched from Houthi-controlled areas in Yemen and struck *M/V Genco Picardy*, a Marshall Islands-flagged, American-owned and operated bulk carrier ship, in the Gulf of Aden.[41]

The following day, the Houthis launched two anti-ship ballistic missiles at *M/V Chem Ranger*, a Marshall Island-flagged, American-owned, Greek-operated tanker ship.[42]  The crew observed the missiles impact the water near the ship.[43]

On January 24, 2024, the Houthis fired three anti-ship ballistic missiles from Houthi-controlled areas of Yemen at the American container ship *M/V Maersk Detroit*, which was transiting the Gulf of Aden.[44]  One missile made impact in the sea.[45]  The two other missiles were successfully engaged and shot down by the *USS Gravely*.[46]

In the midst of this latest wave of attacks, the United States Department of State designated the Houthis as a Specially Designated Global Terrorist group on January 17, 2024,

---

[41]    *Houthis Attack U.S. Owned and Operated Bulk Carrier*, U.S. CENT. COMMAND (Jan. 17, 2024), https://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/3648157/houthis-attack-us-owned-and-operated-bulk-carrier/ [https://perma.cc/U57F-3PJF].

[42]    *Third Houthi Terrorists Attack on Commercial Shipping Vessel in Three Days*, U.S. CENT. COMMAND (Jan. 18, 2024), https://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/3649828/third-houthi-terrorists-attack-on-commercial-shipping-vessel-in-three-days/ [https://perma.cc/82AY-BJAZ].

[43]    *Id.*

[44]    *Houthis Attack Commercial Shipping Vessel with Anti-Ship Missiles*, U.S. CENT. COMMAND (Jan. 24, 2024), https://www.centcom.mil/MEDIA/PRESS-RELEASES/Press-Release-View/Article/3654573/houthis-attack-commercial-shipping-vessel-with-anti-ship-missiles/ [https://perma.cc/Y3WV-LR5Q].

[45]    *Id.*

[46]    *Id.*

13

with an effective date of February 16, 2024.[47]  As DOS announced at the time, "[s]ince November, the Houthis have launched unprecedented attacks against international maritime vessels in the Red Sea and Gulf of Aden, as well as military forces positioned in the area to defend the safety and security of commercial shipping.  These attacks against international shipping have endangered mariners, disrupted the free flow of commerce, and interfered with navigational rights and freedoms."[48]

On or around January 29, 2024, the Houthis publicly announced a missile attack targeting the *USS Puller* in the Gulf of Aden.[49]  In making this announcement, Houthi spokesperson Saree also asserted that the Houthi attacks would continue "until the aggression is stopped, and the siege is lifted on the people of Palestine in the Gaza Strip."[50]  The veracity of the Houthis' claim concerning this purported attack on the *USS Puller* in the wake of the interdiction against the *Yunus* remains unconfirmed.  *See* Gambrell, *supra* note 49 (quoting U.S. defense official denying the attack on the *USS Puller*); (Hr'g Tr. 123:22–25).

---

[47]    Press Release, Matthew Miller, Department Spokesperson, U.S. Department of State, Department Press Briefing (Jan. 17, 2024), https://2021-2025.state.gov/briefings/department-press-briefing-january-17-2024/ [https://perma.cc/528P-R32Q].

[48]    Anthony J. Blinken, *Terrorist Designation of the Houthis*, U.S. DEP'T OF STATE (Jan. 17, 2024), https://2021-2025.state.gov/terrorist-designation-of-the-houthis/ [https://perma.cc/B9M4-KLZG].

[49]    Jon Gambrell, *Houthis Say They Attacked U.S. Warship, But American Official Rejects Their Claim*, PBS NEWS (Jan. 29, 2024, 1:08 PM), https://www.pbs.org/newshour/world/houthis-say-they-attacked-u-s-warship-but-american-official-rejects-claim [https://perma.cc/CD6B-UQ5T].

[50]    *Id.*

On March 4, 2025, the United States elevated the Houthis' designation to that of a Foreign Terrorist Organization ("FTO").[51]  President Donald J. Trump previously noted in an Executive Order that: "The Houthis have . . . attacked commercial vessels transiting [the] Bab al-Mandeb [strait] more than 100 times, killing at least four civilian sailors and forcing some Red Sea maritime commercial traffic to reroute, which has contributed to global inflation. . . . The Houthis' activities threaten the security of American civilians and personnel in the Middle East, the safety of our closest regional partners, and the stability of global maritime trade."[52]

To this day, the Houthis remain hostile to the United States and continue their violent conduct in the area surrounding the Red Sea and the Gulf of Aden, making it "one of the most volatile and dangerous areas in the world[.]"  (Hr'g Tr. 23:9–24:14, 43:23–44:2.)

## 2.    The Boarding (January 11, 2024)

The boarding of the *Yunus* that ultimately led to Defendants' charges was led by Chief Petty Officer Justin Mulkey, a member of the United States Coast Guard ("USCG") and a federal law enforcement officer.  (*Id.* 355:2–8.)  As a member of the Maritime Security Response Team, a USCG counterterrorism unit, Chief Mulkey "work[s] overseas . . . to stop or deter any illicit smuggling activities."  (*Id.* 355:13–18.)  At the time of the interdiction, Chief Mulkey was stationed on the *USS Puller* and was conducting maritime operations "in and around the Arabian Sea" to "stop the flow of ACWs to the Houthis" in support of Operation Prosperity Guardian. (*Id.* 367:23–17.)

---

[51]    Marco Rubio, *Designation of Ansarallah as a Foreign Terrorist Organization*, U.S. DEP'T OF STATE (Mar. 4, 2025), https://www.state.gov/designation-of-ansarallah-as-a-foreign-terrorist-organization/ [https://perma.cc/TMA4-A9AJ].

[52]    Donald J. Trump, *Designation of Ansar Allah as a Foreign Terrorist Organization*, THE WHITE HOUSE (Jan. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/designation-of-ansar-allah-as-a-foreign-terrorist-organization/ [https://perma.cc/PX3F-L3FG].

The United States military suspected that the *Yunus* was transporting advanced conventional weaponry in advance of the interdiction.  (*Id.* 245:15–17.)  Chief Mulkey testified that, due to the suspected ACWs on board and the region where the interdiction would take place, the planned January 11, 2024 boarding qualified as a "high-risk boarding."  (*Id.* 359:7–11.) The Boarding Team also had "a high likely suspicion" that the *Yunus* was a stateless vessel.  (*Id.* 244:23–245:1, 446:25–447:6.)  This suspicion was based in part on reconnaissance drones, which confirmed, in the moments leading up to the interdiction, that the *Yunus* flew no flag and contained no exterior markings indicating a claim of nationality or registry.  (*Id.* 375:9–11.)  The planned interdiction of the *Yunus* would therefore follow protocols for a "flag verification boarding," which applies to vessels "that [are] not flying a flag or displaying any type of registry or nationality," and which requires boarding officers to "speak[] with a master or the captain of the vessel and verify[] that, through their documentation, they are what they are claiming to be." (*Id.* 357:2–7.)

On the night of January 11, 2024, the Boarding Team, operating from the *USS Puller*, proceeded to approach the *Yunus* in international waters off the coast of Somalia, south of the island of Socotra in the Arabian Sea.  (*Id.* 245:22–246:4, 370:6–11.)  Chief Mulkey testified that, while approaching the target vessel in four smaller Navy support vessels, also known as CCAs, the Boarding Team looked for any indicia of nationality, as well as any impediments to the Boarding Team's safety.  (*Id.* 247:4–8; 373:5–11.)  The Boarding Team members also "held cover" on approach, meaning that they pointed their rifles at the *Yunus* crew members in the event that they became violent.  (*Id.* 361:17–21, 375:5–11.)  Multiple members of the Boarding Team were also calling out "stop your vessel" to the *Yunus* crew members.  (*Id.* 440:6–10.)

Pursuant to their authority to board stateless vessels, the Boarding Team, which consisted of several specially trained operators,[53] interdicted the *Yunus* armed with rifles, tactical helmets and vests, multiple magazines loaded with ammunition, and sidearm pistols.  (*Id.* 60:13–24.) Chief Mulkey testified that the Boarding Team was armed "[f]or the[ir] protection."  (*Id.* 359:16–17.)  In addition, two helicopters, equipped with automatic weapons and sniper rifles, hovered above the *Yunus*.  (*Id.* 360:2–6, 372:8–11, 440:24–441:13.)  Drones also flew in the airspace above the helicopters, conducting surveillance.  (*Id.* 372:13–16.)

Upon boarding the *Yunus*, the Boarding Team immediately conducted a protective sweep to identify any additional crew members that were not immediately apparent and searched for any devices, such as "booby traps" or improvised explosive devices, that could harm the Boarding Team.  (*Id.* 362:9–13, 373:23–374:8.)  The Boarding Team discovered three crew members sleeping underneath an elevated floor in the living quarters.  (*Id.* 379:5–19.)  The Boarding Team then escorted all fourteen crew members, with rifles trained on their foreheads, to sit at the bow of the vessel.  (*Id.* 379:20–380:6.)

Once the mariners were gathered at the bow of the vessel, the Boarding Team instructed the crew members to remain silent and "keep their heads down and their hands out" until the Boarding Team completed the initial security sweep.  (*Id.* 363:8–364:18, 381:4–5, 383:3–11.) Chief Mulkey testified that the Boarding Team pointed their rifles at the crew members "to ensure that they [were] not able to act in any violent [way] or take any action against the boarding team."  (*Id.* 362:24–363:1.)  Chief Mulkey testified that allowing the crew members to move freely around the boat at this point would have created unsafe conditions for the Boarding

---

[53]     Chief Mulkey testified that "about six" members of the Boarding Team arrived on the *Yunus* on the night of January 11, 2024.  (Hr'g Tr. 373:19.)

Team, because it had not yet "cleared the vessel to ensure that there was nothing that was going to harm [the Boarding Team]" or "done a frisk search on the individuals to determine that they [were] not carrying weapons." (*Id.* 380:7–14.) This initial sweep lasted approximately 20 minutes, in part, because two Navy SEALs went overboard.[54] (*Id.* 383:15–24.) After accounting for the *Yunus*'s crew and securing the vessel, the Boarding Team focused primarily on searching for the two Navy SEALs lost at sea. (*Id.* 242:6–10.)

From the evening of January 11, 2024 through the morning of January 12, 2024, the mariners were held at the front of the *Yunus*, where they slept overnight. (*Id.* 386:6–10.) During this time, an armed member of the Boarding Team was staged near the mariners at all times, maintaining his weapon in an "inside carry" position with its muzzle pointed toward the ground. (*Id.* 385:14–386:5.) Following the initial protective sweep, the Boarding Team did not point its rifles at the mariners, and they were no longer required to keep their heads down. (*Id.* 383:25–384:5.) The Boarding Team permitted the crew to eat, drink, use the restroom and otherwise leave the holding area with an armed escort. (*Id.* 445:24–446:4, 455:22–23; ECF No. 273-9 ("Farooq Dep.") 119:8–17; ECF No. 273-2 ("Ahmad Dep.") 117:13–18.) However, Chief Mulkey testified that the crew members were "being isolated to one area so they cannot move freely" and that they were "not free to leave." (Hr'g Tr. 444:3–10.)

At one point during the evening of January 11, 2024, the *Yunus* physically made contact with the *USS Puller*. (*Id.* 420:10–12.) As a result, the *Yunus* sustained minimal damage above

---

[54]    During the boarding, one Navy SEAL fell into the water. (*Id.* 242:11–14.) Another Navy SEAL jumped in after him. (*Id.*) After a thorough search lasting nearly two weeks, the Navy pronounced both Navy SEALs dead. Haley Britzky, *US Identifies 2 Navy SEALs Declared Dead After Operation Off Somali Coast*, CNN (Jan. 22, 2024, 3:33 PM), https://www.cnn.com/2024/01/22/politics/us-identifies-2-navy-seals-somali-coast/index.html [https://perma.cc/8NSG-F9Z7].

the waterline.  (*Id.* 421:3–8.)  However, this damage had no effect on the seaworthiness of the vessel.  (*Id.* 421:9–11.)

As a result of its focus on finding the missing Navy SEALs, the Boarding Team did not initiate any questioning of the mariners until the morning of January 12, 2024, approximately eight to ten hours after the initial security sweep.  (*Id.* 384:13–18, 386:14–18, 387:18–20.)  Chief Mulkey subsequently interviewed the mariners as follows:  (1) a short group interview on the morning of January 12, 2024; and (2) individual questioning with an Urdu interpreter over a satellite phone on January 13, 2024.

### 3.    Group Interview Aboard the *Yunus* (January 12, 2024)

During the morning of January 12, 2024, Chief Mulkey conducted initial questioning with the mariners positioned in a group on the deck of the *Yunus*.  (*Id.* 388:15–21.)  By this point, additional Boarding Team members had arrived on the *Yunus*, for a total of approximately 10 military personnel on board.  (*Id.* 388:23–389:3.)  However, the Boarding Team had not yet discovered the weapons components aboard the vessel.  (*Id*. 388:10–14.)  For security purposes, Chief Mulkey conducted the group questioning in the presence of two other Boarding Team members, who were carrying their rifles at an inside carry position pointed away from the mariners.  (*Id.* 389:4–20.)  The two helicopters supporting the interdiction had been tasked to personnel recovery by this point, and the *USS Puller* sat between 200 to 1,000 yards away.  (*Id.* 389:21–390:2.)  Chief Mulkey did not have an interpreter present during this group questioning, because the Boarding Team had already determined that the two linguists aboard the *USS Puller* did not speak the same languages as the mariners and were unable to communicate with them. (*Id.* 390:3–12, 449:20–21, 450:18–23.)

Chief Mulkey testified that he approached the group and began asking questions in English.  (*Id.* 392:10–11.)  Specifically, he asked the crew to identify the "captain," the "master"

or the "person in charge" of the *Yunus*.  (*Id.* 392:7–9.)  Nobody in the group answered his initial questions.  (*Id.* 392:17–18.)  Chief Mulkey then asked if anyone in the group spoke English, to which one crew member — Ghufran Ullah ("Ullah") — indicated that he spoke limited English.  (*Id.* 392:25–393:4.)

Using Ullah as a translator, Chief Mulkey again asked whether anyone in the group was the master, captain or person in charge of the vessel.  (*Id.* 393:7–9.)  Again, no mariners responded.  (*Id.* 393:12–14.)  Using Ullah as a translator, Chief Mulkey then asked whether anyone served as the engineer.  (*Id.* 393:17–21.)  In response, Ullah pointed to Mazhar and identified him as the *Yunus*'s engineer.  (*Id.* 393:21–24.)  The testimony presents two different accounts of what occurred next.  Under one telling, when Chief Mulkey asked Mazhar, through Ullah, to identify the captain, master or person in charge of the *Yunus*, Mazhar stated that he did not know who served as the captain.  (*Id.* 393:21–24, 480:25–481:2.)  Chief Mulkey also testified that when he asked Mazhar, through Ullah, to identify the captain, master or person in charge of the *Yunus*, Mazhar gave no response at all.[55]  (*Id.* 393:25–394:4.)  Nothing in the record suggests that Defendant Pahlawan responded to any of Chief Mulkey's questions during the group interview.  (*See generally id.* 392:7–394:13.)  By the end of the group questioning, the Boarding Team still had no definitive information as to whether a captain or engineer was on board the *Yunus*, and if so, who among the crew performed those roles.  (*Id.* 396:22–25.)

Chief Mulkey acknowledged in his testimony that he does not know what languages the mariners spoke or whether Ullah in fact spoke the same language as Pahlawan and Mazhar.  (*Id.* 481:3–16.)  He further testified that the language barrier between him and Ullah prevented

---

[55]    In its supplemental brief, the Government provided yet another account:  "When [Chief Mulkey] then asked Mazhar (in English) about his role on the dhow, Mazhar indicated that Mazhar could not understand [Chief Mulkey's] question."  (ECF No. 300 at 14.)

further questioning of the crew, as Ullah appeared not to understand some of the English terms that Chief Mulkey used.  (*Id.* 482:5–12.)  Chief Mulkey eventually paused questioning to obtain an interpreter who could communicate with the mariners.  (*Id.* 402:3–6.)

Chief Mulkey did not issue *Miranda* warnings in advance of this group interview.  (*Id.* 425:12–18, 415:17–21, 418:11–14.)

After the initial group questioning, the Boarding Team moved the *Yunus* crew members from the front of the vessel to the living quarters near the rear of the vessel, where the mariners were held until their transfer to the *USS Puller* the following day.  (*Id.* 251:23–25, 252:24–253:5, 394:16–17.)  The mariners remained under constant guard by an armed member of the Boarding Team.  (*Id.* 395:1–396:2, 456:3–4.)  When using the restroom, the mariners remained under surveillance and were "not allowed to close the door and use the bathroom in privacy."  (*Id.* 455:24–456:4.)

### 4.    Determination of Statelessness, Further Search and Discovery of the Weapons Components

On the morning of January 12, 2024, after he ended the initial group questioning, Chief Mulkey conducted a preliminary search of the pilothouse.  (*Id.* 396:6–11.)  At this point, the Boarding Team still had not discovered any indicia of a claim of nationality or registry.  (*Id.* 396:12–21.)  Nor had any crew member identified himself as the captain, master or person in charge.  (*Id.* 396:22–25.)  During this initial search, Chief Mulkey searched for any documentation, registration, placard, flag or any other indicia of nationality that were in plain view.  (*Id.* 397:7–10, 397:20–398:1.)  Chief Mulkey did not open drawers or cabinets, in accordance with standard operating procedure.  (*Id.* 397:11–18.)  Chief Mulkey testified that he did not discover any indicia of nationality and reported this information to the ground force commander.  (*Id.* 397:25–398:8.)

The Navy subsequently made the determination that the *Yunus* qualified as a stateless vessel. (*Id.* 248:14–18, 398:13–15); *see also* DEP'T OF THE NAVY, COMMANDER'S HANDBOOK ON THE LAW OF NAVAL OPERATIONS § 3.11.2.3 (2022) (explaining that a vessel can be treated as stateless when, *inter alia*: (1) "[t]he vessel displays no name, flag, or other identifying characteristics," or (2) "[t]he master or person-in-charge, upon request, makes no claim of nationality or registry for that vessel"). Based on this finding of statelessness, Chief Mulkey determined that continued boarding and a more thorough search of the *Yunus* were warranted. (Hr'g Tr. 398:13–17.)

The Boarding Team subsequently began a thorough search of the *Yunus*. (*Id.* 202:14–17.) This search involved opening all cabinets and drawers and included, among other places, the cabin area, the pilothouse, the "crawl space just below the captain's quarters," the living quarters, the engine room, the structure surrounding the engine room, the deck, two flash freezers, the net hold and the hull of the vessel. (*Id.* 202:23–206:2, 398:18–400:3.) During this extensive search, the Boarding Team looked for weapons, ledgers, documentation, flags, electronics and any other items that could provide information. (*Id.* 205:15–16, 207:8–11.)

The Boarding Team did not discover any registration paperwork on the dhow. (*Id.* 208:1–7, 400:16–18.) Aside from two red fishing buoy markers, the Boarding Team also did not discover any flags. (*Id.* 213:19–214:4, 400:22–23.) Nor did the *Yunus* bear any decals or markings indicating nationality. (*Id.* 214:13–15, 400:24–401:3.)

The Boarding Team did, however, discover electronic devices, including personal cell phones, a course plotter navigation system, a VHF radio and an Automatic Identification System ("AIS"), which it collected and retained. (*Id.* 208:11–18, 209:4–16, 400:8–13.)

Ryan Marangola, a member of the Boarding Team, testified that he also discovered packages on top of and underneath some of the fishing nets inside the hold at the front of the *Yunus*.  (*Id.* 207:1–7, 274:22–24.)  The Boarding Team sorted through these fishing nets and subsequently removed several packages.  (Gov't Exs. 52, 53, 86.)  A number of these items "were brought up top in order to be opened and searched."  (Hr'g Tr. 277:6–10.)  Inside these packages, as well as inside corrugated tubes also found in the net hold, the Boarding Team found missile components, including components for an antiship cruise missile and antiship ballistic missiles, as well as pan-tilt-zoom cameras.  (ECF No. 3-1 at 16–17 (photographs of ACWs discovered on board); Hr'g Tr. 122:12–14.)  Although the crew members were held "out of sight" as the Boarding Team inspected the packages, "[m]ariners that were in the back would nonetheless be escorted around in order to . . . use the restroom," creating a potential opportunity to observe the Boarding Team.  (*Id.* 277:16, 278:8–9.)

Mr. Marangola also received authorization to conduct two destructive searches, which involved "mechanically or manually open[ing]" up hidden compartments "to see inside of an area and confirm that we have exposed everything."  (*Id.* 209:23–210:5.)  Mr. Marangola conducted the first of these destructive searches above the captain's quarters, creating a small hole to be able to see inside of the dead space.  (*Id.* 210:24–211:5.)  He conducted the second destructive search forward of the engine room in what appeared to be fish holds, using a circular saw to cut a hole wide enough to view the hidden compartment.  (*Id.* 211:24–212:15.)  Neither of these destructive searches caused any damage below the waterline or otherwise impacted the seaworthiness of the *Yunus*.  (*Id.* 213:3–16.)

At some point on January 12, 2024, the Boarding Team members removed their protective equipment and stored their rifles at a location away from the crew members. (*Id.* 401:4–23.) They remained armed with pistols and weapons belts. (*Id.*)

### 5.    Water Problems and Attempts to Tow the *Yunus*

By the time that Mr. Marangola boarded the *Yunus* on the morning of January 12, 2024, an "abnormal amount of water" had accumulated in the engine room.[56] (Hr'g Tr. 222:1–14.) Mr. Marangola testified that he first checked the water level at the propeller shaft, "as it's the deepest and most dependent, lowest part of the ship and it would give an accurate depiction of how low the water is." (*Id.* 223:24–224:6.) Mr. Marangola used a five- or six-foot broomstick to test the water level. (*Id.* 224:7–12.) Laying on the planks, Marangola fully extended his arm and the broomstick below the shaft, and the water level reached all the way up to his arm. (*Id.* 224:10–225:1.) He mentally noted the water level, observing that it remained below the shaft at that time. (*Id.* 225:7–9.)

Multiple *Yunus* crew members, including Muhammad Rashid ("Rashid") and Mehandi Hassan ("Hassan"), testified during their material witness depositions that the *Yunus* regularly took on water in the engine room. (ECF No. 378-3 ("Rashid Dep.") 143:23–144:3; ECF No. 378-2 ("Hassan Dep.") 59:21–60:23.) Rashid explained that the water entered through the propeller shaft and that one of the crew members — usually Defendant Mazhar — activated a pump every four to five hours to drain the engine room of water. (Rashid Dep. 159:23–160:15.) No such pumping took place once the interdiction began. (*Id.* 160:16–20.)

---

[56]    Between the night of January 11, 2024, and the morning of January 12, 2024, Mr. Marangola was focused on recovering the two lost Navy SEALs, which delayed his arrival aboard the *Yunus*. (*Id.* 251:10–13.)

Mr. Marangola testified that the Boarding Team considered a variety of possible solutions to address the rising water level. (Hr'g Tr. 227:12–14.) For instance, he searched for a bilge pump, which "is a marine pump that's generally used to remove water that's coming in from the boat overboard." (*Id.* 227:18–19.) However, Marangola did not recognize any pumps that could operate as a bilge pump onboard the *Yunus*. (*Id.* 227:22–23.) Nor was transporting a bilge pump from the *USS Puller* to the *Yunus* a viable option, due to the size of the pumps aboard the *USS Puller* and the narrow entryway to the *Yunus*'s engine room. (*Id.* 229:17–230:8.) To address the situation, Mr. Marangola attempted, through an interpreter, to identify either the captain or engineer of the vessel, either of whom might have possessed knowledge as to how the water accumulation could be ameliorated. (*Id.* 227:24–228:20.) None of the crew members identified themselves as the captain or engineer of the *Yunus*. (*Id.* 228:3–6.) Mr. Marangola briefly discussed "manual bailing" as an option, which involves using a bucket (or any sort of container) "to fill it up with water and dump it overboard." (*Id.* 230:12–15.) However, the Boarding Team rejected this option, because it would have required removing floorboards to access the majority of the water, which may, in turn, have adversely impacted the *Yunus*. (*Id.* 230:19–22.) Moreover, manual bailing alone would not have sufficiently addressed the issue. (*Id.* 230:23–25.)

Mr. Marangola noted that he sought to limit his time in the engine room due to the "tremendous amount of hazards" present. (*Id.* 232:7–8.) Aside from the water accumulation, Marangola also noticed a raw fuel leak near electric extension cords that were already soaked in a combination of water and fuel. (*Id.* 215:13–17, 216:11–20.) Due to the risk of electrocution and drowning (if the *Yunus* were to capsize), Mr. Marangola decided not to risk addressing the fuel leak. (*Id.* 231:14–19, 232:7–11.)

Chief Mulkey and Mr. Marangola also shared responsibility for steering the *Yunus*. (*Id.* 216:21–24, 419:21–23.) Mr. Marangola described this task as "extremely difficult" due to the lack of a proper steering system. (*Id.* 217:1–5.) The *Yunus* relied, in part, on chains tied to the rudder. (*Id.*) This jerry-rigged steering system created a substantial delay between turning the wheel and the *Yunus* actually turning, which negatively impacted the *Yunus*'s ability to maintain a consistent bearing. (*Id.*) In other words, the *Yunus* could not travel in a straight line. (*Id.* 217:10–16.)

As the water situation on the *Yunus* worsened, Mr. Marangola navigated the *Yunus* alongside the *USS Puller*, albeit with difficulty. (*Id.* 218:14–17.) To protect the two vessels from damaging one another in the event of a collision, the Navy put down large buoys and fenders — approximately 15 feet in circumference and 6 to 15 feet tall. (*Id.* 218:7–13.)

At some point, the Boarding Team attempted to secure the *Yunus* to the *USS Puller* by wrapping ropes around three connection points at the front of the *Yunus*. (*Id.* 218:18–219:6.) However, Mr. Marangola testified that these connection points turned out to be unsuitable as tow points, because "[t]he tow point in the stern failed" and the others "were not solid enough structures to hold the dhow alongside the Puller." (*Id.* 219:11–16.) While the stern of the vessel sustained some damage during this process, Mr. Marangola noted that none of this damage impacted the seaworthiness of the *Yunus*, because it was "[w]ell above the waterline." (*Id.* 219:21–221:9.)

In addition to the Navy's inability to tow the *Yunus* to a port due to the lack of connection points, Mr. Marangola also noted that craning the *Yunus* onto the *USS Puller* was not an option, since the available crane lacked sufficient capacity to lift the *Yunus*. (*Id.* 231:4–13.)

26

Eventually, the Boarding Team was able to position the *Yunus* close enough to the *USS Puller* to begin offloading the ACWs. (*Id.* 217:22–218:3.) The process of transferring the ACWs took "a number of hours." (*Id.* 266:1–2.) During this time, the *USS Puller* lingered "as close . . . as possible without making contact," while personnel lifted the ACWs above the *Yunus* on a crane and then transferred them over to the *USS Puller*. (*Id.* 218:1–3.) These multi-hour crane operations occurred before Chief Mulkey conducted individual interviews. (*Id.* 479:10–480:4.)

### 6.    Individual Interviews Aboard the *Yunus* (January 13, 2024)

On the morning of January 13, 2024, Chief Mulkey turned his focus to individual interviews with the mariners. (*Id.*) To help perform these interviews, Chief Mulkey had been provided with an Urdu interpreter over a satellite phone. (*Id.* 401:24–402:6.) Chief Mulkey proceeded to conduct individual interviews with several *Yunus* crew members, including Defendants Pahlawan and Mazhar. (*See* Gov't Ex. 85 (Chief Mulkey's interview notes).)

As to the circumstances of the individual interviews on January 13, 2024, Chief Mulkey conducted these interviews on the *Yunus*'s breezeway on the back, starboard side of the dhow. (*Id.* 402:10–22.) The *USS Puller* remained anywhere from 200 to 1,000 yards from the *Yunus* during this time. (*Id.* 405:1–4.) Chief Mulkey and the other Boarding Team members carried only their sidearm pistols, which remained holstered during the interviews. (*Id.* 280:1–6, 401:20–23.) The mariners were not handcuffed before or during these interviews. (*Id.* 424:16–18.) However, the mariners "still knew that they could not leave." (*Id.* 405:22–25.) Defendants and the other crew members remained "confined to [an] area in the aft" and were "not free to move around the dhow." (*Id.* 405:15–21.)

Defendants were taken by the arm and separated from the other crew members for their individual interviews with Chief Mulkey. (*Id.* 406:2–5; Farooq Dep. 135:19–25.) At one point,

however, Pahlawan and Mazhar were seated next to each other on one of the benches that ran parallel to the side of the dhow, while a member of the Navy's Intelligence Exploitation Team ("IET") collected identification cards, biometric information and fingerprints from the mariners. (*Id.* 409:6–16, 417:11–19.)  The IET member proceeded to route this information through her channels at DOD.  (*Id.* 409:18–23.)

In terms of the nature of the questioning, Chief Mulkey referred to his interview technique as employing "tactical questioning."  (*Id.* 402:19.)  The first step of this approach in situations where "we . . . have discovered something" is primarily about "trying to figure out who was in charge," since those persons are likely to possess "more knowledge of the crew and of their purpose of voyage."  (*Id.* 366:21–367:5, 367:14–17, 367:20–22.)  Once key members have been identified, the second step involves asking those individuals more substantive questions to extract further information for intelligence-gathering purposes.  (*Id.* 367:16–22, 407:20–408:9.)  For instance, Chief Mulkey would ask questions about "where the vessel came from," "who supplied the weapons" and "who they're going to give them to."  (*Id*. 476:22–477:4.)  Such information about the weapons smuggling network could then be used to "stop the flow of the missiles."  (*Id.* 408:1–6.)

Chief Mulkey testified that "[i]t was very difficult to hear anything that the interpreter was saying, and we kept on losing connection with the sat phone."  (*Id.* 406:8–10.)  Whenever the call disconnected, they "[h]ad to wait until we could reestablish connection."  (*Id.* 406:11–12.)  At times, Chief Mulkey had difficulty understanding the interpreter, and "[i]t took several attempts and communicating back and forth to clear up what he was saying."  (*Id.* 406:13–19.)  Although "[i]t took a while," Chief Mulkey was "ultimately able to understand the message [that the interpreter] was conveying."  (*Id.* 406:20–22.)

### a.        Interview with Mazhar

During his individual interview with Mazhar, Chief Mulkey asked Mazhar about the *Yunus*'s port of origin.  (*Id.* 412:22–413:1.)  Mazhar responded that the vessel had come from Gwadar, Pakistan.  (*Id.*)

Chief Mulkey then asked Mazhar to identify the captain or the person in charge of the vessel.  (*Id.* 413:2.)  In response, Mazhar responded that the captain was not on board and provided two conflicting accounts.  First, Mazhar stated that when the crew saw the Navy helicopter approach their vessel, the captain called to get picked up by another dhow.  (*Id.* 413:2–6.)  Second, Mazhar said that another vessel had recently called the *Yunus* on the crew's satellite phone and communicated that it was having engine problems.  (*Id.* 413:8–15.)  The captain was then picked up from the *Yunus* and transferred to the other vessel to help fix that vessel.  (*Id.*)  Mazhar identified "Raheem Baksh" as the captain of the *Yunus*.  (*Id.*; Gov't Ex. 85 at 4.)  Mazhar also claimed that the captain had taken the *Yunus*'s registration paperwork with him when he went to the other vessel.  (Hr'g Tr. 413:16–20.)

Chief Mulkey proceeded to ask Mazhar about the timing of the *Yunus*'s departure from Gwadar, Pakistan.  (*Id.* 413:21–23.)  Mazhar responded that the crew departed ten days before the Navy's interdiction of the *Yunus*.  (*Id.*)

Chief Mulkey then asked Mazhar about the cargo on board and who was responsible for retrieving supplies for the *Yunus*.  (*Id.* 414:1–3.)  Mazhar responded that "Raheem Baksh" was responsible for the supplies and logistics and had already loaded the cargo onto the *Yunus* in advance of Mazhar's arrival.  (*Id.* 414:1–7; Gov't Ex. 85 at 4.)

Finally, Chief Mulkey asked Mazhar about who had ownership of the satellite phone, in a further attempt to determine the person in charge aboard the *Yunus*.  (Hr'g Tr. 415:4–9.)  Chief Mulkey did not provide testimony as to Mazhar's response to this question.

Chief Mulkey did not issue *Miranda* warnings in advance of his individual interview with Mazhar.  (*Id.* 415:17–19.)

### b.        Interview with Pahlawan

During his individual interview with Pahlawan, which took place after his interview with Mazhar, Chief Mulkey "had the interpreter ask roughly the same questions as previously asked to Mr. Mazhar and then gave Mr. Pahlawan the phone to begin talking."  (*Id.* 416:16–22.)  When Mr. Pahlawan returned the phone, the call dropped.  (*Id.* 416:22–23.)  Chief Mulkey reestablished the connection, at which point the interpreter conveyed that Pahlawan "was basically saying the same things [as Mazhar] as far as the captain leaving due to hearing the helicopter, and that he got onto another dhow."  (*Id.* 416:25–417:3.)  However, the interpreter did not mention anything about "Raheem" or the paperwork.  (*Id.* 417:7–10.)

Chief Mulkey also asked Pahlawan about his role on the dhow.  (*Id.* 417:23–24.) Pahlawan responded that he was a fisherman and just a crew member.  (*Id.* 418:1–3.)

Chief Mulkey inquired about who controlled the satellite phone, to which Pahlawan responded that nobody controlled it.  (*Id.* 418:4–10.)

Chief Mulkey's interview with Pahlawan was cut short when the ground force commander indicated that the *Yunus* had become unseaworthy, necessitating the Boarding Team's and crew's evacuation from the *Yunus*.  (*Id.* 410:23–411:1, 418:23–25.)  As such, Chief Mulkey never reached the second phase of questioning regarding the ACWs or the operational network during the individual interviews at issue here, because he never successfully ascertained who the captain was.  (*Id.* 410:15–17, 415:10–13, 485:4–10.)

Chief Mulkey did not issue *Miranda* warnings in advance of his individual interview with Pahlawan.  (*Id.* 418:11–14.)  He also testified that, during his questioning with both Mazhar and

Pahlawan, he never expressly referenced the Boarding Team's earlier discovery of ACWs or any other illicit cargo on board. (*Id.* 414:12–19.)

### 7.    Transfer to the *USS Puller* and Sinking the *Yunus*

By the afternoon of January 13, 2024, the Navy had decided to scuttle the *Yunus*. (*Id.* 238:16–21.) The Navy made this decision for "a plethora of reasons." (*Id.* 215:10–11.) To begin, water had continued rising below deck; by the time that Mr. Marangola left the dhow, the water level "was all the way up to the floorboards, past the shaft." (*Id.* 225:19–23.) This created a grave risk of capsizing if the water in the bottom of the vessel shifted to one side. (*Id.* 216:8–10.) In addition, there was raw fuel leaking in the engine room, which could lead to fire, combustion and a lack of egress. (*Id.* 215:13, 216:11–13.) This fuel had mixed with water that "slosh[ed] and disperse[d] . . . all the way up past the shaft throughout the entire engine room" as the *Yunus* rocked back and forth. (*Id.* 268:15–18.) Water and fuel were also soaking electrical lines. (*Id.* 216:14–20.) Furthermore, the *Yunus* was unmarked and could not be safely maneuvered, rendering it a hazard to navigation. (*Id.* 215:18–21, 241:2–3.) The *Yunus* had become unseaworthy and, in that condition, put "lives in danger." (*Id.* 240:25–241:8.)

In preparation for scuttling the *Yunus*, the Boarding Team transferred all collected evidence to the *USS Puller* and captured photo and video footage of the *Yunus*. (*Id.* 238:25–239:2, 422:2–9; *see, e.g.*, Gov't Exs. 51, 82, 83, 84 (photographs and video footage of the *Yunus*).) At some point, Chief Mulkey also recorded rough measurements for the *Yunus*. He approximated that the *Yunus* extended about 130 feet long, equivalent to three or four CCAs in length. (*Id.* 437:18–438:1.) To Chief Mulkey's knowledge, no one from the Boarding Team obtained a formal measurement of the *Yunus*. (*Id.* 438:2–4.) The Boarding Team also escorted the mariners to the *USS Puller* under guard. (*Id.* 278:6–7, 467:13–15.)

Later that same day, the Navy gave final authorization to scuttle the *Yunus*.  (*Id.* 239:5–8.) Once all other personnel and evidence had been safely transported aboard the *USS Puller*, Mr. Marangola cut the water intake pipe, which would cause water to quickly fill the body of the *Yunus* and sink it.  (*Id.* 233:22–234:6.)  Within minutes, Mr. Marangola disembarked the *Yunus*. (*Id.* 237:3–8, 239:13–15.)  By that time, "nothing of importance" remained on board the *Yunus*; the only items left behind were nets, food, the engines and anything that was bolted or otherwise without "significance to the boarding."  (*Id.* 239:21, 422:10–14.)  Once Mr. Marangola left the *Yunus*, members of the Navy used small arms to fire at the sinking vessel to "follow through" with its sinking "as quickly as possible."  (*Id.* 240:2–4.)

Mr. Marangola testified that the Navy had no plans to scuttle the *Yunus* in advance of the interdiction and that the deaths of the two Navy SEALS had no effect on the Boarding Team's decision-making in this regard.  (*Id.* 241:9–18.)  Rather, the Boarding Team scuttled the *Yunus* entirely due to safety concerns.  (*See id.* 240:25–241:1 (testifying to the *Yunus*'s unseaworthiness and lack of safety), 241:7–8 (testifying that "if we were to leave [the *Yunus*] in that condition, we would have been putting [the mariners'] and other lives in danger").)  As Mr. Marangola explained, as a "partially sunk vessel in the middle of the ocean," the *Yunus* presented "a massive hazard to navigation."  (*Id.* 240:8–13.)  The *Yunus* "wasn't transponding any sort of signal to other marine traffic, as well as didn't have any lights to notify people transiting throughout the area.  And we, as Americans, took responsibility for the dhow and morally and ethically didn't feel that it was safe to others to leave that in the condition that it was in."  (*Id.* 240:13–18.)

The entirety of the boarding lasted approximately two full days.  (*Id.* 254:2–6.)

### 8.    Interviews Aboard the *USS Puller*

After being transferred from the *Yunus* to the *USS Puller* on January 13, 2024, the *Yunus* crew members remained aboard the *USS Puller* until their arrest on February 14, 2024.  Two

types of interviews were conducted with Defendants aboard the *USS Puller*.  First, DOD conducted intelligence interviews with several of the mariners, including Defendants, between January 27, 2024 and January 29, 2024.  The Government does not seek to introduce any statements made during these interviews in its case-in-chief.  Second, the FBI and the Naval Criminal Investigative Service ("NCIS") sent agents to the *USS Puller* to conduct law enforcement interviews of the mariners, including Defendants, after DOD completed their interviews.[57]  Those interviews began on January 31, 2024.

FBI investigators took several steps in advance of meeting with Defendants to prevent the FBI and NCIS's interviews from being "tainted" by DOD interviews for purposes of admissibility at any future trial.  As part of these preparations, federal prosecutors met with FBI SA Joseph Ahonen and Task Force Officer ("TFO") Benjamin Lam in advance of their departure for the *USS Puller* and established certain protocols to ensure that the mariners' un-*Mirandized* interviews with DOD were sufficiently separated in time and space from any *Mirandized* interviews with the FBI and NCIS.  These included the FBI team's efforts to "form[] a wall" aboard the *USS Puller*.  (*Id.* 116:21.)  Pursuant to this "wall," the FBI team remained "completely separate" from the DOD team.  (*Id.* 116:23–25, 119:20–23.)  The FBI team maintained this barrier by removing agents from email distribution lists that might have included discussion or results of DOD's un-*Mirandized* interviews, eating at different tables from DOD interviewers on the *USS Puller* and limiting conversations between the FBI team and DOD team to logistical and chain-of-custody questions.  (*Id.* 117:2–118:13, 119:25–120:5.)  SA Ahonen

---

[57]     On January 26, 2024 — one day before DOD intelligence interviews began — the FBI team conducted separate interviews with both Pahlawan and Mazhar to inquire whether they consented to the Government searching their electronic devices.  The FBI team utilized an interpreter to communicate with Defendants, both of whom consented to the searches and signed the appropriate consent forms.  (Gov't Exs. 92A, 92B.)

testified that the FBI team did not discuss any of the substance of the DOD interviews throughout their time on the *USS Puller*, did not review any information related to the DOD un-*Mirandized* interviews and otherwise abided by the established protocol to "keep the wall up." (*Id.* 117:10–25, 118:9–13, 121:2–4, 126:4–9.)

SA Ahonen also testified that, in preparation for this case, he reviewed the standard FBI *Miranda* rights advisement.  (*Id.* 112:13–14.)  He then reviewed relevant case law and worked with federal prosecutors to modify the standard FBI advice of rights to incorporate curative steps that would ensure an appropriate two-step process without any potential taint from the prior un-*Mirandized* DOD interviews.  (*Id.* 112:13–20.)  SA Ahonen submitted these revised *Miranda* warnings to language services so that a verbatim translation could be prepared.  (*Id.* 115:3–8.)

The FBI team arrived aboard the *USS Puller* on January 26, 2024, in the vicinity of Country A.[58]  (*Id.* 123:18, 125:1–3.)  That same day, the FBI team obtained a federal search warrant to search and seize the electronic devices from the *Yunus*'s crew members, and federal agents began extracting data from these devices.  (*Id.* 178:12–25.)  SA Ahonen testified that soon after his team's arrival, the captain of the *USS Puller* indicated that they would have to immediately depart the area due to the Houthi threat.  (*Id.* 123:10–13.)  This was due to the fact that the *USS Puller* remained in the Houthis' weapons engagement zone, where it sat within target range of Houthi missiles stationed in Yemen.  (*Id.* 123:14–16.)

Beginning on January 31, 2024, the FBI team engaged in substantive interviews with the mariners.  (*Id.* 130:16–18.)  In all of these interviews, the FBI team used a different translator than the one employed by the DOD team.  (*Id.* 131:25–132:6.)  The FBI team also read

---

[58]    During the evidentiary hearing, the parties referred to various countries by designated country codes due to national security implications.  (*See* ECF No. 345 (providing country codes).)  The Court utilizes those same country codes throughout this Memorandum Opinion.

Defendants the revised *Miranda* warnings in English at the beginning of each interview, while

the interpreter translated the warnings into Urdu.  (*Id.* 131:13–22, 132:7–17, 144:17–21.)  This

warning consisted of a revised version of the FBI's standard *Miranda* instruction based on

*United States v. Khweis*, 971 F.3d 453 (4th Cir. 2020), and read as follows:

> Before we question you, you must understand your rights:
>
> You have the right to remain silent.  We understand that you may have already
> spoken to others.  We do not know what, if anything, they said to you, or you said
> to them.  Likewise, we are not interested in any of the statements you may have
> made to them previously.  We are starting anew.  You do not need to speak with us
> today just because you have spoken with others in the past.
>
> If you previously made statements to others in the U.S. Government, it is likely that
> those statements will not be useable against you in a U.S. court.  Anything you now
> say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions.
>
> You have the right to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, you have the right to have one appointed for you
> before any questioning if you wish.
>
> However, our ability to provide you with counsel at this time may be limited by the
> decisions of the local authorities or the availability of an American-trained attorney.
>
> If you decide to answer questions now without a lawyer present, you have the right
> to stop answering at any time.

(Gov't Ex. 93N; Hr'g Tr. 114:17–24.)  In addition, the FBI team provided a written version of

the *Miranda* warnings, which was translated into Urdu.  (*Id.* 115:3–15, 144:17–23.)  Both

Pahlawan and Mazhar acknowledged that they understood the verbal translation of the revised

*Miranda* warnings and consented to proceeding with a voluntary interview without consulting

with an attorney.  (Gov't Exs. 93A, 94A, 95A, 99A, 100A.)  They also confirmed that they had

read and understood the written, translated version of the *Miranda* warnings and agreed to

proceed without an attorney.  (*Id.*)  Pahlawan and Mazhar both signed the Urdu version of the *Miranda* warnings before any questioning began.  (Gov't Exs. 93O, 94L, 95B, 99I, 100B.)

SA Ahonen testified that Pahlawan's substantive interviews took place aboard the *USS Puller* in Room 4, a different room from where the DOD team conducted any previous interviews.  (Hr'g Tr. 130:1–5.)  The FBI team interviewed Mazhar in a distinct area within Room 3 from where he had previously been interviewed.  (*Id.* 142:21–143:8; Gov't Exs. 90B, 90C.)

On January 31, 2024, SA Ahonen and NCIS SA Robert Wilson conducted Pahlawan's first substantive interview, which lasted about four hours.  (Gov't Ex. 93A–M.)  That same day, TFO Lam and NCIS SA Patrik Paszek conducted Mazhar's only substantive interview, which lasted about two hours.  (Gov't Exs. 99A–G.)

On February 1, 2024, SA Ahonen and SA Wilson conducted Pahlawan's second substantive interview, which lasted nearly four hours.  (Gov't Exs. 94A–K.)

On February 4, 2024, the FBI team conducted one additional interview with Pahlawan to identify which electronic devices belonged to him.  (Gov't Ex. 95A.)  That same day, TFO Lam, SA Paszek and SA Wilson interviewed Mazhar in Room 4 to have him identify which electronic devices belonged to him.  (Gov't Ex. 100A.)

Throughout these interviews on the *USS Puller*, Defendants were provided breaks as needed.  (Hr'g Tr. 144:3–9.)  The FBI team also offered Defendants food, drinks and snacks at every interview.  (*Id.* 127:7–10.)

### 9.    Interagency Communications Concerning Defendants

Due to the various complexities resulting from the interdiction, including the presence of foreign mariners on board a Navy vessel and the possibility that American laws had been broken by some or all of these mariners, a coordinated government response involving several U.S.

Government agencies ensued.  FBI SA Eric Larsen testified that he first learned of this case on January 16, 2024, and remained involved in interagency coordination efforts from that date onwards.  (*Id.* 306:12–14.)  SA Larsen immediately notified his FBI superiors, and the FBI's Washington Field Office and the United States Attorney's Office for the Eastern District of Virginia were assigned to the case soon thereafter.  (*Id.* 296:17–297:6.)

During this time, the *USS Puller* was operating in support of Operation Prosperity Guardian, an ongoing military operation in the Gulf of Aden and the surrounding region.  (*Id.* 368:4–24.)  The *USS Puller*'s original operational schedule in the aftermath of the interdiction was as follows.  Between January 24, 2024 and January 27, 2024, the *USS Puller* was scheduled for a port call in Country A.  (Gov't Ex. 110 at 33.)  From there, the *USS Puller* planned to spend several days in active, ongoing military operations in the Gulf of Aden before docking in Country B from February 5, 2024 through February 7, 2024, after which it would again depart for military operations in the Gulf of Aden.  (Hr'g Tr. 322:9–12.)  However, as outlined more fully below, these plans ultimately changed.

On January 17, 2024, SA Larsen began making inquiries about "FBI/DOJ interest in this [case.]"  (Gov't Ex. 110 at 36.)

On January 18, 2024, a Marine Operational Threat Response ("MOTR")[59] teleconference was held to discuss interagency coordination as to "the disposition of crewmembers from a stateless vessel interdicted by U.S. naval forces."  (Gov't Ex. 110 at 3.)  The participating

---

[59]    The MOTR process constitutes a mechanism for interagency coordination when an incident at sea requires a coordinated national response.  (Hr'g Tr. 16:3–6, 18:7–10.)  Throughout the process, DOS ensures that the United States's diplomatic equities and relationships are taken into consideration in resolving matters.  (*Id.* 16:13–17.)  DOD remains responsible for military and operational considerations, (*id.* 16:19–24), whereas DOJ oversees the investigative and prosecutorial decisions.  (*Id.* 16:25–17:4.)

agencies included DOD, the Department of Homeland Security ("DHS"), DOJ and DOS.  (*Id.*)
The stated desired national outcome was to "[s]upport expeditious disposition of the
crewmembers with minimal operational impact."  (*Id.* at 4.)

On January 19, 2024, another MOTR teleconference was held with representatives from
the same agencies as well as the FBI.  (*Id.* at 5.)  SA Larsen testified that this was the first MOTR
call that he attended for this matter.  (Hr'g Tr. 311:1–2.)  At that time, DOD wanted to offload the
crew members from the *USS Puller* in Country A between January 24, 2024 and January 27,
2024.  (*Id.* 315:23–316:2.)  The FBI hoped to interview the *Yunus* crew members before that
time, because DOD would have no legal authority to hold the mariners once the *USS Puller*
docked in Country A.  (*Id.* 316:3–12.)  The expectation was that, once the *USS Puller* reached
Country A, "pending coordination with [the] host nation, if [it] would accept [the mariners],
[DOD] would release them to that host nation."   (*Id.* 316:10–12.)

Three days later, on January 22, 2024, representatives from DOD, DHS, DOJ, FBI and
DOS held another MOTR teleconference.  (Gov't Ex. 110 at 7.)  DOD still planned for the *USS
Puller* to port in Country A from January 24, 2024 to January 27, 2024.  (*Id.* at 8; Hr'g Tr.
319:18–21.)  As to next steps, the FBI was planning to coordinate with Navy personnel to
transport federal agents to the *USS Puller* to conduct interviews on January 24, 2024, and DOD
would discuss the location of these interviews with DOS to clarify whether they could be
conducted inside Country A's territorial sovereignty.  (Gov't Ex. 110 at 8.)

Another MOTR call took place the following day, on January 23, 2024.  (Gov't Ex. 110
at 11.)  During that call, the FBI and DOJ expressed an interest in prosecuting some of the
mariners and stated that the "[r]esults of NCIS and DOJ interviews" would be one of the
deciding factors in "ultimately determin[ing] classification of [the] crewmembers."  (Hr'g Tr.

322:17–24, 323:5–10; Gov't Ex. 110 at 11.)  Following the January 23, 2024 MOTR call, the reported "desired national outcome" was changed to include "[e]nsur[ing] accountability of involved crewmembers, as appropriate."  (Gov't Ex. 110 at 11.)  As for next steps, the summary of the January 23, 2024 MOTR call indicated that "DOJ HQ will route formal request to DoD regarding keeping the 14 involved crewmembers onboard the LEWIS B. PULLER until interviews of all 14 crewmembers and members of PULLER . . . can be completed."  (*Id.*)

That same day, Acting Director Christopher Deutsch of DOS sent an email stating (in reference to the *Yunus* crew members) that:  "The Pakistanis are currently being held on the [*USS Puller*], which is tentatively scheduled to dock in [Country B] on February 5 or return to . . . [Country C] for maintenance.  The [*USS Puller*] will dock in [Country A] January 25-26, but [the Bureau of African Affairs] has advised that the [Country A] government will not agree to the disembarkation of the Pakistanis."  (Gov't Ex. 133 at 1.)  As Mr. Deutsch explained in his testimony, given the context of the interdiction — that is, the United States Navy's interception of Iranian weapons enroute to the Houthis in Yemen — Government A, which did not support the United States's effort to address the Houthi threat in the Red Sea, was unwilling to be implicated in the regional conflict.  (Hr'g Tr. 22:2–10.)  Therefore, DOS assessed that Country A did not present a feasible option for disembarkation of the mariners.  (*Id.* 26:1–3.)

As of January 23, 2024, DOS was also considering Countries B and C as potential alternative locations to disembark the 14 mariners.  (*Id.* 25:1–4.)  However, DOS recognized that those countries would likely have reservations about becoming involved in the operation due to fears of reprisal.  (*Id.* 25:8–25.)

As of January 24, 2024, the *USS Puller*'s port call in Country A had been cancelled. (Gov't Ex. 110 at 14.)  Its next port call was "tentatively scheduled for 5 Feb (or sooner) in [Country B]" but was "subject to change."  (*Id.*)

As of January 25, 2024, the *USS Puller*'s next port call was "tentatively scheduled for [Country B] on approximately 29-30 January but [was] subject to change."  (*Id.* at 17.)

That same day, Mr. Deutsch emphasized in an email that offloading the mariners "without a plan for their immediate onward travel elsewhere is a terrible idea, and in the case of [Country B] is an absolute non-starter."  (Gov't Ex. 136 at 1.)

By January 26, 2024, DOD shifted the *USS Puller*'s scheduled port call in Country B back to February 5, 2024, "subject to change."  (Gov't Ex. 110 at 20.)  The January 26, 2024 MOTR call summary also listed "[c]ompletion of DOJ request to DoD to hold crewmembers on board until charging decisions are made" among its "next steps."  (*Id.*)

That same day, DOS also began efforts to verify the identities and nationalities of the 14 mariners.  (Gov't Ex. 135 at 2–3.)  However, there was "some back and forth between our government and the Pakistani government" that delayed this process.  (Hr'g Tr. 37:11–14.)  The national elections scheduled to take place in Pakistan further delayed efforts to verify the mariners' nationalities.  (*Id.* 39:12–16.)  Ultimately, DOS's efforts to confirm the mariners' identities and nationalities extended "well into February."  (*Id.* 40:14–19.)

The FBI team arrived on the *USS Puller* on January 26, 2024, and began the process of searching electronic devices and interviewing the mariners.  (*Id.* 125:1–3.)

By January 29, 2024, the *USS Puller* had begun "mak[ing] its way to [Country C] and expected to port on/around 5 FEB."  (Gov't Ex. 110 at 22.)  The Navy indicated that it "could port earlier if DOJ makes a charging determination."  (*Id.*)  Following a January 29, 2024 MOTR

call, an FBI agent also memorialized that "DOJ (FBI) is requested to prepare an EXECSEC anticipating a need to reclassify from 'Displaced Mariner' to 'Detainee' and transfer of the detainees to the U.S. for prosecution."  (*Id.*)  SA Larsen testified that the FBI "wanted to make . . . very clear that CENTCOM was not going to do any action without an exec sec [i.e., an official request to the Secretary of Defense seeking interagency support] from the FBI or the Department of Justice."  (Hr'g Tr. 329:22–24.)

Following their final interviews with *Yunus* crew members on February 4, 2024, the FBI team determined that its investigative activities on board the *USS Puller* were complete and arranged to be flown off of the vessel.

The following day, on February 5, 2024, a DOD member sent an email, stating that "DoJ came over the top and stated they have not made a decision on how many mariners they will prosecute."  (Def. Ex. 2 at 1.)

Later that same day, a DOD member stated in an email that "[t]he USS LEWIS B PULLER ports in [Country C] on the 8th of FEB. . . . FBI told us today that they intend to prosecute all [14 mariners], which would require a flight from [Country C] back to the United States, hopefully as soon as the 8th when the LBP ports[.]"  (Def. Ex. 3 at 2.)  In that same email, the author acknowledged that "if DoJ comes back and says they do not intend to prosecute all," then "a re-patriating flight of some, not likely all, back to Pakistan" would be required.  (*Id.*)

At some point during the week of February 5, Deputy AAG Newman expressed DOJ's view at an Interagency Policy Committee ("IPC") discussion that "we were probably a few days away from making a decision one way or the other, that we had not decided either whether to charge or how many individuals to charge, and that my expectation was that we would make that decision within a handful of days, probably three to five days."  (*Id.* 78:15–20.)

On February 7, 2024, Mr. Deutsch sent an email to a similar effect, stating as follows: "We understand NAVCENT Commander will delay the docking of the USS PULLER at [Country C] until February 11.  DOJ confirmed February 7 they are pursuing new charges that require a higher burden of proof and anticipated needing 4-5 additional days to assess evidence [and] determine charging decisions."  (Def. Ex. 70 at 1.)

On February 8, 2024 at 2:10 a.m.,[60] a Navy Commander sent an email, indicating that "DoJ stated they are not ready to issue charges at this time and will require at least 5 additional days before pressing charges."  (Def. Ex. 7 at 1.)

On February 8, 2024 at 8:26 a.m., a DOD member stated in an email that the *USS Puller* "is remaining at sea to give DoJ more time."  (Def. Ex. 5 at 1.)

On February 8, 2024 at 2:15 p.m. Eastern Time,[61] SA Larsen stated in a Skype message: "I got word from J33 and the guys on the boat this was happening.  They are doing it based on the DOJ request to hold for 5 days, till 11/12 FEB."  (Gov't Ex. 144 at 5.)  SA Larsen sought to clarify at the evidentiary hearing that "J33," "the element within U.S. Central Command that runs maritime operations within the CENTCOM AOR," contacted him and "indicated that they had heard that there was going to be a request from DOJ to request five additional days."  (Hr'g Tr. 303:14–18.)  However, according to SA Larsen, he had never conveyed that "DOJ or FBI wanted the Puller to stay offshore."  (*Id.* 304:1–3.)  Moreover, he testified that "CENTCOM

---

[60]    The Court notes that the redacted versions of this email and the email cited in the following paragraph that were introduced at the evidentiary hearing do not list the corresponding time zone, nor did any testimony shed light on the time zone from which they would have been sent.

[61]    SA Larsen testified that he is based in Tampa, Florida, and that therefore, his computer is typically set to Eastern Standard Time.  (Hr'g Tr. 305:18–22.)

made it abundantly clear that without an exec sec, they would not do it because they did not have the authority to."  (*Id.* 304:3–5.)

Mr. Newman similarly emphasized, in his testimony, that, to his knowledge, DOJ never requested DOD to alter its operational plans to allow greater time to investigate.  (*Id.* 75:17–22.) Rather, Mr. Newman sought to "send a very clear message that at the highest levels [DOJ] intended to take as much time as was needed before deciding whether to charge and that other departments needed to make their own decisions under their own authorities."  (*Id.* 85:18–22.)

SA Larsen also testified that, to his knowledge, the FBI never asked DOD to alter its operational plans to allow greater time for the FBI to investigate.  (*Id.* 304:18–21.)  Nor, to his knowledge, did DOJ ever request the same.  (*Id.* 304:22–25.)

Likewise, Mr. Deutsch stated that, although DOJ expressed its view that it needed more time to complete its charges, to his knowledge, DOJ never asked for the mariners to be detained on the *USS Puller*.  (*Id.* 55:1–21, 56:24–25.)  Rather, "DOJ acknowledged [the] reality" that DOD "cannot hold the mariners, and that if it has an opportunity to offload them (including, for example, a ship-to-ship transfer sometime before February 5), it will do so, even if DOJ has not completed its investigation."  (Gov't Ex. 137 at 2.)  Mr. Deutsch testified that DOD vocalized their "operational requirements and that they were not willing to simply wait indefinitely for DOJ to take action, and that if they had an opportunity to remove these individuals from the ship before DOJ was ready, they would do so."  (Hr'g Tr. 56:3–8.)

Ultimately, Country C agreed to assist with the resolution of the "displaced mariner" situation, but with conditions.  (*Id.* 43:9–15.)  Country C would permit the *USS Puller* to dock as long as its involvement was "minimized to the maximum extent possible."  (*Id.* 43:17–20.)

### 10.     Arrest, Processing and Presentment

On February 11, 2024, at approximately 10:30 p.m. Eastern Time, following the Government's application for arrest warrants for four *Yunus* crew members as defendants and ten crew members as material witnesses, United States Magistrate Judge Summer L. Speight signed a complaint and arrest warrants for all four initial defendants in this matter — Muhammad Pahlawan, Izhar Muhammad, Ghufran Ullah and Mohammad Mazhar.  (ECF No. 3.)  At that same time, Judge Speight also signed and authorized ten material witness warrants for the remaining mariners on board the *USS Puller*.  (*See, e.g.*, *United States v. Zulfiqar*, No. 3:24mw1, ECF No. 4.)  The *Yunus* crew members remained on board the *USS Puller* at this time.

Between February 11, 2024 and February 14, 2024, the Navy transformed an office building on its Country C base into a holding facility where the mariners could be temporarily detained.  (Hr'g Tr. 162:15–22.)

On February 13, 2024, DOJ sent its first formal request, via an "Exec Sec," to DOD, requesting the detention of the *Yunus*'s crew members (either as defendants or as material witnesses) in Country C until transportation to the United States could be arranged.  (*Id.* 337:19–25; Gov't Ex. 110 at 66, 69.)  DOJ also intended "to formally request DoD provide transportation for the arrestees and security detail to the United States (Eastern District of Virginia; airfield TBD)."  (Gov't Ex. 110 at 66.)

On February 14, 2024, FBI agents made multiple trips out to the *USS Puller* to arrest and transport each of the mariners to the temporary detention facility erected on the Navy base in Country C.  (Hr'g Tr. 162:7–13.)  Upon arrival, the agents ensured that all of the defendants and material witnesses had adequate food, water, clothing and hygiene materials, as well as access to medical care.  (Gov't Ex. 164 at 3; ECF No. 6 at 4.)

On February 15, 2024, in accordance with standard FBI procedure, the agents began the formal process of notifying all fourteen mariners of the general basis for their arrest. (Gov't Ex. 164 at 3.)

### a. Interviews in Country C (February 15, 2024 and February 19, 2024)

On February 15, 2024, FBI TFO Lam and FBI SA Rashid Hassanpoor interviewed Defendant Pahlawan in Country C following his formal arrest and transfer from the *USS Puller*. (Gov't Ex. 164 at 3.) During the interview, the FBI team advised Pahlawan that he was under arrest. (*Id.*) The agents also asked Pahlawan about whether he had a fear of returning to Pakistan. (*Id.*) The agents then asked Pahlawan if he wanted to participate in a voluntary interview. (*Id.*) Pahlawan agreed. (*Id.*)

On the same day, TFO Lam and NCIS SA Jermaine Davis interviewed Mazhar in Country C. (*Id.*) During the interview, the FBI team advised Mazhar that he was under arrest and asked him about whether he had a fear of returning to Pakistan. (*Id.*) Mazhar also agreed to participate in a voluntary interview. (*Id.*)

On February 19, 2024, TFO Lam and FBI SA Annalise Stone conducted additional interviews with Pahlawan and Mazhar in Country C. (Gov't Exs. 98, 103.) The focus of these interviews was to inform Defendants of their right to notify the Pakistani consulate about their arrest and to inquire whether they wanted to notify the consulate.

### b. Coordination of Military Air Transportation (February 15–21, 2024)

While FBI agents advised Defendants of the charges against them, DOD began working to arrange military air transportation of the crew members to the United States. DOD indicated that it required a 96-hour coordination window to have an aircraft in Country C. (Gov't Ex. 110 at 69.)

The FBI, DOJ, DHS and other agencies also began efforts to obtain "Significant Public Benefit" Parole approval for each of the fourteen mariners, so that they would be allowed to land in the United States for their initial appearances.  (Hr'g Tr. 81:17–22.)

Mr. Newman testified that the agencies explored "a menu of options" for transporting the defendants and material witnesses to the United States.  (*Id.* 82:10–13.)  He stated that DOJ "felt a lot of urgency, first and foremost, to bring the charged defendants to the United States given our obligation of prompt presentment."  (*Id.* 82:14–16.)  Mr. Newman further indicated that, "[a]s to the material witnesses, there was some question about whether they would be transported on the same flight as the charged defendants or whether logistically it would be more prudent and appropriate to bring the defendants first and the witnesses once an aircraft was available."  (*Id.* 82:17–21.)  Ultimately, however, DOJ sent a second Exec Sec request to DOD on February 15, 2024, the day after the crew members were arrested, requesting transportation for all 14 mariners in a single trip.  (*Id.* 343:7–11.)

On February 20, 2024, a military aircraft arrived in Country C to transport the 14 mariners to the United States.  (*Id.* 165:14–20.)  Shortly thereafter, the plane departed Country C with all 14 mariners, as well as the federal agents serving as their security detail, on board.  (*Id.* 166:13–21.)  Following a refueling stop in Spain, the plane landed in Richmond, Virginia on February 21, 2024.  (*Id.* 166:2–9.)

### c.    *Presentment in the Eastern District of Virginia (February 22, 2024)*

The defendants and material witnesses all appeared in the Eastern District of Virginia before two United States Magistrate Judges beginning on February 22, 2024.  (ECF No. 9.)

### B.    Procedural History

On December 4, 2024, the grand jury returned a Second Superseding Indictment (ECF No. 239) against Defendants, which charges Pahlawan with one count of conspiracy to provide material support or resources to terrorists; one substantive count of providing material support or resources to terrorists; two counts of participating in weapons of mass destruction threats to the United States; one count of conspiracy to commit violence against maritime navigation and maritime transport involving weapons of mass destruction; one substantive count of committing violence against maritime navigation and maritime transport involving weapons of mass destruction; two counts of witness tampering through intimidation or threat; and one count of providing materially false information to a federal law enforcement officer during a boarding of a vessel.  (*Id.* at 12–20.)  Mazhar faces one count of providing materially false information to a federal law enforcement officer during a boarding of a vessel, in violation of 18 U.S.C. § 2237(a)(2)(B).  (*Id.* at 21.)

The Court has since dismissed Count Two of the Second Superseding Indictment (providing material support or resources to terrorists) on multiplicity grounds and has ordered that, should the jury return a conviction on Counts Three and Four (participating in weapons of mass destruction threats to the United States), these counts shall be merged.  (ECF Nos. 269, 329.)  The Court has also dismissed Count Eight (witness tampering), because the Government failed to provide sufficient notice of this additional charge before the material witness depositions, thereby creating a Confrontation Clause issue if the depositions were admitted at trial.  (ECF No. 302.)

## II.    LEGAL OVERVIEW

### A.    Suppression Motions

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  This clause "permits a person to refuse to testify against himself at a criminal trial in which he is a defendant" and "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."  *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)).  "In addition, the right bars the introduction against a criminal defendant of out-of-court statements obtained by compulsion."  *Vega v. Tekoh*, 597 U.S. 134, 141 (2022).  The Fifth Amendment privilege against self-incrimination constitutes a trial right that applies to citizens and non-citizens alike.  *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990); *United States v. Hasan*, 747 F. Supp. 2d 642, 656 (E.D. Va. 2010), *aff'd sub nom. United States v. Dire*, 680 F.3d 446 (4th Cir. 2012).  As such, any violation of the right "occurs only at trial."  *Verdugo-Urquidez*, 494 U.S. at 264; *see United States v. Bin Laden*, 132 F. Supp. 2d 168, 181–82 (S.D.N.Y. 2001), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 177 (2d Cir. 2008) (stating that "any violation of the privilege against self-incrimination occurs . . . when a defendant's involuntary statements are actually used against him at a[] . . . criminal proceeding").

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court instituted procedural measures to protect the privilege against self-incrimination.  With "the advent of modern custodial police interrogation," there arose "an increased concern about confessions obtained by coercion" in violation of this right.  *Dickerson v. United States*, 530 U.S. 428, 434–35 (2000).

To combat the pressures inherent in custodial interrogation, the *Miranda* Court required that, before any custodial interrogation, a suspect must be informed:

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 444.  In the absence of *Miranda* warnings, the prosecution generally may not use any statements procured through custodial interrogation in its case-in-chief.  *Id.* at 444, 479.

Although *Miranda*'s rules are "constitutionally based," *Dickerson v. United States*, 530 U.S. 428, 440 (2000), *Miranda* and its progeny make clear that *Miranda* imposed a set of prophylactic safeguards but did not create a constitutional right to be warned.  *Vega*, 597 U.S. at 142, 144; *see Michigan v. Tucker*, 417 U.S. 433 (1974) ("[*Miranda*'s] suggested safeguards were not intended to create a constitutional straightjacket, but rather to provide practical reinforcement for the right against compulsory self-incrimination."); *United States v. Sanchez*, 859 F.2d 483, 485–86 (7th Cir. 1988) (Easterbrook, J.) ("*Miranda* warnings are not themselves required by the Constitution, but are simply ways of bringing home to suspects the underlying rights"). Consequently, suspects do not possess a constitutional right to *Miranda* warnings, and a *Miranda* violation does not necessarily establish a Fifth Amendment violation.  *Vega*, 597 U.S. at 144, 150.  For instance, in *New York v. Quarles*, 467 U.S. 649 (1984), the Supreme Court held that unwarned statements obtained in violation of *Miranda* need not be suppressed when the questioning occurs to address an ongoing "public safety" concern.  *Id.* at 654–57.  The Court reasoned that *Miranda* warnings are "not themselves rights protected by the Constitution" and that "the need for answers to questions in a situation posing a threat to the public safety outweigh[ed] the need for the prophylactic rule."  *Id.* at 654, 657.

49

Statements obtained in the absence of *Miranda* warnings must generally be suppressed at trial. *Miranda*, 384 U.S. at 479. The Supreme Court subsequently elucidated the *Miranda* exclusionary rule's "twin rationales": trustworthiness and deterrence. *Oregon v. Elstad*, 470 U.S. 298, 308 (1985); *see Michigan v. Tucker*, 417 U.S. 433, 447–48 (1974) (discussing deterrence and "protection of the courts from reliance on untrustworthy evidence" as justifications for the exclusionary rule). The deterrence rationale lies at the core of the Court's *Miranda* jurisprudence and has consistently led the Court to reevaluate pragmatically, rather than dogmatically, the outer boundaries of its *Miranda* jurisprudence. *See Vega*, 597 U.S. at 151 (recognizing that "*Miranda* rests on a pragmatic judgment about what is needed" to safeguard Fifth Amendment rights); *United States v. Pryor*, 32 F.3d 1192, 1196 (7th Cir. 1994) ("The Supreme Court devised the exclusionary rule to reduce incentives to violate the Constitution by preventing the prosecutors from using evidence the police turn up."); *United States v. Villalba-Alvarado*, 345 F.3d 1007, 1015 (8th Cir. 2003) ("It is plain upon reading *Miranda* that the deterrence rationale served as the primary theoretical underpinning for the Court's decision."); *In re Terrorist Bombings*, 552 F.3d at 204–05 (emphasizing the "flexibility and adaptability of the [*Miranda*] rule" and underscoring that a "context-specific approach is wholly consistent with . . . the Supreme Court decisions construing the *Miranda* framework").

## B.    Rule 5(a) Motion

Federal Rule of Criminal Procedure 5(a) provides, in relevant part, that a "person making an arrest outside the United States must take the defendant without unnecessary delay before a magistrate judge" unless one of a narrow set of exceptions applies. Fed. R. Crim. P. 5(a)(l)(B). As the Supreme Court emphasized, Rule 5(a)'s prompt presentment requirement "has always mattered in very practical ways and still does." *Corley v. United States*, 556 U.S. 303, 320 (2009). Specifically, the Rule serves to "foreclose Government overreaching" by both ensuring

that defendants are informed of the charges against them and their rights in this regard and by preventing secret detention and interrogation. *Id.* at 306, 320. The Supreme Court has long acknowledged the heightened risk of "intensive interrogation" during periods of "unwarranted detention," *Mallory v. United States*, 354 U.S. 449, 453 (1957), wherein officers invariably "subject[] the accused to the pressures of a procedure which is wholly incompatible" with the duties of law enforcement officers and which "tends to undermine the integrity of the criminal proceeding." *McNabb v. United States*, 318 U.S. 332, 342 (1943); *see also Culombe v. Connecticut*, 367 U.S. 568, 584–85 (1961) (describing Rule 5 and similar state rules as "responsive both to the fear of administrative detention without probable cause and to the known risk of opportunity for third-degree practices which is allowed by delayed judicial examination"). Much like *Miranda*, Rule 5(a) serves as a protective "barrier" against such practices by prohibiting unreasonable presentment delays and the "pressures" inherent in interrogations during this critical timeframe, with suppression of statements obtained during the period of delay as the ordinary remedy. *Mallory*, 354 U.S. at 453, 456.

The defendant carries the burden of proving unnecessary (and therefore unreasonable) delay in arraignment. *E.g.*, *Tillotson v. United States*, 231 F.2d 736, 738 (D.C. Cir. 1956); *United States v. Boche-Perez*, 755 F.3d 327, 336 (5th Cir. 2014); *United States v. Van Poyck*, 77 F.3d 285, 288 (9th Cir. 1996); *Miller v. United States*, 396 F.2d 492, 496 (8th Cir. 1968).

### C.    Spoliation Motion

A criminal defendant "has a constitutionally protected privilege to request and obtain from the prosecution evidence that is . . . material to the guilt of the defendant." *California v. Trombetta*, 467 U.S. 479, 485 (1984) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *Id.* (citing

*United States v. Agurs*, 427 U.S. 97 (1976)).  The suppression of material exculpatory evidence violates the right to due process, "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.

A defendant may establish a due process violation based on the prosecution's failure to preserve evidence if the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed" and if it is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  *Trombetta*, 467 U.S. at 489. "A showing of bad faith is required, however, when the lost evidence can only be said to be 'potentially useful' to the defendant because the contents of the evidence are unknown."  *United States v. Johnson*, 996 F.3d 200, 206 (4th Cir. 2021) (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988)).

## III.    ANALYSIS

### A.    Suppression Motions

Defendants seek to suppress three categories of statements on *Miranda* grounds.  First, Defendants challenge the admissibility of Pahlawan's silence and Mazhar's statements (or silence) in response to un-*Mirandized* group questioning on the *Yunus*.[62]  Second, Defendants seek to suppress their statements to Chief Mulkey during un-*Mirandized* individual questioning on the *Yunus*.[63]  Third, Defendant Pahlawan moves to suppress his *Mirandized* statements to the

---

[62]    As the Court stated in its factual findings, the testimony presents two different accounts of what occurred when Chief Mulkey asked Mazhar, through Ullah, to identify the captain, master or person in charge of the *Yunus*.  Under one telling, Mazhar stated that he did not know who served as the captain.  (Hr'g Tr. 393:21–24, 480:25–481:2.)  Alternatively, Mazhar gave no response at all.  (*Id.* 393:25–394:4.)

[63]    Counts Nine and Ten of the Second Superseding Indictment charge Defendants with providing materially false information to a federal law enforcement officer during a boarding of a vessel in violation of 18 U.S.C. § 2237.  (2d Sup. Ind. at 20–21.)  These counts stand premised

FBI team while aboard the *USS Puller*, because in his view, the FBI did not properly advise him of his *Miranda* rights.[64]

The Government does not dispute that foreign nationals questioned outside the United States enjoy the constitutional rights protected by *Miranda*.  Instead, the Government contends that no constitutional violation exists, because Defendants were neither in custody nor interrogated for purposes of *Miranda*.  (ECF No. 161 ("MTS Opp.") at 2.)  Furthermore, even assuming that Defendants' un-*Mirandized* statements on the *Yunus* were procured through custodial interrogation, the Government argues that the public safety exception applies, placing the statements outside the ambit of the exclusionary rule.  (ECF No. 300 ("Gov't Suppl. Br.") at 69.)  The Government further argues that Defendants' alleged false statements would still be admissible as to the false statement charges, because "the Fifth Amendment does not prohibit the use of an unmirandized false statement where the false statement is itself the crime."  (MTS Opp. at 2, 20.)  As to Defendant Pahlawan's claim that his *Mirandized* statements on the *USS Puller* should be suppressed, the Government contends that Pahlawan received sufficient *Miranda* warnings and that he made a voluntary and knowing waiver of his rights.  (*Id.*)

For the reasons set forth below, the Court finds that Defendants were not in custody for *Miranda* purposes during the initial group interview on the *Yunus*, and therefore, Defendants' statements (or silence) in response to Chief Mulkey's questions during this interview are admissible.  In addition, the Court finds that Defendants' statements to Chief Mulkey during

---

on the allegedly false statements made by Defendants during these two sets of interviews with Chief Mulkey aboard the *Yunus*.

[64]     Between January 27, 2025 and January 29, 2025, DOD engaged in un-*Mirandized* interviews of Defendants on the *USS Puller*.  The Government does not seek to admit any statements made in these interviews unless Defendants testify.  (Gov't Suppl. Br. at 6.)

their individual interviews on the *Yunus* were procured through custodial interrogation, but that the public safety and false statement exceptions apply to these interviews.  Accordingly, Defendants' un-*Mirandized* statements during their individual interviews aboard the *Yunus* are also admissible in the Government's case-in-chief.  Lastly, Defendant Pahlawan's *Mirandized* statements to the FBI team on board the *USS Puller* are admissible, because Pahlawan was provided sufficient *Miranda* warnings and voluntarily, knowingly and intelligently waived his Fifth Amendment rights.  Accordingly, the Court will DENY Defendants' motions to suppress. (ECF Nos. 113, 117.)

### 1.    Defendants' un-*Mirandized* statements (or silence) during the group interview on the *Yunus* are admissible.

Absent formal arrest, a suspect stands entitled to *Miranda* warnings only "where there has been such a restriction on [his] freedom as to render him 'in custody.'"  *United States v. Colonna*, 511 F.3d 431, 435 (4th Cir. 2007) (citations omitted).  An individual qualifies as "in custody" for *Miranda* purposes when, under the totality of the circumstances, his "freedom of action is curtailed to a degree associated with formal arrest."  *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001).  Facts relevant to this objective inquiry include:

> the time, place and purpose of the encounter, the words used by the officer, the officer's tone of voice and general demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and whether there was any physical contact between the officer and the defendant.

*United States v. Hashime*, 734 F.3d 278, 283 (4th Cir. 2013).

Courts engage in a two-step inquiry to determine whether a suspect's freedom of action is curtailed to a degree associated with a formal arrest.  *Howes v. Fields*, 565 U.S. 499, 509 (2012). A court must first ascertain "whether a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave."  *Id.* (cleaned up).  If a reasonable person would not have felt at liberty to leave, then a court must ask "the additional question [of] whether the

54

relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Id.*

As the Fourth Circuit explained, "[d]istinguishing between these two steps helps explain why the Supreme Court and the Fourth Circuit have concluded that a person might not be free to leave but might also not be in custody under *Miranda*."  *United States v. Leggette*, 57 F.4th 406, 410 (4th Cir. 2023).  For instance, a motorist may not be free to leave during a traffic stop, but such stops do not ordinarily constitute "custody," because they lack the necessary coercion. *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984).  Likewise, the "temporary and relatively nonthreatening detention involved in a . . . *Terry* stop does not constitute *Miranda* custody." *Howes*, 565 U.S. at 509.

The Court finds that Defendants were not in *Miranda* custody during the group interview on the *Yunus*.  Although Defendants were not free to leave, the circumstances of the group interview do not reveal the "same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Howes*, 565 U.S. at 509.  Chief Mulkey, who was accompanied by two other Boarding Team members for security purposes, questioned Defendants once the emergency personnel recovery efforts ceased.  Using a *Yunus* crew member as a translator, Chief Mulkey asked only a handful of questions targeted at determining the identity of the captain and locating any registration paperwork.  Far from the isolated setting of the police interview in *Miranda*, the interview here occurred in a group setting with all fourteen mariners present and over only a brief period of time, since Chief Mulkey subsequently paused questioning to procure an interpreter who could communicate with the mariners.  Although the Boarding Team interdicted the *Yunus* with weapons drawn, gathered the crew members at the bow of the vessel and instructed them to remain silent and keep their heads down and their hands

out until the Boarding Team completed the initial security sweep, this initial show of force alone, which was justified to ensure officer safety, did not automatically place Defendants in *Miranda* custody. *See United States v. Leshuk*, 65 F.3d 1105, 1109–10 (4th Cir. 1995) ("[D]rawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes."). Given that Chief Mulkey conducted a brief interview with twelve other mariners sitting alongside Defendants, the totality of the circumstances demonstrates that the atmosphere surrounding the group interview was substantially less police-dominated than that surrounding the kind of interrogation at issue in *Miranda*. Thus, because Defendants were not in custody for *Miranda* purposes when Chief Mulkey conducted the group interview on the *Yunus*, *Miranda* warnings were not required, rendering their un-*Mirandized* statements (or silence) during the group interview admissible.[65] [66]

---

[65]     Pahlawan separately objects to admitting evidence of his silence in response to the group questioning under Federal Rules of Evidence 401 and 403. (ECF No. 314 ("Pahlawan Suppl. Br.") at 26–30.) According to Pahlawan, his silence in the face of questions posed in a language that he did not understand bears no relevance as to whether he understood the purpose of the boarding and intentionally failed to respond, and any probative value is substantially outweighed by the risk of unfair prejudice and confusing the jury. (*Id.*) The Court rejects these arguments. During the evidentiary hearing, the Government admitted evidence suggesting that Pahlawan understood Chief Mulkey's request to identify the "captain," the "master" or the "person in charge" of the *Yunus*. (*See* Gov't Ex. 165 at 4 (stating, in a text message from Pahlawan to another person, that "I am a fish shep captain").) Pahlawan can raise arguments about the weight of this evidence to the jury.

[66]     Even if Defendants were subject to custodial interrogation for *Miranda* purposes, the public safety and false statement exceptions would apply to this questioning for the same reasons that they apply to Chief Mulkey's January 13, 2024 individual interviews, placing any statements outside the ambit of the exclusionary rule. *See infra* Sections III.A.2.c (public safety exception), III.A.2.d (false statement exception).

> ### 2.   Defendants' un-*Mirandized* statements to Chief Mulkey during their individual interviews on the *Yunus* are admissible.

The Court next considers whether Defendants' un-*Mirandized* statements to Chief Mulkey during their individual interviews on the *Yunus* resulted from custodial interrogation.  If so, their statements must be suppressed unless an exception applies.

> #### a.   *Defendants were in custody during their individual interviews on the* Yunus*.*

Defendants argue that the Boarding Team's use of overwhelming force during the boarding and its continued control over the crew from the evening of January 11, 2024 through the morning of January 13, 2024, when Defendants were eventually questioned, placed Defendants in custody for *Miranda* purposes.  In response, the Government relies on what it terms an "overwhelming consensus" among courts that routine boardings of vessels do not place a crew "in custody" for purposes of *Miranda*.  (Gov't Suppl. Br. at 49.)  In the Government's view, the show of force, restriction of movement, length of the boarding and discovery of missile components do not set this boarding apart from routine boardings.  (*Id.* at 53–58.)  The Government further notes that the Boarding Team did not place Defendants in handcuffs or restraints while on board the *Yunus* and claims that the Boarding Team provided the mariners "sufficient freedoms to navigate their vessel during the boarding process," pointing to the fact that crew members were permitted "to go to the restroom (with an escort) when they wanted, grab[] blankets to stay warm when they were cold, [eat] when they were hungry, and sle[ep] when they were tired."  (*Id.* at 52.)  For the reasons stated below, the Court finds that Defendants' freedom of action during the boarding was curtailed to a degree associated with a formal arrest, and that Defendants were therefore in custody for *Miranda* purposes.

To determine whether Defendants were in *Miranda* custody, this Court must first ascertain "whether a reasonable person would have felt he or she was not at liberty to terminate

the interrogation and leave." *Howes*, 565 U.S. at 509 (cleaned up).  On the evening of January 11, 2024, the Boarding Team, with assault rifles trained on Defendants' foreheads, collected the mariners and held them at the front of the *Yunus*, where they were ordered to remain silent and keep their heads down and their hands out.  Thereafter, the Boarding Team conducted a protective sweep, gained operational control of the *Yunus* and began regulating the crew members' movements at all times.  Over the course of the boarding, Defendants needed permission to eat, drink, use the restroom and otherwise leave their holding area.  Defendants and the other crew members were "not free to move around the dhow" and remained "confined to [an] area in the aft," where they were held under constant armed guard.  (Hr'g Tr. 405:15–21.) On the morning of January 13, 2024, members of the Boarding Team separated Defendants from the rest of the crew members to conduct individual interviews with Chief Mulkey.  Defendants were not handcuffed before or during these interviews, but they "still knew that they could not leave." (*Id.* 405:22–25.)  Given the express restrictions on Defendants' movements for nearly 36 hours and the use of weapons to limit Defendants to secured areas of the *Yunus*, the Court finds that, under the totality of the circumstances, a reasonable person in Defendants' position would not have felt "at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509.

Moreover, the circumstances under which the individual interviews took place on the *Yunus* served as the functional equivalent to a station house interrogation.  Although the interviews were limited in duration, other circumstances highlight the inherently coercive pressures that elevate this boarding to a custodial arrest for *Miranda* purposes.  Defendants were taken by the arm and isolated from the other crew members for individual questioning with Chief Mulkey, who remained armed with a sidearm pistol.  By the time that Chief Mulkey conducted individual interviews, the *USS Puller* had towered over the *Yunus* for several hours as craning

operations to transfer the ACWs took place, additional military personnel had boarded the *Yunus* and an IET member had collected (or was in the process of collecting) biometric information from the crew members.  Defendants' only alternative to answering Chief Mulkey's questions was to be escorted back by an armed guard to a small holding area on the *Yunus*, where Defendants would remain captive.  These circumstances created precisely the type of coercive conditions that ordinarily trigger *Miranda*.

The Government resists this outcome by arguing that Defendants "retained a level of freedom and control during the boarding," as they "were able to go to the restroom (albeit, with an escort) when they wanted, grab blankets to stay warm when they were cold, [eat] when they were hungry, and sleep when they were tired."  (MTS Opp. at 14.)  The Government emphasizes that Defendants also "made tea when they wanted and that at least one member of the Boarding Team *shared some tea* with the mariners during the boarding."  (*Id.* (emphasis in original).)  Yet, the fact remains that for nearly 36 hours, members of the Boarding Team confined Defendants and kept them under constant guard in the middle of the Arabian Sea.  Such confinement stands "tantamount to having been placed in a modern day jail pod, where inmates cook for themselves, are free to walk around the pod and associate together, but all the while being confined to a secure space."  *United States v. Portocarrero-Reina*, 2006 WL 1460277, at *2 (M.D. Fla. May 23, 2006).

The instant case presents similar circumstances to those in *United States v. Hasan.* There, the defendant faced charges for piracy and related crimes in connection with an assault on a United States Navy frigate, the *USS Nicholas*, off the coast of Somalia.  *Hasan*, 747 F. Supp. 2d at 654–55.  During an interview on board the *USS Nicholas*, which was translated through an interpreter on a satellite phone, the defendant "immediately confessed to being a pirate."  *Id.* at

660.  The interview lasted only "a few minutes," during which the defendant "was seated in the open . . . without handcuffs, and without armed guards in the immediate vicinity."  *Id.* at 659, 661.  Nevertheless, this Court concluded that the defendant was in custody for purposes of *Miranda*, because he "was detained in handcuffs and under constant guard by armed sailors on the *USS Nicholas* in the middle of the high seas."  *Id.* at 661.

Likewise, in this case, the evidence before the Court demonstrates that Defendants were similarly held captive on board the *Yunus*.  As in *Hasan*, Chief Mulkey conducted brief interviews of Defendants with the aid of an interpreter on a satellite phone.  The evidence also demonstrates that, like the defendant in *Hasan*, Defendants were being held at the mercy of the Boarding Team, who isolated Defendants in specified areas of the *Yunus* and surveilled Defendants at all times, even when they used the restroom.  Although Defendants were not physically restrained in handcuffs, as the Government repeatedly notes, Defendants remained under constant guard by an armed escort in the middle of the high seas.  Such a degree of restraint imposed on Defendants' movements illustrates their captivity on board the *Yunus*.  Moreover, the fact that the *USS Puller* lingered "as close . . . as possible [to the *Yunus*] without making contact" for multiple hours before the individual interviews, and remained as close as 200 yards from the *Yunus* while Chief Mulkey interviewed Defendants, would have strongly suggested to the mariners that they would not be released and free to leave at the end of the questioning.[67]  (Hr'g Tr. 218:1–3.)  Under these circumstances, like in *Hasan*, Defendants were restricted from moving freely and were therefore in custody for *Miranda* purposes.

---

[67]    For this reason, the Court rejects the Government's attempt to distinguish the instant case from *Hasan* on the basis that the interviews in *Hasan* "took place *after* the mariners had been captured, handcuffed, and *removed* from their vessel to be taken onboard the larger Navy vessel." (ECF No. 326 at 2 (emphasis in original).)  Regardless of whether Defendants had already set foot on the *USS Puller* or were awaiting imminent transfer to the *USS Puller* due to the

Furthermore, the Court does not stand persuaded by the Government's reliance on a

purported "overwhelming consensus" that "a boarding does not place the crew 'in custody' for

purposes of *Miranda*."  (MTS Opp. at 11–12.)  Even assuming that routine Coast Guard

boardings normally would not create a custodial scenario requiring *Miranda* warnings, the

boarding of the *Yunus* hardly qualifies as routine.[68]  Operating on a suspicion that the *Yunus* was

transporting ACWs, the Boarding Team, with helicopters hovering overhead, boarded the *Yunus*

in the late hours of the evening and herded the crew members into specified areas at gunpoint.

For multiple days, the crew members were constantly monitored by armed guards and were "not

free to leave." (*Id.* 444:3–10.)  And Defendants' individual interviews did not take place during

the initial moments of the boarding, as would be routine; instead, the Boarding Team conducted

the individual interviews approximately 36 hours after boarding the *Yunus*.  These unique and

dramatic circumstances elevate the at-issue boarding from routine to one involving a level of

restraint analogous to formal arrest and place the crew in custody for purposes of *Miranda*.[69]

---

unseaworthy nature of the *Yunus*, the fact remains that Defendants were unable to leave at the
end of questioning and almost certainly knew as much during the interview.  *See Howes*, 565 U.S
at 509 (considering the "release of the interviewee at the end of the questioning" to determine
how a suspect would have gauged his freedom of movement).

[68]    The Government acknowledges that even a routine boarding can become custodial in
nature.  (*See* ECF No. 161 at 11 (recognizing that "aggravating circumstances" may create a
custodial boarding but asserting that these circumstances "are not present here").)

[69]    Accordingly, the out-of-circuit cases cited by the Government concerning routine
boardings stand inapposite here.  *See, e.g.*, *United States v. Rioseco*, 845 F.2d 299, 300, 303
(11th Cir. 1988) (finding that a brief detention by armed Coast Guard officers during a routine
boarding and inspection did not constitute *Miranda* custody); *United States v. Li*, 206 F.3d 78, 83
(1st Cir. 2000) (finding that the Coast Guard's request for the crew to slow the ship cannot be
construed as a custodial boarding, because the request "was made during the opening moments
of the boarding" and "the Coast Guard had neither applied nor threatened any force"); *United
States v. Baker*, 641 F.2d 1311, 1319 (9th Cir. 1981) (finding no custodial atmosphere where an
agent called across the water, "are you involved in treaty fishery?"); *United States v. Warren*, 578

Likewise, the Court rejects the Government's notion that the boarding of the *Yunus*

stands analogous to a *Terry* stop.  (MTS Opp. at 16.)  The nature and duration of the boarding at

issue in this case simply does not compare to the "temporary and relatively nonthreatening

detention" involved in such a stop.  *Leggette*, 57 F.4th at 411.  The Boarding Team was not only

armed, but they also rounded up the mariners at gunpoint and held them at the front of the *Yunus*

to conduct the protective sweep.  Moreover, by the Government's own account, the boarding

extended nearly two days — from the evening of January 11, 2024, through the afternoon of

January 13, 2024.  Such duration stretches the term "temporary" in the context of *Terry* well

beyond its ordinary meaning.  Case law concerning *Terry* stops thus proves inapposite here.

The Government seeks to rebut Defendants' argument that the Boarding Team's

discovery of the weapons before the individual interviews further contributed to a "custodial"

atmosphere for *Miranda* purposes, arguing that "nothing changed from [Defendants'] viewpoint

based on the Boarding Team's actions."  (Gov't Suppl. Br. at 57.)  The Government's argument

falls flat.  First, the custodial inquiry constitutes an *objective* one that asks whether a reasonable

person in the suspect's position would have understood that he was in custody.  *Hashime*, 734

F.3d at 283.  Here, even if the Boarding Team did not expressly announce that they had

discovered weapons, and even if the crew members had no direct line of sight to the Boarding

---

F.2d 1058, 1070–71 (5th Cir. 1978), *abrogated by United States v. Bengivenga*, 845 F.2d 593 (5th
Cir. 1988) (cautioning that routine boardings can become coercive).

    In the Government's best case, *United States v. Ortega*, 2012 WL 12894242 (S.D. Fla.
Dec. 3, 2012), the defendant argued that an initial show of force, and the associated protective
sweep conducted to secure the vessel, transformed the routine boarding into a custodial arrest.
*Id.* at *6.  The court rejected this argument, because the show of force proved necessary to ensure
officer safety.  *Id.*  Although an initial show of force alone may not necessarily create a custodial
situation, *see infra* Section III.A.1, *Ortega* proves distinguishable from the instant case, given the
significantly longer detention and heightened degree of control exerted over the crew between
boarding and interrogation.

Team's activities, the Court is highly skeptical that the mariners remained oblivious as the Boarding Team discovered cargo in the net hold, untangled that cargo from fishing nets, carried that cargo up to the deck for inspection, opened that cargo to reveal ACWs, lifted those ACWs up on a crane above the *Yunus* and then transferred them to the *USS Puller* — a process that lasted nearly 24 hours.  (Hr'g Tr. 207:1–7, 217:22–218:3, 274:22–24, 277:6–10.)  During this multi-hour operation, the crew members likely had an opportunity to observe these events when they were "escorted around in order to . . . use the restroom."  (*Id.* 278:8–9.)  Defendants' undoubted awareness that the Government had found troubling cargo comports with a reasonable person's understanding that their ability to "terminate the interrogation and leave" had likely been reduced, if not eliminated.  Second, Chief Mulkey's knowledge of the weapons also led to new questions about the "cargo" and "supplies," which would likely manifest to any individual under interrogation that the cargo contained contraband.  *See Stansbury v. California*, 511 U.S. 318, 325 (1994) (recognizing that "an officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned").

Even aside from the Boarding Team's discovery of the weapons, the circumstances of the boarding had undoubtedly changed by the time that Chief Mulkey questioned Defendants on January 13, 2024.  The *USS Puller*'s presence and the additional military personnel on board the *Yunus* enhanced the coercive atmosphere.  Defendants' prolonged detention and physical restrictions also vitiated any sense of freedom.  And unlike the initial interview on January 12, 2024, which occurred in a group setting, Defendants were isolated from the other crew members to conduct their individual interviews.  The totality of these circumstances demonstrate that the boarding became custodial by the time of Defendants' individual interviews on the *Yunus*.

In sum, the overwhelming show of force, the high degree of restraint for an extended period of time and the coercive conditions throughout the duration of the boarding curtailed Defendants' freedom of action to a degree associated with formal arrest, rendering Defendants in custody for purposes of *Miranda*.

> ### b. Defendants were interrogated during their individual interviews on board the Yunus.

The Government next asserts that Defendants were not interrogated for purposes of *Miranda*, because Defendants were only asked "routine boarding and biographical questions." (Gov't Suppl. Br. at 58.)  According to the Government, Chief Mulkey's questions were designed to inquire about the statelessness of the vessel and the identity of the captain — "routine initial topic[s] for all boarding processes" — and were therefore not reasonably likely to elicit an incriminating response, falling outside of *Miranda*'s purview.  (*Id.* at 59.)  The Government analogizes these boarding questions to the routine booking questions that courts have consistently found beyond the reach of *Miranda*.  (*Id.* at 59–60.)  The Court rejects the Government's arguments and finds that Chief Mulkey conducted a custodial interrogation on board the *Yunus*.

For purposes of *Miranda*, an "interrogation" consists of "words or actions on the part of the police (other than those normally incident to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  This inquiry employs an objective standard.  *See Grueninger v. Dir., Virginia Dep't of Corr.*, 813 F.3d 517, 527 (4th Cir. 2016) (noting that the state court improperly substituted "a subjective standard ('designed to' elicit) for *Innis*'s objective standard ('should know are reasonably likely to' elicit)").

While an exception to *Miranda*'s strictures exists for routine booking questions securing "biographical data necessary to complete booking or pretrial services," this exception does not apply to questions, even during booking, that are designed to elicit incriminatory admissions. *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 & n.14 (1990); *see United States v. Abdallah*, 911 F.3d 201, 213 (4th Cir. 2018) (distinguishing between when officers make "requests for routine information necessary for basic identification purposes" and when officers "should reasonably be aware that the information sought is *directly relevant to the substantive offense charged*" (emphasis in original)). Thus, when an officer "has reason to know that a suspect's answer may incriminate him, what once was an innocuous routine question . . . may take the form of an incriminating question that then becomes subject to *Miranda*." *United States v. Guess*, 756 F. Supp. 2d 730, 742 (E.D. Va. 2010).

Here, Chief Mulkey should have reasonably expected his questions to elicit an incriminating response. The Government's assertion that these questions constituted routine boarding questions ignores both the timing and the substance of the interviews. By the time that Chief Mulkey questioned Defendants on January 13, 2024, the Boarding Team had already discovered weapons on the *Yunus* and transferred them to the *USS Puller*. Chief Mulkey then proceeded with "tactical questioning" related to the cargo, the vessel's origin and the identity of the captain in an attempt to identify key crew members for further substantive questioning. After uncovering evidence of a weapons smuggling operation, Chief Mulkey had every reason to expect that his questions, under the guise of routine boarding questions, could lead to an incriminating response; an admission that Pahlawan served as the captain of the *Yunus* or that Pahlawan was responsible for the cargo on the *Yunus*, for instance, would draw a link between Pahlawan and the Iranian weapons found on the vessel, subjecting him to criminal liability. The

Court's outcome does not change merely because Chief Mulkey's questions resemble routine boarding questions, since he asked these questions for a purpose beyond mere identification.[70] *See Guess*, 756 F. Supp. 2d at 741–42 (recognizing that "even information that appears administrative in one context can mutate into incriminatory information if used for a unique purpose"). Once the Boarding Team discovered weapons on board the *Yunus*, Chief Mulkey should reasonably have anticipated that his questions to members of the crew transporting those weapons could lead to incriminating responses. Therefore, the Court finds that the individual interviews on board the *Yunus* constituted an interrogation for *Miranda* purposes.[71]

The Government insists that Chief Mulkey did not interrogate the mariners on the *Yunus*, because Chief Mulkey was purportedly acting under his authority pursuant to Title 10 of the United States Code, as opposed to Title 14, during the entirety of the interdiction. (ECF No. 361

---

[70] The Court notes that the Government's position regarding the purpose of Chief Mulkey's questioning is internally inconsistent. For the sake of its interrogation analysis, the Government contends that Chief Mulkey asked questions merely aimed at identifying the captain of the *Yunus* and the vessel's statelessness. (Gov't Suppl. Br. at 59.) Yet, elsewhere in its brief, the Government acknowledges the dual-purpose nature of Chief Mulkey's questioning: to ascertain the identity of the captain as part of the flag-verification process *and* to collect intelligence. (*Id.* at 16, 79; *see id.* at 61 (conceding that Chief Mulkey's questions "were of course relevant to the ACWs"); *see also* ECF No. 311 at 3 (stipulating that the Navy assessed that an interdiction of the *Yunus* "would provide intelligence relating to smuggling advanced conventional weaponry in the Arabian Sea").) Given that the *Yunus* was the target of a deliberate military operation to interdict an illicit weapons shipment and collect intelligence, the Government cannot accurately characterize Chief Mulkey's questions concerning the vessel, the crew members and their roles as mere "routine" boarding questions.

[71] The Government's reliance on *United States v. Brown*, 163 F.3d 599 (4th Cir. 1998) (unpublished table decision), proves unwarranted. In *Brown*, the defendant consented to a search of his vehicle, and an agent asked the defendant to identify his car key. *Id.* at *1. The defendant sought to suppress his statement regarding the car key on the ground that it was obtained without the benefit of *Miranda* warnings. *Id.* at *3. The Fourth Circuit concluded that the identification of the car key in the course of giving consent to search the vehicle did not amount to interrogation for *Miranda* purposes. *Id.* at *3. Unlike the defendant in *Brown*, however, Defendants did not consent to a search of the *Yunus*. *Brown* is thus distinguishable from the instant case.

at 4.)  According to the Government, "[m]embers of the United States Coast Guard are uniquely
situated in the United States government because they possess both law enforcement authorities
and military authorities."  (*Id.*)  As the Government explained, the "Coast Guard is at all times a
military service and one of the armed forces of the United States."  (*Id.* (citing 14 U.S.C. § 101;
10 U.S.C. § 101(a)(4)).)  Yet, the Coast Guard also serves a law enforcement function under Title
14.  (*Id.* (citing 14 U.S.C. § 102).)  The Government argues that Chief Mulkey was engaged in
"military intelligence gathering under Title 10, not an attempt to incriminate the defendants," and
therefore, his individual questioning did not constitute interrogation for the purposes of *Miranda*.
(*Id.* at 3–4; *see also* Hr'g Tr. 415:22–24 (Chief Mulkey testifying that his questions "weren't
designed to incriminate").)

        The Court rejects this argument, because the interrogation inquiry does not turn on Chief
Mulkey's subjective intent.  *See Grueninger*, 813 F.3d at 527 (noting the state court's improper
use of a subjective standard).  The Boarding Team acted on suspicion that the *Yunus* was
transporting ACWs when it interdicted the *Yunus*, did in fact discover these ACWs and then
employed a questioning technique to elicit information that would help stop the flow of ACWs to
the Houthis.  Whether Chief Mulkey believed that he acted pursuant to his Title 10 or Title 14
authority does not alter the Court's analysis, because Chief Mulkey had reason to believe that his
questions about the "cargo" could lead to an incriminating response.

        Because Defendants' statements during their individual interviews were procured through
custodial interrogation, the Court proceeds to assess whether an exception to the *Miranda*
requirement applies.

c.    *The public safety exception applies.*

i.    *Background on* Quarles

The Government contends that, even if Defendants' un-*Mirandized* statements were obtained through custodial interrogation, the public safety exception applies, placing the statements outside the ambit of the exclusionary rule.  (Gov't Suppl. Br. at 69.)  The Government notes that, at the time of the boarding, the Houthi rebel forces had engaged in numerous maritime attacks on international commercial and military vessels in the aftermath of the October 7, 2023 Hamas attack on Israel.  (*Id.* at 73–79.)  According to the Government, these circumstances prompted concerns that the *Yunus* contained additional warheads or that "other actors were operating nearby with similarly dangerous weapons of mass destruction," constituting an imminent public safety threat.  (*Id.* at 72–73.)

The Supreme Court announced, in *New York v. Quarles*, 467 U.S. 649 (1984), a "public safety exception" to the requirement that *Miranda* warnings be given before a suspect's answers might be admitted into the evidence.  *Id*. at 655.  In that case, an armed suspect ran into a supermarket where he was apprehended by the police.  *Id.* at 651–52.  An officer searched the suspect and discovered an empty shoulder harness.  *Id.* at 652.  Without providing *Miranda* warnings, the officer asked the suspect where he had placed the gun.  *Id.*  The suspect indicated that the gun lay under some empty cartons in the store, and the officer immediately retrieved the loaded gun.  *Id.*  The *Quarles* Court reasoned that:

> The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket.  So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety:  an accomplice might make use of it, a customer or employee might later come upon it.

*Id.* at 657.  Under these circumstances, "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.*  The public safety exception, as originally articulated, thus permits an officer to question a suspect before issuing *Miranda* warnings in situations where there exists "an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." *Id.* at 659 n.8.

The Court's primary purpose in fashioning the public safety exception was straightforward:  to permit police officers "to follow their legitimate instincts when confronting situations presenting a danger to the public safety." *Id*. at 659.  In so doing, the *Quarles* Court emphasized the importance of granting law enforcement officers the necessary flexibility in situations where the safety of the public or their own wellbeing stand at risk.  *See id*. at 656 (declaring that "we do not believe that the doctrinal underpinnings of *Miranda* require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety" and emphasizing that, in such situations, "spontaneity rather than adherence to a police manual is necessarily the order of the day").  While characterizing the exception as "narrow," the Court also emphasized the case-by-case evaluation necessary to assess the exception's scope, underscoring that "*in each case* [the exception] will be circumscribed by the exigency which justifies it." *Id.* at 658 (emphasis added).

A key feature of the *Quarles* Court's opinion involves the manner that it pragmatically weighed costs and benefits in arriving at its holding.  Finding that the "need for answers . . . outweighs the need for" *Miranda* protections in this case, the Court assessed *Miranda*'s "primary social cost" in ordinary cases as "the possibility of fewer convictions," given that the warnings might deter suspects from providing potentially inculpatory responses to questions from law

69

enforcement.  *Id.* at 656–67.  The Court characterized this cost as one that the *Miranda* majority believed "would simply have to be borne" so that the Fifth Amendment privilege against self-incrimination remained protected.  *Id.* at 657.  Yet, by applying a cost-benefit lens to situations involving public safety concerns, the *Quarles* Court drew a sharp contrast between run-of-the-mill *Miranda* cases and those implicating an acute danger to the public, like *Quarles*.  In such cases, the cost of providing warnings (and potentially deterring a suspect from answering officers' questions) would be "more than merely the failure to obtain evidence useful in convicting" that suspect.  *Id.*  Rather, that cost consisted of "further danger to the public" and the inability of officers to "neutralize the volatile situation confronting them."  *Id*. at 657–58.  Under the Court's cost-benefit approach, such a cost clearly outweighs the benefits of *Miranda*'s prophylactic measures, justifying an exception to the rule.

The Court recently reaffirmed the integral nature of this cost-benefit approach to its *Miranda* jurisprudence in *Vega v. Tekoh*, 597 U.S. 134 (2022).  After rejecting the argument that a *Miranda* violation necessarily constitutes a violation of the Constitution — a result that would have nullified the Court's ability to craft exceptions to *Miranda* in the first place — the Court proceeded to clarify the fundamental cost-benefit assessment that underlay its prior efforts to "chart[] the dimensions" of *Miranda*.  *Id.* at 142–144.  In the Court's words, "all the post-*Miranda* cases" it discussed, including *Quarles*, "engaged in cost-benefit analysis to define the scope of these prophylactic rules," based on what remains, at core, a "pragmatic judgment."  *Id.* at 148, 151.  The Court also cited its opinion in *Maryland v. Shatzer*, 559 U.S. 98 (2010), where it expressly found that a judicially-crafted rule like *Miranda* "applies only where its benefits outweigh its costs."  *Vega*, 597 U.S. at 144 (citing *Shatzer*, 559 U.S. at 106).  Viewed in tandem with *Quarles*'s emphasis on assessing "in each case" what constitutes the particular exigency that

justifies un-*Mirandized* questioning, *Vega* affirms the importance of examining the costs and the benefits of *Miranda* warnings as the critical element in assessing whether a particular set of questions and answers may stand exempted from the *Miranda* requirement under the public safety exception.

In practice, the vast majority of cases implicating the public safety exception have presented scenarios similar to the one in *Quarles*, with the potential danger to the public or law enforcement officers stemming from a single individual and a (potentially) missing or discarded firearm.[72]  *United States v. Mobley*, 40 F.3d 688 (4th Cir. 1994), the only Fourth Circuit case that provides a substantial discussion of the public safety exception,[73] features such a fact pattern.

---

[72]    A 2014 survey of public safety exception opinions found that nearly 85% of cases involved such a fact pattern.  Aaron J. Ley & Gordie Verhovek, *The Political Foundations of* Miranda v. Arizona *and the* Quarles *Public Safety Exception*, 19 Berkeley J. Crim. L. 206, 242–43 (2014).

[73]    Since deciding *Mobley*, the Fourth Circuit has meaningfully engaged with the public safety exception in only seven cases (including one dissent), none of which significantly enhance its elucidation of *Quarles*.  *See United States v. Coleman*, 175 F.3d 1016 (4th Cir. 1999) (unpublished table decision) (affirming lower court's application of the public safety exception, because the questioning stemmed from officers' reasonable "concern for safety and to neutralize a potentially dangerous situation"); *United States v. Young*, 58 F. App'x 980, 982 (4th Cir. 2003) (affirming district court's application of the public safety exception to questions about the whereabouts of a suspect's guns during a search of his residence, even where the suspect was handcuffed, because "the officers could reasonably have believed that there might be other armed individuals present" and "the questions asked were limited to the presence of weapons and did not suggest any attempt to elicit testimonial evidence"); *United States v. Melvin*, 2007 WL 2046735, at *11 (4th Cir. July 13, 2007) (rejecting application of the public safety exception to questions concerning a suspect's truck, because the government "failed to demonstrate an immediate need that would validate protection" under the exception); *United States v. Hill*, 340 F. App'x 950, 952 (4th Cir. 2009) (affirming application of the public safety exception to questioning about potential weapons in a suspect's residence, since police were aware that he "did not reside . . . alone," they "had reason to suspect that weapons were located in the residence," and "the residence had not yet been secured," but rejecting application for questions about drugs); *United States v. Lloyd*, 581 F. App'x 203, 204 (4th Cir. 2014) (affirming district court's application of the exception to questions concerning the whereabouts of a suspect's gun and the other person in his vehicle, because the officers "reasonably were concerned about their safety and that of citizens in the immediate area"); *United States v. Bell*, 901 F.3d 455, 478 n.2

There, law enforcement officials entered a suspected drug dealer's apartment on a search

warrant, whereupon they secured the defendant, conducted a security sweep and concluded that

he was the only person in the apartment.  *Id*. at 690.  The Court noted that the defendant was

naked when he answered the door and that, as such, it was "quite apparent that he was unarmed."

*Id.* at 690.  Officers subsequently asked him if there were any weapons in the apartment.[74]  *Id*. at

690–91.  The defendant acknowledged that there was a weapon in the bedroom

closet.  *Id.* at 691.  He was subsequently indicted and convicted as a felon in possession of a

firearm under 18 U.S.C. § 922(g)(1).  *Id*. at 690.

Recognizing the public safety exception as a "valid and completely warranted exception"

to *Miranda*, the Fourth Circuit proceeded to find that the facts before it did not, however, justify

its application.  *Id*. at 693.  According to the court, the exception was inapplicable, because the

officers faced neither "extraordinary circumstances" nor an "objectively reasonable concern for

immediate danger to police or public," given that the defendant was alone, unarmed and secured.

*Id*.  Significantly, the Fourth Circuit emphasized the fact-specific, cost-balancing nature of its

inquiry, stressing that "each case must be examined on its own facts to determine whether the

---

(4th Cir. 2018) (Wynn, J., dissenting) (noting that majority's decision not to affirm the district court's decision to suppress statements on public safety exception grounds was "[f]or good reason," since law enforcement "could have advised Defendant of his *Miranda* rights before asking if there were any dangerous objects in the homes," given that he was "handcuffed and under the control of the officers"); *United States v. Khweis*, 971 F.3d 453, 472 n.4 (4th Cir. 2020) (noting, in dicta, that "[b]y its own terms, *Quarles* only applies to questioning necessary to defuse a 'volatile situation[]'" (citing *Quarles*, 467 U.S. at 657–58)).

[74]    Officers asked the defendant this question after advising him of his *Miranda* rights, and after the defendant invoked his right to counsel.  *Mobley*, 40 F.3d at 690.  While acknowledging that "the reasoning of *Quarles* is not on all points with the situation in which the accused has claimed his right to counsel," the Fourth Circuit found that the public safety exception applied with equal force in this post-*Miranda*-warnings scenario.  *Id*. at 692.  *Mobley*'s discussion of the scope of what it terms the "public safety exception to the *Miranda* framework" consequently extends to both the pre- and post-warnings setting.

deviation from the standard rule is justified by the totality of the circumstances in which the questioning takes place." *Id.* at 693 n.2. In making such a determination, courts must "fairly balance the general need to bolster Fifth Amendment rights . . . while recognizing the exceptional circumstances that will justify the occasional departure in order to protect police and public alike from objectively reasonable danger of harm." *Id.*

Since *Quarles* and *Mobley* were decided, courts have increasingly applied the public safety exception beyond *Mobley*'s one-suspect, one-gun scenario to events involving acts of terrorism. To make sense of this growing body of jurisprudence and extrapolate governing principles for how to best apply the public safety exception in such scenarios, the Court reviews three cases where courts grappled with the dimensions of the exception in the terrorism context, and whose findings inform the Court's analysis here: *United States v. Abdulmutallab*, 2011 WL 4345243 (E.D. Mich. Sept. 16, 2011); *People v. Holmes*, 2013 Colo. Dist. LEXIS 1474 (Dist. Ct. Nov. 1, 2013); and *United States v. Bowers*, 676 F. Supp. 3d 403 (W.D. Pa. 2022).

In *United States v. Abdulmutallab*, the district court considered whether the un-*Mirandized* questioning of Umar Farouk Abdulmutallab, also known as the "underwear bomber," fell within the public safety exception. Abdulmutallab had tried to detonate plastic explosives sewn into his underwear while on a commercial flight to the United States, which carried 288 other persons on board. *Abdulmutallab*, 2011 WL 4345243, at *1. After the plane landed safely in Michigan, emergency responders transported Abdulmutallab to the hospital, where he received treatment for third degree burns. *Id.* FBI agents began questioning him approximately three hours after his arrival at the hospital. *Id.* By that point, agents had learned that Abdulmutallab claimed to have acted on behalf of the al-Qaeda terrorist network, which the agents knew had coordinated large plots and attacks in the past. *Id.* The FBI agents questioned Abdulmutallab for

approximately 50 minutes without advising him of his *Miranda* rights.  *Id*.  Their questions

covered a broad range of topics including where, when, how and with whom Abdulmutallab had

traveled; details of the explosive device and the bombmaker; where he had received the bomb;

his intentions in attacking this flight; and who else may be planning a related attack.  *Id*. at *2.

The agents subsequently shared the defendant's answers with law enforcement and intelligence

agencies worldwide.  *Id*.

      The court found that the circumstances present at the time of the defendant's questioning

warranted application of the public safety exception.  *Id*. at *5.  The court began by noting

Second Circuit authority extending *Quarles* to situations involving the questioning of terrorism

suspects.  *Id*. (citing *United States v. Khalil*, 214 F.3d 111, 121–22 (2d Cir. 2000); *In re Terrorist

Bombings*, 552 F.3d at 203 n.19, 204).  The court proceeded to find that the questioning of

Abdulmutallab was "intended to shed light on the obvious public safety concerns in this case"

and therefore satisfied *Quarles*'s requirement of being "necessary to secure . . . the safety of the

public."  *Id*. (citing *Quarles*, 467 U.S. at 659).  The court also found that the agent had reason to

believe, based on his training and experience concerning al-Qaeda attacks, that "this was not a

solo incident" and that "the potential for a multi-prong attack existed."  *Id*.  Consequently, the

court found that the agents "logically feared that there could be additional, imminent . . . attacks

in the United States and elsewhere," and that the questions "sought to identify . . . [i]nformation

that could be used . . . to identify and disrupt such imminent attacks."  *Id*. at *6.  The court also

highlighted that the agents "immediately passed that information on" to relevant agencies

worldwide, "further underscoring that it was obtained for purposes of public safety" and "to deal

with other possible threats."  *Id*.  As such, and viewing all these circumstances in the aggregate,

the court found that the public safety exception applied to this 50-minute interview.

In *People v. Holmes*, the Arapahoe District Court in Colorado rejected the defendant's

motion to suppress statements that he made in the wake of the horrific 2012 Aurora Theater mass

shooting.  Shortly after being dispatched to the scene, law enforcement officers arrived at what

resembled a "war zone," with "injured parties covered in blood . . . running out of the theater

screaming."  2013 Colo. Dist. LEXIS 1474, at *3.  Two officers near the back of the theater

complex approached Holmes, who was uninjured and wearing extensive body armor and a gas

mask, and held him at gunpoint until they were able to arrest him.  *Id*. at *6–7.  The officers

dragged him to a nearby area and asked him if anyone was with him, which he denied.  *Id*. at *8–

9.  They conducted a partial pat-down search, revealing several knives and a magazine for a

handgun, but were unable to fully ascertain whether Holmes was unarmed due to his body armor.

*Id*. at *9–10.  The officers subsequently moved Holmes to the back of a police car, where the

officers observed him "fidgeting around"; they subsequently asked him if he had any weapons on

him, whether the address on his license was correct and whether anyone else was with him.  *Id*.

at *12–13.  Defendant answered all of these questions and stated that he had "improvised

explosive devices at his house" that would not "go off unless police officers set them off."  *Id*. at

*12 (cleaned up).

The court held that the officers' un-*Mirandized* questions fell within the public safety

exception.  In finding that the logic of *Quarles* extended to the circumstances of this case, the

court invoked a host of case law that endorsed greater flexibility for law enforcement in terms of

(a) the timing of officer questioning relative to the incident, *id.* at *22–23 (quoting *United States

v. Ferguson*, 702 F.3d 89, 95–96 (2d Cir. 2012), for the proposition that the public safety

exception's applicability "does not necessarily hinge on the amount of time between the

defendant's arrest and questioning by law enforcement"); (b) the specific situational context, *id*.

at *23–24 (quoting *People v. Allen*, 199 P.3d 33, 36 (Colo. App. 2007), for its finding that "courts

have applied the public safety exception in other contexts" than just "immediate, on scene

investigations of crime"); (c) the subject matter of the questions asked, *id*. at *25 (quoting *People

v. Askew*, 632 N.Y.S.2d 287, 287 (N.Y. App. Div. 1995), for the proposition that the public safety

exception applies not just to questions about weapons, but also to "questions about other suspects

who may pose a danger to the public or law enforcement"); and (d) the type of threat posed to

the public, *id*. at *26 (citing *Khalil*, 214 F.3d at 121, for its finding that questions concerning

bombs fell within the public safety exception).  Applying this expanded framework to the facts,

the court found that the "exigencies present demanded that the officers promptly find out

whether the defendant was alone or whether he had accomplices."  *Id*. at *27.  The court also

emphasized that this conclusion was informed by the officers' awareness, "based on their

training, experience, and knowledge of the Columbine High School shooting and similar

incidents around the country," that mass shootings "often involve multiple assailants."  *Id*. at

*28.  Subsequent questioning about the defendant's weapons and his home similarly fell within

the public safety exception, because the "threat posed by improvised explosive devices in the

defendant's apartment 'outweigh[ed] the need for the prophylactic rule'" of *Miranda*.  *Id*. at *30

(quoting *Quarles*, 467 U.S. at 657).  The court summed up its ruling by invoking *Quarles*'s cost-

benefit language:  had *Miranda* warnings been given here, and had they deterred the defendant

from answering the police's questions, "the cost [could] have been something more" than the

ability to obtain evidence.  *Id*. at *34.  Therefore, the need for answers "far outweighed the need

for the prophylactic *Miranda* warnings" in this case.  *Id*.

   Finally, *United States v. Bowers* provides the most recent reference point for applying the

public safety exception in the context of terrorism.  There, the district court examined

questioning that took place in the wake of the defendant's heinous 2018 attack on the Tree of Life synagogue in Pittsburgh, Pennsylvania.  The court describes in harrowing detail the "[n]umerous factors" that "coalesced to present an imminent threat both to the safety of the responding officers and the public at large," highlighting the responding officers' belief that multiple active shooters were at the scene, that these shooters were still inside the synagogue where congregants were sheltering in place, and the fact that automatic weapons had been fired at these officers, some of whom sustained serious injuries.  *Bowers*, 676 F. Supp. 3d at 408. Following several exchanges of fire between Bowers and the officers, Bowers started calling for help, beginning a dialogue between him and a member of the SWAT team.  *Id.* at 409–10.  As Bowers crawled towards the officers, the SWAT team member asked him his name and age, purportedly to keep him "alert and awake and focused."  *Id*. at 411.  These answers were relayed to other officers for the purpose of gathering information on him.  *Id*.  The SWAT team member asked Bowers about his weapons and why he had "given up," as well as why he "did it."  *Id*. Finally, the officer asked if Bowers had any bombs or explosives.  *Id*. at 412.  Bowers provided answers to all of these questions.  *Id.*

Officers subsequently handcuffed Bowers and pulled him into a separate room.  *Id*. at 413.  At that point, officers conducted a "ruse," asking him where his partner was, to which he answered that he was acting alone.  *Id*.  Officers next asked him how he arrived at the synagogue, leading him to disclose the make and model of his car.  *Id*.  Following some emergency medical treatment, but before the scene was secured, Bowers was carried out of the synagogue.  *Id.* at 414.  During that time, another officer asked him about a suspected explosive device found inside one of the rooms, which Bowers confirmed was a "distraction device," not a bomb.  *Id*. Officers provided Bowers with *Miranda* warnings in the ambulance before its departure, at

77

which point he invoked his right to speak with an attorney. *Id*. Upon arrival at the hospital, two officers resumed questioning Bowers without an attorney present, asking him whether there was "anything that we should be concerned about that's remaining at the synagogue" and whether any dangers were present at Bowers's home. *Id*. at 415. Bowers identified the weapons that he had used, but denied the existence of other threats. *Id*. The officers testified that, at the time that this questioning took place, they had not yet received word that the synagogue had, in fact, been cleared and that all other threats had been neutralized. *Id*.

In assessing the applicability of the public safety exception to this case, the court found the exception applicable to the full range of questioning. *Id*. at 420. In support, the court stressed the "imminent threat to public safety" that existed from the moment that officers were dispatched to the time of their departure from the hospital many hours later, given the "unprecedented large scale attack," the use of "high powered weapons," the significant number of victims, the "potential use of explosives" and numerous other aggravating circumstances. *Id*. at 419. In such a scenario, information about the quantity and location of firearms, explosive devices and potential accomplices was essential to "ensure the safety of the officers . . . and the surrounding community"; the officers' questions "served those purposes" and "furthered the goal of ensuring safety." *Id*. The Court also noted that, to the extent that the officers' questions were focused on ascertaining the whereabouts of Bowers' weapons, this line of questioning "alone would justify application of the exception in this case," given its similarity to the questions posed by the officer in *Quarles*. *Id*. Yet, in seeking to distinguish this case from the "single gun in a grocery store" scenario that constitutes the bulk of public-safety-exception case law, the court found that cases like this one require a broad construction of the exception, "as the threat to the public and responding officers is commensurately greater." *Id*. at 420. The court stressed that

any other outcome would place officers "in the untenable position" of having to weigh immediate public safety concerns against the ability to later prosecute a suspected criminal, the exact dilemma that *Quarles* expressly sought to eliminate. *Id.* (citing *Quarles*, 467 U.S. at 657–58).

These three cases illuminate several important principles that guide the public safety exception's application in terrorism-related events. First, the larger context of the suspected terrorist activity may inform the exigency's scope. In *Abdulmutallab*, for instance, that context included previous attacks perpetrated by Al-Qaeda, in which actors rarely operated "solo" and "the potential for a multi-prong attack" always remained present. *Abdulmutallab*, 2011 WL 4345243, at *5. In *Holmes*, meanwhile, the Court considered the exigency in the context of mass shootings (including the Columbine High School shooting) and the fact that these shootings "often involve multiple assailants" as it sought to define the scope of the exigency for purposes of applying the public safety exception. *Holmes*, 2013 Colo. Dist. LEXIS 1474, at *28. In that spirit, courts may extend the exception to cover questions that concern separate (but related) actions and events from the ones that officers are on the scene to investigate. *See Abdulmutallab*, 2011 WL 4345243, at *6 (permitting questioning that sought information "to identify and disrupt" "imminent . . . attacks in the United States and elsewhere"); *see also United States v. Rogers*, 2013 WL 6388457, at *4 (D. Minn. Dec. 6, 2013) (permitting broad questioning of potential domestic terrorist concerning his future attack plans in other locations).

Second, so long as the questioning remains "reasonably prompted by a concern for the public safety," the scope of permissible questioning is broader than in one-suspect, one-gun cases and requires a less direct nexus to the immediate situation confronted by law enforcement

officers.[75]  *Quarles*, 467 U.S. at 656; *see Bowers*, 676 F. Supp. 3d at 419 (permitting broad array of questions, including questions about why defendant had "given up" and why he "did it," because officers' questions "furthered the goal of ensuring safety"); *see also U.S.A. v. Ciancia*, 2015 WL 13798663, at *5 (C.D. Cal. Oct. 26, 2015) (extending public safety exception to broad questioning in the wake of a shooting at Los Angeles International Airport, because "the nature of the questions were not investigatory and were not seeking to elicit testimonial evidence of the crime").

Third, the end of an acute emergency at the site of law enforcement intervention — for example, when weapons have been secured or suspects arrested — does not preclude law enforcement from continuing to interview suspects under the public safety exception when the exigency transcends the current location or personnel.  *See Bowers*, 676 F. Supp. 3d at 415 (allowing admission of statements made in response to hospital questioning that took place after the mass murder site had been declared safe); *Abdulmutallab*, 2011 WL 4345243, at *5–6 (permitting questions hours after the attempted attack had occurred and the suspect had been arrested).  In other words, the geographic scope of the exigency may extend beyond the scene of the crime and the site of the questioning.

Fourth, and relatedly, law enforcement enjoys greater latitude regarding the length and timing of the un-*Mirandized* questioning.  *See Abdulmutallab*, 2011 WL 4345243, at *1 (questioning falls within the public safety exception despite beginning more than three hours after the defendant's arrest and lasting 50 minutes); *see also Holmes*, 2013 Colo. Dist. LEXIS

---

[75]    While this "nexus" requirement is not explicitly stated in *Quarles*, courts applying the public safety exception routinely inquire as to the necessity of the specific questions asked in resolving the exigency.  *See, e.g.*, *Khweis*, 971 F.3d at 472 ("*Quarles* only applies to questioning necessary to defuse a volatile situation." (quotations omitted)).

1474, at \*22–23 (acknowledging that the public safety exception does not "hinge on the amount of time between . . . arrest and questioning").

Finally, evidence demonstrating that officers immediately shared the fruits of their un-*Mirandized* questioning with other authorities supports a finding that such questioning falls within the public safety exception.  *See Abdulmutallab*, 2011 WL 4345243 at \*6 (highlighting that agents "immediately passed [the] information on" to relevant agencies worldwide and finding that this fact "further underscor[ed] that it was obtained for purposes of public safety"); *Rogers*, 2013 WL 6388457, at \*2 (arriving at the same conclusion on similar facts).

In adapting the contours of the public safety exception to the novel context of terrorism, these courts expressly embraced and sought to build on the very purpose that animated the *Quarles* Court in the first place:  to better support law enforcement officers in situations where their ability to defuse a public safety emergency might otherwise be hindered by *Miranda*.  *See, e.g.*, *Bowers*, 676 F. Supp. 3d at 420 (quoting *Quarles* in support of a broad construction of the public safety exception in the terrorism context, because the alternative places officers "in the untenable position" of weighing safety against the ability to prosecute).  These courts also framed their decisions squarely within *Quarles*'s cost-benefit framework, weighing the relative costs of deterring information-sharing by suspects against the importance of extending *Miranda*'s prophylactic protections.  *See, e.g.*, *Holmes*, 2013 Colo. Dist. LEXIS 1474, at \*30, \*34 (finding that the threat posed by explosive devices at the defendant's apartment "outweighed the need for" *Miranda*'s prophylactic warnings and emphasizing that, had warnings been given, "the cost [could] have been something more" than merely the loss of evidence in a future prosecution); *Bowers*, 676 F. Supp. 3d at 420 (arguing that the public safety exception must be "broadly construed" in the terrorism context, because the threats to the public are

"commensurately greater").  By doing so, these courts aligned themselves with decades of *Miranda* jurisprudence and expressly employed the Court's preferred approach to "charting the dimensions" of *Miranda*'s reach, integrating themselves within a long tradition of pragmatic adaptations of the *Miranda* rule as public safety needs have evolved.  *Vega*, 597 U.S. at 135.

### ii.        Application of *Quarles*

The Government here argues that Defendants' statements made in response to un-*Mirandized* questioning aboard the *Yunus* on January 13, 2024 — the morning after the Boarding Team discovered Iranian weapons components aboard the vessel and about 36 hours after members of the Boarding Team first boarded the *Yunus* — fall within the public safety exception. Whether this exception applies to custodial interrogations of persons who, like Defendants, are purportedly acting on behalf of a terrorist organization and operating in an area of active hostilities presents a question of first impression.  The Court finds that the public safety exception applies here.  This finding rests on the text of *Quarles*, its animating principles and the development of those principles in the case law applying *Quarles* to the terrorism context.  It also comports with the Supreme Court's *Miranda* jurisprudence, which lends support to limiting *Miranda*'s prophylactic protections to accommodate the needs of law enforcement in the ongoing war on terror that continues to threaten the safety of the public, including American military members and civilians, here and around the world.

The interdiction of the *Yunus* on January 11, 2024 occurred under circumstances replete with a host of acute and serious dangers to the public safety.  As revealed during the evidentiary hearing, the region where the Boarding Team interdicted the *Yunus* constituted part of the focal area of Operation Prosperity Guardian, a multinational initiative formed in response to dozens of attacks by the Houthis against military and commercial vessels in the wake of Hamas' incursion

into Israel on October 7, 2023.  *See* Austin, *supra* note 30.  The Houthis mounted these attacks using various types of lethal weaponry, including unmanned aerial systems (drones), missiles and rockets.  (Hr'g Tr. 293:9–10.)  The Houthis have also expressed unwavering hostility to United States interests; as such, the maritime region within range of Houthi missiles constitutes a hostile military zone for United States forces and personnel.  (*Id.* 24:11–15.)  Acting Director Deutsch, the senior DOS official testifying before the Court, confirmed that the region constitutes "one of the most volatile and dangerous areas in the world."  (*Id.* 43:23–44:2.)

The flow of advanced conventional weaponry from Iran to the Houthis via smugglers constituted a particular focus of Operation Prosperity Guardian.  (*Id.* 368:16–17, 369:12–13.) These illicit weapons shipments provided the Houthis with the armaments necessary to wage their violent assault on commercial and military vessels in the region, including against United States Navy ships, both within and outside the Red Sea.  As such, every weapon smuggled to the Houthis in early 2024 carried with it the potential for untold calamity and destruction of human lives and presented a direct threat to the safety of the public throughout the region.  Any successful efforts to frustrate the transport of such weapons, and any information leading to such successes, thus directly reduced the ongoing exigency in the region by eliminating the very source of death and destruction underlying that exigency.

Several pieces of evidence before the Court document the imminence of these dangers, specifically to members of the United States military aboard the *USS Puller*.  SA Ahonen testified that the *USS Puller*'s captain and executive officer were acutely aware of a possible attack by the Houthis, explaining that the *USS Puller* could not safely remain in its position near the port of Country A, because it was within the "weapons engagement zone" of the Houthis and thus within range of its missiles.  (Hr'g Tr. 123:11–17.)  Indeed, the Houthis released a public

statement shortly after the *Yunus*'s interdiction, stating that they had, in fact, fired a missile at the *USS Puller*, demonstrating not just their awareness of its proximity, but also their intent to strike. (*Id.* 123:21–25.)  The Houthis further affirmed the threat to *USS Puller* sailors in the days following the interdiction, when a spokesman confirmed that the Houthis "consider all American and British ships and warships . . . as hostile targets."  *See* Gambrell, *supra* note 38.  They also acted on their threats, firing an anti-ship cruise missile at the *USS Laboon* — operating nearby in the southern Red Sea — one day after the questioning at issue.  *See* U.S. CENTRAL COMMAND, *supra* note 35.  This attack, in turn, preceded the firing of at least seven additional missiles or warheads at U.S.-affiliated ships operating in the region in the immediate aftermath.  *See supra* Section I.A.1.

Defendants' activities aboard the *Yunus* formed an integral part of this acute threat to the safety of U.S. military members and the public at large.  As both SA Larsen and Chief Mulkey testified, the interdiction against the *Yunus* formed part of Operation Prosperity Guardian and was executed on the suspicion that the *Yunus*'s crew was smuggling Iranian-made weapons to the Houthis.  (Hr'g Tr. 293:20–22, 367:23–368:17.)  The discovery of a warhead and numerous missile components — itself a source of grave danger to all aboard the *Yunus* and the *USS Puller* — confirmed these suspicions and brought the *Yunus*'s crew firmly within the ambit of the exigency enveloping the region.  It also confirmed the ongoing ability of the Houthis to restock missiles for the purposes of their attacks, via Defendants' crew and other smugglers operating in a similar manner, and vividly demonstrated the continued existence of an acute and ongoing threat.  Defendants' smuggling of highly lethal weaponry for imminent use by the Houthis — a highly combustible event presenting serious danger for law enforcement officials and military personnel on board or close to the *Yunus* — brought the Boarding Team's interdiction directly

within the much larger public safety emergency enveloping the region, while confirming, and arguably increasing, the threat to the public throughout an active theater of war.

On the basis of these uncontroverted facts, the Court finds that the Boarding Team faced a scenario on the *Yunus* where "an objectively reasonable need to protect [law enforcement] or the public from any immediate danger associated with [a] weapon" existed. *Quarles*, 467 U.S. at 659 n.8. Stated differently, the Court finds that the evidence amply supports the determination that the Boarding Team encountered a sufficiently "volatile" situation to reasonably prompt a "concern for the public safety." *Id*. at 656, 658.

The Court also finds that Chief Mulkey's questioning was sufficiently tethered to the exigency to qualify as "necessary" for purposes of protecting the Boarding Team or the public. As Chief Mulkey testified, following the Boarding Team's discovery of the ACWs, Chief Mulkey asked Mazhar "where the vessel departed from" and "where the captain was or the person in charge of the vessel." Chief Mulkey also asked "about the paperwork," date of departure, supplies and cargo (specifically, "how the captain would get logistics or any kind of supplies"), how the mariners had "c[o]me about to get on board the boat" and "who had ownership of the satellite phone." (*Id*. 412:22–414:7, 415:1–9.) Chief Mulkey asked Pahlawan essentially the same questions, including what his role was aboard the *Yunus* and who controlled the satellite phone. (*Id*. 417:23–418:10.) By asking these questions, Mulkey sought to "narrow down the key individuals [so] that I would focus . . . more of the intelligence questioning to them."[76] (*Id*. 407:6–8.) These questions constituted the first part of what Chief Mulkey intended to be a two-part process: first, identifying the captain or person in charge, and then, once the

---

[76]    Chief Mulkey specified that his purpose in asking these questions and ascertaining the identity of the captain was "not to incriminate" any of the crew members, but "just to get more information about their network." (Hr'g Tr. 408:11–13.)

captain has been identified, questioning him further to ascertain "how much knowledge he has about the operation" and "where the cargo was coming from," (*id.* 407:20–22), with the ultimate goal of "get[ting] . . . information further into that network" that could help "stop the flow of the missiles." (*Id*. 408:1–5.) However, due to the ground force commander's decision to terminate the boarding early because of concerns about the *Yunus*'s seaworthiness, Chief Mulkey was unable to complete his initial questioning of Pahlawan and never proceeded to phase two. (*Id*. 410:15–411:1.)

Despite his efforts being thwarted by the early termination of the boarding, the Court finds that the evidence establishes that Chief Mulkey's questions were reasonably necessary to reduce the volatile situation existing aboard the *Puller* and in the region at large. As Chief Mulkey credibly testified, his questioning of both Defendants was focused on ascertaining the identity of the vessel's captain, whom Chief Mulkey would then ask more targeted questions aimed at better understanding, and ultimately neutralizing, the threat to public safety that stemmed from Iranian weapons smuggling to the Houthis. While the Court acknowledges that the questions asked and the (minimal and allegedly false) answers provided did not meaningfully improve the Boarding Team's ability to neutralize that threat, this fact does not render the questions any less reasonable or "essential to elicit[ing] information necessary to neutralize the threat to the public." *Berkemer*, 468 U.S. at 429 n.10. Indeed, Chief Mulkey's testimony that he sought ultimately to engage in "intelligence questioning" comports with the Court's finding that his questions were a necessary response to the public safety emergency, given that such questioning may well have revealed important details about the smuggling operation that Defendants allegedly participated in, thereby allowing U.S. officials to stem or stop the flow of

weapons to the Houthis, whose use of those weapons constituted the root cause of the emergency.  (Hr'g Tr. 407:6–8.)

Application of the public safety exception in this case also satisfies *Quarles*'s implicit cost-benefit requirement, which demands that the hypothetical cost of providing *Miranda* warnings must consist of "something more than" just the failure to gather evidence in support of a criminal prosecution, and where "the need for answers . . . [must] outweigh[] the need for the prophylactic rule."  *Quarles*, 467 U.S. at 657; *see also Vega*, 597 U.S. at 148, 151 (discussing the Court's consistent use of "cost-benefit analysis to define the scope of these prophylactic rules" based on exercises of "pragmatic judgment"); *Shatzer*, 559 U.S. at 106 (reaffirming that judicially crafted rules, including *Miranda*, "appl[y] only where [their] benefits outweigh [their] costs").  As in *Quarles* itself, that cost-benefit analysis is not a close call here.  The potential cost of providing *Miranda* warnings to Defendants — alleged smugglers in a sophisticated network supplying dangerous weapons to a highly volatile and belligerent terrorist group — and thereby deterring them from sharing information about their operation is best measured in numbers of lives lost.  Their silence would allow missiles to continue flowing to the Houthis, who would continue to fire them at commercial and military vessels, targeting and murdering unsuspecting mariners in the process.  In *Quarles*, the Court held that the cost of deterring a secured suspect's willingness to answer questions about a loose gun in a supermarket "outweighs the need" for "protecting the Fifth Amendment's privilege against self-incrimination," given its potential to pose "more than one danger to the public safety."  *Id*.  To argue that the level of danger to public safety, and hence the potential cost of deterring a suspect's willingness to help neutralize that danger, is any lower under the facts before the Court here defies common sense.

Beyond the text of *Quarles*, the Court also finds support for its application of the public safety exception in the principle animating that opinion:  its concern, above all else, for allowing law enforcement to "follow their legitimate instincts" when "protect[ing] the police or the public from any immediate danger."  *Quarles*, 467 U.S. at 659, 659 n.8.  That concern expressly militates against placing law enforcement officers "in the untenable position of having to consider . . . whether it best serves society for them to ask the necessary questions" without warnings and thereby render evidence inadmissible in court, or "to give the warnings . . . but possibly damage or destroy their ability to . . . neutralize the volatile situation" before them.  *Id.* at 657–58.  Despite the significant differences in the underlying factual predicates, the dilemma that law enforcement faced here is no less undesirable than in *Quarles*:  either preserve evidence for potential prosecution of serious terrorism offenses (but run the risk of foregoing actionable intelligence about smuggling operations that could save human lives) or question suspects about these operations (but jeopardize the government's ability to hold them accountable later).  Meanwhile, the danger to the public — in terms of potential bloodshed — stands immeasurably greater than in *Quarles*.  As such, the dilemma faced by Chief Mulkey and the Boarding Team stands on all fours with the precise problem that the *Quarles* Court sought to alleviate in crafting its public safety exception, further justifying its application here.

Applying the public safety exception to Defendants' statements fits neatly within the growing body of jurisprudence applying *Quarles* to incidents involving terrorism.  As previously discussed, the Boarding Team's actions and Chief Mulkey's questioning were informed by the broader goals of Operation Prosperity Guardian and the Boarding Team's awareness of key contextual information, including Iran's ongoing efforts to smuggle weapons to the Houthis and the "active military zone" in which the Boarding Team operated.  (Hr'g Tr. 368:16–24, 369:4–

20.)  Relying on such contextual information to define the exigency's scope for purposes of questioning under the public safety exception represents a hallmark of the *Quarles* terrorism jurisprudence.  *See Abdulmutallab*, 2011 WL 4345243, at *5 (finding that the officers' awareness of Al-Qaeda's operating principles informed the scope of permissible questioning); *Holmes*, 2013 Colo. Dist. LEXIS 1474, at *28 (finding the same with regard to the officers' awareness of mass shootings).  Meanwhile, Chief Mulkey's broader questions about Defendants' origins, activities and knowledge of logistical details concerning the mission at hand stand analogous to expansive questioning in prior terrorism-related cases, where courts repeatedly found such questions sufficiently "motivated by exigent circumstances," *Rogers*, 2013 WL 6388457 at *4, "further[ing] the goal of ensuring safety," *Bowers*, 676 F. Supp. 3d at 419, and generally permissible under the public safety exception, so long as they did not seek to elicit testimonial evidence.  *Ciancia*, 2015 WL 13798663, at *5.  While the Boarding Team's success at securing and offloading the warhead and missile components before questioning might otherwise diminish a finding of exigent circumstances for purposes of the public safety exception, this Court's consideration of the broader threat to public safety that existed beyond the *Yunus* closely tracks the manner in which courts routinely look beyond the geographic scope of the acute incident when evaluating the applicability of the public safety exception in the context of terrorism situations.  *See, e.g.*, *Rogers*, 2013 WL 6388457, at *3 (permitting questioning about the broader exigency despite having secured the suspect and his weapons); *Bowers*, 676 F. Supp. 3d at 420 (permitting questioning even after the suspect was detained and the site was declared secure).  Finally, Chief Mulkey and the IET member's efforts to quickly pass along information recovered from Defendants "through [DOD] channels" resemble those noted by other courts in support of a finding that law enforcement actively sought to defuse a volatile situation, and that

therefore, the exception should apply.  (Hr'g Tr. 409:22–23); *see, e.g.*, *Abdulmutallab*, 2011 WL 4345243, at *6 (finding that agents' "immediately pass[ing] information on" to other agencies "further underscor[ed] that it was obtained for purposes of public safety").

Critically, the Court's decision not to exclude Defendants' statements also stands consonant with the Supreme Court's exclusionary rule jurisprudence and its "twin rationales" for excluding evidence obtained in violation of *Miranda*:[77] trustworthiness and deterrence.  *Elstad*, 470 U.S. at 308.  Concerning trustworthiness, a defendant who makes un-*Mirandized* statements that fall within the public safety exception may still seek to have them excluded for lack of voluntariness, as the *Quarles* Court itself pointed out.  *Quarles*, 467 U.S. at 655 n.5 ("[R]espondent is certainly free on remand to argue that his statement was coerced under traditional due process standards.")  Such a claim — which neither Defendant has made here — triggers an inquiry that would ultimately lead to exclusion of coerced or otherwise involuntary statements that would threaten the integrity of the evidence and the underlying judicial proceedings.  *See Elstad*, 470 U.S. at 307–08 ("Where an unwarned statement is preserved for use in situations that fall outside the sweep of the *Miranda* presumption, the primary criterion of admissibility remains the 'old' due process voluntariness test." (cleaned up)).  Application of the public safety exception therefore poses no threat to trustworthiness, here or elsewhere.

More importantly, exclusion of Defendants' statements would fail to deter undesirable police practices in any way.  As *Quarles* recognized, and as the facts here amply illustrate, holding officers "accountable" for a failure to provide *Miranda* warnings when they stand "in the

---

[77]    The Court notes that such violations do not, of course, constitute violations of constitutional rights on their own.  *See Elstad*, 470 U.S. at 309 ("If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself.").

untenable position of having to consider . . . whether it best serves society for them to ask the necessary questions" without warnings or "to give the warnings . . . but possibly damage or destroy their ability to . . . neutralize [a] volatile situation" serves no useful deterrent purpose whatsoever. In such cases, law enforcement officials face a non-choice — they must place public safety first. Deterring officers from following their "legitimate instincts" in the midst of a volatile situation (such as an active theater of war) is not only a highly unlikely outcome, practically speaking; it also actively endangers human lives. This Court cannot countenance an approach that would yield such a result.

As the *Quarles* Court emphasized, a framework that "penaliz[ed] officers for asking the very questions which are the most crucial to their efforts to protect themselves and the public" was not an outcome the Court was willing to support. *Quarles*, 467 U.S. at 658 n.7; *see also Withrow v. Williams*, 507 U.S. 680, 707 (1993) (O'Connor, J., concurring in part) (emphasizing that "the damage *Miranda* does to the truth-seeking mission of the criminal trial can become intolerable"); *Pryor*, 32 F.3d at 1196 ("An exclusionary rule that does little to reduce the number of unlawful seizures, and much to increase the volume of crime, cannot be justified."). The Court also emphasized the lack of any "constitutional imperative requiring the exclusion" of evidence obtained in this way. *Quarles*, 467 U.S. at 658 n.7. The exclusionary rule is not a game of "gotcha." As such, and because its "twin rationales" of trustworthiness and deterrence are simply not implicated in this case, this Court finds no reason to second-guess its application of the public safety exception on *Miranda* grounds.

Defendants oppose application of the public safety exception to their January 13, 2024 statements aboard the *Yunus*, raising a host of factual and legal arguments in support.[78]  On the fact side, Defendants primarily argue that the Government failed to establish sufficiently extraordinary circumstances related to an immediate danger to warrant application of the exception, with the delay in questioning purportedly providing further proof that no such immediate danger existed.  (Pahlawan 2d Suppl. Br. at 7–9; ECF No. 311 ("Mazhar Suppl. Br.") at 15.)  As to the exception's legal scope, Defendants contend that it must be construed narrowly, and that the Court's application here violates that precept.  (ECF No. 314 ("Pahlawan Suppl. Br.") at 37.)  In support, Defendants invoke the Fourth Circuit's holding in *Mobley*, this Court's opinion in *Hasan*, and the purported danger of the exception "swallow[ing] the *Miranda* rule in all terrorism investigations."  (ECF No. 311 at 17.)  For the reasons set forth below, the Court finds that Defendants' arguments lack merit.

Defendants argue that the January 13, 2024 questioning aboard the *Yunus* does not fall within the public safety exception, because no "extraordinary circumstances related to an immediate danger" existed.  (Pahlawan 2d Suppl. Br. at 7 (quoting *Quarles*, 467 U.S. at 659 n.8).)  In support of their contention, Defendants point out that the location of the interdiction was "hundreds of miles away" from the area that Chief Mulkey identified as the primary region where Houthi missiles were sighted, and that consequently, "Mulkey was not in danger of immediate attack" during the questioning.  (*Id.* at 8.)  Chief Mulkey's lack of any "intelligence about a specific, imminent attack on the *Puller*" purportedly supports this argument further.  (*Id.*

---

[78]    Defendants Pahlawan and Mazhar raise some of the same arguments in their respective briefs, while raising other arguments individually.  For purposes of this analysis, the Court will assess the merits of all arguments against application of the public safety exception articulated by either Defendant, regardless of who raised them.

at 8.)  In addition, Defendants contend that what they term "[s]peculation about danger based on attacks occurring" elsewhere fails to establish an "objectively reasonable concern about immediate danger," citing *Hasan* in support.  (*Id.* at 8; *see* Mazhar Suppl. Br. at 15 ("[T]here is no evidence that there was a danger to the public.").)  By securing the ACWs that it found aboard the *Yunus*, the Boarding Team successfully "dispelled" any "imminent and non-speculative danger," thus rendering the public safety exception inapposite.  (Pahlawan Suppl. Br. at 38.)  Defendants also cite the extended delay of Chief Mulkey's questioning, arguing that the 36 hours that elapsed from the start of the boarding until the questioning constituted "a significantly longer period than necessary to address any purported immediate threat to public safety." (Mazhar Suppl. Br. at 15.)  Finally, Defendants posit that the interdiction was part of "an ongoing mission" targeting the "degradation of illicit weapons smuggling routes" that has been going on "for many years," arguing that the "ongoing" nature of this military operation supports an inference that the interdiction at hand was "far from" implicating "an imminent threat."  (*Id.* at 16.)

        Underlying Defendants' factual arguments is the contention that the public safety exception essentially requires a highly limited construction as a matter of law.  Defendant Pahlawan cites *Mobley* — the Fourth Circuit's first and only significant opinion interpreting *Quarles* — as standing for a categorically narrow interpretation of *Quarles*.  (*See* Pahlawan Suppl. Br. at 37 (citing *Mobley* and discussing "[t]he narrow scope of the public safety exception in the Fourth Circuit").)  Pahlawan also provides an extended discussion of this Court's opinion in *Hasan*, where the Court found the public safety exception inapplicable and which Pahlawan contends "further exemplifie[s]" the narrowness of the exception's scope under Fourth Circuit law.  (*Id.*)  Defendant Mazhar, meanwhile, emphasizes the danger of applying the public safety

exception in this case, arguing that doing so would allow the exception "to swallow the *Miranda* rule in all terrorism investigations, with no outer limit to when terrorism suspects could be interrogated without being provided *Miranda* warnings."  (Mazhar Suppl. Br. at 17.)

Defendants' argument that the facts fail to demonstrate a sufficiently imminent danger to justify application of the public safety exception does not persuade the Court.  During the evidentiary hearing, the Court heard testimony confirming that the region where the *USS Puller* operated in early 2024 was one of the most volatile regions in the world.  (Hr'g Tr. 43:23–44:6.) It also learned that the *USS Puller* traveled within the "weapons engagement zone" of the Houthis, an actively belligerent terrorist group that remains hostile to the United States and that attacked multiple U.S. vessels in the immediate lead-up to the *Yunus*'s interdiction.  (*Id.* 123:14– 20.)  While Chief Mulkey testified that the bulk of the Houthis' attacks centered on the Red Sea, the Court also heard testimony concerning the *USS Puller* captain's grave safety concerns about operating within range of Houthi missiles — including outside of the Red Sea itself — as well as the Houthis' claim of an attack on the *USS Puller* in the interdiction's immediate aftermath.  (*Id.* 123:11–25.)  And although DOD ultimately rated the latter as a false claim, the Houthis' statement nonetheless indicates a sophisticated awareness of and unabated intent to harm U.S. military personnel.  This evidence, and in particular the ongoing hostilities in what constituted an active theater of war, justifies a reasonable apprehension of imminent danger on the part of Chief Mulkey and anyone else involved in the interdiction.  Chief Mulkey's purported lack of "intelligence about a specific, imminent attack" does nothing to reduce the reasonableness of that apprehension, (Pahlawan 2d Suppl. Br. at 8); if anything, it makes his questioning of Defendants *more* reasonable on public safety grounds, given the dangerous overall environment and the urgent need to obtain additional information.

While the facts sufficiently establish a basis for a reasonable apprehension of immediate danger to the Boarding Team, members of the public aboard other American and foreign ships in the region faced an even greater immediate danger. *See Mobley*, 40 F.3d at 693 (stating that officers asking questions must possess an "objectively reasonable concern for immediate danger to police *or public*" (emphasis added)). As the Government correctly notes, "the defendants' flow of weaponry to another region where *missiles were exploding against civilian and military vessels* still constituted a public safety threat." (ECF No. 361 at 8 (emphasis added).) Defendants' related argument that the weapons aboard the *Yunus* had been secured, and that therefore all relevant danger was "dispelled" for purposes of the public safety exception, (Pahlawan Suppl. Br. at 38), also misapprehends the case law, which recognizes, in cases linked to terrorism, that securing the immediate threat at hand does not, by itself, neutralize the exigency and preclude further questioning under a public safety exception rationale. *See, e.g.*, *Abdulmutallab*, 2011 WL 4345243, at *6 (permitting questioning after the suspect was secured and in custody); *Rogers*, 2013 WL 6388457, at *3 (permitting questioning about the broader exigency despite having secured the suspect and his weapons). Defendants' attempts to redefine the public safety exception along such narrow lines fail to hold water in the face of this jurisprudence.

Defendants' invocation of the roughly 36-hour period between the beginning of the interdiction and the January 13, 2024 interviews does not alter the Court's calculus. As a threshold matter, the Court disagrees with Defendants' premise that the Boarding Team's arrival on the *Yunus* constitutes the proper reference point for this inquiry. At that point in the interdiction, the Team's suspicions about the vessel's participation in illicit activity connected to the public safety dangers throughout the region remained unconfirmed, rendering any in-depth

questioning concerning these dangers unwarranted and potentially unfruitful. Rather, the Boarding Team's discovery of the missile components properly triggered the exigency. That discovery confirmed the existence of actual danger both on board the *Yunus* (in the form of explosive weapons components) and in the region at large (in the form of an ongoing smuggling operation supplying the Houthis with lethal weaponry). This finding stands analogous to *Quarles*, where the Court looked to the moment that officers discovered the suspect's empty holster, rather than his arrest or the police's mere arrival on the scene, as the trigger for the emergency. *Quarles*, 467 U.S. at 652.

Chief Mulkey's decision to hold off on questioning Defendants immediately upon discovering a cache of unsecured, lethal weaponry does not diminish the applicability of the public safety exception. For one, the public safety exigency was emphatically not "dispelled" in the hours between the Boarding Team's discovery of the weapons components and the commencement of questioning, as evidenced by the ongoing Houthi attacks in the days and weeks following the interdiction. In addition, as discussed above, the case law concerning the public safety exception in the context of terrorism consistently affords greater latitude, in terms of timing, to law enforcement officers confronting multiple public safety concerns at the same time. *See, e.g.*, *Abdulmutallab*, 2011 WL 4345243, at *1 (finding multi-hour delay before questioning acceptable for public safety exception); *see also Ferguson*, 702 F.3d at 95–96 (recognizing that application of the public safety exception "does not necessarily hinge on the amount of time between the defendant's arrest and questioning by law enforcement"); *People v. Oquendo*, N.Y.S.2d 437, 439 (N.Y. App. Div. 1999) ("The entire thrust of *Quarles* is that the police should have flexibility to respond to true emergency circumstances, whether the danger is momentary or ongoing. That purpose would not be served by setting artificial limits as to the

96

time and location of questions that are objectively necessary for the immediate public safety." (internal citations omitted)).  Here, the Boarding Team engaged simultaneously in securing a potentially booby-trapped vessel on rough seas, conducting a search-and-rescue operation for two of its members, securing ACWs and safely transferring them to the *USS Puller*, and steering a malfunctioning ship that was rapidly taking on water — all while in hostile territory.  The Court sees no reason why these circumstances diminish the need for, or the reasonableness of, Chief Mulkey's questioning in furtherance of public safety at the time that he commenced his interviews.

Defendants' claim that the United States military's longstanding efforts at disrupting weapons smuggling operations in the Arabian Sea renders the threat from such illicit activity less imminent lacks merit for similar reasons.  As the Government adduced during the evidentiary hearing, the United States recently redoubled its efforts in the region due to an unprecedented barrage of attacks by the Houthis — mounted in direct retaliation for Israel's military operation in Gaza — which had begun barely three months before the interdiction in question.  That testimony permits the inference that the overall level of danger to the public throughout the region was distinctly *higher* than what had existed previously and was undoubtedly imminent for anyone sailing within missile range of the Houthis in early 2024.  As such, the notion that prior efforts of the United States military dispelled or diminished the imminence of the danger faced by members of the public in the Arabian Sea in January 2024 stands contradicted by the facts on the ground.  The Court therefore disregards Defendants' argument to this end.

Defendants' law-based objections fare no better.  Defendants contend, in essence, that the Fourth Circuit's decision in *Mobley* requires this Court to take a narrower approach to the public safety exception than the facts of this case demand.  In support, Defendants appear to argue that

97

*Mobley* defines the public safety exception in a more circumspect manner than other circuits. (*See, e.g.*, Pahlawan Suppl. Br. at 37 (referencing the "narrow scope of the public safety exception in the Fourth Circuit"). Yet, *Mobley*'s characterization of the public safety exception neither adds to, nor subtracts from, *Quarles* in any meaningful way. The plain text of *Mobley* merely sets forth the truisms that "it is imperative that the scope of this exception be recognized and followed" and that "[a]s an exception, [the public safety exception] must be construed narrowly," 40 F.3d at 693 — a statement that tracks *Quarles*'s own characterization of the exception. *See Quarles*, 467 U.S. at 658 (describing exception as "narrow"). Where — as here — the text, purpose and progeny of *Quarles* all support application of the public safety exception, the Court finds no reason why *Mobley*, which applied *Quarles* to an entirely different, and much narrower, factual scenario, requires a contrary result.

Defendants seek to bolster their argument for a narrowed reading of the public safety exception by citing *United States v. Hasan*, where this Court found that the public safety exception was inapplicable in the context of an interview following an attack by Somali pirates. *Hasan*, 747 F. Supp. 2d at 664. In that case, U.S. forces captured the defendants after they helped launch an attack on the *USS Nicholas* off the coast of Somalia. *Id.* at 655. One of the defendants subsequently confessed, during an un-*Mirandized* interview, to being a pirate. *Id.* at 660. In asking the Court to find the public safety exception applicable, the Government noted the possibility of terrorist involvement in the attack and indicated the danger of an additional attack, given that "a third vessel tracked on radar . . . might have remained in the vicinity, preparing to launch another attack." *Id.* at 664. The Court disagreed and declined to apply the exception, finding that the questions posed were not necessary to address an imminent threat. *Id.* at 666. Specifically, the Court noted that (a) the interview occurred a day and a half after the

defendant's capture; (b) the nature of the questioning did not suggest a "'ticking time bomb'
scenario in which specific information [was] urgently sought;" (c) there were no concerns about
"hidden traps and discarded weapons" that could have injured law enforcement officers or the
public; and (d) the interviews "consisted of eliciting basic biographical information from
Defendants and asking them what they were doing out on the high seas, without extensive
follow-up or more specific inquiries directed toward concerns of 'immediate danger.'" *Id.* at
664–65.

     The Court stands unpersuaded by Defendants' reliance on *Hasan* for several reasons. As
to the nature of the questioning, the Court notes that in the instant case, Chief Mulkey's questions
were focused on ascertaining the identity of the vessel's captain, not Defendants' biographical
background. The Court credits Mulkey's testimony that, had his questioning not been
interrupted, he would have performed precisely the kind of "extensive follow-up" and "more
specific inquiries directed toward concerns of immediate danger" that the court found lacking in
*Hasan. Id.* at 665. In the same vein, the Court does not find that Chief Mulkey's questioning
demonstrated a lack of a "ticking time bomb scenario," as the court found in *Hasan*, since his
line of questioning was cut short by circumstances beyond his control. *Id.* As to a lack of
specific concerns about "hidden traps and discarded weapons" at the time of questioning, the
Court finds no support in *Quarles*, *Mobley* or *Quarles*' other progeny for such a specific
requirement — particularly where the evidence demonstrates that law enforcement's public
safety concerns were of a significantly greater magnitude.[79] *Cf. Berkemer*, 468 U.S. at 429 n.10

---

[79]    While *Hasan*'s reference to "hidden traps and discarded weapons" stems from *Mobley*,
the Fourth Circuit used this phrase — presumably to illustrate the kinds of things that might
serve as sources of injury at a crime scene — within the context of its discussion of whether the
public safety exception ought to apply with equal force "after the *Miranda* warnings have been
given as before," not in defining its contours. *Mobley*, 40 F.3d at 692.

(indicating that, under *Quarles*, law enforcement officers may ask questions that are "essential to elicit information necessary to neutralize the threat to the public"); *United States v. Estrada*, 430 F.3d 606, 612 (2d Cir. 2005) (stating that a question that "plainly encompasses safety concerns, but is broad enough to elicit other information, does not necessarily prevent application of the public safety exception when safety is at issue and context makes clear that the question primarily involves safety").  The Court notes, in this regard, the significant differences in the factual predicate surrounding these two incidents:  an isolated pirate attack in *Hasan* versus a weapons interdiction within a known smuggling region and an active theater of war that involved alleged affiliates of a known terrorist organization in the instant case, where law enforcement's concerns were necessarily more multi-faceted.  As such, the Court respectfully disagrees with *Hasan*'s reliance on these narrow criteria in determining whether to apply the public safety exception.  Finally, as to the period of time that elapsed between the discovery of the warheads and Chief Mulkey's questioning, the Court refers back to its prior discussion of the *Quarles* terrorism jurisprudence and the latitude courts regularly extend to law enforcement officials when confronted with complex, multi-threat scenarios.  While *Hasan* considered such delay to counsel against applying the public safety exception, that finding tacks a different course from the one typically adopted by district courts facing emergency questioning in terrorism contexts. The Court respectfully declines Defendants' invitation to follow *Hasan*'s path.[80]

Finally, Defendants emphasize the "exceptive nature" of the public safety exception, warning that its application in this case would both violate precedent requiring a narrow

---

[80]    The Court also notes Chief Judge Davis's discussion, in *Hasan*, of "circumstances in which an attack on a ship *would* render the 'public safety' exception applicable."  747 F. Supp. 2d at 665 (emphasis added).  There, the court found that, under certain circumstances, a "ship's vulnerability to further attacks might well justify questioning without *Miranda* warnings to ascertain the nature of the initial attack and the potential for such further attacks."  *Id.*

application and allow the exception "to swallow the *Miranda* rule in all terrorism investigations, with no outer limit." (Mazhar Suppl. Br. at 17.) The Court finds Defendants' concern unwarranted. Defendants' argument ignores the strictures that govern, and will continue to govern, the public safety exception in the context of terrorism or other mass-casualty events. First and foremost, the requirement for "immediate danger" to the public serves as a clear limit on the ability of law enforcement to conduct un-*Mirandized* interviews in situations that stand outside a context where such dangers remain present, such as the active theater of war in this case. The Supreme Court's longstanding cost-benefit framework surrounding the *Miranda* rule also serves as a powerful limitation on the exception's applicability. Under that framework, the Government must demonstrate a significant cost (in terms of deterrence) to offset the well-established benefits of protecting suspects' Fifth Amendment rights if it wishes to prevail on a public-safety-exception argument. While the Court need not define the outer bounds of the public safety exception for the purposes of this opinion, it has no difficulty imagining scenarios where the potential cost of deterrence remains lower than in the instant case, since here, that deterrence may have directly led to the deaths of countless innocent victims of Houthi aggression. Defendants' concerns that its application in this case eviscerates the rule stand unwarranted, given the doctrinal strictures that remain in place.

When it decided *Quarles*, the Supreme Court sought to strike a fair balance between guaranteeing the ability of law enforcement officers to protect public safety and safeguarding defendants' Fifth Amendment rights. It did so in the context of a grocery-store arrest in the 1980s. The world has changed significantly since then. Law enforcement officers now question arms smugglers in the middle of the open seas, surrounded by hostile terrorist actors capable of pinpointing their location and firing lethal weapons at them. Such officers should not be placed

in the "untenable position of having to consider . . . whether it best serves society for them to ask the necessary questions with the *Miranda* warnings" under these circumstances. *Quarles*, 467 U.S. at 657.  Accordingly, the Court finds that the public safety exception applies to the Boarding Team's questions and Defendants' responses on January 13, 2024 aboard the *Yunus*.  Defendants' un-*Mirandized* statements are admissible at trial on these grounds.[81]

### d.    *The false statement exception applies.*

Alternatively, the Government argues that Defendants' alleged false statements during their interviews aboard the *Yunus* are also admissible as to the charges under 18 U.S.C. § 2337, because "the Fifth Amendment does not prohibit the use of an unmirandized false statement where the false statement is itself the crime."  (MTS Opp. at 20.)  The Court agrees that the exclusionary rule does not bar statements that constitute crimes in and of themselves.  However, it disagrees with the notion that the jury may only consider Defendants' false statements with respect to their § 2337 charges.  Instead, the Court finds that Defendants' un-*Mirandized* alleged false statements made in response to Chief Mulkey's questioning on the *Yunus* are also admissible as to all charges under the false statement exception.

Supreme Court and Fourth Circuit precedent make clear that the Fifth Amendment privilege does not encompass the right to commit perjury.  *United States v. Kennedy*, 372 F.3d 686, 693 (4th Cir. 2004) ("It is well established that a defendant cannot immunize acts of perjury through suppression of false statements that were taken in violation of the defendant's constitutional rights."); *United States v. Mandujano*, 425 U.S. 564, 576–78 (1976) (plurality opinion); *United States v. Wong*, 431 U.S. 174, 178–79 (1977).  In *Mandujano*, a grand jury witness claimed that his false statements before a grand jury should have been suppressed from

---

[81]    Defendants do not challenge their statements as involuntarily rendered.  The Court therefore deems any objection on voluntariness grounds waived.

his perjury trial, because the government failed to give *Miranda* warnings. 425 U.S. at 569. Although the Supreme Court was divided as to the exact nature of Mandujano's constitutional rights in grand jury proceedings, the Supreme Court unanimously agreed that violation of those rights — whatever their nature — would not require exclusion of his false statements at his perjury trial. *Id.* at 576–77, 582–84 (plurality opinion); *id.* at 584–85, 607–08 (Brennan, J., concurring); *id.* at 609 (Stewart, J., concurring). As the plurality explained, "perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings." *Id.* at 576. As such, the Supreme Court "ha[s] consistently — indeed without exception — allowed sanctions for false statements or perjury," even "where the perjurer complained that the Government exceeded its constitutional powers in making the inquiry." *Id.* at 577; *see also Wong*, 431 U.S. at 178 (reaffirming the principle that "the Fifth Amendment privilege does not condone perjury").

Other circuits have invoked this principle to deny motions to suppress in false statement prosecutions where the Government obtained statements in violation of *Miranda*. *See United States v. Melancon*, 662 F.3d 708, 712 (5th Cir. 2011) ("The exclusionary rule does not act as a bar to the prosecution of a crime where the statements themselves are the crime."); *United States v. Vreeland*, 684 F.3d 653, 661 (6th Cir. 2012) (finding that a defendant "cannot invoke the Fifth Amendment to protect the falsehoods made to [a probation officer] that resulted in his conviction under 18 U.S.C. § 1001"). As the Sixth Circuit explained, "[w]hile the Fifth Amendment may protect the defendant's right to remain silent, it does not give him the right to lie once he chooses to speak." *Vreeland*, 684 F.3d at 660; *see also Brogan v. United States*, 522 U.S. 398, 404 (1998) ("[N]either the text nor the spirit of the Fifth Amendment confers a privilege to lie."). Thus, "no [F]ifth [A]mendment problem is presented when a statement is admitted into evidence which is not confessional in nature, but in and of itself constitutes the crime charged." *United States v.*

103

*Kirk*, 528 F.2d 1057, 1062 (5th Cir. 1976); *see United States v. Owuor*, 397 F. App'x 572, 575 (11th Cir. 2010) (finding "no fifth amendment problem," because "the defendant's threat was itself a crime"); *see also Pryor*, 32 F.3d at 1195 ("[Defendant] did not divulge *evidence* of some prior crime during his few minutes in the office; instead he *committed* a crime, which makes all the difference.").

Although the Fourth Circuit has yet to address the issue, this Court finds no reason to depart from the persuasive authority of the circuit courts, especially in the absence of any case law to the contrary.  Defendants submit that this Court should not adopt the reasoning of the Fifth and Sixth Circuits, because *Miranda* demands that "no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.'"  (ECF No. 220 at 8 (citing *Miranda*, 384 U.S. at 476–77); ECF No. 224 at 9.)  However, as Justice Brennan explained, "even when the privilege against self-incrimination permits an individual to refuse to answer questions asked by the Government, if false answers are given the individual may be prosecuted for making false statements."  *Mandujano*, 425 U.S. at 584 (Brennan, J., concurring) (quoting *Mackey v. United States*, 401 U.S. 667, 705 (1971) (Brennan, J., concurring in judgment)).  Although the Fifth Amendment guarantees the right to refuse to answer potentially incriminating questions, in answering falsely, Defendants chose "a course that the Fifth Amendment gave [them] no privilege to take."  *Id.* (quoting *United States v. Knox*, 396 U.S. 77, 82 (1969)).  Defendants are not free to make false statements and then use *Miranda* as a shield to protect them from the consequences of those lies.

The Court sees no reason to limit the admissibility of Defendants' purported false statements for purposes of their charges under 18 U.S.C. § 2237 only, as the Government proposes.  (Gov't Suppl. Br. at 68.)  The Fifth Amendment does not protect Defendants'

statements here, because they do not constitute confessions, but charged crimes in and of themselves. *Kirk*, 528 F.2d at 1062.  Moreover, the Government's proposed limitation would be inconsistent with the purpose of the exclusionary rule, as exclusion serves no deterrent effect here.  As Judge Easterbrook explained:

> Police do not detain people hoping that they will commit new crimes in their presence; that is not a promising investigative technique, when illegal detention exposes the police to awards of damages.  Thus the gains from extending the rule to exclude evidence of fresh crimes are small, and the costs high.

*Pryor*, 32 F.3d at 1196.  Accordingly, the Government may introduce Defendants' alleged false statements on board the *Yunus* in its case-in-chief as to all charges under the false statement exception as well.[82]

### 3.    Pahlawan's *Mirandized* statements on board the *USS Puller* are admissible.

Defendant Pahlawan next argues that his *Mirandized* statements on the *USS Puller* must be suppressed, because the Government's *Miranda* warnings were inadequate.  (ECF No. 113 ("Pahlawan MTS") at 13.)  Specifically, Defendant Pahlawan argues that he was not adequately advised of his right to counsel before or during questioning and that the FBI improperly abridged his rights by informing him that counsel may be limited by "local authorities' decisions or the unavailability of an American-trained attorney."  (*Id.* at 13–14; ECF No. 224 at 8.)  Pahlawan further notes that "the FBI agent did not follow the FBI's standardized warnings when reading Pahlawan his rights."  (Pahlawan MTS at 15.)  In response, the Government contends that there exists "no meaningful daylight" between the warnings that Pahlawan received and the standard FBI advice of rights.  (MTS Opp. at 24.)  The Court agrees with the Government.  Assuming that

---

[82]    Pahlawan's false statements (if proven) are also relevant to the additional charges against him as they could be argued to constitute consciousness of guilt. *United States v. Ath*, 951 F.3d 179, 187 (4th Cir. 2020).

Pahlawan was subject to custodial interrogation on board the *USS Puller*, the Court finds that Pahlawan was sufficiently advised of his *Miranda* rights and waived his rights voluntarily, knowingly and intelligently.

As an initial matter, the Court acknowledges that Defendants engaged in both un-*Mirandized* interviews with DOD and *Mirandized* interviews with the FBI team on board the *USS Puller*. However, the record stands devoid of any facts suggesting that the FBI team engaged in an intentional scheme to undermine the effectiveness of *Miranda* warnings. In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Supreme Court held that law enforcement intentionally frustrated the effectiveness of *Miranda* warnings by intentionally withholding them, obtaining a confession, and then immediately providing warnings and requestioning the defendant using the same questions to obtain a "*Mirandized*" confession. *Id.* at 604–05. The Fourth Circuit previously determined that Justice Kennedy's concurring opinion, which provided the narrowest grounds for the holding, "represents the holding of the *Seibert* Court." *United States v. Mashburn*, 406 F.3d 303, 309 (4th Cir. 2005). In Justice Kennedy's view, courts must apply a narrowed voluntariness analysis "only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). In the event of such a "deliberate two-step strategy," Justice Kennedy concluded that "postwarning statements that are related to prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* Those curative measures must "ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver," and could include things such as "a substantial break in time and

circumstances" to allow a suspect "to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.*

Here, the Court finds that the FBI team did not engage in a deliberate two-step process as described in *Seibert*. The testimony demonstrates that the FBI team went to great lengths to "form[] a wall" between itself and DOD intelligence officials aboard the *USS Puller*. (Hr'g Tr. 116:21.) The FBI team remained "completely separate" from the DOD team, (*id.* 116:23–25), with the FBI team conducting their interviews substantially separated in time and space from the DOD intelligence interviews. Furthermore, DOD did not discuss any substantive aspects of its interviews with the FBI, which negates a claim of a coordinated effort to circumvent *Miranda*. *See United States v. Khweis*, 2017 WL 2385355, at *14 (E.D. Va. June 1, 2017), *aff'd*, 971 F.3d 453 (4th Cir. 2020) ("recognizing the rule that the police have not engaged in a deliberate two-step to circumvent *Miranda* where different officers questioned the suspect at different locations . . . and the second officer was not aware of the suspect's previous inculpatory statement" (internal quotations omitted)).

Even assuming that the FBI team deliberately employed a two-step strategy to undermine the *Miranda* warnings here (which it did not), Pahlawan's statements would still be admissible, because the FBI team took sufficient curative measures. The Fourth Circuit's decision in *United States v. Elsheikh*, 103 F.4th 1006 (4th Cir. 2024), stands directly on point. Here, as in *Elsheikh*, the FBI team questioned Pahlawan after a sufficient break in time from the un-*Mirandized* DOD interviews. *See Elsheikh*, 103 F.4th at 1019. In both cases, the warned interviews were held in a different space than the unwarned interviews and involved entirely different teams. *Id.* at 1019. Like in *Elsheikh*, the FBI team provided Pahlawan modified *Miranda* warnings based on *United States v. Khweis*, 971 F.3d 453 (4th Cir. 2020), which highlighted that the interview would be

different from any prior ones. *Elsheikh*, 103 F.4th at 1016–17; (Gov't Ex. 93N). Specifically,
Pahlawan's advice of rights explained: "[y]ou may have already spoken to others. We do not
know what, if anything, they said to you, or you said to them. . . . We are starting anew. You do
not need to speak with us today just because you have spoken with others in the past." (Gov't
Ex. 93N.) Likewise, the FBI team advised that although prior statements "likely . . . will not be
useable against you in a U.S. court[,] [a]nything you now say can be used against you in court."
(*Id.*) The FBI team then explained that Pahlawan had the right to speak to a lawyer before and
during questioning and that, regardless, he could decide whether to answer any questions or
"stop answering at any time." (*Id.*) As the Fourth Circuit explained in *Elsheikh*, where FBI
agents provided nearly identical cleansing instructions, the defendant "was plainly and
repeatedly informed of the difference between the two types of interviews, the legal significance
of any statements he would make if he waived his rights going forward with the FBI interview,
and that the FBI agents had no knowledge of what had been said earlier." *Id.* at 1020.
Accordingly, the Court finds that these measures prove sufficiently curative to ensure that a
reasonable person in the defendant's position would understand "the import and effect of the
*Miranda* warning and of the *Miranda* waiver." *Elsheikh*, 103 F.4th at 1020 (quoting *Seibert*, 542
U.S. at 622).

The Court thus proceeds to assess whether the FBI team provided adequate *Miranda*
warnings and whether Pahlawan voluntarily, knowingly and intelligently waived those rights.
*See Khweis*, 971 F.3d at 461 (noting that in the "typical midstream warning case," the
admissibility of post-warning statements should continue to be governed by *Elstad*'s
voluntariness principles). Before any custodial interrogation takes place, a suspect must be
advised:

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 479.  However, *Miranda* does not require any particular recitation of these warnings.  *See California v. Prysock*, 453 U.S. 355, 359 (1981) (per curiam) ("This Court has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a criminal defendant.").  Instead, in determining whether a suspect has been adequately advised of his rights, "[t]he inquiry is simply whether the warnings reasonably convey[ed] to a suspect his rights as required by *Miranda*."  *Florida v. Powell*, 559 U.S. 50, 60 (2010) (cleaned up).  Here, Pahlawan only contests whether he was adequately advised of his right to counsel.  The Court limits its inquiry accordingly.

A comparison of Pahlawan's translated advice of rights and the standard FBI advice of rights illustrates that Pahlawan's right-to-counsel advisement reasonably conveyed his rights as required by *Miranda*.[83]  The standard FBI warnings provide, in relevant part, that:  "You have the right to talk to a lawyer for advice before we ask you any questions.  You have the right to have a lawyer with you during questioning."  *Powell*, 559 U.S. at 64.  Pahlawan received the following Urdu translation:  "Before you ask us any questions or we ask you any questions, you have the right to consult with an attorney.  You have the right to have the questions and answers take place in the presence of your attorney."[84]  (Gov't Ex. 93N.)  Although the Urdu translation

---

[83]    The FBI team read the *Miranda* warnings to Pahlawan in English, and an interpreter translated the warnings into Urdu.  In addition, the FBI team provided Pahlawan with a written version of the *Miranda* warnings in Urdu.  SA Ahonen's testimony established that Defendant Pahlawan acknowledged that he understood the verbal and written translations of the *Miranda* warnings and consented to an interview without consulting with an attorney.

[84]    The FBI agent also warned Pahlawan that:  "If you are unable to afford an attorney but wish to have one, you have the right to have an attorney appointed for you."  (Gov't Ex. 93N.)

offered slightly different words, the Court finds that it "communicated the same essential message" as the standard FBI warnings. *Powell*, 559 U.S. at 64.

Furthermore, the Court rejects Pahlawan's assertion that the FBI agent improperly qualified his right to counsel by informing him that counsel may be limited by "local authorities' decisions or the unavailability of an American-trained attorney." (Pahlawan MTS at 14.) Pahlawan's translated warnings advised as follows: "While our ability to provide an attorney is currently limited due to local authorities' decisions or the unavailability of an American-trained attorney[,] [i]f you decide to answer questions now in the absence of an attorney, you have the right to refuse to answer at any time." (Gov't Ex. 93N.) This statement conveys that Pahlawan may elect to wait for an attorney before speaking with the FBI. Furthermore, the written version of the *Miranda* warnings, which was translated into Urdu, reiterated Pahlawan's right to an attorney before and during questioning.

Pahlawan's reliance on *Lujan v. Garcia*, 734 F.3d 917 (9th Cir. 2013), and *United States v. Wysinger*, 683 F.3d 784 (7th Cir. 2012), is misplaced. In *Lujan*, the defendant invoked his right to counsel, at which point the detective informed the defendant that a lawyer would not be available on a Sunday evening. 734 F.3d at 921. In contrast, here, Pahlawan never invoked his right to an attorney; the FBI agent informed Pahlawan that his ability to provide an attorney was limited by the existing circumstances but that Pahlawan nonetheless had the right to speak to an attorney before any questioning commenced. Moreover, in *Wysinger*, a DEA agent informed the defendant that he had the "right to talk to a lawyer for advice before we ask any questions or have one — have an attorney with you during questioning." 683 F.3d at 798. Taken literally, this warning incorrectly advised the defendant that he had the right to have an attorney present before *or* during questioning. *Id.* The FBI agent did not commit such an error here. (*See* Gov't

Ex. 93N (advising Defendant Pahlawan that he had the right to consult with an attorney "before . . . we ask you any questions" and "to have the questions and answers take place in the presence of your attorney"). Accordingly, these cases prove distinguishable from the instant case. The Court thus finds that Defendant Pahlawan was sufficiently advised of his *Miranda* rights on board the *USS Puller*.[85]

Moreover, the Court finds that Pahlawan made a voluntary, knowing and intelligent waiver of his rights. A suspect may waive his Fifth Amendment rights and voluntarily participate in a custodial interrogation. *Miranda*, 384 U.S. at 444. A valid *Miranda* waiver requires the following:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*United States v. Cristobal*, 293 F.3d 134, 139–40 (4th Cir. 2002). A court may conclude that a suspect validly waived his *Miranda* rights "if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Here, an FBI agent provided Pahlawan with an accurate warning of his rights under *Miranda*. The FBI agent issued these warnings in English, which was then translated into Urdu. The FBI agent also provided Pahlawan with a written Urdu translation of his *Miranda* rights.

---

[85]     To the extent that Pahlawan argues that the Urdu interpreter, Zafar Iqbal, failed to accurately interpret the *Miranda* rights, (Pahlawan 2d Suppl. Br. at 11), the Court rejects this argument. Not only did Pahlawan receive verbal *Miranda* warnings, but he also received a verbatim translation of the *Miranda* warnings in written Urdu. Pahlawan confirmed that he read and understood the written, translated version of the *Miranda* warnings and agreed to proceed without an attorney on that basis.

Defendant Pahlawan acknowledged that he understood the verbal and written translations of the *Miranda* warnings and consented to proceeding with a voluntary interview without consulting with an attorney.  No evidence in the record suggests that Defendant Pahlawan was threatened or coerced.  Accordingly, the Court finds that Defendant Pahlawan made a voluntary, knowing and intelligent waiver of his *Miranda* rights.

As a result, the Court will not suppress any *Mirandized* statements made by Pahlawan on board the *USS Puller*.

### B.    Rule 5(a) Motion

Defendants argue that some or all of their purported detention aboard the *Yunus* and the *USS Puller* and at a temporary facility in Country C constituted an unreasonable presentment delay in violation of Federal Rule of Criminal Procedure 5(a), and that the length and circumstances of this delay warrant dismissal of the Second Superseding Indictment or, in the alternative, suppression of all statements made on the *Yunus* and the *USS Puller*, as well as all evidence extracted from electronic devices.  For the reasons set forth below, the Court will DENY Defendants' Rule 5(a) Motion.  (ECF No. 103.)

Before assessing the merits of Defendants' Rule 5(a) Motion, the Court briefly addresses Defendants' proposed remedies:  dismissal of the Second Superseding Indictment or suppression of "all statements and evidence obtained on the *Puller*."  (Pahlawan 2d Suppl. Br. at 12.)  The Supreme Court has long recognized that suppression of post-arrest statements made during a period of unreasonable delay constitutes the appropriate remedy for a prompt presentment violation.  *Corley v. United States*, 556 U.S. 303, 322 (2009).  In *Corley v. United States*, the Supreme Court discussed its landmark holdings in *McNabb v. United States* and *Mallory v. United States*, which together stand for the proposition that "confessions made during periods of detention that violat[e] the prompt presentment requirement of Rule 5(a)" are "generally . . .

112

inadmissible." *Corley*, 556 U.S. at 309.  In recognizing a six-hour "safe harbor" for delays as set

forth in 18 U.S.C. § 3501(c), the Court emphasized that if a confession was made "within six

hours of arrest," it is generally admissible, but if a confession was made "before presentment and

beyond six hours" from the time of arrest, and that delay was "unreasonable or unnecessary

under the *McNabb-Mallory* cases," the "confession is to be suppressed."  *Id.* at 322.  Notably, the

Court did not extend the suppression remedy to cover statements made *before* any presentment

delay occurs, or to non-testimonial evidence obtained before such a delay.  This comports with

the purpose ascribed to the prompt presentment requirement in *McNabb*, serving to prevent

"secret interrogation of persons *accused* of crime," *McNabb*, 318 U.S. at 344 (emphasis added),

and the Court's reaffirmation, in *Corley*, of the principle that "delay *for the purpose of

interrogation*" is the epitome of "unnecessary delay" under Rule 5(a).  *Corley*, 556 U.S. at 308

(emphasis added).

Defendants' initially proposed remedy — dismissal of the indictment — stands wholly

inappropriate to address a Rule 5 violation.  *See United States v. Peeples*, 962 F.3d 677, 685–86,

686 nn.22, 26 (2d Cir. 2020) (collecting Supreme Court cases "confirm[ing] that the remedy for

[a Rule 5(a)] violation is the exclusion of evidence, not dismissal of a criminal case"); *see also

United States v. Cabezas-Montano*, 949 F.3d 567, 594 n.25 (11th Cir. 2020) ("[T]he remedy for

a . . . Rule 5(a) delay-in-presentment violation [on appeal] is suppression of the evidence

obtained during the delay, not the vacatur of a conviction.").  Defendant relies primarily on

*United States v. Dominguez-Caicedo*, 40 F.4th 938 (9th Cir. 2022), for the proposition that

"dismissal of the indictment is warranted in cases of egregious violations of Rule 5."  (Pahlawan

Suppl. Br. at 64 (citing *Dominguez-Caicedo*, 40 F.4th at 950).)  However, the Ninth Circuit

remains the only federal court of appeals to expressly recognize this possibility, and its finding

113

rests primarily on one district court case, *United States v. Osunde*, 638 F. Supp. 171 (N.D. Cal. 1986), where the trial court dismissed an indictment despite acknowledging that it "cannot point to case law supporting dismissal, rather than suppression of evidence" even for "flagrant violations of Rule 5(a)." *Id*. at 176. The *Osunde* court's reasoning has been criticized by other courts, both within and outside of the Ninth Circuit. *See, e.g.*, *United States v. Savchenko*, 201 F.R.D. 503, 507 (S.D. Cal. 2001); *United States v. DiGregorio*, 795 F. Supp. 630, 634 n.13 (S.D.N.Y. 1992).[86] The Ninth Circuit's approach does not bind this Court; nor does its reasoning compel an outcome here that would stand at odds with Supreme Court precedent and the overwhelming weight of the case law.

Defendants' alternatively proposed remedy — suppression of all statements, including all *pre-arrest* statements, and all other non-testimonial evidence obtained during the interdiction — proves similarly overbroad and fails to comport with the governing case law and the purpose of Rule 5(a), both of which support suppression of evidence obtained during, and as a result of, the presentment delay. That remedy stands rooted in Justice Frankfurter's focus, in *McNabb*, on "evidence secured through [] a flagrant disregard of the procedure which Congress has commanded," which, if used as a basis for conviction, would render "the courts themselves accomplices in willful disobedience of law." *McNabb*, 318 U.S. at 345. As previously discussed, *McNabb*'s approach has been repeatedly affirmed and constitutes the law of the land. *See Corley*, 556 U.S. at 322 (discussing *McNabb-Mallory*'s suppression remedy only with regard to post-arrest statements made during an unreasonable or unnecessary delay); *see also United States v. Cooke*, 853 F.3d 464, 471 (8th Cir. 2017) (stating that "the appropriate remedy for a

---

[86] In an unpublished opinion, the Fourth Circuit expressly declined to follow *Osunde*, finding appellant's reliance on the case "unpersuasive given this Circuit's precedent." *United States v. Malachi*, 972 F.2d 343, 343 n.3 (4th Cir. 1992) (unpublished table decision).

violation of Rule 5(a)(1)(A) is not dismissal of an indictment, but suppression of evidence illegally obtained as a result of the violation"); *United States v. Dyer*, 325 F.3d 464, 470 n.2 (3d Cir. 2003) (same).  As such, the Court rejects Defendants' requested remedies and will consider suppression only as to any statements made by Defendants during a period of impermissible presentment delay, in accordance with the *McNabb-Mallory* rule and 18 U.S.C. § 3501(c).

Before the Court can assess whether any of Defendants' statements warrant suppression, however, it must first analyze what, if any, presentment delay occurred.  While the parties agree that the period between Defendants' formal arrest on February 14, 2024 and their appearances before Judge Speight in Richmond on February 22, 2024 constitutes a presentment delay, the parties disagree on two critical issues:  (1) whether February 14, 2024 constitutes the proper trigger for the Government's "presentment clock," and (2) whether the presentment delay — regardless of its length — qualifies as "unnecessary."  For the reasons set forth below, the Court finds that Defendants' right to prompt presentment was triggered only by their arrest by federal law enforcement officials on February 14, 2024.  Since Defendants fail to present sufficient evidence for a finding of an "impermissible working arrangement" between DOJ and DOD that would counsel for an earlier trigger date, and since the Government has already agreed to suppress all evidence collected after February 5, 2024, (Gov't Suppl. Br. at 91), the Court finds that it need not inquire as to whether the Government's presentment delay qualifies as "unnecessary," as the Government's voluntary suppression of statements cures any presentment violation that may have occurred.

Defendants present three main theories in support of an earlier trigger date than February 14, 2024 for the start of the Government's "presentment clock."  In their Rule 5(a) Motion, Defendants argue that the Court should use January 11, 2024 — the day of the Boarding Team's

interdiction — as the starting point for its delay calculation.  Defendants argue that their status aboard both the *Yunus* and the *USS Puller* amounted to detention from the outset of the Government's boarding, and that, given the length of this detention and its restrictive circumstances, their condition was tantamount to arrest for purposes of Rule 5(a).  (Rule 5(a) Mot. at 6–7, 10.)  In the alternative, Defendants argue that their "Rule 5 clock" should begin no later than January 26, 2024 — the date that FBI agents first arrived on the *USS Puller*.  (Pahlawan Suppl. Br. at 53.)  Defendants argue that this date, at the latest, represents the moment that the Government "decided to pursue a criminal investigation," and that this decision (in conjunction with Defendants' "federal detention on the *USS Puller*") triggers Defendants' right to prompt presentment under Rule 5(a).  (*Id*. at 53, 60.)  Finally, Defendants also allege that DOJ and DOD engaged in "collusion designed to circumvent the presentment requirement," manifesting an "impermissible working arrangement" between the agencies that also warrants the Court's finding of an unnecessary presentment delay for the duration of that "collusion."  (*Id*. at 57.)

The Government, by contrast, submits that the "presentment clock" began running only upon Defendants' formal arrest on February 14, 2024.  (ECF No. 197 ("Rule 5(a) Opp.") at 13.)  While the Government concedes that Rule 5 "can at times trigger upon the defendants' detention in a situation that is outside of a formal arrest," (ECF No. 326 at 20), it rejects Defendants' "faulty premise" that the Boarding Team's interdiction on January 11, 2024, and the mariners' subsequent transfer to the *USS Puller* constituted "arrest" for Rule 5(a) purposes.  (Rule 5(a) Opp. at 2.)  Rather, in the Government's view, Defendants were placed in the "civil care" of the United States military (due to the *Yunus*'s unseaworthiness) and enjoyed living conditions under which no "objective, reasonable person would . . . have believed themselves arrested."  (*Id*. at 2–

3.)  The Government also emphasizes that Defendants were not "detained by federal law enforcement" aboard the *USS Puller*, since they remained within the authority of the United States Navy, which does not constitute a federal law enforcement agency.  (ECF No. 326 at 20–21.)  In addition, the Government rejects Defendants' argument that the launch of a criminal investigation triggers its Rule 5 obligation as "without support in law or reason," citing Fourth Circuit precedent in support.  (*Id.* at 21 (citing *United States v. McDaniel*, 441 F.2d 1160 (4th Cir. 1971).)  Finally, the Government submits that no "impermissible working relationship" existed between DOJ and DOD, because DOD "pursued its own objectives under its own authorities" and any communications between the two agencies "did not transcend appropriate interagency communications and coordination."  (*Id.* at 23.)  Consequently, the Government insists that February 14, 2024 remains the proper starting point for the Court's inquiry.

For the reasons set forth below, the Court finds that February 14, 2024 — the day that FBI agents formally placed Defendants under arrest for federal charges — constitutes the proper starting point for the Government's Rule 5(a) delay.  The Rule's text, as well as relevant case law interpreting the rule's reach, indicate that an arrest on federal charges must occur to trigger the federal presentment requirement.  The facts of this case fail to justify application of court-crafted exceptions concerning extreme situations where detention stands tantamount to arrest and "improper working arrangements" seek to circumvent presentment obligations.  In their absence, the Court adheres to the rule's text and looks to the time of formal arrest:  in this instance, February 14, 2024.

### 1.    Defendants were not "arrested" for purposes of Rule 5(a) until their formal arrest on federal charges.

Formal arrest on federal charges constitutes the ordinary trigger for Rule 5(a)'s presentment requirement.  *See* Fed. R. Crim. P. 5(a)(1)(B) (requiring that the "person making an

*arrest* outside the United States must take the defendant without unnecessary delay before a magistrate judge" (emphasis added)); *United States v. Alvarez-Sanchez*, 511 U.S. 350, 358 (1994) ("[The] duty to present a person to a federal magistrate does not arise until the person has been arrested for a federal offense."); *United States v. Gowadia*, 760 F.3d 989, 993–94 (9th Cir. 2014) ("Rule 5(a) applies only in situations involving formal arrest on specific charges."). However, a suspect need not be in federal custody to trigger Rule 5(a); rather, the Rule requires "only that the defendant be detained (by whatever agency) on federal *charges*." *Bin Laden*, 132 F. Supp. 2d at 208 (emphasis in original). The Supreme Court has found support for such a definition of "arrest" in the Rule 5 context based on the ordinary meaning of the term "delay."[87] *Alvarez-Sanchez*, 511 U.S. at 357–58. Since that term "presumes an obligation to act," there must be "some obligation to bring the person before . . . a judicial officer" before any "delay" can occur. *Id.* at 358. And since federal law enforcement "plainly" possesses no obligation to bring a suspect before a magistrate until that person has been "arrested or detained for a federal crime," "no 'delay' [for purposes of presentment] can occur" before then. *Id.* Such a reading of the Rule comports with common sense: in the absence of charges, presenting a detainee before a Magistrate Judge would be an exercise in futility, as he would possess no authority to proceed.

A small number of courts have recognized an exception to this general rule in the rare instance where a subject's detention, though not the result of a formal arrest on federal charges, "is legally tantamount to an arrest." *Gowadia*, 760 F.3d at 995. In *United States v. Robinson*, 439 F.2d 553 (D.C. Cir. 1970), for instance, the D.C. Circuit found that a defendant's civil

---

[87]     While the Court's discussion of "delay" in *Alvarez-Sanchez* focuses specifically on how that term is used in 18 U.S.C. § 3501(c), a statute wherein Congress largely codified Supreme Court precedent concerning the exclusion of evidence obtained during periods violating Rule 5(a), the Court's discussion applies with equal force to the term as used in Rule 5(a) itself.

commitment to a hospital stood subject to Rule 5(a)'s protections. *Id.* at 556–58. While acknowledging that, during his period of commitment, the defendant "[i]n a strict sense . . . was not arrested or detained as envisaged by Rule 5," the D.C. Circuit invoked "the principles embodied in Rule 5" to find that the Rule's protections ought to apply nonetheless. *Id.* at 563–64. Specifically, the D.C. Circuit argued that "[i]n all substance . . . even if not technically arrested, he was as though arrested," pointing to the fact that "[n]o additional restriction of his freedom occurred when the officers later formally said to him, 'you are under arrest,'" and arguing that "[t]he impact of Rule 5 . . . [is] not avoided because of the possible absence of a formal arrest." *Id.* at 564.[88]

Here, Defendants do not dispute that they were not formally in federal custody before February 14, 2024. They argue, however, that their purported detention, beginning on January 11, 2024 with the boarding of the *Yunus* and continuing through their formal arrest aboard the *USS Puller*, nonetheless constitutes "arrest" for purposes of Rule 5(a). Given the lengthy period of that detention and its restrictive circumstances, Defendants suggest that this case presents the kinds of "extraordinary circumstances" that render detention tantamount to arrest for purposes of Rule 5(a). (ECF No. 204 ("Rule 5(a) Reply") at 3.)

As a threshold matter, the Court reiterates its earlier findings concerning the conditions under which the Boarding Team held Defendants during and after its interdiction of the *Yunus*. See *supra* Section III.A.2.a. There, the Court found that Defendants were "in custody" on the *Yunus* for purposes of *Miranda*, because their freedom of action was curtailed to a degree

---

[88]    The D.C. Circuit's approach in *Robinson* has garnered only limited acceptance in other circuits. When citing *Robinson*'s "as though arrested" language, the Ninth Circuit in *Gowadia* expressly framed the facts of that case as an "extreme scenario." *Gowadia*, 760 F.3d at 995. This Court was unable to find any other federal cases that cite *Robinson*'s "as though arrested" language, nor could it find any Fourth Circuit cases that cite *Robinson* at all.

associated with formal arrest.  Notwithstanding the Government's argument that Defendants' legal status aboard the *USS Puller* more properly constituted that of "displaced mariners," the Court will assume, for the purposes of deciding this motion, that Defendants were also in custody on board the *USS Puller* and consequently qualify as "detained."[89]

The Court disagrees with Defendants, however, that their detention aboard the *Yunus* and *USS Puller*, without more and in the absence of federal charges, triggers Rule 5(a)'s presentment requirement.  The text of Rule 5(a) plainly applies only to persons "making an arrest" and does not include detention by foreign authorities or domestic non-law enforcement personnel.[90]  Fed. R. Crim. P. 5(a)(1)(B).  While the case law acknowledges that such "arrest" need not be formal, courts have consistently underscored that federal charges are necessary to trigger the presentment requirement.  *Alvarez-Sanchez*, 511 U.S. at 358; *Gowadia*, 760 F.3d at 993-94; *Bin Laden*, 132 F. Supp. 2d at 208.  As the Supreme Court explained in *Alvarez-Sanchez*, presenting a detainee to a Magistrate Judge before that Magistrate Judge has any charges of which to advise or on which to arraign him would be futile, as there is "no . . . reason to bring [a detainee] before a judicial officer empowered to commit persons charged with offenses against the laws of the United States" in such a scenario.  *Alvarez-Sanchez*, 511 U.S. at 358.  Defendants present no evidence that federal charges underpinned the seizure of their persons on January 11, 2024 — nor could

---

[89]    Defendants appear to equate the term "detain" with "arrest" on at least one occasion in their briefing, suggesting that they were "arrested at sea on or about January 11," before referring to being "detained at sea" in the following paragraph, and then referencing "seizure" in the paragraph after that.  (Rule 5(a) Mot. at 5–6.)  To the extent that Defendants invite the Court to read Rule 5(a)'s "arrest" language as broadly synonymous with any form of detention, the Court rejects this invitation as self-evidently beyond the scope of the Rule's text.

[90]    Despite the participation of some Coast Guard personnel during the boarding of the *Yunus*, Defendants were in the custody and control of the U.S. Navy, which is not a federal law enforcement agency.

they, since their detention occurred in the context of a fast-moving interdiction on the high seas, and before any crime had been uncovered or, in Mazhar's case, had even been committed.  The Court therefore finds that the mere fact of Defendants' detention, without underlying federal charges, cannot constitute "arrest" for purposes of Rule 5(a).

To the extent that Defendants argue that their detention nonetheless triggered Rule 5(a), because they were treated "as though arrested," the Court finds that Defendants' argument lacks legal support.  While the D.C. Circuit arrived at such a finding in *Robinson*, that court cited no case law in support of its position that Rule 5(a)'s presentment requirement could apply without formal arrest or formal charges.  Nor has any court in the Fourth Circuit followed this atextual reading of Rule 5(a).  While the Ninth Circuit made reference to *Robinson*'s "as though arrested" language — the only citation that the Court could find — it deemed it an "extreme scenario" and rejected its application in the case before it.  *Gowadia*, 160 F.3d at 995.  Rather than seek to ascertain the meaning of Rule 5(a)'s text, the D.C. Circuit expressly cast the rule's "strict sense" to the wind, relying instead on what it considered to be "the principles embodied in Rule 5," which it never defined.  *Robinson*, 439 F.2d at 563–64.  This Court declines to follow such an approach.

The fact that the Government began contemplating criminal charges before February 14, 2024 does not alter the Court's analysis.  Defendants claim that "the government was required to seek Mr. Pahlawan's prompt presentment to a judicial officer when it decided to pursue a criminal investigation," citing two sources for support:  *Mallory* and a 2016 law review student note.  (Pahlawan Suppl. Br. at 53.)  Neither source stands for the construction of Rule 5(a) that

Defendant proposes.[91]  Defendant references *Mallory* for the proposition that "Rule 5 comes into play at the beginning of the 'scheme for initiating a federal prosecution,'" (Pahlawan Suppl. Br. at 53 (citing *Mallory*, 354 U.S. at 454)), and proceeds to suggest that the phrase "scheme for initiating a federal prosecution" describes the moment that federal law enforcement decides to "pursue a criminal investigation."  (*Id*.)  But as the Government correctly points out, that is not what *Mallory* says.  *Mallory*'s "scheme" describes as its starting point a formal *arrest*, on probable cause, followed by arraignment before a Magistrate Judge.  *Mallory*, 354 U.S. at 454.[92] Nor does the text of Rule 5(a), which speaks only of "arrest" and does not mention the initiation of criminal investigations, help Defendants here in any way.  Moreover, as the Government notes, Defendants' suggested framework would prevent federal law enforcement agencies from investigating any crimes involving detained suspects "unless they were prepared to arrest and present the defendant the same day as they decide to interview" them.  (ECF No. 326 at 22.) Such an approach would render complex criminal investigations all but impossible.  For all of

---

[91]    Defendants' law review note does not set forth Defendants' argument for a categorical presentment duty to attach at the time that the Government begins a criminal investigation. Rather, the student author merely makes the descriptive and uncontroversial point that, once the Government's intent to prosecute a military detainee becomes clear, "any separation between the civil and criminal regimes becomes less distinct."  Meghan Claire Hammond, *Without Unnecessary Delay: Using Army Regulation 190-8 to Curtail Extended Detention at Sea*, 110 Nw. U. L. Rev. 1303, 1330 (2016).

[92]    To the extent that Defendants suggest that the Government's presentment obligation attached at the time that the Government possessed sufficient evidence to support formal arrest on federal charges against them, the Fourth Circuit already rejected such a theory in *United States v. McDaniel*, 441 F.2d 1160 (4th Cir. 1971) (per curiam).  There, the Fourth Circuit held that, where the FBI was investigating a person currently in state custody, the FBI's possession of "information which may well have met the minimum requirements of probable cause" did not require the FBI to "halt [its] investigation at that point and set the machinery of the criminal process in motion [by way of presentment] before carrying the investigation to a point where [it] could determine with some assurance that a federal complaint should issue."  *Id*. at 1160–61.

these reasons, and in the absence of any support to the contrary, the Court declines to adopt Defendants' suggested reformulation of Rule 5's presentment obligation.

Given the absence of federal charges against Defendants during their time on the *Yunus* and *USS Puller*, and for all the reasons discussed above, the Court finds that Defendants' detention by the Navy, without more, does not rise to the level of an "arrest" for purposes of Rule 5(a). The same stands true regarding Defendants' argument concerning the initiation of a criminal investigation against them. The Court therefore rejects Defendants' arguments that January 11, 2024 or January 26, 2024 should serve as the trigger for the Government's "presentment clock" in this matter.[93]

### 2. The "improper working arrangement" exception does not apply.

Notwithstanding the text of Rule 5(a), federal courts have identified a limited exception, in cases of impermissible cooperation between federal law enforcement and other government agencies, where Rule 5(a)'s presentment requirement may trigger *before* an arrest or the filing of federal charges. Originally articulated by the Supreme Court in *Anderson v. United States*, 318 U.S. 350 (1943), this "working arrangement" exception typically applies in cases where state, local or foreign officials arrest persons suspected of committing (but who have not yet been charged with) federal crimes, and where federal authorities use that other authority's custody as a means to avoid the federal presentment requirement while continuing their investigation.[94] *See*

---

[93]    In addition to alleging a presentment violation under Rule 5(a), Defendants invoke Rule 5(b), evidently alleging that the Government violated this rule by failing to promptly file a criminal complaint following Defendants' "arrest." (Mot. at 5–6.) Since the Court rejects Defendants' contention that they were under arrest before February 14, 2024, and since the criminal complaint against them had already been filed at the time of their actual arrest, Defendants' argument under Rule 5(b) lacks merit.

[94]    As the Government rightly concedes, "this same rule applies to any allegations of coordination between distinct federal agencies, such as the Department of Justice and Department of Defense." (ECF No. 300 at 102.)

*Anderson*, 318 U.S. at 356 (finding confessions made to FBI agents while the defendant was in local sheriff's custody inadmissible due to the impermissible "working arrangement" between state and federal officers); *Alvarez-Sanchez*, 511 U.S. at 359 (describing "the rule announced in *Anderson*" as encompassing the "presumably rare scenario" where "state or local authorities, acting in collusion with federal officers . . . arrest and detain someone in order to allow . . . federal agents to interrogate him in violation of his right to a prompt presentment").

To prevail under a "working arrangement" theory, a defendant must show that federal law enforcement deliberately sought to use the custody of another party to circumvent presentment, usually for the purpose of prolonging its own opportunity to gather evidence. *See, e.g.*, *United States v. Gaines*, 555 F.2d 618, 622 (7th Cir. 1977) (requiring that the delay was "deliberately induced for the express purpose of producing evidence"); *Jones v. Sec'y, Fla. Dep't of Corr.*, 2024 WL 3552037, at *10 (S.D. Fla. July 26, 2024) (requiring a "pre-planned arrangement" between authorities "to obtain [the defendant's] incriminating statements"). In assessing the extent of improper influence that a federal law enforcement authority needs to exercise to rise to this level, courts consider a host of factors. One factor concerns what party exercised actual control and authority over the defendant at the time of the alleged presentment delay. *See Bin Laden*, 132 F. Supp. 2d at 210 (rejecting the defendants' claim of an improper working arrangement, because Kenyan authorities — not United States law enforcement — exercised control over the defendants). Another factor concerns whether the detaining party possessed an "independent interest" in detaining or interrogating the defendant; where such an independent interest exists, courts have found this factor to mitigate against a finding of improper collaboration. *United States v. Abu Ali*, 528 F.3d 210, 227 (4th Cir. 2008). Courts also look to the timing of federal law enforcement's involvement, and specifically whether such involvement

came about only later in an investigation. *Compare United States v. Coppola*, 281 F.2d 340, 343 (2d Cir. 1960), *aff'd per curiam*, 365 U.S. 762 (1961) (finding no improper collaboration where arrangements for defendants' arrest and detention were "exclusively planned and executed by [local] police without any suggestion or participation by the F.B.I."), *with Bin Laden*, 132 F. Supp. 2d at 209–10 (finding that "[t]he early and significant involvement" of U.S. law enforcement in the investigation makes this "a closer 'working arrangement' call than many others").

Notably, courts have emphasized that the burden rests with defendants to make a significant showing of a collusive working arrangement; "mere suspicion" of such an arrangement proves "insufficient." *Coppola*, 281 F.2d at 344; *see Gaines*, 555 F.2d at 622 (recognizing that "no court has ever determined that a bare suspicion of a working arrangement between federal and local authorities is sufficient to make Rule 5(a) protections . . . available"). Similarly, the "mere fact of federal participation in an investigation," including federal officials conducting interrogations, fails, on its own, to establish an improper "working arrangement." *Bin Laden*, 132 F. Supp. 2d at 209 ("[T]he fact that representatives of the United States government interrogated [defendants while in Kenyan custody] is not dispositive."). In following the Supreme Court's characterization of collusive working arrangements as a "presumably rare scenario," courts highlight that this doctrine "has infrequently been applied," *Alvarez-Sanchez*, 511 U.S. at 359, in part, because courts "are reluctant to discourage cooperation between agencies." *Bin Laden*, 132 F. Supp. 2d at 208–09.

This Court has found only three prior cases where courts considered the working collaboration exception in situations involving defendants detained by another federal agency, branch or department. In *Abel v. United States*, 362 U.S. 217 (1960), U.S. Immigration and

Naturalization Service ("INS") officials arrested petitioner under an administrative deportation warrant.[95]  However, the FBI had played a central role in the investigation leading up to the administrative arrest:  an FBI officer had first brought petitioner to the INS's attention, and the FBI had informed the INS of its interest in petitioner for potential espionage charges.  *Id.* at 221–22.  Furthermore, INS officials agreed to delay their arrest so that the FBI could conduct an interview with petitioner beforehand.  *Id.* at 222.  FBI agents were present at petitioner's subsequent arrest and questioned him again at that time.  *Id.* at 222–23.  Several weeks after his INS arrest, the FBI ultimately arrested petitioner on an espionage charge.  *Id.* at 225.  He was subsequently brought to trial and convicted, based in part on evidence collected by the FBI at his hotel immediately after the INS arrested him.  *Id.*

In rejecting petitioner's argument that the trial court should have excluded this evidence due to improper collaboration between the INS and the FBI, the Supreme Court found that the record precluded a finding that INS's decision "to proceed administratively toward deportation was . . . carried out for a purpose of amassing evidence in the prosecution for crime."  *Id.* at 230. The Court further rejected the notion that it should "hold illegitimate . . . the cooperation between I.N.S. and F.B.I.," emphasizing that the FBI "is not required to remain mute . . . merely because . . . [it] entertains the hope that criminal proceedings may eventually be brought against [petitioner]."  *Id.* at 228–29.  In support, the Court highlighted the INS's "independent decision to initiate proceedings" and underscored that such a decision should not bar the FBI "from continuing its investigation in the hope that it might result in a prosecution."  *Id.* at 229.  The Court did, however, distinguish petitioner's case from the hypothetical scenario where an

---

[95]    At the time that *Abel* was decided, the INS and the FBI constituted separate branches of DOJ.  *Abel*, 362 U.S. at 691.

agency's actions were "employed as an instrument of criminal law enforcement to circumvent the latter's legal restrictions," and where a decision to detain "was influenced by, and was carried out for, a purpose of amassing evidence in the prosecution for crime." *Id.* at 230. In such a case, the Court's "view of the matter would be totally different." *Id.*

The Fourth Circuit faced a similar set of facts in *Boeckenhaupt v. United States*, 392 F.2d 24 (4th Cir. 1968), this time involving the United States military. There, an Air Force sergeant was arrested by the Air Force Office of Special Investigation ("OSI") after interactions with Soviet parties had caught the eye of both OSI and the FBI. *Id.* at 25. Following the defendant's OSI arrest, the FBI conducted several interviews, during which the defendant made confessions that led to the filing of federal espionage charges against him several days later, and for which he was later convicted. *Id.* at 25–26. On appeal, the defendant sought exclusion of these confessions, arguing that "the Air Force and the FBI schemed together in an unlawful working arrangement whereby the Air Force would accomplish the military arrest of [the defendant] for the purpose of enabling the FBI to evade Rule 5." *Id.* at 27. The Fourth Circuit rejected this argument, distinguishing between a military arrest — which did not trigger Rule 5 — and a subsequent FBI arrest, which did. *Id.* Citing *Abel* for support, the court determined that DOD had its own legitimate basis for detention, based on the defendant's violation of the military code, and that there was no evidence that DOJ used the OSI detention as a "vehicle of investigation." *Id.* Absent such a finding, the Fourth Circuit rejected the notion that the FBI possessed a presentment duty before filing its charges. *Id.*

Finally, *United States v. Jones*, 184 F. Supp. 328 (N.D. Cal. 1960), involved a similar instance of alleged collusion between domestic law enforcement and the United States military. Based on a tip from foreign authorities, U.S. Customs Officers detained, questioned and searched

127

an enlisted soldier for narcotics upon his return from a trip abroad, but found no evidence of smuggling. *Id*. at 329. Customs and U.S. Army officers returned him to the military terminal where he had first landed, and an Army officer told him to remain "in the general area to be available for . . . further questions." *Id.* at 329–30. Over the next two days, Army and Customs officers conducted further interviews with the defendant on the military base, eventually leading to the issuance of a warrant and the soldier's arrest. *Id*. at 330. The defendant later alleged that military authorities had acted collusively with Customs officials, and that these officials should not "use the United States Army military authority as a convenient instrument for procuring evidence later to be used in a federal prosecution," especially where Customs "could not have legally held defendant without bringing him before a magistrate for the duration of time here involved." *Id.* at 332.

The court rejected the defendant's claim of improper collusion between Customs authorities and the Army. While acknowledging that "the civilian and military authorities may have conducted their detentions of defendant . . . cooperatively," the Court found that the authorities acted "for separate purposes," and that therefore, no "collusion or joint operation" that would "justify the application" of the working arrangement principle existed. *Id*. In arriving at this finding, the Court specifically highlighted the testimony of an Army official, who had asserted that the Army possessed "its own, considerable interest" in this case beyond supporting Customs' prosecution of the defendant. *Id*.

Turning to the case at hand, the evidence before this Court unequivocally establishes extensive coordination between the FBI and DOJ on one side, and U.S. military personnel on the other, before Defendants' arraignment on February 22, 2024. As outlined previously, dating back at least as far as January 18, 2024, DOJ and DOD officials participated in daily or near-daily

128

teleconferences to coordinate responses concerning the disposition of the *Yunus* crew members, including Defendants.  This coordination included DOD allowing federal agents onto the *USS Puller*, where the FBI team conducted several interviews in support of its criminal investigation, as well as coordination between DOD and the FBI for purposes of transferring evidence for potential use in a criminal trial.  Once DOJ made its decision to charge several crew members with criminal offenses, the FBI and DOJ coordinated with DOD to prepare a holding facility for the crew members on a Naval base in Country C and to facilitate military air transportation of the crew members to the United States.  These latter efforts were accompanied by formal "Exec Sec" memoranda from DOJ to DOD.  Critically, the *Yunus* crew members remained in DOD's custody throughout most of the period in question, all the way up to their arrest by FBI members on February 14, 2024.  Yet, the relevant question before the Court is not whether DOJ and DOD coordinated or cooperated in their investigations.  Rather, the Court must assess whether Defendants sufficiently establish that such coordination rose to the level of an impermissible "working arrangement" for the purpose of circumventing DOJ's presentment obligations.  The Court considers Defendants' claims to this effect.

Defendants' central argument for an improper working relationship is that DOD "took actions to extend the detention [of Defendants] at sea" so that "FBI agents could continue to build probable cause for a prosecution" against them.  (Pahlawan 2d Suppl. Br. at 13, 15.)  Specifically, Defendants point to various changes in the *USS Puller*'s porting schedule and emails between different officials referencing DOJ's requests for additional time to finalize its charging decisions.  (*See* Gov't Ex. 110 at 11 ("DOJ HQ will route formal request to DoD regarding keeping the 14 involved crewmembers onboard the LEWIS B. PULLER until interviews . . . can be completed."); *id.* at 20 (listing among "next steps," "[c]ompletion of DOJ

request to DoD to hold crewmembers on board until charging decisions are made"); *id.* at 22

(Navy indicating that the *USS Puller* "could port earlier if DOJ makes a charging

determination"); Def. Ex. 5 at 1 (DOD member stating that the *USS Puller* "is remaining at sea

to give DoJ more time"); Gov't Ex. 144 at 5 (SA Larsen referencing "the DOJ request to hold for

5 days, till 11/12 FEB").)  This additional time was necessary, because the Navy "ha[d] no legal

authority to hold [the mariners]" once the *USS Puller* arrived in port.  (Pahlawan 2d Suppl. Br. at

13.)  Based on this evidence, Defendants claim that DOJ "coordinated" and "took actions" to

"prevent the *Puller* from docking as scheduled and remaining at sea to give it time to investigate

and bring formal charges," creating "an unreasonable delay in . . . presentment and a violation of

Rule 5."  (*Id.* at 13, 15.)

Defendants further allege that the relevant presentment delay based on their working

arrangement claim begins "when the DOJ decided to initiate the criminal prosecution against the

mariners."  (Pahlawan Suppl. Br. at 58.)[96]  Defendants assert that the delay in presentment was

"purposeful and intentional," with its "direct purpose" being to "gather[] additional evidence to

justify the detention and arrest" of Defendants.  (Rule 5(a) Mot. at 7–8.)  More specifically,

Defendants assert that DOJ "plainly requested that the *Puller* remain at sea for purposes of its

prosecution of the defendants," (Pahlawan Suppl. Br. at 60), and claim that the evidence

"indisputably demonstrate[s] that DOJ sought to delay presentment 'for the purpose of illegally

---

[96]    In their original Rule 5(a) Motion, Defendants submitted that the relevant starting point
of the Court's inquiry should be the interdiction of the *Yunus*.  (*See* Rule 5(a) Mot. at 7–8
(referring to "[t]he delay of six weeks").)  However, as Defendants' more recent submission, the
Court will assume that their Reply to the Government's Omnibus Opposition supersedes their
prior position as set forth in Defendants' Rule 5(a) Motion.  (*See* ECF No. 314 at 58 (explaining
that "the working arrangement doctrine is typically invoked by defendants to argue that the Rule
5 'clock' started running upon the initial detention by an authority other than the prosecuting
authority," but arguing here instead that Defendants' "presentment clock began [only] when the
DOJ decided to initiate the criminal prosecution").)

extracting evidence from an accused.'"  (*Id*. at 59 (citing *United States v. Mitchell*, 322 U.S. 65,
67 (1944)).)

Such purposeful evasion of Rule 5(a)'s prompt presentment requirement would indeed
raise serious concerns about an improper "working arrangement" between the Government and
the relevant military authorities.  Defendants fail, however, to substantiate their claims.  Given
the lack of conclusive evidence in support, the Court finds that Defendants fail to clear the high
bar necessary to establish an impermissible working arrangement.

The Court finds the evidence concerning DOJ's alleged attempts to influence DOD's
decision making with regard to keeping the mariners at sea ultimately inconclusive.  The
evidence before the Court leaves no doubt that military decisionmakers were aware, when
making their decisions concerning the *USS Puller*'s port schedule, of the potentially deleterious
effects on DOJ's prosecutorial efforts if the *USS Puller* made a port call before completion of
DOJ's charging decisions.  The Court also notes with some concern SA Larsen's February 8,
2024 Skype message describing "the DOJ request to hold for 5 days."  (Gov't Ex. 144 at 5.)
While SA Larsen explained to the Court that this message referenced a perception, on the part of
military officials, that "there was *going to be* a request from DOJ to request five additional
days," SA Larsen's unqualified reference to "the DOJ request" in his Skype message suggests an
actual request, not a hypothetical one.  (Hr'g Tr. 303:14–18 (emphasis added).)  This five-day
delay request tracks other messages before the Court that confirm DOJ's need for "4-5 additional
days to assess evidence [and] determine charging decisions."  (Def. Ex. 70 at 1.)  At the same
time, the Court finds credible Mr. Newman's representation that DOJ never expressly requested
DOD to alter its operational plans to allow DOJ more time to investigate.  (Hr'g Tr. 75:17–22.)
This representation also stands corroborated by Mr. Deutsch's testimony attesting to DOD's

eagerness to remove the mariners from the *USS Puller* and its willingness to do so "before DOJ was ready," if that opportunity presented itself.  (*Id.* 56:6–7.)  Thus, while the record establishes that military officials were aware of DOJ's need for more time to charge Defendants, and while military officials ultimately made decisions that afforded DOJ such additional time, the evidence remains inconclusive as to whether DOJ "plainly requested" these decisions.

Additionally, even if Defendants had shown that DOJ affirmatively sought a slowdown of the *USS Puller*, the record fails to substantiate Defendants' claim that such a delay was effectuated "for the purpose of illegally extracting evidence."  (Pahlawan Suppl. Br. at 59.)  The FBI team concluded its interviews and departed the *USS Puller* on February 4, 2024, several days before the exchanges cited above concerning potential DOJ requests for delay; it never sought to resume interviewing Defendants or any other crew members before the charges were filed.  In other words, even if DOJ asked DOD to slow down the *USS Puller*'s arrival in port, the Court finds that any such purported request was not for the purpose of gathering additional evidence — the key animating principle in the Supreme Court's "working arrangement" jurisprudence.  *Cf. Alvarez-Sanchez*, 511 U.S. at 359 (describing the working arrangement rule as covering the scenario where non-federal authorities "detain someone in order *to allow . . . federal agents to interrogate him*" (emphasis added)).

Moreover, the factors commonly used by courts to assess working arrangement claims uniformly counsel against such a finding in this case.  As the record and the hearing testimony demonstrate, the Navy acted on its own authority in conducting the interdiction of the *Yunus* on January 11, 2024, and pursued independent objectives in gathering intelligence from Defendants as part of its larger mission under Operation Prosperity Guardian.  *Cf. Abu Ali*, 528 F.3d at 227 (examining whether the detaining party possessed an "independent interest" in detaining and/or

interrogating a defendant). While FBI agents conducted interviews aboard the *USS Puller*, the Navy continued to exercise actual control and authority over Defendants at all times. *Cf. Bin Laden*, 132 F. Supp. 2d at 210 (looking to what party exercised actual control and authority over the defendant at the time of the alleged presentment delay). Finally, the record suggests that DOJ only became involved in the matter well after the inception of this military operation, another factor that militates against a finding of an impermissible working relationship. *Cf. Coppola*, 281 F.2d at 343 (noting that the defendant's arrest and detention were "exclusively planned and executed by [local] police without any suggestion or participation by the F.B.I."). These factors all counsel against applying the improper working arrangement exception here.

The Court finds support for this outcome in the two cases discussed above that share the closest factual predicates: *Abel* and *Jones*. In *Abel*, despite significant evidence that the FBI was pulling most investigatory strings, Justice Frankfurter still found that the record did not support a finding of improper collaboration, because Petitioner failed to show that his arrest by the INS was purely in service of FBI efforts to procure more evidence for a criminal prosecution. *Abel*, 362 U.S. at 230. The same remains true here: Defendants' detention and questioning by military personnel after the discovery of smuggled weapons onboard their vessel undoubtedly served military motives unrelated to any potential criminal prosecution. Nor does any evidence before the Court support a finding that DOD's decisions surrounding Defendants' custody were made "for a purpose of amassing evidence in the prosecution for crime," as the *Abel* court would have required for a finding of improper collaboration. *Id*.

Meanwhile, in *Jones*, the trial court faced a similar scenario as the one presently before the Court: but for the Navy's power to control the defendant's whereabouts, law enforcement questioning related to a potential federal crime would have been impossible. Yet, there too the

court found no collusive working arrangement, despite clear cooperation between federal law enforcement and military authorities, because the parties were acting "for separate purposes." *Jones*, 184 F. Supp. at 332.  The same holds true here.  While DOJ and DOD cooperated extensively in the instant case, their purposes remained separate:  intelligence gathering on the one side and criminal prosecution on the other.  As such, under the logic applied by the court in *Jones*, Defendants' claim concerning an impermissible "working arrangement" between domestic law enforcement and the military under similar circumstances must fail.

For all of these reasons, the Court finds that no improper "working arrangement" existed between DOJ and the FBI on one hand, and DOD on the other, for purposes of circumventing Rule 5(a)'s presentment requirement.  Defendants' detention under U.S. military guard before their formal arrest on February 14, 2024, therefore, was not subject to Rule 5(a)'s prompt presentment requirement.

### 3. No additional remedy is required for the Government's purported Rule 5(a) violation.

Having determined that February 14, 2024 constitutes the date of arrest for purposes of Defendants' right to presentment before a Magistrate Judge under Rule 5(a), the Court would ordinarily proceed to analyze whether the eight-day period between this date and Defendants' presentment before Magistrate Judge Speight on February 22, 2024 qualifies as "unnecessary," and therefore impermissible, delay for purposes of Rule 5(a).  However, the Government has already represented to the Court that it "does not intend to use any evidence acquired from interviews of the defendants between February 5 and February 22, 2024."  (Gov't Suppl. Br. at 9.)  That period encompasses the entirety of the Government's eight-day presentment delay in the instant case.  As the Court noted previously, the proper remedy for a Rule 5(a) violation consists of suppressing evidence improperly obtained during the relevant presentment delay.  *See*

*Peeples*, 962 F.3d at 685–86, 686 nn.22, 26 (collecting Supreme Court cases "confirm[ing] that the remedy for [a Rule 5(a)] violation is the exclusion of evidence, not dismissal of a criminal case"). Thus, even if this Court found the Government's delay unnecessary and violative of Rule 5(a), it would have no further relief to grant, given the Government's willingness to voluntarily suppress all evidence collected during the delay. The Court therefore refrains from assessing whether the Government's eight-day presentment delay constitutes "unnecessary" delay for purposes of Rule 5(a), since any prejudice to Defendants stemming from that violation has already been cured, and will DENY Defendants' Rule 5(a) Motion accordingly.[97]

### C.    Spoliation Motion

Defendants argue that the Government violated their due process rights, because the *Yunus* contained exculpatory evidence that was destroyed when the United States Navy scuttled it. (ECF No. 104 ("Spol. Mot.").) Defendants have identified several categories of evidence contained on or aboard the vessel that purportedly possess exculpatory value: (1) the *Yunus*'s

---

[97]    In light of the Court's finding that any prejudice stemming from the Government's alleged presentment violation has been cured, the Court need not address the Government's alternative argument that Defendants waived their right to prompt presentment under Rule 5(a) by previously waiving their *Miranda* rights. (ECF No. 300 at 94–95.)

Defendants also raised concerns in their Rule 5(a) Motion about the conditions aboard the *USS Puller*, claiming that their detention amounted to pretrial detention in violation of their due process rights. (Rule 5(a) Mot. at 9–10.) Defendants first raised these concerns near the end of their Rule 5(a) Motion, under a heading entitled "Dismissal of the indictment is the appropriate remedy." (*Id.* at 9.) Based on where Defendants raised these issues and the cursory nature of the briefing, the Court presumes that Defendants included these claims to bolster their argument for a more sweeping remedy, not to raise an independent due process claim.

The Court notes that Defendants appear to restyle this argument in their Reply to the Government Omnibus Opposition as a substantive due process claim under the Fifth Amendment, arguing that "dismissal as a remedy . . . is available for egregious government conduct that violates substantive due process." (Pahlawan Suppl. Br. at 65.) However, Defendants' cursory briefing on this issue fails, critically, to establish any legal basis for their claim that, despite being foreign nationals outside the United States, they were nonetheless entitled to substantive due process protections under the Fifth Amendment. Consequently, the Court rejects Defendants' arguments concerning a purported substantive due process violation as meritless.

exterior markings and dimensions; (2) the *Yunus*'s route of travel (presumably in the form of an SD data storage card in the vessel's AIS system); and (3) the *Yunus*'s physical condition. (*Id.* at 12–16.) In Defendants' view, they stand entitled to relief based on the failure to preserve this evidence, because the destroyed evidence qualifies as both "apparently" exculpatory under *Trombetta* and "potentially" exculpatory under *Youngblood*. (ECF No. 203 ("Spol. Reply") at 7–8.)

The Government opposes Defendants' motion. (ECF No. 166; ECF No. 195 (redacted version).) As a threshold matter, the Government disputes whether *Trombetta* and *Youngblood* articulate distinct tests for establishing a due process violation. In the Government's view, *Youngblood* refined the test articulated in *Trombetta* and incorporated a bad-faith requirement into all failure-to-preserve cases. (ECF No. 195 at 12 n.7.) In any event, the Government contends that Defendants' claim must fail, because comparable evidence exists, the destroyed evidence did not possess exculpatory value and the Government did not act in bad faith. (*Id.* at 9–10.)

For the reasons set forth below, the Court will DENY Defendants' Spoliation Motion. (ECF No. 104.)

### 1.    Rules Governing the Duty to Preserve Evidence Under the Due Process Clause

The parties dispute the proper analytical framework for assessing whether the sinking of the *Yunus* deprived Defendants of due process of law. The Supreme Court's decisions in *Trombetta* and *Youngblood* govern the prosecution's duty under the Due Process Clause to preserve evidence on behalf of a defendant. *Trombetta*, 467 U.S. at 480, 488–89; *Youngblood*, 488 U.S. at 58. Because the parties set forth different interpretations of the collective meaning of *Trombetta* and *Youngblood*, the Court begins with an overview of the governing legal principles.

136

Under the Due Process Clause of the Fourteenth Amendment, the Supreme Court developed "what might loosely be called the area of constitutionally guaranteed access to evidence." *Trombetta*, 467 U.S. at 485. In *Trombetta*, the Supreme Court first set forth the framework for assessing whether the destruction of evidence deprives a defendant of due process of law. To the extent that the Constitution imposes a duty upon the Government to preserve evidence, "that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.* at 488–89. To satisfy this standard of constitutional materiality, evidence must: (1) "possess an exculpatory value that was apparent before the evidence was destroyed," and (2) "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489.

Four years later, in *Arizona v. Youngblood*, the Supreme Court considered a state's failure to preserve blood and semen samples that might have been useful to a criminal defendant. 488 U.S. at 51. Although the Supreme Court acknowledged that "the good or bad faith of the State [proves] irrelevant when the State fails to disclose to the defendant material exculpatory evidence," the Court reasoned that "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it . . . might have exonerated the defendant." *Id.* at 57. The Court thus held that the "failure to preserve potentially useful evidence" does not violate due process "unless a criminal defendant can show bad faith on the part of the police." *Id.* at 58.

Courts have fashioned different interpretations of the relationship between *Trombetta* and *Youngblood*. The Seventh Circuit, for instance, has interpreted *Youngblood* as adding a third element to *Trombetta*'s test for materiality and reads both cases to stand for the same proposition: "the destruction of potentially exculpatory evidence violates the defendant's right to

due process if (1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means." *McCarthy v. Pollard*, 656 F.3d 478, 485 (7th Cir. 2011). Several other circuits, however, have concluded that *Trombetta* and *Youngblood* create two separate rules, with the former governing "apparently" exculpatory evidence and the latter governing "potentially" exculpatory evidence.[98] Under that rationale, the destruction of "apparently exculpatory" evidence does not require a showing of bad faith, while the destruction of only "potentially useful" evidence does.

Although the Fourth Circuit has not expressly addressed this issue, it has implicitly endorsed the interpretation adopted by the Fifth, Sixth, Ninth and Tenth Circuits. *See Johnson*, 996 F.3d at 215 (explaining that *Trombetta* "requir[es] that lost evidence have apparent exculpatory value and that comparable evidence be unavailable," whereas *Youngblood* "allow[s] lost evidence to be just potentially useful but only with [a] showing of [the] Government's bad faith"); *see also United States v. Matthews*, 373 F. App'x 386, 390–91 (4th Cir. 2010) (analyzing whether the government violated due process first under *Trombetta* and then under *Youngblood*). Such a reading comports with the Supreme Court's most recent opinion on this issue, *Illinois v.*

---

[98]    *See, e.g.*, *United States v. Moore*, 452 F.3d 382, 388 (5th Cir. 2006) ("impermissibly withheld evidence must be either (1) material and exculpatory or (2) only potentially useful, in combination with a showing of bad faith on the part of the government"); *Estrada*, 453 F.3d at 1208 (requiring a showing of bad faith only when the evidence qualifies as "potentially exculpatory, as opposed to apparently exculpatory"); *Bullock v. Carver*, 297 F.3d 1036, 1056 (10th Cir. 2002) ("A defendant can obtain relief under the Due Process Clause when he can show that a police department destroyed evidence with 'an exculpatory value that was apparent before [it] was destroyed.' . . . Where, however, the police only failed to preserve 'potentially useful' evidence that might have been exculpatory, a defendant must prove that the police acted in bad faith by destroying the evidence."); *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001) ("Separate tests are applied to determine whether the government's failure to preserve evidence rises to the level of a due process violation in cases where material exculpatory evidence is not accessible versus cases where 'potentially useful' evidence is not accessible.").

*Fisher*, 540 U.S. 544 (2004), where the Court reiterated that "the applicability of the bad-faith requirement in *Youngblood* depended . . . on the distinction between 'materially exculpatory' evidence and 'potentially useful' evidence." *Id.* at 549. Accordingly, the Court proceeds with the understanding that a due process claim based on destruction of evidence requires a showing of bad faith only when the evidence qualifies as "potentially exculpatory," rather than "apparently exculpatory."

With this standard in mind, the Court considers whether Defendants can establish a due process violation based on the destruction of the *Yunus*.

### 2.    Application of *Trombetta* and *Youngblood*

Defendants argue for relief pursuant to both *Trombetta* and *Youngblood*. (Spol. Reply at 7–8.) According to Defendants, further examination of the *Yunus* might have revealed a small flag or decal sufficient to make a claim of nationality, undermining the Government's basis for jurisdiction over Defendants. (Spol. Mot. at 13–14.) Defendants also claim that examination of the *Yunus* might have revealed that it qualifies as a small vessel (under 24 meters) exempt from any registration requirement in its country of origin, with similar jurisdictional ramifications for the Government's case. (*Id.* at 14.) Pahlawan further contends that evidence aboard the *Yunus* establishing its "intended route of travel" would have confirmed that Pahlawan was transporting weapons *from* Iran and therefore fails to demonstrate that he provided any material support *to* Iran and the IRGC's weapons of mass destruction program, purportedly undermining the Government's case under 18 U.S.C. § 832(a).[99] (*Id.* at 14–15.) According to Pahlawan, that

---

[99]    The Court has already rejected Pahlawan's argument that his alleged actions in transporting weapons on behalf of Iran and the IRGC to the Houthis does not constitute providing material support "*to* a . . . weapons of mass destruction program" under 18 U.S.C. § 832(a). *United States v. Pahlawan*, 2025 WL 27779, at *11 (E.D. Va. Jan. 3, 2025) (ECF No. 268). As the Court explained, Pahlawan's constrained interpretation of the statute improperly

same evidence would support his defense that, as a civilian contractor transporting weapons on behalf of Iran and the IRGC, he stands entitled to immunity from prosecution under 18 U.S.C. § 2280a(c).  (*Id.*)  Lastly, Defendants argue that the physical condition of the *Yunus* might have revealed that it did not constitute a "vessel" at the time of the alleged offenses, because the *Yunus* was ultimately deemed "unsafe and unseaworthy," thereby rendering it "withdrawn from navigation" and no longer a "vessel" subject to United States jurisdiction.  (*Id.* at 15–16.)

The Court finds that the evidence cited by Defendants lacks apparent exculpatory value sufficient to satisfy the *Trombetta* standard.  As the Court previously explained, the mere possibility that destroyed evidence *might* exculpate a defendant fails to satisfy *Trombetta*'s requirement that the exculpatory value be "apparent" before destruction of the evidence.  *Youngblood*, 488 U.S. at 56 n.\*.  Here, Defendants merely highlight potential avenues of investigation that might have led in any number of directions.  For instance, Defendants speculate that further examination of the *Yunus* might have revealed a small flag or exterior markings indicating nationality, but they present no evidence suggesting that such a flag or markings ever existed.  Rather, members of the Boarding Team credibly testified that, even upon an extensive search of the *Yunus*, they did not discover any indicia of nationality.  (Hr'g Tr. 397:25–398:8, 400:16–401:3.)  Nor does any evidence in the record suggest that the *Yunus* qualified as a small vessel exempt from registration requirements; to the contrary, Chief Mulkey measured the *Yunus* at about 40 meters (or 130 feet) long — well beyond the 24-meter maximum for a small vessel.  (*Id.* 437:18–438:1.)  Defendants' arguments concerning the route of travel and the vessel's physical condition are equally speculative as to the evidentiary showings and

---

suggests that it criminalizes only material support that furthers the purported goals of a weapons of mass destruction program, namely development, acquisition or production.  *Id.* at *12.  Thus, Pahlawan's argument here rests on a faulty premise.

rest on legally spurious grounds as to their exculpatory value.  Because Defendants merely point to evidence that "might conceivably" aid their defense, they cannot satisfy *Trombetta* and must therefore show bad faith on the Government's part to establish a due process violation under *Youngblood*.

In the context of a destruction-of-evidence claim, bad faith requires that "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58.  The Government must "have intentionally withheld the evidence for the purpose of depriving the [defendant] of the use of that evidence during his criminal trial." *Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000).  Negligent destruction of evidence, without more, does not constitute bad faith. *United States v. Adetayo*, 682 F. App'x 216, 217 (4th Cir. 2017); *see also Lovitt v. True*, 403 F.3d 171, 187 (4th Cir. 2005) (finding no bad faith despite "a serious error in judgment").  In addition, the destruction of evidence in accordance with an established procedure or regulation generally precludes a finding of bad faith. *United States v. Elliott*, 83 F. Supp. 2d 637, 647 (E.D. Va. 1999); *see also Holdren v. Legursky*, 16 F.3d 57, 60 (4th Cir. 1994) (finding no bad faith where physicians "followed standard procedures" in disposing of semen samples).

Here, Defendants cannot establish the requisite showing of bad faith.  Upon his arrival on the *Yunus*, Mr. Marangola immediately noticed that an "abnormal amount of water" had accumulated in the engine room and explored various options to ameliorate this issue.  (Hr'g Tr. 222:1–14, 227:12–14.)  The Boarding Team was unable to address the rising water level, however, and by the afternoon of January 13, 2024, the *Yunus* was in danger of capsizing.  (*Id.* 216:8–10.)  Raw fuel was also leaking in the engine room, creating a risk of fire and combustion. (*Id.* 215:13, 216:11–13.)  In addition, the *Yunus* was unmarked and could not be safely

maneuvered, rendering it a hazard to navigation. (*Id.* 215:18–21, 241:2–3.) Given these safety concerns, the Navy deemed the *Yunus* unseaworthy and transferred the Boarding Team and the mariners, as well as all collected evidence, to the *USS Puller*. (*See id.* 240:25–241:1 (Marangola testifying about the *Yunus*'s unseaworthiness and lack of safety), 241:7–8 (Marangola testifying that "if we were to leave [the *Yunus*] in that condition, we would have been putting [the mariners'] and other lives in danger").) However, the *Yunus* could not be towed, because it lacked suitable tow points. (*Id.* 219:11–16.) Nor could the *Yunus* be brought aboard the *USS Puller*, because the available crane lacked sufficient capacity to lift the *Yunus*. (*Id.* 231:4–13.) Because the *Yunus* was sinking and posed a navigational hazard, the Navy proceeded to scuttle the *Yunus* in accordance with established policies and procedures. *See* U.S. NAVAL SEA SYS. COMMAND, U.S. NAVY SALVAGE MANUAL VOLUME 1: STRANDINGS, HARBOR, CLEARANCE, AND AFLOAT SALVAGE § 14-2.1 (2013) [hereinafter SALVAGE MANUAL] (noting that "[b]adly damaged sunken or stranded ships that create navigation hazards or obstruct port operations are often partially or entirely wrecked in place" and providing scenarios in which wrecking ships in place presents "a viable option"). Before destroying the *Yunus*, however, the Navy captured photo and video footage of the *Yunus*, measured the *Yunus*, took control of the AIS equipment and secured the missile components and all electronic evidence. (*Id.* 159:7–11, 238:25–239:2, 422:2–9, 437:18–438:1; *see, e.g.*, Gov't Exs. 51, 82, 83, 84 (photo and video footage of the *Yunus*).) The Navy's adherence to standard protocol by sinking the *Yunus* due to the navigational hazard that it presented provides compelling evidence against a finding of bad faith here. In addition, the Navy's actions to secure evidence and document the *Yunus* through photo and video footage undermine any argument that the Navy "intentionally withheld" evidence of the *Yunus* "for the purpose of depriving" Defendants from using such evidence at trial, as is required for a showing

of bad faith under Fourth Circuit law. *Collins*, 221 F.3d at 663; *see United States v. Revolorio-Ramo*, 468 F.3d 771, 773–75 (11th Cir. 2006) (rejecting the defendant's argument that the Government had destroyed the defendant's boat and its contents in bad faith, in part, because before Coast Guard destroyed the boat due to the navigational hazard that it presented, it attempted to preserve evidence by taking photographs and video footage). Accordingly, the Court finds that the Navy did not act in bad faith by sinking the *Yunus*.

The Court remains unpersuaded by Defendants' argument that *United States v. Elliott* requires a different outcome. In *Elliott*, the defendant faced charges for conspiracy to possess, manufacture and distribute methamphetamine. 83 F. Supp. 2d at 639. Law enforcement officers seized glassware smeared with an unidentified residue from the defendant's vehicle, but a Drug Enforcement Administration ("DEA") agent destroyed the glassware before testing the residue and retained no representative sample for future testing. *Id.* at 640, 645. Because the DEA agent destroyed evidence "contrary to applicable policies," the Court found that the DEA agent acted in bad faith. *Id.* at 647.

Here, by contrast, Navy regulations permitted the destruction of the *Yunus*, precluding a finding of bad faith. As a partially sunk vessel in the middle of the Arabian Sea, the *Yunus* constituted a "massive hazard to navigation"; leaving the *Yunus* in such a condition would have endangered lives. (Hr'g Tr. 240:8–13, 241:7–8.) Meanwhile, pumping, patching and preparing the *Yunus* for refloat would have siphoned essential resources from the *USS Puller*'s ongoing military operations in support of Operation Prosperity Guardian. (*Id*. 368:4–24.) Thus, the Navy determined that sinking the *Yunus* presented the safest and most operationally sound option — a decision consonant with applicable regulations. *See* SALVAGE MANUAL § 14-2.1 (permitting wrecking in place when "it would take longer to patch, pump, and prepare a ship for

refloating than it would to demolish the ship" or "[t]actical, logistic, or operational situations may not allow salvors time to prepare for conventional refloating"). Because the Boarding Team was expressly authorized to scuttle the *Yunus*, *Elliott* proves disanalogous to the instant case.

Moreover, the evidence before this Court demonstrates that, at the time that the Navy sunk the *Yunus*, it lacked any knowledge that the *Yunus* contained exculpatory value. *See Youngblood*, 488 U.S. at 56 n* (indicating that bad faith necessarily turns on the government's knowledge of the exculpatory value of the evidence). As the Court previously explained, the Navy had no reason to believe that any purported exterior markings on the *Yunus* bore exculpatory value, because no evidence suggests that any such markings were present. Likewise, the Navy had no reason to think that the *Yunus* might qualify as a small vessel exempt from registration, because Chief Mulkey reported the *Yunus* at over 24 meters long. Lastly, the Navy would not have recognized that the physical condition of the *Yunus* might be exculpatory, because there exists no genuine dispute that the *Yunus* constituted a "vessel" when Defendants committed their alleged crimes. Although the *Yunus* was eventually withdrawn from navigation when the Navy sunk it, at the time that Defendants committed their alleged crimes, the *Yunus* was necessarily able to transport people and cargo over water — even if it was simultaneously taking on water. *See* 1 U.S.C. § 3 (defining "vessel" as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water"). Because the Navy lacked knowledge of any potential exculpatory value of *Yunus* at the time that it was destroyed, Defendants cannot demonstrate that the Navy acted in bad faith.[100]

---

[100]    As to the *Yunus*'s route of travel, the Government represents, and Defendants do not contest, that it produced the *Yunus*'s physical AIS equipment to Defendants before they filed the instant motion. The Boarding Team members credibly testified that they transferred all electronic evidence to the *USS Puller* before scuttling the *Yunus*. (*See* Hr'g Tr. 239:21 (testifying that "nothing of importance" remained on the *Yunus*), 422:10–14 (same).) Thus, even assuming

144

In sum, Defendants cannot make a showing of bad faith, because the Navy followed established policy when it sunk the *Yunus*, and the Navy lacked any basis to believe that the *Yunus* possessed any exculpatory value at the time of its destruction.  Accordingly, Defendants fail to establish a due process violation under both *Trombetta* and *Youngblood*.

## IV.      CONCLUSION

The Court will DENY Defendants' motions to suppress.  (ECF Nos. 113, 117.) Defendants were not in custody for *Miranda* purposes during the initial group interview on the *Yunus*, and therefore, their un-*Mirandized* statements or silence in response to Chief Mulkey's questions are admissible.  As to Defendants' statements to Chief Mulkey during their individual interviews on the *Yunus*, while the Court finds that these statements were procured through custodial interrogation, the public safety and false statement exceptions apply, rendering the statements outside the exclusionary rule's ambit.  Lastly, Pahlawan's *Mirandized* statements to the FBI team on board the *USS Puller* are admissible, because Pahlawan was provided sufficient *Miranda* warnings and voluntarily, knowingly and intelligently waived his Fifth Amendment rights.

The Court will also DENY Defendants' Rule 5(a) Motion.  (ECF No. 103.)  Defendants' formal arrest by federal law enforcement officers on February 14, 2024 triggered the Government's presentment requirement under Rule 5(a).  Defendants were not presented to a Magistrate Judge until February 22, 2024, constituting an eight-day delay.  The Court finds that no impermissible working arrangement existed between DOJ and DOD that would alter the

---

that the AIS equipment, as provided, contained only limited data due to a missing SD card, whatever data loss may have occurred is not attributable to the Navy.  Because "the government has no duty to produce evidence outside of its control, and it is not responsible for the preservation of evidence that was never in its control in the first place," Defendants cannot establish a due process violation on this ground.  *Hasan*, 747 F. Supp. 2d at 698 (quoting *United States v. Hughes*, 211 F.3d 676, 688 (1st Cir. 2000)).

length of this delay. The Government has agreed to suppress any evidence acquired from interviews with Defendants during this period of delay, effectuating the same remedy that the Court would have ordered if it found the Government's delay "unnecessary," and thus impermissible. Any potential presentment violation by the Government has therefore been cured.

Lastly, the Court will DENY Defendants' Spoliation Motion. (ECF No. 104.) Defendants cannot establish a due process violation under *Trombetta* or *Youngblood*. The Court finds that the evidence cited by Defendants lacks apparent exculpatory value sufficient to satisfy the *Trombetta* standard; rather, Defendants merely point to evidence that might conceivably aid their defense. The Court further finds that the Navy did not act in bad faith, because it followed established policy when it scuttled the *Yunus* and lacked any basis to believe that the *Yunus* possessed any exculpatory value at the time of its destruction, thereby precluding relief under *Youngblood*.

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date: April 29, 2025

146